UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br>GBG USA Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 21-11369 (MEW)<br><br>Jointly Administered |
| PETER HURWITZ, AS LITIGATION TRUSTEE OF THE GBG USA LITIGATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD NIXON DARLING, MARK JOSEPH CALDWELL, RONALD VENTRICELLI, ROBERT K. SMITS, STEPHEN HARRY LONG, BRANDON CARREY, FUNG HOLDINGS (1937) LIMITED, FUNG DISTRIBUTION INTERNATIONAL LIMITED, STEP DRAGON ENTERPRISE LTD., GOLDEN STEP LIMITED, WILLIAM FUNG KWON LUN, KING LUN HOLDINGS LIMITED, FIRST ISLAND DEVELOPMENTS LIMITED, VICTOR FUNG KWOK KING, SPENCER THEODORE FUNG, HSBC TRUSTEE (C.I.) LIMITED, BRUCE PHILIP ROCKOWITZ, AND HURRICANE MILLENNIUM HOLDINGS LIMITED,<br><br>Defendants. | Adversary Proceeding<br><br>Adv. Proc. Case No. 23-_____ (MEW)<br><br>**FILED UNDER SEAL** |

**COMPLAINT**

---

[1] The "Debtors" in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are as follows: GBG USA Inc. (2467), Jimlar Corporation (8380), GBG North America Holdings Co., Inc. (5576), Homestead International Group Ltd. (0549), IDS USA Inc. (7194), MESH LLC (8424), Frye Retail, LLC (1352), Krasnow Enterprises, Inc. (0122), Krasnow Enterprises Ltd. (0001), Pacific Alliance USA, Inc. (0435), GBG Spyder USA LLC (9108), and GBG Sean John LLC (1287). The Debtors' mailing address was GBG USA Inc., P.O. Box 4965, Greensboro, NC 27404.

Peter Hurwitz, the Litigation Trustee (the "Plaintiff" or the "Trustee") of the GBG USA Litigation Trust (the "Litigation Trust") established in connection with the above-captioned chapter 11 cases of the Debtors, by and through his undersigned counsel, hereby alleges against the above-named Defendants, on personal knowledge as to all matters regarding himself and on information and belief as to all other matters, as follows:

## I. INTRODUCTION

1. This Complaint is brought by the Trustee of the Litigation Trust as successor in interest and representative of the above-captioned Debtors' estates (each, an "Estate," and collectively, the "Estates") pursuant to 11 U.S.C. § 1123(b)(3)(B), and as the transferee and assignee of certain claims and causes of action that arose in favor of the Debtors before the creation of their bankruptcy Estates, namely the Litigation Trust Assets (as such term is defined in the Plan).

2. Starting long before the events giving rise to the claims in this Complaint, the Debtors have been dominated by Defendant William Fung Kwon Lun ("William Fung") and his brother, Defendant Victor Fung Kwok King ("Victor Fung") (together with William Fung, the "Fung Brothers"). The Fung Brothers run a Hong Kong-based multinational group of companies which engage in sourcing, logistics, distribution, and retailing (the "Fung Group"). The Fung brothers' current and former companies include Li & Fung Limited, Global Brands Group Holding Ltd. ("GBGH"), the indirect owner of Debtor GBG USA, Inc. and the other Debtors, as well as the publicly-listed Convenience Retail Asia Limited and other privately held entities. The Fung Brothers played a leading role in driving the development of the supply chain infrastructure at Li & Fung Limited, which has enabled it to become the leading consumer goods design, development, sourcing, and logistics company for major retailers and brands around the world.

3.	This lawsuit is a necessary step to remedy the wrongs perpetrated on the Debtors and on holders of claims against the Debtors by the Fung Brothers, GBGH, and its controlling shareholders, as well as by the Debtors' conflicted officers and directors who were beholden to the Fung Brothers, and whose failure to exercise their fiduciary duties permitted such harm.

4.	Debtor GBG USA, Inc. ("GBG USA") was an indirect, wholly owned subsidiary of GBGH, a Bermuda company then publicly traded on the Hong Kong Stock Exchange. In August 2018, GBG USA, with GBGH's support, engagement, and direction, and the blessing of GBGH's shareholders, agreed to sell all of their North American licensing business to Centric Brands Inc., f/k/a Differential Brands Group Inc. ("Centric Sale"). The transaction closed in October 2018, with a final sale price of approximately $1.2 billion.[2]

5.	GBG USA used the Centric Sale's proceeds to pay $1.2 billion in outstanding debt owed under GBG USA's then-largest credit facility. However, GBG USA's use of the entirety of the sale proceeds to extinguish its debt proved problematic for GBGH, which in August 2018 had promised its shareholders to pay them a special dividend ("Special Dividend") from the proceeds of the Centric Sale in order to gain their approval and support for their transaction.

6.	Even though no money remained from the Centric Sale, GBGH forged ahead with its scheme to pay a Special Dividend in cash and stock to GBGH's shareholders, and used GBG USA as the vehicle to borrow the funds to do so. In November 2018, GBGH announced it would pay its shareholders an approximate $300 million dividend in 2019. In making this announcement, GBGH falsely stated that the Special Dividend would be paid from the Centric Sale proceeds. GBGH, which was then a Fung Group company, made its announcement with the support of its

---

[2]	All references to the U.S. Dollar are referenced herein by "$" rather than "US$". References to Hong Kong Dollars are referred to herein by "HK$".

"controlling shareholders" – William Fung, other members of the Fung family, and entities that they own or control. At the time, these controlling shareholders, led by William Fung, owned approximately one third of GBGH's common stock.

7.      To obtain the money necessary to fund the Special Dividend, GBGH caused GBG USA to borrow over $325 million in loans under three separate credit facilities between January 2019 and March 2019, drawing each of these facilities down in their entirety by March 31, 2019. With these borrowings, GBG USA had sufficient cash available to fund the Special Dividend, which GBGH planned to pay GBGH's shareholders on April 4, 2019. The borrowings, however, came at a substantial cost to GBG USA, which was insolvent. Indeed, at the time that GBG USA was borrowing hundreds of millions of dollars of loans, GBG USA (with GBGH) was projecting that it was only weeks away from defaulting on its $375 million Revolving Credit Facility ("Prepetition RCF"). The Prepetition RCF required GBGH, as guarantor, to maintain compliance with certain financial metrics while any loans were outstanding, and it was apparent to GBGH, GBG USA, and their advisors that GBGH would not be able to do so by March 31, 2019 (at the latest).

8.      By late March 2019, the Prepetition RCF lenders had alleged that GBG USA had defaulted on the Prepetition RCF credit facility. Yet, GBGH was still insistent on paying a Special Dividend on April 4, 2019. Accordingly, on March 28, 2019, the lenders demanded – under threat of litigation – that GBGH take steps to enhance GBGH's liquidity and stability, through loans provided by the Fung-related shareholders. After several days of "round the clock negotiations," GBGH largely acceded to the Prepetition RCF lenders' demands on April 3, 2019, resulting in a waiver to the Prepetition RCF, and clearing the way for GBGH to pay the Special Dividend on April 4, 2019.

9.     The capitulation was a *fait accompli*, however, because at the time of the lenders' demands, GBGH had already initiated the process by which GBG USA transferred $196 million to GBGH between March 28 and 29, 2019 ("Special Dividend Cash Transfer") in order to fund the Special Dividend. Accordingly, March 31, 2019 came and went with GBG USA in default of the Prepetition RCF, in substantial debt to its other lenders, and ultimately insolvent. To make things worse, GBG USA's Directors and Officers, who wore dual hats as Directors and Officers of GBGH, had not authorized the payment of the Special Dividend Cash Transfer, and never took steps to inform themselves whether the payment of the Special Dividend Cash Transfer was in GBG USA's interests. Their sole interest was in making sure that GBGH would pay the Special Dividend to GBGH's shareholders as promised, irrespective of the impact of the Special Dividend Cash Transfer on GBG USA and its creditors.

10.     Further, GBGH's dictating of the Special Dividend Cash Transfer was not the only burden it hoisted on GBG USA in the final week of March 2019. In December 2018, GBGH had received a $100 million loan from its largest shareholder, Defendant Fung Holdings (1937) Limited ("Fung Holdings"), another Fung Group Company ("December Shareholder Loan"). GBGH entered into the December Shareholder Loan in order to ensure it would have sufficient funds to continue to make payments on enormous debts that GBGH's subsidiaries owed other Fung Group companies as intermediaries for vendors and suppliers. After making these payments, however, GBGH required GBG USA to repay GBGH's obligations under the December Shareholder Loan at the same time it was requiring GBG USA to fund the Special Dividend. In this instance, GBGH required GBG USA make a direct payment to Fung Holdings to satisfy GBGH's obligations, using the proceeds of the substantial loans GBG USA had taken out between January 2019 and March 2019. As with the Special Dividend Cash Transfer, GBG USA's

Directors and Officers made no effort to inform themselves regarding whether the payment of GBGH's obligation under the December Shareholder Loan was in GBG USA's interest or the effect that the payment would have on GBG USA or its creditors.

11.     This lawsuit (i) seeks to avoid as actual and constructive fraudulent transfers to GBGH for the March 2019 Special Dividend Cash Transfer as against the controlling shareholders of GBGH, as subsequent transferees of such transfers; (ii) alleges breaches of fiduciary duties against GBG USA's former Directors and Officers related to the funding of the Special Dividend Cash Transfer, (iii) alleges that GBG USA's Special Dividend Cash Transfer to GBGH was an unlawful dividend under Delaware law, (iv) seeks to avoid as actual and constructive transfers to Fung Holdings for the March 2019 repayment of GBGH's own obligations under the December Shareholder Loan, and (v) alleges breaches of fiduciary duties against GBG USA's former Directors and Officers in connection with the March 2019 repayment of GBGH's obligations under the December Shareholder Loan.

12.     In addition to the foregoing claims, Plaintiff has reviewed a draft written consent prepared in March 2019 (but not signed until at least April 3) of the GBG USA Board of Directors (the "GBG USA Board") declaring a $307 million dividend in connection with funding the Special Dividend. Plaintiff has not yet reviewed an executed copy of such a resolution (if it exists), and therefore is not aware of the final amount of any dividend declared in excess of the Special Dividend Cash Transfer. However, to the extent such a resolution or written consent exists and the declared dividend exceeds the amount of the Special Dividend Cash Transfer, Plaintiff may seek to avoid the entirety of that dividend up to the total value of the GBGH Special Dividend as actual and constructive fraudulent transfers.

## II.    PARTIES

13.     Plaintiff Peter Hurwitz is the Litigation Trustee of the Litigation Trust. Hurwitz is a citizen of the United States of America, and a resident of New York. Hurwitz was appointed as Trustee of the Litigation Trust pursuant to the First Amended Joint Liquidating Plan of the Debtors under Chapter 11 of the Bankruptcy Code (the "Plan"). *See* Case No. 21-11369, Docket No. 512, 518. The Plan authorized the creation of the Litigation Trust for the express purpose of, among other things, pursuing all of the "Preserved Claims", which include all "Causes of Action" on behalf of the Debtors against (i) Li & Fung, (ii) past or present equity holders of GBGH, and (iii) certain past or present directors and officers of the Debtors, among others. *See* Plan, §1.73 (definition of "Litigation Trust Assets"), 1.94 (definition of "Preserved Claims"). The Trustee is authorized under the Plan and the Litigation Trust Agreement to investigate, prosecute and liquidate claims against Defendants on behalf of the Litigation Trust.

14.     Richard Nixon Darling was formerly GBG USA's Chief Executive Officer ("CEO") and formerly Executive Director of the Board of Directors of GBG USA (the "GBG USA Board"). Darling served as GBG USA's CEO and Executive Director of the GBG USA Board from October 2018 through the Effective Date of the Plan. *See* Case No. 21-11369 (Bankr. S.D.N.Y.), Dkt. No. 13 (the "Caldwell Declaration"), Exhibit I. At all times relevant to this Complaint, Darling was also the CEO and an Executive Director of GBGH. Additionally, Darling was a Director of GBG Asia Limited during 2020 and 2021. Darling is a citizen of the United States of America, and a resident of Kentucky. Darling resides at 4770 Grooms Lane, Princeton, KY 42445. Darling has in the past resided at 210 Manor Rd., Ridgewood, NJ 07450.

15.     Mark Joseph Caldwell was formerly GBG USA's Chief Financial Officer ("CFO"). Caldwell served as GBG USA's CFO from December 2018 through the Effective Date of the Plan. *See* Caldwell Decl., Ex. I. At all times relevant to this Complaint, Caldwell was also the CFO of

GBGH. Caldwell is a citizen of the United States of America, and a resident of North Carolina. Caldwell resides at 5903 Mary Hall Ct., Summerfield, NC 27358. Caldwell previously resided at 311 Badin View Dr., New London, NC 28127-9156 and at 707 Little Britain Rd., New Windsor, NY 12553-6154.

16.     Ronald Ventricelli was formerly GBG USA's Chief Operating Officer ("COO") and President. Ventricelli served as GBG USA's President and COO from December 2018 through the Effective Date of the Plan. *See* Caldwell Decl., Ex. I. At all times relevant to this Complaint, Ventricelli was also the COO of GBGH. Prior to December 2018, Ventricelli had served GBG USA's CFO for approximately three and a half years. *See id.* Ventricelli was also a director of Millwork Pte. Ltd., another indirect subsidiary of GBGH, during 2020 and 2021. Ventricelli is a citizen of the United States of America, and a resident of New Jersey. Ventricelli resides at 58 Riviera Drive, Monroe Township, NJ 08831. Ventricelli formerly resided at 11 Grenoble Ct, Matawan, NJ 07747.

17.     Robert K. Smits was formerly GBG USA's General Counsel, Executive Vice President, and Secretary, and during the relevant time period was also a Director of GBG USA. Smits served as GBG USA's General Counsel, Executive Vice President, and Secretary from January 2013 through the Effective Date of the Plan. *See* Caldwell Decl., Ex. I. At all times relevant to this Complaint, Smits also served as General Counsel and Executive Vice President to GBGH. Smits is a citizen of the United States of America, and a resident of New York. Smits served as a Director of GBG USA at the time of the Special Dividend Cash Transfer in March 2019, and through the Petition Date. Smits resides at 530 East 72nd Street, Apt. 14J, New York, NY 10021. Smits has in the past resided at 301 East 62nd Street, Apt. 4C, New York, NY 10021.

18.     Stephen Harry Long was formerly a member of the GBG USA Board. Long served as a member of the GBG USA Board from July 2014 to June 2021. *See* Case No. 21-11369 (Bankr. S.D.N.Y.), Docket No. 189 (answer to question 29). At all times relevant to this Complaint, Long was also a member of the GBGH Board of Directors (the "GBGH Board"). Long is a citizen of the United States of America, and a resident of New York.

19.     Brandon Carrey was formerly GBG USA's Treasurer and Vice President. Carrey served as GBG USA's Treasurer and Vice President during the period April 13, 2015 through July 26, 2021. Carrey is a citizen of the United States of America, and a resident of North Carolina.

20.     Dr. William Fung Kwon Lun is the former Chairman of the Board of Directors of GBGH, and also the Vice-Chairman of Defendant Fung Holdings (1937) Limited. William Fung directly or indirectly owned (i) 1,490,636,996 GBGH shares as of March 6, 2019 and (ii) 1,866,726,829 GBGH shares as of April 4, 2019.

21.     Fung Holdings, a company incorporated in Hong Kong, was the largest shareholder of GBGH, and directly or indirectly, owned (i) 2,395,727,908 GBGH shares as of March 6, 2019, and (ii) 3,187,907,573 GBGH shares as of April 4, 2019. *See* GBGH Annual Report for year ended March 31, 2019 ("GBGH 2019 Annual Report"), at 74-76. This amounted to a 30.99% interest in GBGH. According to the Fung Group website, Fung Holdings is "the major shareholder of the Fung Group of companies," which operate at various levels of the global supply chain for consumer goods. Fung Holdings is owned and controlled by the Fung Brothers and the Fung Family. Fung Holdings' Chairman is Victor Fung and its Vice Chairman is William Fung. Fung Holdings is an entity organized under the laws of Hong Kong, China.

22.     William Fung, Victor Fung, and other members of the Fung family own and control Non-Party Li & Fung Limited (together with its affiliates and subsidiaries, "Li & Fung"), which

is another Fung Group company. Certain of the Debtors' Directors and Officers, including Darling, either hold, or have held, positions with Li & Fung and/or its affiliates. Li & Fung Limited is a Bermuda incorporated company.

23.    King Lun Holdings Limited ("King Lun"), a private BVI company, owned 50% by Defendant HSBC Trustee (C.I.) Limited ("HSBC Trustee") and 50% by William Fung. King Lun, directly or indirectly, owned (i) 2,395,727,908 GBGH shares as of March 6, 2019, and (ii) 3,187,907,573 GBGH shares as of April 4, 2019, which, on both dates, were held its subsidiary, Fung Holdings, and its indirect subsidiary, Fung Distribution. King Lun is an entity organized under the laws of the British Virgin Islands.

24.    Fung Distribution International Limited ("Fung Distribution"), a wholly-owned subsidiary of Fung Holdings, directly or indirectly owned 200,000,000 GBGH shares as of March 6, 2019 and April 4, 2019. Fung Distribution is an entity organized under the laws of the British Virgin Islands.

25.    Step Dragon Enterprise Ltd. ("Step Dragon"), an entity beneficially owned by William Fung, directly or indirectly owned 50,294,200 GBGH shares as of March 6, 2019 and April 4, 2019. Step Dragon is an entity organized under the laws of the British Virgin Islands.

26.    Golden Step Limited ("Golden Step"), an entity beneficially owned by William Fung, directly or indirectly owned 26,114,400 GBGH shares as of March 6, 2019 and April 4, 2019.

27.    Victor Fung, the brother of William Fung, directly or indirectly, owned 2,814,444 GBGH shares as of March 6, 2019 and April 4, 2019. He and his family also had interest in an additional 3,001,743,031 shares through HSBC Trustee. As noted above, Victor Fung is the Chairman of Fung Holdings.

28.     HSBC Trustee is a Channel Islands entity, located at 1 Greenville Street, St. Heiler, Jersey, JE4 9PF, Channel Islands. HSBC Trustee, which serves as the trustee of a trust established for the benefit of Victor Fung's family, directly or indirectly owned (i) 1,407,789,244 GBGH shares as of March 6, 2019, and (ii) 1,803,879,077 GBGH shares as of April 4, 2019.

29.     First Island Developments Limited ("First Island"), a wholly owned subsidiary of HSBC Trustee, directly or indirectly, owned 209,925,290 GBGH shares as of March 6, 2019 and April 4, 2019. First Island is an entity organized under the laws of the British Virgin Islands.

30.     Spencer Theodore Fung ("Spencer Fung") is the son of Victor Fung and nephew of William Fung. Spencer Fung directly or indirectly owned 1,408,000 GBGH shares as of March 6, 2019 and April 4, 2019. At all relevant times, Spencer Fung was the CEO of Li & Fung Limited and also a member of its Board of Directors. Spencer Fung is a resident of Hong Kong, China.

31.     Bruce Philip Rockowitz ("Rockowitz") was, at all times relevant to this action, the Vice-Chairman of GBGH. Prior to October 30, 2018, Rockowitz was also GBGH's CEO. Rockowitz held 153,284,093 GBGH shares as of both March 6, 2019 and April 4, 2019. Rockowitz is a resident of Hong Kong, China.

32.     Hurricane Millennium Holdings Limited ("Hurricane Millennium") is an entity organized under the laws of British Virgin Islands entity with a registered address believed to be P.O. Box 3444 Town Road, Tortola British Virgin Islands. Hurricane Millennium is beneficially owned by a trust established for the benefit of Bruce Rockowitz's family members. Hurricane Millennium, directly or indirectly, owned 253,340,780 GBGH shares as of March 6, 2019 and April 4, 2019.

## III.     NON-PARTIES

33.     Debtor GBG USA Inc. was, at all times applicable to the allegations in this complaint, incorporated under the laws of the State of Delaware. On November 20, 1986, "West

Bay Design Inc." was incorporated in the state of Delaware. On March 31, 1994, "West Bay Design Inc." changed its name to "The Millwork Trading Co., Ltd." On January 8, 2009, "The Millwork Trading Co., Ltd." changed its name to "LF USA Inc." On June 4, 2014, "LF USA Inc." changed its name to "GBG USA Inc." At all times applicable to this Complaint, GBG USA's principal place of business was 350 Fifth Avenue, 10th Floor, New York, NY 10118.

34. Non-Debtor GBGH was, at all times applicable to this Complaint, the indirect ultimate parent of GBG USA. GBGH was a limited company organized under the laws of Bermuda, and was also a Fung Group company, having been spun-off from Li & Fung Limited and separately listed on the Hong Kong Stock Exchange on July 9, 2014. Notwithstanding the spinoff, the ownership of GBGH and Li & Fung Limited remained consistent, in that GBGH's controlling shareholders were also controlling shareholders of Li & Fung (i.e., Fung Holdings, the Fung Brothers, and members of the Fung Brothers' family or entities that they control).

## IV. JURISDICTION AND VENUE

35. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, and under Section 13.01 of the Plan. This adversary proceeding contains claims both core and non-core claims under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(2)(F).

36. Plaintiff consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the Constitution of the United States of America.

37. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## V. FACTUAL ALLEGATIONS

### A. Overview of the Debtors' Business

38. The Debtors were members of the Global Brands Group ("GBG"), a global wholesale footwear and apparel business headed by GBGH, with business segments in North

America, Europe, and the Middle East and Asia, respectively, as well as a fourth "Brand Management" segment. The Debtors – led by GBG USA – operated the North American segment of the GBG business, and maintained a strong market presence in the United States of America. Prior to the Petition Date, the Debtors had a diversified brand portfolio, including licensed brands owned by third parties and brands owned by the Debtors. The corporate capital structure of the GBG businesses as it pertains to the Debtors is described in Section V.B below.

39. Prior to being spun-off from Li & Fung Limited in July 2014, GBGH and its subsidiary companies served as the distribution arm of Li & Fung, which operates a global supply chain for consumer goods, including apparel.

40. Post spinoff, GBG continued to distribute products sourced by Li & Fung. Pursuant to a Buying Agency Agreement ("BAA") between Millwork Pte. Ltd. ("Millwork") (another indirect subsidiary of GBGH) and a Li & Fung company (the name of which changed from time to time), Li & Fung served as Millwork's non-exclusive agent to purchase products. The BAA was entered into at the time of the spinoff and renewed again in 2016 and 2019. *See* FCGS-02019587. Pursuant to that agreement, Millwork would order products from Li & Fung identified manufacturers and take delivery of the product. GBG USA (and other GBG business segments) then "purchased" from Millwork the products that Millwork had ordered on its behalf. In this manner, GBG USA and the non-Debtor GBG companies remained dependent on Li & Fung to bring products to the market.

41. Under the BAA, Millwork paid Li & Fung a commission of "up to seven percent" for all products ordered from Li & Fung-identified vendors. *See* BAA, § 8.1. Li & Fung collected invoices from the vendors from which Millwork had ordered products and presented those invoices to Millwork on a regular basis. Millwork was responsible for remitting payment to Li & Fung for

the invoiced amounts plus commissions. Li & Fung would then pay the vendors. At all times relevant to this action, GBGH and its subsidiaries owned hundreds of millions of dollars in outstanding debt to Li & Fung under the BAA, much of which was overdue.

**B. The Debtors' Corporate and Capital Structure**

42.     GBGH was the ultimate parent of GBG USA through multiple intermediate entities, as set forth in the following paragraphs and illustrated in **Exhibit A**.

43.     GBG USA was, at all relevant times, the direct or indirect parent of the other Debtors, aside from Debtor GBG North America Holding Co., Inc.

44.     GBG USA was a wholly owned subsidiary of Debtor GBG North America Holding Co. Inc., also, a Delaware corporation. At all times applicable to this Complaint, GBG North America Holding Co.'s principal place of business was identified as the GBG USA headquarters at 350 Fifth Avenue, 10th Floor, New York, NY 10118.

45.     GBG North America Holding Co. Inc., in turn, was a wholly owned subsidiary of GBG International Holding Company Limited. GBG International Holding Company Limited was a company organized under the laws of the United Kingdom.

46.     GBG International Holding Company Limited was a wholly owned subsidiary of Global Brands (Hong Kong) Limited. Global Brands (Hong Kong) Limited was a company organized under the laws of the Hong Kong, China.

47.     Global Brands (Hong Kong) Limited was a wholly owned subsidiary of GBG International Holding Limited. GBG International Holding Limited was a company organized under the laws of the British Virgin Islands.

48.     Finally, GBG International Holding Limited was a wholly owned subsidiary of GBGH, which, as noted above, was a limited liability company incorporated in Bermuda whose shares were publicly traded on the Hong Kong Stock Exchange.

49.     GBGH was also the ultimate parent of the other GBG business segments. In this regard, GBGH was the direct parent company of GBG Asia Ltd, which, in turn, is the parent of Millwork. Millwork is incorporated in the Republic of Singapore. Millwork was originally incorporated under the name "LF USA (ASIA) PTD. LTD" and later changed its name to "LF ASIA PTD. LTD." before changing its name to Millwork following the spinoff of the Global Brands Group from Li & Fung Limited.

50.     As of April 4, 2019, Fung Holdings, owned by William Fung and HSBC Trustee, directly owned 30.99% of GBGH's issued and outstanding shares. William Fung directly owned an additional 2.85% of GBGH's shares and HSBC Trustee directly owned an additional 2.04% interest, which in combination formed a 35.88% controlling interest in GBGH. As noted in Section II above, other members of the Fung Brothers' family and/or Fung Brothers' affiliated entities also directly owned shares in GBGH.

### C.     The Debtors' Borrowing Facilities Prior to October 2018

#### 1.     The Standard Charter Facility

51.     On December 24, 2014, Standard Chartered Bank New York Branch and GBG USA entered into a bilateral facility (as amended, amended and restated, supplemented, or otherwise modified from time to time) (the "Standard Chartered Facility"). The Standard Chartered Facility was scheduled to mature on April 26, 2022 and accrued interest at a rate of "LIBOR" plus 3.0%. GBG USA was the sole borrower under the Standard Chartered Facility and GBGH was the sole guarantor.

52.     As of March 31, 2019, the entire amount of the Standard Chartered Facility, $25 million, was drawn by GBG USA.

53.     As of the Petition Date, the Standard Chartered Facility has approximately $22 million in aggregate principal outstanding.

### 2. The Syndicated Credit Facility

54.     On December 22, 2015, GBG USA, as borrower, and GBGH as guarantor, entered into a $1.2 billion syndicated credit agreement, with $500 million maturing in June 2019 and $700 million in June 2021 ("Syndicated Credit Facility").

55.     As of immediately prior to the closing of the Centric Sale, the Syndicated Credit Facility was fully drawn, with $1.2 billion borrowed by GBG USA.

56.     The Syndicated Credit Facility was paid off in October 2018 following the closing of the Centric Sale, and thus no amounts were outstanding as of the Petition Date.

### D. Project Legend and the Resulting Centric Sale

57.     Starting in mid-2018 GBGH began working on the sale of a significant portion of their North American licensing business. The prospect of selling GBGH's North American licensing business to a potential buyer was referred to as "Project Legend."

58.     Pursuant to a Purchase Agreement dated June 27, 2018, GBGH agreed to sell all of their North American licensing business (i.e., the Centric Sale) to Centric Brands Inc., f/k/a Differential Brands Group Inc. for what became an ultimate net purchase price of approximately $1.2 billion. *See* GBG_US_00005072.

59.     On August 2, 2018, a Special General Meeting of GBGH's shareholders occurred. *See* GBGHOLDING_0001907. William Fung acted as Chairman of the meeting. *Id*. Rockowitz, Darling, Caldwell, and Ventricelli also attended the meeting. *See* GBGHOLDING_0001910, Victor Fung, Spencer Fung, Step Dragon, Golden Step, and First Island attended the meeting by their proxy, William Fung. *See* GBGHOLDING_0001947, GBGHOLDING_0001950.

60.     At that Special General Meeting, the shareholders of GBGH voted on the approval of the Centric Sale and the payment of a Special Dividend following the Centric Sale. Specifically, by "Resolution No. 1", shareholders voted to

approve, ratify and confirm the Sale and Purchase Agreement relating to the sale and purchase of certain North American business of the Company and all transactions contemplated under the Transaction Documents and to authorise [sic] any Director of the Company to execute for and on behalf of the Company all such documents and to implement the Transaction and all matters incidental or ancillary thereto.

GBGHOLDING_0001908.

61.     Each of William Fung, Bruce Rockowitz, Victor Fung, Spencer Fung, Step Dragon, Golden Step, and First Island cast votes at that Special General Meeting to approve that Resolution No. 1, either personally, or through their appointed proxies.

62.     By "Resolution No. 2", shareholders voted "to authorize the Directors of the Company to pay a distribution from contributed surplus in such amount as the Directors consider appropriate, subject to a maximum amount of HK$0.325 per share" subject to and conditional upon closing of the Centric Sale." *Id.*

63.     Each of William Fung, Bruce Rockowitz, Victor Fung, Spencer Fung, Step Dragon, Golden Step, and First Island cast votes at that Special General Meeting to approve that Resolution No. 2, either personally, or through their appointed proxies.

64.     Both Resolutions were overwhelmingly approved by the GBGH Shareholders. The promise to pay a Special Dividend was a substantial factor in gaining the GBGH shareholders' approval of the Centric Sale.

65.     On October 29, 2018, GBG USA closed on the Centric Sale. The entirety of the sale proceeds were used to repay the outstanding $1.2 billion due under the Syndicated Credit Facility.

66.     Following of the closing of the Centric Sale, the Debtors' remaining businesses were comprised of all of its global footwear business, European businesses, global brand management businesses, women's New York fashion business, and men's non-denim business in North America.

67.     GBGH's legal advisor concerning the Centric Sale and the subsequent payment of the Special Dividend was Freshfields Bruckhaus Deringer. However, Freshfields Bruckhaus Deringer did not represent or advise GBG USA, or GBG USA's directors or officers acting in their capacity as such, specifically with respect to the Special Dividend.

68.     Under a standing 2015 engagement letter with GBGH, attorneys from Reed Smith LLP provided legal advice to GBGH, GBG USA, and other GBG entities concerning the Centric Sale and the documentation of the Special Dividend. However, those Reed Smith attorneys did not advise GBG USA, or GBG USA's directors and officers acting in such capacity with respect to the Special Dividend's compliance with Delaware or other U.S. law, or fiduciary duties owed by GBG USA's directors and officers to GBG USA in connection with the Special Dividend.

### E.     GBG USA Obtains New Borrowing Facilities Following the Centric Sale

#### 1.     The Revolving Credit Facility

69.     The Centric Sale was originally scheduled to close in August 2018, but was delayed until October 29, 2018. In the interim, GBGH approached HSBC, CitiBank, Bank of America Merrill Lynch ("BAML"), Mizuho Bank and Standard Chartered Bank (together, the "RCF Banks") about a new $375 million term loan to replace the then existing $1.2 billion term loan that was to be repaid on the completion of the Centric Sale. *See* GBGHOLDING_0002650.

70.     On October 29, 2018, GBG USA and GBGH entered into that certain Credit Agreement (as amended, amended and restated, supplemented, or otherwise modified from time to time) pursuant to which the RCF Banks provided a line of credit in an aggregate principal amount of $375 million, which was the "Prepetition RCF.*" See* ¶ 7, *supra*. GBG USA was the sole borrower under the Prepetition RCF. GBGH and each of the other Debtors were guarantors under the Prepetition RCF, and certain non-Debtor affiliates were pledgers and guarantors under the Prepetition RCF. Citibank, N.A. was the initial Agent under the Prepetition RCF.

71.     Section 5.03 of the Prepetition RCF provided that "so long as any Advance shall remain unpaid or any Lender shall have any Commitment hereunder, the Guarantor shall" comply with certain financial measurables ("Prepetition RCF Covenants"). Specifically, the Prepetition RCF Covenants required GBGH and its subsidiaries (on a consolidated basis) to (i) maintain a "Consolidated Total Net Worth" (as defined therein) of at least $950 million prior to March 31, 2019, and of at least $1 billion thereafter; (ii) maintain a ratio of "Consolidated EBITDA to Consolidated Cash Interest Expense" (as defined therein) greater than 3:1 prior to March 31, 2019, and 5:1 thereafter, to be calculated every 6 months after March 31, 2019; and (iii) maintain at all times a "Consolidated Adjusted Net Debt to Consolidated Total Net Worth" ratio (as defined therein) of less than or equal to 0.35:1.00. *See* Prepetition RCF, at §§ 1.01, 5.03.

72.     The Prepetition RCF required GBGH to provide a "Compliance Certificate" within 180 days of the end of each fiscal year and/or within 120 days at the end of the second fiscal quarter which contained, among other things, confirmation of compliance with the Prepetition RCF Covenants. Prepetition RCF, at § 5.01(e).

73.     On March 14, 2019, GBG USA, as borrower, GBGH, as guarantor, and HSBC Bank USA, National Association, as administrative agent for the Lenders (as defined in the Credit Agreement for the Prepetition RCF), entered into Amendment No. 1 to the Credit Agreement for the Prepetition RCF. Pursuant to Amendment No. 1 to the Credit Agreement for the Prepetition RCF, CitiBank, N.A. was replaced as Agent by HSBC Bank USA, National Association. Darling signed the Amendment No. 1 to the Credit Agreement for the Prepetition RCF as CEO and Director for GBG USA and GBGH, respectively.

74.     As stated further below, the entire amount of the Prepetition RCF, $375 million, was drawn by GBG USA as of March 31, 2019.

### 2. The Citibank Facility

75.     On October 26, 2018, Debtors GBG USA, Homestead International Group Ltd, IDS USA Inc., Jimlar Corporation, GBG North America Holdings Co. Inc., MESH LLC, Krasnow Enterprises, Inc., Krasnow Enterprises Ltd., Pacific Alliance USA, Inc. and GBG Spyder USA LLC, as borrowers, and GBGH, as guarantor, entered into a bilateral facility with Citibank, N.A. (as amended, amended and restated, supplemented, or otherwise modified from time to time) ("Citibank Facility"). Several of the Debtors' non-debtor affiliates were also borrowers under the Citibank Facility. The Citibank Facility was scheduled to mature on April 26, 2022 and accrues interest at a rate of "LIBOR" plus 1.3%.

76.     As of March 31, 2019, $20 million was drawn on the Citibank Facility, with another $119 million of the Citibank Facility used for letters of credit and other purposes, resulting in zero available to be drawn from the Citibank Facility by GBG USA.

77.     As of the Petition Date, the Citibank Facility had approximately $21.9 million in aggregate principal outstanding.

### 3. The Mizuho Facility

78.     On January 25, 2019, Mizuho Bank, Ltd., Hong Kong Branch, and GBG USA entered into a $50 million revolving credit facility (as amended, amended and restated, supplemented, or otherwise modified from time to time) ("Mizuho Facility"). The Mizuho revolving credit facility was scheduled to mature on April 26, 2022 and accrues interest at a rate of "LIBOR" plus 3.95%. GBG USA was the sole borrower under this facility and GBGH was the sole guarantor.

79.     As of March 31, 2019, the entire amount of loans under the Mizuho Facility, $50 million, was drawn by GBG USA) ("Mizuho Second Lien Loans").

80.     As of the Petition Date, the Mizuho Facility had approximately $44.1 million in aggregate principal outstanding.

### 4.     The HSBC Facility

81.     On March 7, 2019, Debtor GBG USA, as borrower, and GBGH, as guarantor, entered into a $25 million bilateral facility with HSBC (as amended, amended and restated, supplemented, or otherwise modified from time to time) ("HSBC Facility"). The HSBC Facility was scheduled to mature on April 26, 2022 and accrued interest at a rate of 4.90%.

82.     As of March 31, 2019, $25 million of loans under the HSBC Facility ("HSBC Second Lien Loans") was drawn and outstanding with respect to the HSBC Facility.

83.     As of the Petition Date, the HSBC facility had approximately $18.2 million in aggregate principal outstanding.

### F.     Payment of the Special Dividend

84.     GBGH's officers and directors promised to pay a dividend following the Centric Sale from its proceeds and were determined to keep that promise despite GBG USA's having used the entirety of the Centric Sale proceeds to repay the Syndicated Credit Facility and despite projected underperformance and staunch lender opposition.

### 1.     GBGH's Officers and Directors Set the Amount of the Special Dividend

85.     Within a month of the closing of the Centric Sale, it was apparent that GBGH faced significant financial difficulties in the near future, particularly with respect to the Prepetition RCF. Specifically, on November 27, 2018, Long presided as Chairman over a meeting of the GBGH Board Audit Committee. *See* GBGHOLDING_0002602. William Fung, Bruce Rockowitz, Darling, Ventricelli, and Caldwell attended that GBGH Board Audit Committee meeting. *Id.* At

this meeting, William Fung, Bruce Rockowitz, Long, Darling, Ventricelli, and Caldwell were advised that

> Going concern consideration — the bank loan of US$l.2 billion was repaid after the disposal of the Target Businesses. Based on management cash flow forecast for 12-month ending 30 September 2019, there may be potential breach of covenants for the new revolving credit facility from a consortium of banks amounting US$375 million with a maturity in April 2022. Ron [Ventricelli] updated the members that negotiation with several banks for new financing is in progress and anticipated that it will be resolved in January before the covenants test in March 2019. Also, the cash flow forecast is based on the assumption that the payable to Li & Fung remained at a similar level as at 30 September 2019 as compared to 30 September 2018. Ron responded that given the additional financial resources in place, they will gradually reduce the payable balance.
>
> Shia Yuen emphasised [sic] that the business performance is poor and the cashflow position is very tight for the 6-month period ended 30 September 2018, and also with the current uncertainties in economy and trade wars issues, management has to implement significant changes and improvement to their business. The goodwill impairment assessment and the cashflow forecast is highly dependent on the effect of the restructuring program as mentioned by Mr. Richard Darling ("Rick") and the changes in business strategies. Shia Yuen reiterated the importance that management should closely monitor the progress of their restructuring program and business strategies, and the adequancy [sic] of cashflow under the new financing arrangements and bank covenants. PwC will assess the goodwill impairment assessment and the cashflow forecast and going concern assumptions during the year end audit.

GBGHOLDING_0002603.

86.     Notwithstanding that report, on the following day, November 28, 2018, GBGH's Board of Directors (the "GBGH Board") held a meeting attended by William Fung, Bruce Rockowitz, Long, and Darling, as Directors of GBGH, as well as by Ventricelli and Caldwell. *See* GBGHOLDING_0002798. The GBGH Board resolved to establish a committee ("GBGH Special Dividend Committee") comprising of William Fung, Bruce Rockowitz, Darling and Ventricelli "to determine and finalize on behalf of the [GBGH] Board the details of the special dividend.…" GBGHOLDING_0002800.

87. At the same meeting, Darling presented the first half results for fiscal year 2019 for the continuing operations of GBG business. He reported decreased revenues, a $159 million operating loss, and a net loss to GBGH shareholders of $190 million.

88. On November 28, 2018, the GBGH Special Dividend Committee held a meeting attended by William Fung, Bruce Rockowitz, Darling, and Ventricelli, and were joined by Caldwell. *See* GBGHOLDING_0002817. At that meeting, it was resolved that, based upon the anticipated adjusted Centric Sale purchase price of approximately $1.2 billion, the Special Dividend would be roughly HK$2.4 billion (or approximately $305 million), representing payment of HK$0.28 per GBGH share. *Id*. The Special Dividend Committee observed that while the precise amount of the Special Dividend could not be calculated until Centric delivered the final closing calculations, it was not anticipated that those calculations would materially impact the final $1.2 billion price. *Id*. As a result, GBGH announced the estimated size of the Special Dividend to its shareholders on the same day, noting that it would be paid in 2019.

**2. GBGH Receives a $100 Million Shareholder Loan to Pay Amounts Due to Li & Fung in Advance of the Payment of the Special Dividend**

89. In December 2018, GBGH was under financial duress, which was to get a whole lot worse when it paid the Special Dividend. In particular, GBGH and its subsidiaries owed hundreds of millions of dollars to Li & Fung under the BAA, both for amounts due to vendors and suppliers as well as for commissions. Indeed, as of September 2018, GBGH owed related parties over $690 million, an amount that increased to $706 million by March 2019. While Li & Fung had not called overdue debts, it was putting pressure on GBGH to make substantial payments. GBGH did not have sufficient liquidity to make those payments. Indeed, in a December 10, 2018 email, Caldwell wrote to Ventricelli that "I am not sure how we can get to [the] level" of payment that Li & Fung was demanding.

90. While the Special Dividend was months away from being paid, the Fung Brothers began to contemplate some reinvestment of the amounts paid to them into GBGH. Accordingly, it was proposed that the Fung Holdings make a $100 million shareholder loan to GBG as "a one off arrangement to bridge the year end liquidity." (the "December Shareholder Loan"). *See* FCGS-05000058.

91. On December 18, 2018, the GBGH Board held a meeting attended by William Fung, Bruce Rockowitz, Darling, Ventricelli, Caldwell, and Smits at which they considered the December Shareholder Loan. The minutes of that meeting state that

> For facilitating the controlling shareholder to plough back its share of the special dividend to [GBGH] and for working capital purpose, a shareholder loan in the amount of US$100 million from Fung Holdings (1937) Limited was proposed for consideration by the Directors. Board paper setting out the key terms of the proposed shareholder loan together with a draft Shareholder Loan Agreement were circulated to the Directors before the Meeting.

GBGHOLDING_00002794. The draft agreement provided to the GBGH Board identified Fung Holdings as the "Lender" and GBGH as the "Borrower." After reviewing the draft, the GBGH Board approved the insider loan.

92. At the same meeting, there was discussion as to whether the December Shareholder Loan needed to be disclosed under Hong Kong law because it was "price sensitive information" ("PSI") in light of GBGH's financial position. The GBGH Board was advised that, under applicable law, the December Shareholder Loan would be PSI if, in its absence, GBGH's ability to continue as a going concern was in question. In an email exchange among some of GBGH's Directors and Officers prior to the meeting, including William Fung, Bruce Rockowitz, Darling, Long, Ventricelli, and Caldwell, GBGH Director Paul Selway-Swift noted that, in his view, the December Shareholder Loan was not PSI so long as "Li & Fung is not about to demand payment of its overdue receivables." While GBGH's directors ultimately to recognize the unmistakable fact

that GBGH's dire financial condition required disclosure, it was readily apparent to all that its financial condition was going to be directly impacted by the impending Special Dividend and the substantial amounts GBGH owed to Li & Fung.

93. The December Shareholder Loan was executed on the day of the GBGH Board meeting, December 18, 2018, by and between Fung Holdings and GBGH. The loan had a 6-month term, but was repayable at any time at the option of GBGH, as the borrower. Darling signed the December Shareholder Loan on behalf of GBGH.

94. Pursuant to the December Shareholder Loan agreement, Fung Holdings loaned $100 million to GBGH, transferring $100 million to GBGH's HSBC account in Hong Kong, China on December 20, 2018. GBGH immediately used the proceeds of the December Shareholder Loan Cash Transfer loan to pay Li & Fung, which GBGH understood would be used to pay down amounts owed to its vendors and suppliers.

### 3. GBGH Prepares to Pay the Special Dividend

95. On January 31, 2019, the GBGH Board held at meeting attended by William Fung, Bruce Rockowitz, Long, and Darling, as Directors of GBGH, as well as by Ventricelli, Caldwell, and Smits. *See* GBGHOLDING_0002636. At the meeting, the GBGH Board fixed the amount of the Special Dividend as HK$2.4 billion (representing HK$0.28 per share), payable in cash to GBGH's shareholders whose names appeared on the registry of GBGH as of March 6, 2019. *Id.* The GBGH Board minutes state that the Special Dividend was to be paid "from the proceeds of the Sale of the Target Business," even though the entirety of the Centric Sale proceeds had been already been used to repay the Syndicated Credit Facility.

96. At the January 31, 2019 GBGH Board meeting, the GBGH Board also discussed and approved an alternative election to receive the Special Dividend in new shares (the "Scrip Shares") credited as fully paid in lieu of cash. The minutes of the meeting state that "the controlling

shareholders of the company…would[] like to take up the proposed scrip dividend allocation in full and re-invest in the Company" but were aware that doing so could have regulatory implications under the Hong Kong Codes on Takeovers and Mergers. Finally, at the same meeting, the GBGH Board approved GBGH's entry into the $50 million Mizuho Facility. *See* Sec. V.E.3, *supra.*

97.     On February 14, 2019, GBGH publicized the offering of Scrip Shares in lieu of cash to its Shareholders. In the publication, GBGH noted that the option to elect to receive the Special Dividend in the form of Scrip Shares would need to be exercised by March 28, 2019 and the Special Dividend was expected to be paid on April 4, 2019. GBGHOLDING_0000909.

98.     On March 1, 2019, the GBGH Board held at meeting attended by William Fung, Bruce Rockowitz, Long, and Darling, as Directors of GBGH, as well as by Ventricelli and Caldwell. *See* GBGHOLDING_0002643. At this GBGH Board meeting, William Fung advised that the Controlling Shareholders would not be electing to receive Scrip Shares, but would instead provide their cash portion of the Special Dividend to GBGH in the form of a loan from Fung Holdings:

> William further added that should the Controlling Shareholders not taking up the proposed scrip dividend allocation in the Shareholders, through Fung Holdings (1937) Limited, shall provide the balance of the amount of the special dividend payable to them by way of an interest-free and unsecured shareholders' loan (the "Loan") at a term of three years or such term longer than the term offered by bank.

GBGHOLDING_00026044.

99.     At the same meeting, "[i]t was reported that a new USD25,000,000 banking facility had been offered by HSBC for working capital purpose." *Id*. That banking facility would later become the HSBC Facility. *See* Section V.E.4 *supra*. The March 1, 2019 GBGH Board meeting meetings note "that it was advisable and in the interests of [GBGH] and GBG USA to enter into the [HSBC] Bank Documents in accordance with the terms and conditions therein." GBGHOLDING_00026045. The GBGH Board approved what would become the HSBC Facility

in order to ensure continued cash flow and sufficient working capital prior to the end of the fiscal year on March 31, 2019. *Id.*

100.    In addition to the GBGH Board meeting, on March 1, 2019, in an effort to ensure the promise that the Special Dividend was delivered, GBGH held a Special General Shareholder Meeting attended by William Fung, Bruce Rockowitz, Long and Darling, as Directors of GBGH, as well as by Ventricelli and Caldwell, at which the shareholders approved an increase in capital in connection with the offering of Scrip Shares.   William Fung served as the Chairman of the Meeting and also acted as the proxy for First Island, Fung Distribution, Fung Holdings, Victor Fung, Golden Step, Spencer Fung, and Step Dragon.

### 4.    GBG USA Draws Down on the Remainder of the Prepetition RCF in Advance of Paying the Special Dividend

101.    In advance of the planned payment of the Special Dividend, GBG USA drew down on several of its borrowing facilities.

102.    Most notably, on March 11, 2019, GBG USA drew down on the Prepetition RCF, borrowing the remaining $253 million available under the Prepetition RCF, and bringing the total amount borrowed to $375 million. *See* FCGS-00497893. GBG USA needed to borrow $253 million to fund the Special Dividend because the proceeds of the Centric Sale had already been used in October 2018 to repay the Syndicate Lending Facility.

103.    The $253 million drawdown on the Prepetition RCF was in addition to GBG USA's substantial borrowing against other facilities. Specifically, between January 25, 2019 and the payment of the Special Dividend, GBG USA drew down the entire $50 million Mizuho Facility. Further, between March 7, 2019 and the payment of the Special Dividend, GBG USA also drew down the entire  $25 million HSBC Facility.

104.     Thus, in total, GBG USA borrowed $328 million in loans in the three-month period preceding the Special Dividend, which were used to fund the Special Dividend and to repay the December Shareholder Loan, as described below.

### 5.     GBG USA Funds the Special Dividend and Repays the December Shareholder Loan

105.     In the last week of March 2019, GBG USA transferred the Special Dividend Cash Transfer to GBGH and also repaid the December Shareholder Loan between Fung Holdings and GBGH by making a direct payment to Fung Holdings.

106.     The Special Dividend Cash Transfer was wired directly from GBG USA directly to GBGH. The transferred funds from were then converted to Hong Kong dollars and placed in a separate account from which the Special Dividend was paid to GBGH shareholders.

107.     The direct payment of cash from GBG USA to GBGH representing the Special Dividend Cash Transfer was in lieu of the following intermediate distributions: (i) from GBG USA to GBG North America Holding Co. Inc.; (ii) from GBG North America Holding Co. Inc. to GBG International Holding Company Limited; (iii) from GBG International Holding Company Limited to Global Brands (Hong Kong) Limited); (iv) from Global Brands (Hong Kong) Limited) to GBG International Holding Limited; and (v) from GBG International Holding Limited to GBGH.

108.     Specifically, on Thursday March 28, 2019, Carrey directed that GBG USA transfer $181,000,000 – the first part of the Special Dividend Cash Transfer -- from its ordinary debtor – creditor bank account at Citibank located in New York, N.Y. to GBGH through an HSBC correspondent bank account also located in New York, N.Y. Caldwell was copied on the email directing the transfer. The transfer was meant to cover the initially calculated amount of the net

cash dividend to be paid to GBGH shareholders of HK$1,406,857,513 (or approximately $179.3 million) along with a buffer to ensure sufficient funds were available to GBGH.

109.    Later in the day on March 28, 2019, the Hong Kong share registrar informed GBGH that the actual amount of the net cash dividend to be paid was HK$1,513,861,819.68 (or approximately $193 million). Therefore, on Friday March 29, 2019, Carrey directed GBG USA to transfer an additional $15,000,000, the second portion of the Special Dividend Cash Transfer, from one or more of its ordinary debtor – creditor bank accounts at Citibank located in New York, N.Y. to GBGH through an HSBC correspondent bank account in also in New York, N.Y. Caldwell was again copied on the email directing this transfer. This additional transfer was meant to provide sufficient cash to pay the HK$106,004,306 shortfall in GBGH's initial calculation of the dividend amount, along with a buffer to ensure sufficient funds were available to GBGH. *See* FCGS-04424565.

110.    Accordingly, by March 29, 2019, GBG USA had transferred a total of $196 million to GBGH (i.e., the Special Dividend Cash Transfer) to fund the payment of the Special Dividend. The excess "buffer" portion of the Special Dividend Cash Transfer was never returned to GBG USA.

111.    William Fung, Bruce Rockowitz, Darling, Ventricelli, Caldwell, Long, Smits, and Carrey were all aware that GBG USA was making the Special Dividend Cash Transfer, and that the proceeds of the Special Dividend Cash Transfer would be used by GBGH to pay the Special Dividend.

112.    At the time that GBG USA made the Special Dividend Cash Transfer, the GBG USA Board of Directors had not executed any written resolution authorizing the payment of the Special Dividend Cash Transfer and/or authorizing GBG USA's Officers and employees to take

steps to effectuate paying the Special Dividend Cash Transfer. A draft resolution of the GBG USA Board declaring a $307 million dividend was prepared in March 2019, but was not signed at the time of the Special Dividend Cash Transfer. On information and belief, to the extent any written resolution was signed, it was signed in April 2019 and then backdated so as to appear as if executed on March 29, 2019

113.    As described in Section V.F.6, herein, the Special Dividend only occurred "as a result of the agreement with [the] lenders" under the Prepetition RCF (as defined in section V.E.1 herein) that marked the conclusion of GBGH's negotiation of the Waiver to Credit Agreement (as discussed in section V.E.1 herein).

114.    In addition to the Special Dividend Cash Transfer, GBG also funded GBGH's repayment of the December Shareholder Loan. On Tuesday, March 26, 2019, Darling and Caldwell approved Carrey's request to repay the December Shareholder Loan on behalf of GBGH before the end of the week (or before Sunday, March 31, 2019). On the same day, March 26, 2019, Carrey directed that GBG USA send $100 million plus any interest owed under the December Shareholder Loan directly to Fung Holdings. ("December Shareholder Loan Cash Transfer").

115.    William Fung, Bruce Rockowitz, Darling, Ventricelli, Caldwell, Long, and Smits were all aware that GBG USA made the December Shareholder Loan Cash Transfer, and that the proceeds of the December Shareholder Loan Cash Transfer would be treated by Fung Holdings as repayment of GBGH's obligations as Borrower under the December Shareholder Loan.

116.    At the time of the December Shareholder Loan Cash Transfer, the GBG USA Board had not executed any resolution or written consent authorizing payment of GBGH's obligations to Fung Holdings under the December Shareholder Loan. At the time of the December Shareholder Loan Cash Transfer, the GBG USA Board did not make any determination of whether GBG USA

was able to make the December Shareholder Loan Cash Transfer in compliance with Delaware or other applicable law, or even whether such payment was advisable in light of GBG USA's financial position at the time.

### 6. At the Time of the Special Dividend Cash Transfer, GBGH Was Negotiating With The RCF Banks to Avoid Default

117.    Unbeknownst to GBG USA's creditors aside from the RCF Banks, at the time of the Special Dividend Cash Transfer, GBG USA and GBGH were frantically fighting the allegation that GBG USA was in default under the Prepetition RCF.

118.    As noted paragraph 84, above, in November 2018, William Fung, Darling, Ventricelli, and Caldwell were advised during a GBGH Board Audit Committee meeting that based on management's cash flow forecast for the 12-month period ending September 30, 2019, GBGH would likely default with respect to the Prepetition RCF Covenants on or before March 31, 2019.

119.    Minutes from a GBGH Board meeting on April 2, 2019 – attended by William Fung, Bruce Rockowitz, and Darling in their capacity as GBGH Board members as well as Ventricelli and Smits -- explained the potential breach of covenant issue as follows:

> …as early as November 2018, Management noticed that compliance with [the EBITDA to Cash Interest ratio covenant] on 31 March 2019 on a trailing 12 months basis would be problematic because the interest component of the ratio would include the much higher cash interest expense incurred on the USD1,200 million loan in the first 7 months of the relevant 12 months period and at the same time EBITDA would entirely exclude the EBITDA for the business which had been sold. This issue would not have arisen if the USD375 million loan had provided for [the EBITDA to Cash Interest ratio covenant] to be tested on 31 March 2019 only by reference to the cash interest expense on the USD375 million loan on an annualised basis for the period from the date on which the new loan was put in place to 3 1 March 2019.

GBGHOLDING_0002650.

120.    In November 2018, William Fung, Bruce Rockowitz, Long, Darling, Ventricelli, and Caldwell were advised that, as a result of the projected breach of the Prepetition RCF Covenants, negotiations with the RCF Banks were in progress and that it was anticipated any that potential covenant breaches would be resolved by January 2019. *Id.*

121.    Discussions with the RCF Banks continued into December 2018. Notably, at the time that the December Shareholder Loan was agreed, GBGH's legal advisers were concerned that entering into that loan would itself trigger an early event of default under the Prepetition RCF. Specifically, on December 10, 2018, an attorney at Freshfields emailed Jason Yeung at Fung Holdings with a copy to Ventricelli, Smits, and others, indicating their concern that the December Shareholder Loan would be treated as debt for purposes of the Prepetition RCF Covenants, which would potentially trigger a breach of the Prepetition RCF.

122.    By March 2019, the potential covenant breaches had not been resolved, and PricewaterhouseCoopers ("PwC"), GBGH's auditor, was projecting that GBGH would be in breach of at least the "Consolidated Total Net Worth" and the "Consolidated Adjusted Net Debt to Consolidated Total Net Worth" covenants when measured at the end of the fiscal year on March 31, 2019.

123.    Accordingly, on or around March 14, 2019, GBGH management met with the RCF Banks in Hong Kong, China and asked for waivers of the Prepetition RCF Covenants. Based on the projections presented during the meeting, the RCF Banks subsequently took the position that GBG USA and GBGH were in breach of the Prepetition RCF Covenants as of March 14, 2019.

124.    By the time of the March 14, 2019 meetings between GBGH's management and the RCF Banks, the RCF Banks were aware that GBG USA had drawn down on the remaining

funds available under the Prepetition RCF on March 11, 2019 and that GBGH intended to pay a Special Dividend in early April 2019.

125.    Following the March 14, 2019 meeting with the RCF Banks, GBGH, with the assistance of PwC, prepared a draft letter to the RCF Banks providing for a general waiver of all of the Prepetition RCF Covenants through March 31, 2020. The initial draft of the letter was circulated by HSBC, as administrative agent under the agreement, to the RCF Banks on or about March 20, 2019.

126.    In subsequent negotiations, GBGH and the RCF Banks narrowed the scope of the waiver so as to only waive compliance with respect to the covenants that would be breached as of March 31, 2019.

127.    During the negotiations, an early draft of the waiver letter contained its own "Covenants" section, which would have precluded the Obligors (i.e., GBG USA, GBGH and subsidiaries), from, among other things, from making, declaring or paying "any dividend, charge, fee or other distribution (whether in cash or in kind) on or in respect of its share capital (or any class of the share capital)."

128.    On March 21, 2019, upon review of this proposed covenant in the draft waiver agreement, Smits noted to GBGH's outside counsel at Freshfields that this text would need to be changed so as to permit payment of the Special Dividend. Smits ultimately directed Freshfields to delete the covenant in the draft waiver letter altogether.

129.    On March 25, 2019, GBGH management made additional individual presentations to each of the RCF Banks – HSBC (as agent), Citibank, Bank of America Merrill Lynch, Mizuho Bank, and Standard Charter Bank – concerning GBGH's business. Darling and Caldwell participated in the presentations.

130.    After the March 25, 2019 presentations, the RCF Banks asked that Fung Holdings

(as Controlling Shareholder) pledge to make a $200 million loan to GBGH should GBGH's March

2020 EBITDA be less than $134 million. Freshfields prepared a draft "Comfort Letter" with those

terms on or around March 27, 2019. The draft letter was shared with Darling, Smits, Ventricelli,

and Caldwell, with Darling instructing Smits, Ventricelli, and Caldwell to maintain the letter's

confidentiality.

131.    Before the Comfort Letter or Waiver Agreement were signed, however, on March

28, 2019, Linklaters LLP, acting as counsel for the RCF Banks, informed GBG USA and GBGH

that – on further consideration – the RCF Banks would only agree to a waiver of the Prepetition

RCF Covenants "on the following general terms and conditions:

- [GBGH and subsidiaries] shall arrange for a USD100m shareholder loan to be made to [GBGH] which shall be subordinated to the repayment of all obligations to the Lenders under the Credit Agreement.

- [GBGH and subsidiaries] shall arrange for a USD207m cash capital infusion to be made to [GBGH] which shall be used to repay outstanding amounts under the Credit Agreement and permanently reduce Lender commitments thereunder.

- The Lenders will retain an independent financial advisor (the "IFA") at the expense of the Company by a date to be agreed. [GBGH and subsidiaries] will provide access to and cooperate with the IFA to assist the Lenders, among other matters, in their review of [GBGH and subsidiaries], its business and financial situation, and any restructuring efforts underway.

- [GBGH and subsidiaries] shall provide as soon as reasonably practicable a list of assets that could serve as collateral for obligations under the Credit Agreement and shall pledge such collateral within a period of time to be determined after the effectiveness of the waiver.

- The covenants under the Credit Agreement shall be temporarily suspended for a period of 60 days during which time [GBGH and subsidiaries] and the Lenders shall mutually agree to new types and levels of covenants to govern the Credit Agreement; provided, however, that failing such agreement, all covenants under the Credit Agreement shall be reinstated.

- [GBGH and subsidiaries] shall maintain a new minimum monthly liquidity requirement at a level to be determined.

- [GBGH and subsidiaries] shall provide the Lenders with the following (a) a restructuring plan in sufficient detail to the Lenders by a date to be agreed; (b) a rolling 13-week cashflow (updated weekly commencing on a date to be agreed; and (c) additional financial reports in form and substance as required by the Lenders."

FCGS-050000651.

132.    The RCF Banks' demands were sent via email to Ventricelli, Smits, and Caldwell, as well as attorneys at Freshfields. The subject matter of the email was "GBG: Lender Feedback re Waiver [SUBJECT TO FRE 408]."

133.    The RCF Banks made these additional demands on March 28, 2019 because (i) GBGH's financial condition was such that both GBG USA and GBGH would default on the Prepetition RCF within 72 hours (or already were in default, in the RCF Banks' view), but (ii) GBGH still intended to pay the Special Dividend on April 4, 2019. That the RCF Banks demands were made "SUBJECT TO FRE 408" made clear that the RCF Banks were prepared to sue GBG USA and GBGH to prevent GBG USA from making the Special Dividend Cash Transfer and GBGH from paying the Special Dividend.

134.    In this regard, GBGH's Board minutes from its April 2, 2019 meeting explain that the waiver request:

> …was exasperated by the fact that the Banks were aware that [GBGH] would be paying a very large Special Dividend on 4 April 2019, one that had been promised to shareholders from the August 2nd 2018 [Special General Meeting] when the sale of a major part of the US business was approved by shareholders.
>
> As a result of this perceived time pressure to try and prevent this large dividend from being paid to shareholders, the Banks asked for round the clock talks and indicated that (based on the forecast figures from the March 14th meetings) they considered that an Event of Default had already occurred (which would prohibit payment of the Special Dividend under the terms of the US$375 million loan).

GBGHOLDING_0002652.

135. Accordingly, the ensuing "round the clock talks" focused on the conditions under which the RCF Banks would agree to waive the Prepetition RCF Covenants in a manner that would permit GBGH to pay the Special Dividend.

136. On March 31, 2019, the RCF Banks and GBGH continued their negotiations concerning whether a default had occurred and whether GBGH was able to pay the Special Dividend.

137. GBGH and the RCF Banks did not reach an agreement on a waiver of one or more of the Prepetition RCF Covenants on March 31, 2019. Accordingly, as of March 31, 2019, GBGH was not in compliance with the Prepetition RCF Covenants, and such non-compliance constituted a default by GBG USA as borrower that, if left uncured, would have made the outstanding balance of $375 million due had the RCF Banks exercised their right to serve a demand notice.

138. Less than 48 hours from the promised payment of the Special Dividend, GBGH Board met on April 2, 2019, lamenting that "it seems like these efforts [to resolve the covenant compliance issue] were too late and several of the Banks and especially BAML has passed the situation to their workout division."

139. The April 2, 2019 GBGH Board meeting's minutes characterize the RCF Banks' proposal to waive compliance with the Prepetition RCF Covenants and permit payment of the Special Dividend as follows:

> the conditions set by the Banks for them not to issue a Notice of Default or other more drastic means to stop the April 4th payment of the Special Dividend of approximately USD300 million and to issue an appropriate waiver for the breach of [the EBITDA to Cash Interest ratio covenant] for the end of FY2019 were as follows:
>
> > 1. The Controlling Shareholder would reinvest their portion of the Special Dividend amounting to approximately USD100 million back into [GBGH] as either taking up the scrip option as much as they are allowed (i.e. up to 1.99%) and lending the balance to [GBGH] by way of an

unsecured and interest-free loan which is subordinated to the US$375 million loan and which matures after the US$375 million loan (i.e. for 4 years). The Controlling Shareholder had already undertaken to do this (as per the March 14th circular to shareholders).

2. As a temporary measure, the Controlling Shareholder would make arrangements to "collateralise" the remaining approximately USD200 million of the Special Dividend payable to other shareholders by way of a further cash injection, guarantee or standby Letter of Credit to maintain the Loan at USD375 million. This obligation would fall away if the outstanding syndicated loan from the Banks is paid down to USD175 million.

*Id*.

140.    The GBGH Board advised "Management to work with the Controlling Shareholder to try to agree [to] a mutually acceptable basis on which the Banks would agree to provide the necessary waivers for FY2019 and such other waivers and amendments as are necessary in order to give the business a stable financial footing going forwarded." *Id*. The GBGH Board minutes for its April 2, 2019 meeting also note that such a resolution "would also protect the interest of the small outside [GBGH] shareholders by ensuring that the Special Dividend is paid to them on time on 4 April 2019." GBGHOLDING_0002653.

141.    At the eleventh hour, GBGH made concessions that allowed payment of the promised Special Dividend and entered into a "Waiver to Credit Agreement" with the RCF Banks.

### 7.    Waiver to Credit Agreement for the Prepetition RCF

142.    The "Waiver to Credit Agreement," dated April 3, 2019, is by and between GBG USA, as borrower, GBGH, as guarantor, and HSBC Bank USA, National Association, as administrative agent for the Lenders (as defined in the Credit Agreement for the Prepetition RCF). The recitals to the agreement make clear that its terms were driven by a desire to ensure the payment of the Special Dividend on April 4, 2019, stating that "[t]he board of directors of [GBGH] at its board meeting on January 31, 2019, fixed and approved a special dividend valued at HK$2.4

billion which [GBGH] has subsequently announced it intends to pay on April 4, 2019." *See* FCGS-04711216. Darling signed the Waiver to Credit Agreement on behalf of GBG USA (as CEO) and GBGH (as CEO and Executive Director).

143.     The Waiver to Credit Agreement provides that, upon the "Waiver Effective Date," the Lenders waive the requirements of compliance with the Prepetition RCF Covenants until May 31, 2019 or such time as the Parties agree on revised covenants (absent some other default under the Credit Agreement or breach of the Waiver to Credit Agreement). *Id.* § 1.

144.     However, consistent with the negotiations between GBGH and the RCF Banks, the Waiver to Credit Agreement places multiple conditions precedent to the "Waiver Effective Date." *See* Waiver to Credit Agreement, § 2. Those conditions included, among other things:

- The Controlling Shareholders returning their cash portion of the Special Dividend (or an amount not less than HK$723,508,577.40) to GBGH in the form of an interest free loan from Fung Holdings that was subordinated to the Prepetition RCF (the "Dividend Shareholder Loan");

- Fung Holdings making an additional interest free, subordinated loan to GBGH in the amount of $94,181,882.90 (HK$739,308,944.36) (the "New Shareholder Loan");

- GBGH applying the proceeds of the New Shareholder Loan (or the equivalent amount) to pay down amounts advanced under the Prepetition RCF; and

- Fung Holdings execution of a Deed of Undertaking ("Deed of Undertaking") that would obligate it to pay an additional $94,181,882.90 to the RCF Banks on May 31, 2019, unless the amount due under the Prepetition RCF was reduced to $175,000,000 or the Controlling Shareholders had provided the Lenders with a standby letter of credit ("SBLC") conforming with terms set out in the Waiver of Credit Agreement.

145.     Additionally, Section 1.2 of the Waiver to Credit Agreement provided that any prior default due to non-compliance with the Prepetition RCF Covenants would be permanently waived if, prior to May 31, 2019, the borrowings under the Prepetition RCF were reduced to under $175 million (or if GBGH could procure a suitable SBLC).

### a.     The Dividend Shareholder Loan

146.     The Dividend Shareholder Loan is memorialized in a "Shareholder Loan Agreement" (the "Dividend Shareholder Loan Agreement") dated April 3, 2019, by and among GBGH, as borrower, and Fung Holdings, as lender. Fung Holdings provided the Dividend Shareholder Loan in the amount of $91,169,046.02 (the equivalent of HK$723,508,577.40), representing the cash portion of the Special Dividend payable to the Controlling Shareholders, in a single drawdown on April 4, 2019. Darling signed the Dividend Shareholder Loan Agreement as CEO and Executive Director of GBGH.

147.     The drawdown of the Dividend Shareholder Loan was executed in two parts. First, $87,679,258.89 (the equivalent of HK$688,264,646.44) was withheld by GBGH and treated as having been disbursed by Fung Holdings to GBGH. Second, Fung Holdings transferred $4,489,787.13 (the equivalent of HK$35,243,930.96), to a GBGH designated account representing amounts disbursed to the Controlling Shareholders (through their brokers) as part of the Special Dividend.

148.     The Dividend Shareholder Loan was an interest-free, unsecured loan, and subordinated in right to payment of all of GBG USA's and GBGH's obligations under the Loan Documents (as defined in the Prepetition RCF). GBGH agreed not to repay the Dividend Shareholder Loan prior to the payment in full of all "Senior Obligations" as such term was defined in the "Subordination Agreement" (described below), dated April 3, 2019.

149.     As noted above, the Controlling Shareholders resolved to make the Dividend Shareholder Loan at a meeting on March 1, 2019, when it was settled that the Controlling Shareholders could not invoke the Scrip Shares option for the Special Dividend without triggering the Hong Kong Code on Takeovers and Mergers. The Controlling Shareholders' commitment to

make the Dividend Shareholder Loan was a key component of reaching agreement with the RCF Banks on the Waiver to Credit Agreement.

### b. The New Shareholder Loan

150. The New Shareholder Loan is memorialized in a separate "Shareholder Loan Agreement" (the "New Shareholder Loan Agreement") dated April 3, 2019, by and among GBGH, as borrower, and Fung Holdings, as lender. *See* GBG_US_00004862. Pursuant to the New Shareholder Loan Agreement, Fung Holdings loaned GBGH $94,181,882.90 (the equivalent of HK$739,308,944.36), which was borrowed in a single drawdown on April 3, 2019. Darling signed the New Shareholder Loan Agreement as CEO and Executive Director of GBGH.

151. The New Shareholder Loan was an interest-free, unsecured loan, and subordinated in right to payment of all of GBG USA's and GBGH's obligations under the Loan Documents (as defined in the Prepetition RCF). GBGH agreed not to repay the borrowings under the New Shareholder Loan prior to the payment in full of all "Senior Obligations" as such term was defined in the "Subordination Agreement," dated April 3, 2019 by and between GBGH, GBG USA, Fung Holdings, and HSBC, as Agent under the Prepetition RCF.

152. Finally, a "Subordination Agreement," dated as of April 3, 2019, was entered into by and among GBG USA, as borrower, GBGH, as guarantor, Fung Holdings, as creditor of GBGH, and HSBC Bank USA, National Association, as agent for the lenders under the Prepetition RCF. In the Subordination Agreement, Fung Holdings, GBG USA, and GBGH agreed that the obligations under the Dividend Shareholder Loan Agreement and the New Shareholder Loan Agreement are subordinate to the prior payment in full of all "Senior Obligations" under the Prepetition RCF. *See* Subordination Agreement, § 2.

### 8. Payment of the Special Dividend to the GBGH Shareholders

153. GBGH provided the RCF Banks with executed copies of the Dividend Shareholder Loan, New Shareholder Loan, and Subordination Agreement contemporaneously with the executed Waiver to Credit Agreement on April 3, 2019, ensuring that the "Waiver Effective Date" occurred prior to the payment of the Special Dividend the following day.

154. Following the execution of the Waiver of Credit Agreement, GBGH used proceeds of the Special Dividend Cash Transfer to pay the Special Dividend to its shareholders on April 4, 2019. The Special Dividend was made to GBGH Shareholders who held GBGH shares as of March 6, 2019 (the "Dividend Record Date") at a rate of HK$0.28 per share held on the Dividend Record Date.

155. The final cash portion of the Special Dividend was HK$2,202,126,466.12, paid on account of the 7,864,737,379 GBGH shares that elected for the cash payment. When converted to U.S. dollars, and then rounded, the cash portion of the Special Dividend was approximately $280,526,000, as recorded on GBGH's Cash Flow Statement for the year ended March 31, 2020.

156. For purposes of the Special Dividend, Fung Holdings, Fung Distribution, William Fung (including Step Dragon and Golden Step), and HSBC Trustee were deemed to be "Controlling Shareholders."

### a. Controlling Shareholders

157. Fung Holdings, which directly or indirectly owned 2,395,727,908 GBGH shares as of the Dividend Record Date, elected a cash award on account of 1,881,260,673 of those GBGH shares. Accordingly, Fung Holdings directly or indirectly received a distribution in Hong Kong Dollars equivalent to $74,235,959. Fung Holdings also received 792,179,665 "Scrip Shares" in lieu of a cash distribution on account of 314,467,035 GBGH shares.

158.	King Lun, which directly or indirectly owned 2,395,727,908 GBGH Shares that elected to receive a cash award as of the Dividend Record Date, and thus received a distribution in Hong Kong Dollars equivalent to $74,235,959 as part of the Special Dividend.

159.	William Fung owned directly or indirectly 1,490,636,996 GBGH shares as of the Dividend Record Date, which included 216,255,642 in personal GBGH shares, 108,000 in his spouse's GBGH shares, and 26,114,000 GBGH shares held by Step Dragon, and 50,294,200 GBGH shares held by Golden Step. In combination, William Fung, his family members, and his affiliates, but excluding Victor Fung, received a total distribution in Hong Kong Dollars equivalent to $41,952,504 by the Special Dividend.

160.	Of the award to William Fung, Step Dragon received a distribution in Hong Kong Dollars equivalent to $1,793,931 and Golden Step received a distribution in Hong Kong Dollars equivalent to $931,468.

161.	Fung Distribution owned directly 200,000,000 GBGH shares as of the Dividend Record Date and elected the cash option for all of those GBGH shares. Accordingly, Fung Distribution received a distribution in Hong Kong Dollars equivalent to $7,133,749. *See* FCGS-04506359.

162.	HSBC Trustee, through its wholly owned subsidiary First Island, owned directly or indirectly 209,295,290 GBGH shares as of the Dividend Record Date and elected the cash option for all of those shares. Accordingly, HSBC Trustee (through First Island) received a distribution in Hong Kong Dollars equivalent to $7,487,771.

163.	In combination, the Controlling Shareholders, i.e., William Fung (including his spouse, Step Dragon and Golden Step), Fung Holdings, and HSBC Trustee (through First Island), held 2,898,426,240 GBGH shares as of the Dividend Record Date and elected the cash option for

2,583,959,205 of those GBGH shares. At the Controlling Shareholders instruction, HK$688,264,646.44 which is equivalent to $87,678,258.99 of their cash award was retained by GBGH, and treated as having been conveyed to the Controlling Shareholders in a cash award, with the same amount then being returned in the form of the Dividend Shareholder Loan extended by Fung Holdings. The Controlling Shareholders also received HK$35,263,930.96 which is equivalent to $4,492,283.66, with such funds being the proceeds of the Special Dividend Cash Transfer. Fung Holdings separately paid that amount back to GBGH to provide the balance of the Dividend Shareholder Loan.

### b. Other Shareholders

164. Victor Fung personally owned 2,814,444 GBGH shares as of the Dividend Record Date and elected the cash option for all GBGH shares. Victor Fung also indirectly owned 1,407,789,244 GBGH shares as of the Special Dividend Record Date. Thus, Victor Fung received, directly or indirectly, a distribution in Hong Kong Dollars equivalent to $50,314,460 as part of the Special Dividend.

165. Spencer Fung directly owned 1,408,000 GBGH shares as of the Dividend Record Date and elected the cash option for all GBGH shares. Accordingly, Spencer Fung received a distribution in Hong Kong Dollars equivalent to $59,222 as part of the Special Dividend, with such funds being the proceeds of the Special Dividend Cash Transfer.

166. Bruce Rockowitz directly or indirectly owned 406,624,873 GBGH shares as of the Dividend Record Date and elected the cash option for all GBGH shares. Accordingly, he received a distribution in Hong Kong Dollars equivalent to $14,503,798 as part of the Special Dividend, with such funds being the proceeds of the Special Dividend Cash Transfer.

167. Hurricane Millennium owned 253,340,780 GBGH shares as of the Dividend Record Date and elected the cash option for all GBGH shares. Accordingly, it received a

distribution in Hong Kong Dollars equivalent to $9,036,347 as part of the Special Dividend, with such funds being the proceeds of the Special Dividend Cash Transfer.

**9. Following the Special Dividend, GBGH Uses the Proceeds of Shareholder Loans to Pay Down the Prepetition RCF**

168. Pursuant to the terms of the Waiver to the Credit Agreement, the proceeds of the New Shareholder Loan were immediately applied to the amounts owed to the RCF Banks under the Prepetition RCF. As of April 30, 2019, the amounts due to the RCF Banks had been reduced from $375 million to $281 million.

169. The Waiver of Credit Agreement, however, required the Prepetition RCF to be reduced below $175 million by May 31, 2019 in order to avoid Fung Holdings either having to directly pay an additional $94 million to the RCF Banks or secure the SBLC containing the terms outlined in the Waiver of Credit Agreement.

170. GBGH's financial performance alone did not allow for any further reduction of the Prepetition RCF. Accordingly, GBGH, as borrower, and Fung Holdings, as lender entered into the "Third Shareholder Loan Agreement" in May 2019. Pursuant to the Third Shareholder Loan Agreement, Fung Holdings loaned GBGH $105,818,117. *See* GBGHOLDING_0002532. The proceeds of the Third Shareholder Loan were used by GBGH to reduce the outstanding obligations under the Prepetition RCF and to pre-pay such amounts so that as of May 31, 2019, the principal outstanding amount under the Prepetition RCF would be reduced from $281 million to $174,055,000. Because the outstanding amount was reduced below $175 million, GBGH satisfied Section 1.2 of the Waiver Agreement, and its prior defaults due to non-compliance with the Prepetition RCF Covenants were permanently waived.

171. The Third Shareholder Loan was an interest-free, unsecured loan, and subordinated in right to payment of all of GBG USA's and GBGH's obligations under the Loan Documents (as

defined in the Prepetition RCF). GBGH agreed not to repay the borrowings under the Third Shareholder Loan prior to the payment in full of all "Senior Obligations" as such term was defined in the "Subordination Agreement," dated April 3, 2019 by and between GBGH, GBG USA, Fung Holdings, and HSBC, as Agent under the Prepetition RCF. Darling signed the New Shareholder Loan Agreement as CEO and Executive Director of GBGH.

172.    Thus, the sum of shareholder loans made by Fung Holdings to GBGH during April and May 2019 totaled approximately $291,169,046.

**G.    GBG USA Acted with Fraudulent Intent in Making the December Shareholder Loan Cash Transfer**

173.    GBG USA acted with fraudulent intent in making the December Shareholder Loan Cash Transfer because: (i) the December Shareholder Loan Cash Transfer  was a transfer to an insider of GBG USA (*see* 6 Del. C. § 1304(b)(1); N.C. Gen. Stat. § 39-23.4(b)(1)), (ii) the value of the consideration received by GBG USA in respect of the December Shareholder Loan Cash Transfer was not reasonably equivalent to the value of the cash transferred (*see* 6 Del. C. § 1304(b)(8); N.C. Gen. Stat. § 39-23.4(b)(8)), and (iii) the December Shareholder Loan Cash Transfer occurred shortly before or shortly after a substantial debt was incurred (*see* 6 Del. C. § 1304(b)(10); N.C. Gen. Stat. § 39-23.4(b)(10)).

**H.    GBG USA Acted with Fraudulent Intent in Making the Special Dividend Cash Transfer**

174.    GBG USA acted with fraudulent intent in making the Special Dividend Cash Transfer because: (i) the Special Dividend Cash Transfer was a transfer to an insider of GBG USA (*see* 6 Del. C. § 1304(b)(1); N.C. Gen. Stat. § 39-23.4(b)(1)); (ii) the value of the consideration received by GBG USA in respect of the Special Dividend Cash Transfer was not reasonably equivalent to the value of the cash transferred (*see* 6 Del. C. § 1304(b)(8); N.C. Gen. Stat. § 39-23.4(b)(8)), (iii) the Special Dividend Cash Transfer was concealed from the RCF Banks (*see* 6

Del. C. § 1304(b)(3); N.C. Gen. Stat. § 39-23.4(b)(3)); (iv) before the Special Dividend Cash Transfer occurred, GBG USA had been threatened with suit (*see* 6 Del. C. § 1304(b)(4); N.C. Gen. Stat. § 39-23.4(b)(4)), and (v) the Special Dividend Cash Transfer occurred shortly before or shortly after a substantial debt was incurred (*see* 6 Del. C. § 1304(b)(10); N.C. Gen. Stat. § 39-23.4(b)(10)).

> **1.     The Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer was a Transfer to Insiders of GBG USA**

175.    An insider is defined for corporate debtors to include a director, officer, or person in control of the debtor, and also a relative of a director, officer or person who is in control of the debtor. *See* 6 Del. C. § 1301(7)(b)(1); N.C. Gen. Stat. § 39-23.1(7)(d). "Person" means an individual, partnership, corporation, association, organization…. or any other legal or commercial entity." 6. Del C. § 1301(9); N.C. Gen. Stat. § 39-23.1(9).

176.    GBGH was an "insider" of GBG USA when the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer occurred because it directly or indirectly controlled GBG USA.

177.    William Fung was an "insider" of GBG USA when the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer occurred because he directly or indirectly controlled GBG USA in his capacity as the Chairman of the GBGH Board of Directors. He was also an "insider" because he is a relative of Victor Fung, who also had the ability to exercise such control.

178.    Fung Holdings was an "insider" of GBG USA when the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer occurred. As the largest shareholder of GBGH and one of the Controlling Shareholders for purposes of the Special Dividend Cash

Transfer, Fung Holdings directly or indirectly controlled GBG USA through the actions of William Fung and the other Directors of GBGH, as well as Victor Fung.

179.    Victor Fung was an "insider" of GBG USA when the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer occurred because he directly or indirectly controlled GBG USA through his actions as the Chairman of Fung Holdings and his effective 50% ownership of Fung Holdings through HSBC Trustee. Victor Fung was also an "insider" of GBG USA because he was a relative of William Fung and Spencer Fung.

180.    Spencer Fung was an "insider" of GBG USA when the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer occurred because he was a relative of William Fung and Victor Fung.

181.    An insider is further defined for corporate debtors to include both a person in control of the debtor and "[a]n affiliate or an insider of an affiliate as if the affiliate were the debtor." 6 Del. C. § 1301(7)(d); N.C. Gen. Stat. § 39-23.1(7)(d). An affiliate means "[a] person who directly or indirectly owns, controls or holds with power to vote, 20 percent or more of whose outstanding voting securities of the debtor, …" 6 Del. C. § 1301(1)(a); N.C. Gen. Stat. § 39-23.1(1)(A). An affiliate also means "[a] corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the debtor or a person who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor.…" 6 Del. C. § 1301(1)(b); N.C. Gen. Stat. § 39-23.1(1)(B).

182.    William Fung was an "affiliate" of GBG USA when the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer occurred because he directly or indirectly controlled the power to vote 20% or more of the voting securities of GBG USA through

GBGH. William Fung was also an "affiliate" of GBG USA when the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer occurred because he was an "insider" of GBGH, which was an "affiliate" of GBG USA because GBGH directly or indirectly owned, controlled or held with the power to vote, 20% or more of the voting securities of GBG USA.

183.    Victor Fung was an "affiliate" of GBG USA when the Special Dividend Cash Transfer and December Shareholder Loan Cash Transfer occurred because, as the Chairman of Fung Holdings, he directly or indirectly owned, controlled or held with the power to vote, 20% or more of the voting securities of GBG USA. Victor Fung was also an "affiliate" of GBG USA when the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer occurred because he was an "insider" of GBGH, which was an "affiliate" of GBG USA because GBGH directly or indirectly owned, controlled or held with the power to vote, 20% or more of the voting securities of GBG USA.

184.    Fung Holdings was an "affiliate" of GBG USA when the Special Dividend Cash Transfer and December Shareholder Loan Cash Transfer occurred because it directly or indirectly owned, controlled or held with the power to vote, 20% or more of the voting securities of GBG USA through GBGH. Fung Holdings was also an "affiliate" of GBG USA when the Special Dividend Cash Transfer and December Shareholder Loan Cash Transfer occurred because it was an "insider" of GBGH, which was an "affiliate" of GBG USA because GBGH directly or indirectly owned, controlled or held with the power to vote, 20% or more of the voting securities of GBG USA.

185.    Fung Distribution, the wholly-owned subsidiary of Fung Holdings and a Controlling Shareholder for purposes of the Special Dividend, was an "affiliate" of GBG USA when the Special Dividend Cash Transfer and December Shareholder Loan Cash Transfer

occurred because it was an "insider" of GBGH, which was an "affiliate" of GBG USA because GBGH directly or indirectly owned, controlled or held with the power to vote, 20% or more of the voting securities of GBG USA.

186.    Step Dragon, being beneficially owned by William Fung and considered to be part of his controlled shareholdings for purposes of the Special Dividend, was an "affiliate" of GBG USA at the time that the Special Dividend Cash Transfer and December Shareholder Loan Cash Transfer occurred because it was an "insider" of GBGH, which was an "affiliate" of GBG USA because GBGH directly or indirectly owned, controlled or held with the power to vote, 20% or more of the voting securities of GBG USA.

187.    Golden Step, being beneficially owned by William Fung and considered to be part of his controlled shareholdings for purposes of the Special Dividend, was an "affiliate" of GBG USA at the time that the Special Dividend Cash Transfer and December Shareholder Loan Cash Transfer occurred because it was an "insider" of GBGH, which was an "affiliate" of GBG USA because GBGH directly or indirectly owned, controlled or held with the power to vote, 20% or more of the voting securities of GBG USA.

188.    HSBC Trustee, who held a trust for the benefit of Victor Fung's family, was an "affiliate" of GBG USA at the time because it was an "insider" of GBGH, which was an affiliate of GBG USA because GBGH directly or indirectly owned, controlled or held with the power to vote, 20% or more of the voting securities of GBG USA.

**2.    The Value of the Consideration Received by GBG USA in Respect of the Special Dividend Cash Transfer was Not Reasonably Equivalent to the Value of the Cash Transferred**

189.    The value of the consideration received by GBG USA in respect of the Special Dividend Cash Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6

Del. C. § 1304(b)(2); N.C. Gen. Stat. § 39-23.4(b)(2). The payment of a corporate dividend on account of equity is not a transfer of reasonably equivalent value or fair consideration.

### 3. The Value of the Consideration Received by GBG USA in Respect of the December Shareholder Loan Cash Transfer was Not Reasonably Equivalent to the Value of the Cash Transferred

190. The value of the consideration received by GBG USA in respect of the December Shareholder Loan Cash Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6 Del. C. § 1304(b)(2); N.C. Gen. Stat. § 39-23.4(b)(2). The amounts owed under the December Shareholder Loan was not an antecedent debt of GBG USA. Rather, the amounts owed under the December Shareholder Loan were an antecedent debt of GBGH. Thus, the payment of December Shareholder Loan Cash Transfer is not a transfer of reasonably equivalent value or fair consideration.

### 4. The Special Dividend Cash Transfer Was Likely Concealed from the RCF Banks, Who Threatened to Sue GBG USA and GBGH

191. As described in Section V.F.6, between March 30, 2019 and April 3, 2019, "round the clock negotiations" occurred by and between representatives of GBGH, GBG USA, Fung Holdings, and the RCF Banks. Those negotiations concerned the Special Dividend and whether an Event of Default had already occurred under the Prepetition RCF that would prohibit payment of the Special Dividend.

192. During the course of those meetings, representatives of one or more of the RCF Banks threatened to sue GBGH and GBG USA in order to prevent the Special Dividend from occurring. Linklaters, as counsel for the RCF Banks, emailed the RCF Banks' demands to Freshfields and GBGH with the subject line including "Subject to FRE 408." Freshfields, acting as counsel to GBG USA with respect to the refinancing of the Prepetition RCF, but not acting as GBG USA's counsel with respect to the Special Dividend, undertook legal research and consulted

with GBGH and its representatives concerning the possibility of litigation. At the same time, Reed Smith, which advised GBG USA with respect to documentation of the Special Dividend, did not perform any research or advise GBG USA regarding potential litigation with the RCF Banks.

193.     During these negotiations, however, it is unlikely that GBGH disclosed to the representatives of one or more of RCF Banks (or that those representatives otherwise knew) that the Special Dividend Cash Transfer had already occurred and GBGH was now in possession of $196,000,000 of GBG USA's money from which it intended to pay the Special Dividend. It is more likely the fact that the Special Dividend Cash Transfer had already occurred was concealed.

### 5.     The Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer Occurred Shortly Before or Shortly After a Substantial Debt was Incurred

194.     GBG USA incurred substantial debts before making the Special Dividend Cash Transfer and making the December Shareholder Loan Cash Transfer. *See* 6 Del. C. § 1304(a)(2); N.C. Gen. Stat. § 39-23.4(a)(2). The debts that GBG USA incurred included:

- On January 25, 2019, GBG USA borrowed $50 million under the Mizuho Facility, drawing down on that facility in full;

- On March 7, 2019, GBG USA borrowed $25 million under the HSBC Facility, drawing down on that facility in full; and

- On March 11, 2019, GBG USA borrowed $253 million under the Prepetition RCF.

### 6.     The Totality of the Circumstances Demonstrates Fraudulent Intent

195.     In addition to the statutory badges of fraud, the totality of the circumstances supports the existence of GBG USA's actual intent to hinder, delay or defraud creditors by making the Special Dividend Cash Transfer and making the December Shareholder Loan Cash Transfer. Among other things, the Special Dividend was promised to GBGH Shareholders in order to garner their support for approving the Centric Sale. However, the Centric Sale only provided funds sufficient to repay the Syndicated Credit Facility, leaving GBG USA with no money available for

the Special Dividend Cash Transfer. Nonetheless, the Directors and Officers of GBGH were determined to proceed with the Special Dividend and continued to publicize it as being from the proceeds of the Centric Sale. In actuality, the Special Dividend was simply funded by GBG USA's substantial borrowings. Similarly, the December Shareholder Loan Cash Transfer occurred without regard to GBG USA or its interests.

**I.      GBGH Did Not Contemporaneously Prepare Covenant Compliance Certificates (or Related Calculations) Required under the Prepetition RCF**

196.    Pursuant to section 5.01 of the Prepetition RCF, GBG USA and GBGH, as "Obligors" were required to provide GBGH's audited consolidated financial statements within 180 days after the end of GBGH's fiscal year. *See* Prepetition RCF, at §5.01(e)(i). As relevant here, GBGH's 2019 fiscal year ended March 31, 2019. Pursuant to section 5.01(e)(iii) of the Prepetition RCF, concurrently with the delivery of GBGH's audited consolidated financial statements, a completed "Compliance Certificate" signed by the "Financial Officer" of GBGH was required to be furnished to the agent for the Prepetition RCF. *See* Prepetition RCF, at §5.01(e)(i).

197.    In accordance with section 5.01(e)(iii) of the Prepetition RCF, on October 31, 2019, Carrey sent an email to two email addresses associated with HSBC, as agent under the Prepetition RCF, attaching a Compliance Certificate as of March 31, 2019. *See* FCGS-00088657 (transmittal email); FCGS-00088658 (the "March 31, 2019 Compliance Certificate"); FCGS-00088659-60. The March 31, 2019 Compliance Certificate was signed by Caldwell as CFO of GBGH, but not in his capacity as CFO of GBG USA. While the email transmitting the March 31, 2019 Compliance Certificate also attached what purported to be GBG USA's unaudited "financial statements" for the year ending March 31, 2019, those "financial statements" consisted solely of an income statement and a balance sheet. Neither that income statement nor balance sheet reflected

calculations of "Consolidated Total Net Worth" or "Consolidated Adjusted Net Debt to Consolidated Total Net Worth" as contained in the March 31, 2019 Compliance Certificate.

198. Moreover, GBG USA's unaudited "financial statements" for the year ending March 31, 2019 were prepared from a spreadsheet that does not tie back to actual calculations. *See* FCGS-00066418. The excel file contains all "hard numbers" which were simply entered into the spreadsheet as if they were words on a page. For example, both the pdf of the "financial statement" that Carrey provided to HSBC and the spreadsheet from which it was created state that GBG USA's purported gross profit for the year ending March 31, 2019 was negative $209,426,000. However, the cell in which the "Gross Profit" figure appears does not link to any underlying calculation or source of data. Nor is there a separate tab of underlying detailed information from which one could test whether the number was correctly determined. It is simply a number typed into a spreadsheet cell, without any means to test its accuracy. All of the other numbers that appear in the "financial statements" are similarly unverifiable and lack any support.

**J.    GBG USA (i) Was Insolvent Both When It Made the Special Dividend Cash Transfer and December Shareholder Loan Cash Transfer, (ii) Remained Insolvent Following Both Transfers, (iii) Did Not Have Adequate Statutory Surplus From Which to Make the Special Dividend Cash Transfer or the December Shareholder Loan Cash Transfer, and (iv) Did Not Have Adequate "Net Profits" From Which to Make the Special Dividend Cash Transfer or the December Shareholder Loan Cash Transfer**

199. GBG USA's management prepared a balance for the year ending March 31, 2019 (the "March 31, 2019 GBG USA Balance Sheet"), *see* FCGS-00088659 through FCGS-00088660, that vastly overstated the value of GBG USA's assets and understated the value of GBG USA's liabilities.

200. A careful and objective review of the March 31, 2019 GBG USA Balance Sheet leads to the obvious conclusion that that GBG USA was (i) balance sheet insolvent both when it made the Special Dividend Cash Transfer and when it made the December Shareholder Loan Cash

Transfer, (ii) remained balance sheet insolvent following both the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer, (iii) did not have adequate statutory "surplus" from which to make the Special Dividend Cash Transfer or the December Shareholder Loan Cash Transfer, and (iv) did not have adequate "Net Profits" from which to make the Special Dividend Cash Transfer or the December Shareholder Loan Cash Transfer.

201.     The March 31, 2019 GBG USA Balance Sheet states that the value, as of March 31, 2019, of GBG USA's "Current Assets" minus GBG USA's "Current Liabilities" was negative $252,500,000. *See* FCGS-00088660.

202.     The March 31, 2019 GBG USA Balance Sheet shows $1,505,214,000 of "Non-Current Assets" as well as $1,341,100,000 of "Current Assets." *See* FCGS-00088660. The March 31, 2019 GBG USA Balance Sheet also shows $1,593,000,000 of "Current Liabilities" and $360,356,000 of "Non-Current Liabilities." *Id*. This unaudited balance sheet substantially overstates the value of GBG USA's assets and understates the amount of GBG USA's liabilities.

203.     The largest "current asset" appearing on the March 31, 2019 GBG USA Balance Sheet is $963,497,000 in "Inter-Company Receivable[s]". *See* FCGS-00088660. This figure does not represent the fair value of GBG USA's Inter-Company Receivables, which was substantially less. In fact, GBG USA's financial records, dated as of March 31, 2019, reflect that the Intercompany Receivables owed to GBG USA total $825,572,237, which is ***$137,924,763 less than reflected in the March 31, 2019 GBG USA Balance Sheet***. *See* FCGS-00337106.

204.     The March 31, 2019 GBG USA Balance Sheet also reflects is $126,152,000 in "Inventory, Net". *See* FCGS-00088660. This figure does not represent the fair value of GBG USA's inventory, which was substantially less. In fact, GBG USA's financial records, dated as of

March 31, 2019, reflect that the Inventory owned by GBG USA was $0, which is ***$126,152,000 less than reflected in the March 31, 2019 GBG USA Balance Sheet***. *See* FCGS-00337106.

205.     The March 31, 2019 GBG USA Balance Sheet states that the value, as of March 31, 2019, of GBG USA's "Intangible Assets – Goodwill" was $672,642,000. *See* FCGS-00088660. This $672,642,000 figure does not represent the fair value of GBG USA's goodwill, which was substantially less. In fact, GBG USA's financial records, dated as of March 31, 2019, reflect that GBG USA's goodwill was negative $13,410,940, which is ***$686,052,940 less than reflected in the March 31, 2019 GBG USA Balance Sheet***. *See* FCGS-00337106.

206.     The March 31, 2019 GBG USA Balance Sheet states that the value, as of March 31, 2019, of GBG USA's "Intangible Assets" was $460,672,000. *See* FCGS-00088660. It is believed that this line items reflects mostly brand licenses, with the additional value allocated to global distribution rights and trademarks as well as other intangible assets. This $460,672,000 figure does not represent the fair value of GBG USA's intangible assets, which was substantially less. In fact, GBG USA's financial records, dated as of March 31, 2019, reflect that GBG USA's intangible assets was $411,240,639, which is ***$49,431,361 less than reflected in the March 31, 2019 GBG USA Balance Sheet***. *See* FCGS-00337106.

207.     The March 31, 2019 GBG USA Balance Sheet states that the value, as of March 31, 2019, of GBG USA's "Cash & Equivalents" was $129,593,000. *See* FCGS-00088660. This $129,593,000 figure does not represent the fair value of GBG USA's "Cash & Equivalents", which was substantially less. In fact, GBG USA's financial records, dated as of March 31, 2019, reflect that GBG USA's "Cash & Equivalents" was $103,859,908, which is ***$25,733,092 less than reflected in the March 31, 2019 GBG USA Balance Sheet***. *See* FCGS-00337106.

208.    The March 31, 2019 GBG USA Balance Sheet states that the value, as of March 31, 2019, of GBG USA's "Property, Plant &Equipment" was $98,616,000. *See* FCGS-00088660. This $98,616,000 figure does not represent the fair value of GBG USA's "Property, Plant &Equipment", which was substantially less. In fact, GBG USA's financial records, dated as of March 31, 2019, reflect that GBG USA's "Net PP&E" (a/k/a "Property, Plant &Equipment") was $76,294,773, which is ***$22,321,227*** *less than reflected in the March 31, 2019 GBG USA Balance Sheet*. *See* FCGS-00337106.

209.    The March 31, 2019 GBG USA Balance Sheet states that the value, as of March 31, 2019, of GBG USA's "Long Term Deferred Assets" was $267,899,000. *See* FCGS-00088660. This $267,899,000 figure represents Long Term Deferred Tax Assets, but is of no value to GBG USA. Rather, GBG USA's financial records, dated as of March 31, 2019, reflect that GBG USA's "Long Term Deferred Tax Assets" was $0, which is ***$267,899,000*** *less than reflected in the March 31, 2019 GBG USA Balance Sheet*. *See* FCGS-00337106.

210.    The March 31, 2019 GBG USA Balance Sheet states that the value, as of March 31, 2019, of GBG USA's "Other Receivables and Deposits Long Term" was $885,000. *See* FCGS-00088660. Rather, GBG USA's financial records, dated as of March 31, 2019, reflect that GBG USA's "Other Receivables and Deposits Long Term" was $0, which is ***$885,000*** *less than reflected in the March 31, 2019 GBG USA Balance Sheet*. *See* FCGS-00337106.

211.    The March 31, 2019 GBG USA Balance Sheet states that the value, as of March 31, 2019, of GBG USA's "Trade & Bills Receivables – NET" was $14,797,000. *See* FCGS-00088660. Rather, GBG USA's financial records, dated as of March 31, 2019, reflect that GBG USA's "Trade & Bills Receivables – NET" was not an asset, but a liability of GBG USA with

GBG USA owing $222,991,173, which is **$237,788,173** *less than reflected in the March 31, 2019 GBG USA Balance Sheet*. *See* FCGS-00337106.

212. The March 31, 2019 GBG USA Balance Sheet states that the value, as of March 31, 2019, of GBG USA's "Other Receivable, PPD, & Deposit" was $98,838,000. *See* FCGS-00088660. Rather, GBG USA's financial records, dated as of March 31, 2019, reflect that GBG USA's "Other Receivable, PPD, & Deposit" was $12,354,599, which is **$86,483,401** *less than reflected in the March 31, 2019 GBG USA Balance Sheet*. *See* FCGS-00337106.

213. Thus, by GBG USA's own records, the March 31, 2019 GBG USA Balance Sheet *overstates its asset values by at least $1,640,670,957*, which far exceeds the $892,358,000 in equity purportedly on the March 31, 2019 GBG USA Balance Sheet.

214. Further, GBG USA's March 31, 2019 unaudited balance sheet does not reflect the fair value of GBG USA's assets and GBG USA's liabilities.

215. The sum of GBG USA's liabilities exceeded the fair value of GBG USA's assets as of March 31, 2019, when the Special Dividend Cash Transfer occurred on March 28 and 29, 2019, and when the December Shareholder Loan Cash Transfer occurred on March 26, 2019, rendering GBG USA insolvent on all dates. Similarly, GBG USA lacked sufficient statutory 'surplus' or 'net profits' from which to make the Special Dividend Cash Transfer on March 28, 2019 and on March 29, 2019 and the Dividend Shareholder Loan Cash Transfer on March 26, 2019.

216. Nothing in the March 31, 2019 GBG USA Balance Sheet or its related income statement could have reasonably supported a conclusion by Darling, Long, Ventricelli, Caldwell, and Carrey, acting in their capacity as GBG USA's Officers and Directors, that GBG USA had

statutory "surplus" or "net profits" from which to pay the Special Dividend Cash Transfer, or that GBG USA was solvent as of March 31, 2019.

217.　As discussed more fully in the preceding paragraphs, the March 31, 2019 GBG USA Balance Sheet does not reflect the actual value of GBG USA's "Net Assets" as such term is used in 8 Del. C. § 154. Rather, the March 31, 2019 GBG USA Balance Sheet erroneously overstates the value of GBG USA's "Net Assets."

218.　GBG USA did not prepare a valuation of its assets and liabilities as of March 31, 2019, nor did it request that any competent financial professional prepare such a valuation. If GBG USA or a professional retained by it had prepared such a valuation, there was no reasonable, good-faith basis to believe that GBG USA was solvent or that GBG USA had sufficient statutory "surplus" from which to make the Special Dividend Cash Transfer.

219.　GBG USA's March 31, 2019 fiscal year end income statement reflects a net loss of $48,961,000. *See* FCGS-00088659.

**K.　The Special Dividend Cash Transfer Left GBG USA With Unreasonably Small Capital**

220.　The Special Dividend Cash Transfer left GBG USA with unreasonably small capital.

221.　As set forth above, GBG USA was insolvent at the time of the Special Dividend Cash Transfer. Given that GBG USA was insolvent, GBG USA had insufficient capital to carry on the business in which it was engaged.

222.　Immediately after the Special Dividend Cash Transfer, GBG was in default with respect to the Prepetition RCF, leaving it with a $375 million debt that would have become immediately payable had the RCF Banks exercised their right to accelerate the maturity of that indebtedness.

223. Additionally, GBG USA had drawn down on its borrowing facilities in full (including the RCF, the Mizuho Facility, and the HSBC Facility), and therefore had limited ability to access additional capital to proceed with its business. Nor could it expect such capital from GBGH, which was saddled with hundreds of millions of dollars of indebtedness to Li & Fung.

**L.  The December Shareholder Loan Cash Transfer Left GBG USA With Unreasonably Small Capital**

224. The December Shareholder Loan Cash Transfer left GBG USA with unreasonably small capital.

225. As set forth above, GBG USA was insolvent as a result of the December Shareholder Loan Cash Transfer. Given GBG USA was insolvent, GBG USA had insufficient capital to carry on the business in which it was engaged.

226. Immediately after the December Shareholder Loan Cash Transfer, GBG USA defaulted under the Prepetition RCF, leaving it with a $375 million debt that would have become immediately payable had the RCF Banks exercised their right to accelerate the maturity of that indebtedness.

227. Additionally, GBG USA had drawn down the majority of its borrowing facilities in full (including the RCF, the Mizuho Facility, and the HSBC Facility), and therefore had limited ability to access additional capital to proceed with its business. Nor could it expect such capital from GBGH, which was saddled with hundreds of millions of dollars of indebtedness to Li & Fung.

**M.  GBG USA Did Not Prepare Stand-Alone Financial Statements**

228. During all times relevant to this action, GBG USA did not prepare stand-alone financial statements. *See* FCGS-01837451. Rather, GBGH prepared consolidated financial statements for itself and its subsidiaries. *Id*.

## N. The Prepetition RCF Prohibited the Payment of Dividends During the Continuation of an Event of Default

229.     Pursuant to section 5.02(j) of the Prepetition RCF, GBG USA and GBGH, as obligors under the Prepetition RCF, were prohibited from declaring, making or paying any dividend or other distribution (whether in cash of kind) on or in respect of its share capital during a continuing Event of Default. *See* Prepetition RCF, at §5.02(j).

230.     As noted above, during the "round the clock negotiations" between March 30, 2019 and April 3, 2019, it was the RCF Banks' view that an "Event of Default" had occurred under the Prepetition RCF early as March 15, 2019. If correct, the Special Dividend Cash Transfer was prohibited by Section 5.02(j), and would have constituted a further breach of the Prepetition RCF.

231.     Further, during this same time, GBGH never disputed that both GBG USA and it would be or were in breach of certain of the Prepetition RCF Covenants as of March 31, 2019.

## O. Darling, Caldwell, Ventricelli, Smits, and Long Suffered from Conflicts of Interest, and Failed to Observe Corporate Formalities

232.     Each of Darling, Caldwell, Ventricelli, Smits, and Long were afflicted by uncurable conflicts of interest as a result of their dual-service as Directors and/or Officers of GBG USA, and at the same time, by their parallel service as directors and/or officers of GBGH. The following **Figure 1** reflects the conflicted service by the Darling, Caldwell, Ventricelli, Smits, and Long.

### Figure 1

| Name | GBG USA Role | GBGH Role |
| --- | --- | --- |
| Richard Nixon Darling | Chief Executive Officer & Executive Director | Chief Executive Officer & Executive Director |
| Mark Caldwell | Chief Financial Officer | Chief Financial Officer |
| Ronald Ventricelli | Chief Operating Officer | Chief Operating Officer |
| Robert K. Smits | General Counsel, Executive Vice President, Director & Secretary | General Counsel & Executive Vice President |
| Stephen Harry Long | Director | Director |

233.   For the fiscal year ended March 31, 2019, Darling received a "salary and allowance" of $500,000 from GBGH as well $16,000 in fees for his service as a Director of GBGH. For the fiscal year ended March 31, 2020, Darling received a "salary and allowance" of $4,484,000 from GBGH as well $38,000 in fees for his service as a Director of GBGH. For the fiscal year ended March 31, 2019, Darling also received $92,152.71 from Millwork Holdings Co. Inc., a company affiliated with Li & Fung. For the fiscal year ended March 31, 2020, Darling also received $403,840 from Millwork Holdings Co. Inc. in connection with the redemption of options in Li & Fung Trading Ltd.

234.   For the fiscal year ended March 31, 2019, Long received $70,000 in fees for his service as a Director of GBGH. For the fiscal year ended March 31, 2020, Long received $70,000 in fees for his service as a Director of GBGH.

235.   The GBG USA Board failed to hold its meetings separate from the GBGH Board prior to August 2020. The GBG USA Board did not retain its own counsel or independent financial advisors apart from GBGH prior to May 2020. Additionally, no independent directors were appointed to the GBG USA Board until July 2020 and March 2021.

236.   As set forth above, Caldwell, Smits, and Ventricelli acted in their capacities as GBGH officers and directors at all times in connection with the Special Dividend Cash Transfer and the December Shareholder Loan Cash Transfer, and did not consider the separate interests of GBG USA.

**P.     The Debtors' Bankruptcy Filing and Plan of Reorganization**

237.   On the Petition Date, the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the Bankruptcy Court for the Southern District of New York. *See In re GBG USA Inc., et al.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y.) (jointly administered).

238. The Debtors sold substantially all of their assets during the course of the Debtors' bankruptcy cases. Thereafter, the Bankruptcy Court confirmed the Plan.

239. The Plan was proposed by the Debtors.

240. The Plan establishes the Litigation Trust "for the sole purpose of receiving and being vested with the Litigation Trust Assets." Plan, § 7.05(a). The Plan defines "Litigation Trust Assets" to include the "Preserved Claims." *See id.*, § 1.73. In turn, the Plan defines "Preserved Claims" to include "Causes of Action" (as defined in the Plan) on behalf of the Debtors against

> (i) Li & Fung, (ii) the Non-Debtor Affiliates, (iii) past or present equity holders of Global Brands Group Holding Limited, (iv) past or present directors and officers of the Debtors and/or the Non-Debtor Affiliates, excluding the Independent Directors, solely in their capacities as such,…

*Id.*, § 1.94.

241. The "Preserved Claims" also include "Avoidance Actions" (as such term is defined in the Plan. *Id.*

242. The Plan's definition of "Released Parties" makes clear that, as to the Debtors, the Released Parties are expressly limited to "(i) the Debtors; (ii) the Independent Directors of the Debtors; (iii) those professionals of the Debtors employed by the Debtors pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 330 and 363 of the Bankruptcy Code; . . ." *Id.*, § 1.101.

243. The Plan specifically provides that "the Litigation Trustee, for the benefit of the Litigation Trust, shall … have the power and authority to commence, prosecute, compromise and settle any Preserved Claims…" *Id.*, at 7.05(g). The Plan also provides that "[a]s of the [Plan's] Effective Date, the Litigation Trust Assets and the Debtors' rights, title and interests to such Litigation Trust Assets shall vest in the Litigation Trust…" *Id.*, at § 7.06(b). Finally, the Plan states that "… each Cause of Action, including, without limitation, the Preserved Claims, shall be

preserved and, along with the exclusive right to enforce such Cause of Action, shall vest exclusively in the … Litigation Trust, . . . , as of the [Plan's] Effective Date." *Id*., at § 7.11.

244. As pertinent here, the Plan provides that "nothing in the Plan shall diminish or impair the enforceability of any insurance policy that may cover Claims against … the Debtors' directors and officers or any related Person of the Debtors (including Non-Debtor Affiliates and their respective directors and officers)." *Id*., at 9.05.

245. None of Messrs. Darling, Ventricelli, Long, Smits, Caldwell, and Carrey are "Released Parties" as such term is defined in the Plan.

### Q. Significant Unpaid Creditor Claims Remain Following the Effective Date of the Plan

246. As of the Petition Date, Caldwell and the Debtors estimated that the Debtors had approximately $150 million in unpaid trade and other ordinary course of business obligations. *See* Caldwell Decl.), ¶ 54.

247. In the Debtors' later filed "Disclosure Statement," dated December 18, 2021, Caldwell stated that the Debtors class 5 "General Unsecured Claims" totaled $367.7 million. *See* Case No. 21-11369, Docket No. 422 at 11. At least $367.7 million remained due and owing as of the Effective Date of the Plan.

248. The $367 million figure does not include $129.5 million in "First Lien Claims" as defined in the Plan, including amounts owed under the Prepetition RCF. As of the Petition Date, $126.5 million was outstanding with respect to the Prepetition RCF.

249. The $367 million figure also does not include $111.2 million in "Second Lien Claims" as defined in the Plan, including amounts owed under the Standard Charter Facility, the Mizuho Facility, the Citibank Facility, the HSBC Facility, the "Banc of America Facility," and the "CIT A/R Factoring Facility", as the last two terms are defined in the Caldwell Declaration. As of

the Petition Date, (i) $22 million was outstanding with respect to the Standard Charter Facility, (ii) $44.1 million was outstanding with respect to the Mizuho Facility, (iii) $21.9 million was outstanding with respect to the Citibank Facility, (iv) $18.2 million was outstanding with respect to the HSBC Facility, (v) $2.1 million was outstanding with respect to the "Banc of America Facility," and (vii) $3.6 million was outstanding with respect to and the "CIT A/R Factoring Facility." Caldwell Decl., ¶ 42.

250.    In addition, the Debtors were also party to a $22.8 million letter of credit facility, dated as of March 13, 2019, provided by HK+Shanghai Banking Corporation Ltd. to backstop rent owed by GBG USA for its leased premises at The Empire State Building. *Id*., at ¶ 42 n.9. As of the Petition date, the principal amount outstanding under this letter of credit facility was $22.8 million. *Id*.

## VI.    DEFENDANTS FUNG HOLDINGS, FUNG DISTRIBUTION, STEP DRAGON, GOLDEN STEP, WILLIAM FUNG, KING LUN, FIRST ISLAND, VICTOR FUNG, SPENCER FUNG, HSBC TRUSTEE, BRUCE ROCKOWITZ, AND HURRICANE MILLENNIUM, HAVE EACH SUFFICIENT MINIMUM CONTACTS WITH THE UNITED STATES OF AMERICA TO ESTABLISH PERSONAL JURISDICTION

251.    Fung Holdings, Fung Distribution, William Fung, Step Dragon, Victor Fung, King Lun, Spencer Fung, HSBC Trustee, First Island, Bruce Rockowitz, and Hurricane Millennium each have sufficient minimum contacts with the United States of America to establish personal jurisdiction.

252.    William Fung has purposefully directed his actions, and the actions of GBGH, at the United States of America with sufficiency to satisfy the minimum contacts requirement. William Fung, through his service as Chairman of the Board of Directors of GBGH dictated the terms of the Special Dividend Cash Transfer on GBG USA. In his role as Chairman, at every turn, William Fung participated in the decisions related to the Special Dividend Cash Transfer,

including the decisions made in the GBGH Board, Special Dividend Committee and GBGH shareholder meetings described in Section V.F.

253.     In the GBGH 2019 Annual Report, William Fung specifically wrote that GBGH obtained the funds to pay the Special Dividend from the proceeds of the Centric Sale by GBG USA: "[t]o improve value to [GBGH's] shareholders, proceeds of US$281 million from the [Centric Sale] were allocated to the payment of a special cash dividend of 28 Hong Kong cents per share,…." GBGH 2019 Annual Report, at 8. According to the GBGH 2019 Annual Report, the divestment of GBG USA's licensing business in the Centric Sale and the payment of the Special Dividend Cash Transfer allowed GBGH to reduce the "Group's" financial debt and for general working capital purposes." *Id.*, at 14. Accordingly, William Fung publicly acknowledged the relationship between the Special Dividend and the Centric Sale that occurred in the United States of America.

254.     Further, through his service as Chairman of the GBGH Board, William Fung controlled the compensation that would be paid to Darling, who simultaneously served as GBG USA's and GBGH's Executive Director and CEO during the relevant time.

255.     Given the above, William Fung could have reasonably anticipated that he would be sued in a court in the United States of America in connection with the Special Dividend Cash Transfer.

256.     Fung Holdings has purposefully directed its actions, and the actions of GBGH, at the United States of America with sufficiency to satisfy the minimum contacts requirement. Fung Holdings held an approximate 30.99% shareholding interest in GBGH as of April 4, 2019. At the time of the Special Dividend Cash Transfer, Fung Holdings was – along with William Fung and HSBC Trustee – a "Controlling Shareholder" of GBGH, and in that capacity, was able to dictate

the terms of the Special Dividend Cash Transfer to GBG USA through GBGH, which it did, along with the other Controlling Shareholders. Fung Holdings also had the ability to dictate the Special Dividend Cash Transfer because it, like GBGH, was among the Fung Group of companies, with Victor Fung serving as its Chairman and William Fung serving as its Vice-Chairman.

257.    Through its representatives, Fung Holdings attended the shareholder meetings in Section V.F.1-3. and voted its shares in favor of paying the Special Dividend using purported proceeds of the Centric Sale from GBG USA. Accordingly, when Fung Holdings received any parts of the Special Dividend, it knew such funds were coming from the Special Dividend Cash Transfer that originated with GBG USA in the United States of America. Moreover, Fung Holdings was further responsible for GBGH's payment of the Special Dividend with the proceeds of the Special Dividend Cash Transfer because such payment would not have occurred without Fung Holdings' agreement with the RCF Banks to make the Dividend Shareholder Loan and the New Shareholder Loan. Finally, Fung Holdings accepted the repayment of the December Shareholder Loan directly from GBG USA, despite its' knowledge that GBGH was the borrower and obligor on that debt. Given the above, Fung Holdings could have reasonably anticipated that it would be sued in the United States of America in connection with the Special Dividend Cash Transfer or the December Shareholder Loan Cash Transfer.

258.    Victor Fung has purposefully directed his actions, and the actions of GBGH, at the United States of America. Victor Fung is an effective controlling shareholder of GBGH because, in addition to his personal shareholdings (a) he is the Chairman of Fung Holdings, the largest GBGH shareholder, and (b) HSBC Trustee, also deemed a Controlling Shareholder for purposes of the Special Dividend, holds GBGH shares in trust for the benefit of Victor Fung's family. With that influence and in those capacities, Victor Fung had the ability to dictate the Special Dividend

Cash Transfer through GBGH to GBG USA, which he did, in combination with the other Controlling Shareholders.

259. Victor Fung also attended various GBGH shareholder meetings described in Section V.F. at which he or his proxies voted to approve the payment of the Special Dividend using the purported proceeds of the Centric Sale from GBG USA. Accordingly, when he received the Special Dividend, Victor Fung knew that he was receiving the proceeds of the Special Dividend Cash Transfer from GBG USA in the United States of America. Victor Fung was also responsible for GBGH's payment of the Special Dividend because the payment would not have occurred without Fung Holdings and HSBC Trustee's agreement with the RCF Banks to make the Dividend Shareholder Loan and the New Shareholder Loan. Finally, as the Chairman of Fung Holdings, Victor Fung knew that Fung Holdings accepted the repayment of the December Shareholder Loan directly from GBG USA, despite its' knowledge that GBGH was the borrower and obligor on that debt. Given the above, Victor Fung could have reasonably anticipated that he would be sued in the United States of America in connection with the Special Dividend Cash Transfer.

260. HSBC Trustee has purposefully directed its actions, and the actions of GBGH, at the United States of America. HSBC Trustee – which administers a trust set up for the benefit of Victor Fung's family – was deemed a Controlling Shareholder of GBGH for purposes of the Special Dividend, and therefore had the ability, in combination with the other Controlling Shareholders, to dictate the terms of the Special Dividend Cash Transfer through William Fung and other Fung family members affiliated with GBGH, which they did. HSBC Trustee also attended the GBGH shareholder meetings described in Section V.F.1-3, at which HSBC Trustee's shares were voted to approve the payment of the Special Dividend using the purported proceeds of the Centric Sale from GBG USA. As a result, when HSBC Trustee received any portion of the

Special Dividend funds paid to the Controlling Shareholders, it knew that those funds had been transferred from GBG USA in the United States of America. Given the above, HSBC Trustee could have reasonably anticipated being sued in the United States of America in connection with the Special Dividend Cash Transfer.

261.    Step Dragon has purposefully directed its actions, and the actions of GBGH, at the United States of America. As a company beneficially owned by William Fung, Holdings, Step Dragon was deemed to be among the "Controlling Shareholders" of GBGH at the time of the Special Dividend Cash Transfer, and therefore, along with the other Controlling Shareholders, had the ability with to dictate the terms of the Special Dividend Cash Transfer to GBG USA through William Fung. Representatives of Step Dragon also attended the GBGH shareholder meetings described in Section V.F.1-3, at which Step Dragon's shares were voted to approve the payment of the Special Dividend using the purported proceeds of the Centric Sale from GBG USA. Accordingly, when Step Dragon received any portion of the Special Dividend paid to the Controlling Shareholders, it knew that those funds had been transferred from GBG USA in the United States of America. Given the above, Step Dragon could have reasonably anticipated being sued in the United States of America in connection with this transaction.

262.    Golden Step has purposefully directed its actions, and the actions of GBGH, at the United States of America. As a company beneficially owned by William Fung, Golden Step was deemed to be among the "Controlling Shareholders" of GBGH at the time of the Special Dividend Cash Transfer, and therefore, along with the other Controlling Shareholders, had the ability to dictate the terms of the Special Dividend Cash Transfer to GBG USA through William Fung. Representatives of Step Dragon also attended the GBGH shareholder meetings described in Section V.F.1-3, at which Step Dragon's shares were voted to approve the payment of the Special

Dividend using the purported proceeds of the Centric Sale from GBG USA. Accordingly, when Golden Step received any portion of the Special Dividend paid to the Controlling Shareholders, it knew that those funds had been transferred from GBG USA in the United States of America. Given the above, Step Dragon could have reasonably anticipated being sued in the United States of America in connection with this transaction.

263.     Bruce Rockowitz has purposefully directed his actions, and the actions of GBGH, at the United States of America. As a GBGH board member, Bruce Rockowitz was actively involved in GBGH's decision to pay the Special Dividend using funds from GBG USA through his participation in the GBGH Board meetings described in Section V.F.1-3. Bruce Rockowitz also served on the GBGH Board's Special Dividend Committee, charged with setting the price and form of the Special Dividend that was to be funded GBG USA. In these capacities, Bruce Rockowitz approved of GBGH's direction that the Special Dividend be paid by GBG USA, and the false representations that GBG USA's payment of the Special Dividend Cash Transfer came from the proceeds of the Centric Sale. In addition, Bruce Rockowitz or his representatives attended the GBGH shareholder meetings described in Section V.F.1-3, at which he or his representatives voted the shares held in his name in favor of the payment of the Special Dividend using the purported proceeds of the Centric Sale from GBG USA. As such, when Bruce Rockowitz received his portion of the Special Dividend, he knew that those funds were transferred from GBG USA in the United States of America. Given the above, Bruce Rockowitz could have reasonably anticipated being sued in the United States in connection with this transaction.

264.     Hurricane Millennium– a company beneficially owned by a trust established for the benefit of the Rockowitz family – has purposefully directed its actions at the United States of America. Representatives of Hurricane Millennium attended the GBGH shareholder meetings

described in Section V.F.1-3, at which Millennium Holdings' shares were voted in favor of making the Special Dividend using the purported proceeds of the Centric Sale from GBG USA. As a result, when Hurricane Millennium received its portion of the Special Dividend, it knew that those funds had been transferred from GBG USA in the United States of America. Further, through Bruce Rockowitz, Hurricane Millennium had knowledge that the funds it received in the Special Dividend were the proceeds of the Special Dividend Cash Transfer from GBG USA. Through Bruce Rockowitz, Hurricane Millennium also had knowledge that GBGH was dictating all terms of the Special Dividend, including that it be paid by GBG USA. Given the above, Hurricane Millennium could have reasonably anticipated being sued in the United States of America in connection with this transaction.

265.    King Lun has purposefully directed its actions, and the actions of GBGH, at the United States of America. Representatives of King Lun attended the GBGH shareholder meetings described in Section V.F.1-3, where the GBGH shares in which King Lun had an interest were voted in favor of paying the Special Dividend using the proceeds of the Centric Sale. Accordingly, when King Lun received any proceeds of the Special Dividend, through Fung Holdings or otherwise, it knew that those funds had been transferred from GBG USA in the United States of America. Additionally, through William and Victor Fung (who control its shares), King Lun knew that GBGH was dictating the terms of the Special Dividend cash transfer to GBG USA for the benefit of the Controlling Shareholders. Given the above, King Lun could have reasonably anticipated being sued in the United States of America in connection with this transaction.

266.    Spencer Fung has purposely directed his actions at the United States of America. Spencer Fung, or his representatives, attended the GBGH shareholder meetings described in Section V.F.1-3, where he voted to approve the payment of the Special Dividend using the

proceeds of the Centric Sale. Accordingly, when Spencer Fung received his portion of the Special Dividend, he knew those funds had been transferred from GBG USA in the United States of America. Additionally, as a relative of Victor and William Fung, and as the CEO of Li & Fung, Spencer Fung knew that GBGH was dictating the terms of the Special Dividend Cash Transfer to GBG USA. Given the above, Spencer Fung could have reasonably anticipated being sued in the United States of America in connection with this transaction.

VII.    **CAUSES OF ACTION**

<u>**COUNT I**</u>
**Actual Fraudulent Transfers Related to the Payment of the Special Dividend Cash Transfer and the Subsequent Payment of the Special Dividend Pursuant to 11 U.S.C. §§ 544(b), 550(a)(1), (2); 6 Del. C. §§ 1304(a)(1) & 1307, N.C. Gen. Stat. §§ 39-23.4(a)(1) & 39-23.7(a), and/or NY DCL §§ 276, 276-a, 278 & 279 (Against Defendants Fung Holdings (1937) Limited, Fung Distribution International Limited, Step Dragon Enterprise Ltd., Golden Step Limited, William Fung Kwon Lun, King Lun Holdings Limited, First Island Developments Limited, Victor Fung Kwok King, Spencer Theodore Fung, HSBC Trustee (C.I.) Limited, Bruce Philip Rockowitz, Hurricane Millennium Holdings Limited)**

267.    Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

268.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Special Dividend Cash Transfer occurred.

269.    Plaintiff seeks avoidance of the Special Dividend Cash Transfer and subsequent payment of the Special Dividend from Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, HSBC Trustee, Bruce Rockowitz, and Hurricane Millennium pursuant to 11 U.S.C. §§ 544(b), 6 Del. C. § 1304(a)(1), N.C. Gen. Stat. § 39-23.4(a)(1), and/or NY DCL §§ 276, 276-a, 278 & 279.

270.    The Special Dividend Cash Transfer and subsequent payment of the Special Dividend was a transfer to an insider of GBG USA. *See* 6 Del. C. § 1304(b)(1); N.C. Gen. Stat. § 39-23.4(b)(1). Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, Victor Fung, Spencer Fung, King Lun, HSBC Trustee, First Island, Bruce Rockowitz and Hurricane Millennium are each "insiders" of GBG USA. Sec. V.H.1 *supra*.

271.    Before the entire amount of the Special Dividend Cash Transfer occurred, GBG USA had been threatened with a lawsuit.

272.    The fact that the Special Dividend Cash Transfer from GBG USA to GBGH had occurred by March 29, 2019 was highly likely to have been concealed from representatives of the RCF Banks. *See* 6 Del. C. § 1304(b)(3); N.C. Gen. Stat. § 39-23.4(b)(3).

273.    The value of the consideration received by GBG USA in respect of the Special Dividend Cash Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6 Del. C. § 1304(b)(8); N.C. Gen. Stat. § 39-23.4(b)(8). The payment of a corporate dividend on account of equity is not a transfer of reasonably equivalent value or fair consideration.

274.    GBG USA incurred substantial debts before making the Special Dividend Cash Transfer. *See* 6 Del. C. § 1304(b)(10); N.C. Gen. Stat. § 39-23.4(b)(10). The debts that GBG USA incurred included:

- On January 25, 2019, GBG USA borrowed $50 million under the Mizuho Facility, drawing down on that facility in full;

- On March 7, 2019, GBG USA borrowed $25 million under the HSBC Facility, drawing down on that facility in full; and

- On March 11, 2019, GBG USA borrowed $253 million under the Prepetition RCF.

275.    As the largest GBGH shareholder, Fung Holdings is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because it knew or should have known of the

fraudulent intent underlying the Special Dividend Cash Transfer through its Chairman Victor Fung and Vice Chairman William Fung.

276. Fung Distribution is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because it knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer because it is a wholly owned subsidiary of Fung Holdings that is similarly controlled by the Fung family, including William Fung and Victor Fung.

277. Step Dragon is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because it knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer through its beneficial owner, William Fung.

278. Golden Step is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because it knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer through its beneficial owner, William Fung.

279. William Fung is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because he knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer. William Fung was the Chairman of the GBGH Board of Directors, a member of the Special Dividend Committee, and was a Controlling Shareholder for purposes of the Special Dividend. William Fung had perfect knowledge of the plan to pay the Special Dividend using funds from GBG USA that were purported to be the proceeds of the Centric Sale but were in fact simply GBG USA's borrowings. William Fung also knew that, consistent with that plan, the Special Dividend Cash Transfer was made by GBG USA.

280. King Lun is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because it knew or should have known of the fraudulent intent underlying the Special

Dividend Cash Transfer through William Fung and Victor Fung, who directly or indirectly held all of the GBGH shares in which King Lun had an interest.

281. HSBC Trustee is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because it knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer through Victor Fung, as it administers a trust established for the benefit of Victor Fung's family. Alternatively, HSBC Trustee knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer through William Fung, with whom it shares a 50% ownership interest in King Lun.

282. First Island is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because it is a wholly owned subsidiary of HSBC Trustee and therefore knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer through William Fung.

283. Victor Fung is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because he knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer as (a) the Chairman of Fung Holdings, (b) William Fung's brother, and (c) the direct and indirect holder of a substantial number of GBGH's shares. Victor Fung was aware that the Special Dividend would be funded by GBG USA and presented as the proceeds of the Centric Sale, even though the proceeds of the Centric Sale had already been spent at the time of closing.

284. Spencer Fung is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because he knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer as a relative of William Fung and Victor Fung who played a critical role in the Fung Group's businesses as the CEO of Li & Fung Limited.

285. Bruce Rockowitz is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because he knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer. Bruce Rockowitz was a member of the GBGH Board of Directors and a member of the Special Dividend Committee tasked with setting the amount and form of the Special Dividend. He thus had perfect knowledge of the plan to fund the Special Dividend using money borrowed by GBG USA that was purported to be the proceeds of the Centric Sale.

286. Hurricane Millennium is not a good-faith subsequent transferee of the Special Dividend Cash Transfer because it knew or should have known of the fraudulent intent underlying the Special Dividend Cash Transfer through Bruce Rockowitz.

287. Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of no less than $74,235,959 against Fung Holdings, the attachment or other provisional remedy (including levy) against the assets transferred to Fung Holdings, or the proceeds of such assets now held by Fung Holdings, or other property of Fung Holdings, and/or to hold Fung Holdings liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

288. Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $7,133,749 against Fung Distribution, the attachment or other provisional remedy (including levy) against the assets transferred to Fung Distribution, or the proceeds of such assets now held by Fung Distribution, or other property of Fung Distribution, and/or to hold Fung Distribution liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

289. Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $1,793,931 against Step Dragon, the attachment or other

provisional remedy (including levy) against the assets transferred to Step Dragon, or the proceeds of such assets now held by Step Dragon, or other property of Step Dragon, and/or to hold Step Dragon liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

290.    Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $931,468 against Golden Step, the attachment or other provisional remedy (including levy) against the assets transferred to Golden Step, or the proceeds of such assets now held by Golden Step, or other property of Golden Step, and/or to hold Golden Step liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

291.    Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $41,952,504 against William Fung, the attachment or other provisional remedy (including levy) against the assets transferred to William Fung, or the proceeds of such assets now held by William Fung, or other property of William Fung, and/or to hold William Fung liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

292.    Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $74,235,959 against King Lun, the attachment or other provisional remedy (including levy) against the assets transferred to King Lun, or the proceeds of such assets now held by King Lun, or other property of King Lun, and/or to hold King Lun liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

293.    Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $7,487,771 against First Island, the attachment or other

provisional remedy (including levy) against the assets transferred to First Island, or the proceeds of such assets now held by First Island, or other property of First Island, and/or to hold First Island liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

294. Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $50,314,460 against Victor Fung, the attachment or other provisional remedy (including levy) against the assets transferred to Victor Fung, or the proceeds of such assets now held by Victor Fung, or other property of Victor Fung, and/or to hold Victor Fung liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

295. Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $50,222 against Spencer Fung, the attachment or other provisional remedy (including levy) against the assets transferred to Spencer Fung, or the proceeds of such assets now held by Spencer Fung, or other property of Spencer Fung, and/or to hold Spencer Fung liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

296. Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $14,503,798 against Bruce Rockowitz, the attachment or other provisional remedy (including levy) against the assets transferred to Bruce Rockowitz, or the proceeds of such assets now held by Bruce Rockowitz, or other property of Bruce Rockowitz, and/or to hold Bruce Rockowitz liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

297.     Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $9,036,347 against Hurricane Millennium, the attachment or other provisional remedy (including levy) against the assets transferred to Hurricane Millennium, or the proceeds of such assets now held by Hurricane Millennium, or other property of Hurricane Millennium, and/or to hold Hurricane Millennium liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

298.     Pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of $50,213,716 against HSBC Trustee, the attachment or other provisional remedy (including levy) against the assets transferred to HSBC Trustee, or the proceeds of such assets now held by HSBC Trustee, or other property of HSBC Trustee, and/or to hold HSBC Trustee liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

299.     In the alternative, Plaintiff seeks relief pursuant to Section 276 of New York's Debtor and Creditor law ("N.Y. Debt. & Cred. Law" or "NY DCL"), against certain of GBGH's direct shareholders as subsequent transferees.

300.     The consideration received by GBG USA in return for the Special Dividend Cash Transfer was inadequate.

301.     GBG USA and GBGH had a close relationship at the time of the Special Dividend Cash Transfer. The Special Dividend Cash Transfer was made to insiders of GBG USA.

302.     Moreover, GBGH, through William Fung and the other members of the GBGH Board, controlled GBG USA in a variety of ways.

303.     GBG USA engaged in a series of transactions and/or course of conduct after the incurring of debt, coupled with the onset of financial difficulties, at the time of the Special Dividend Cash Transfer.

304.     The Special Dividend Cash Transfer occurred after the incurrence of significant indebtedness.

305.     Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to Fung Holdings, (ii) the avoidance of the Special Dividend to Fung Holdings, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Fung Holdings in respect of Special Dividend, (iv) to hold Fung Holdings liable for any damages or other remedies that may be awarded by the Court, (v) restrain Fung Holdings from disposing of their property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $74,235,959 against Fung Holdings.

306.     Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to Fung Distribution, (ii) the avoidance of the Special Dividend to Fung Distribution, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Fung Distribution in respect of Special Dividend, (iv) to hold Fung Distribution liable for any damages or other remedies that may be awarded by the Court, (v) restrain Fung Distribution from disposing of their property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $7,133,749 against Fung Distribution.

307.     Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to Step Dragon, (ii) the avoidance of the Special Dividend to Step Dragon, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Step Dragon in respect of Special Dividend, (iv) to hold Step Dragon liable for any damages or other remedies that may be awarded by the Court, (v) restrain Step Dragon from disposing of their property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $1,793,931 against Step Dragon.

308.     Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to Golden Step, (ii) the avoidance of the Special Dividend to Golden Step, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Golden Step in respect of Special Dividend, (iv) to hold Golden Step liable for any damages or other remedies that may be awarded by the Court, (v) restrain Golden Step from disposing of their property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $931,468 against Golden Step.

309.     Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to William Fung, (ii) the avoidance of the Special Dividend to William Fung, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to William Fung respect of Special Dividend, (iv) to hold William Fung liable for any damages or other remedies that may be awarded by the Court,

(v) restrain William Fung from disposing of his property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $41,952,504 against William Fung.

310.    Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to King Lun, (ii) the avoidance of the Special Dividend to King Lun, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to King Lun in respect of Special Dividend, (iv) to hold King Lun liable for any damages or other remedies that may be awarded by the Court, (v) restrain King Lun from disposing of their property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $74,235,959 against King Lun.

311.    Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to First Island, (ii) the avoidance of the Special Dividend to First Island, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to First Island in respect of Special Dividend, (iv) to hold First Island liable for any damages or other remedies that may be awarded by the Court, (v) restrain First Island from disposing of their property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $7,487,771 against First Island.

312.    Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to Victor Fung, (ii) the avoidance of the Special Dividend to Victor Fung, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Victor Fung in respect of Special Dividend, (iv) to hold Victor Fung liable

for any damages or other remedies that may be awarded by the Court, (v) restrain Victor Fung from disposing of is property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $50,314,460 against Victor Fung.

313. Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to Spencer Fung, (ii) the avoidance of the Special Dividend to Spencer Fung, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Spencer Fung in respect of Special Dividend, (iv) to hold Spencer Fung liable for any damages or other remedies that may be awarded by the Court, (v) restrain Spencer Fung from disposing of his property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $50,222 against Spencer Fung.

314. Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to Bruce Rockowitz, (ii) the avoidance of the Special Dividend to Bruce Rockowitz, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Bruce Rockowitz in respect of Special Dividend, (iv) to hold Bruce Rockowitz liable for any damages or other remedies that may be awarded by the Court, (v) restrain Bruce Rockowitz from disposing of his property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $5,467,451 against Bruce Rockowitz.

315. Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to Hurricane Millennium, (ii) the avoidance of

the Special Dividend to Hurricane Millennium, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Hurricane Millennium in respect of Special Dividend, (iv) to hold Hurricane Millennium liable for any damages or other remedies that may be awarded by the Court, (v) restrain Hurricane Millennium from disposing of their property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $9,036,347 against Hurricane Millennium.

316.     Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to HSBC Trustee, (ii) the avoidance of the Special Dividend to HSBC Trustee, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to HSBC Trustee in respect of Special Dividend, (iv) to hold HSBC Trustee liable for any damages or other remedies that may be awarded by the Court, (v) restrain HSBC Trustee from disposing of their property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of $50,214,072 against HSBC Trustee.

317.     Plaintiff also seeks attorneys' fees under NY DCL section 276-a.

## COUNT II
**Constructive Fraudulent Transfers Related to the Special Dividend Cash Transfer
Pursuant to 11 U.S.C. §§ 544(b), 550(a)(1), (2), 6 Del. C. §§ 1304(a)(2) & 1307,
N.C. Gen. Stat. §§ 39-23.4(a)(2) & 39-23.7(a), and/or NY DCL §§ 274, 278 & 279
(Against Defendants Fung Holdings (1937) Limited, Fung Distribution International
Limited, Step Dragon Enterprise Ltd., Golden Step Limited, William Fung Kwon Lun,
King Lun Holdings Limited, First Island Developments Limited, Victor Fung Kwok King,
Spencer Theodore Fung, HSBC Trustee (C.I.) Limited, Bruce Philip Rockowitz, Hurricane
Millennium Holdings Limited)**

318.     Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

319.   Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before Special Dividend Cash Transfer occurred.

320.   Plaintiff seeks avoidance of the Special Dividend Cash Transfer and subsequent payment of the Special Dividend from Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, HSBC Trustee, Bruce Rockowitz, and Hurricane Millennium pursuant to 11 U.S.C. §§ 544(b), 6 Del. C. § 1304(a)(2), N.C. Gen. Stat. § 39-23.4(a)(2), and/or NY DCL §§ 274, 278 & 279.

321.   The value of the consideration received by GBG USA in respect of the Special Dividend Cash Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6 Del. C. § 1304(a)(2); N.C. Gen. Stat. § 39-23.4(a)(2). The payment of a corporate dividend on account of equity is not a transfer of reasonably equivalent value or fair consideration.

322.   At the time of the Special Dividend Cash Transfer, GBG USA was engaged or was about to engage in a business or transaction for which the remaining assets of GBG USA were unreasonably small in relation to the business or transaction. *See* 6 Del. C. § 1304(a)(2)a; N.C. Gen. Stat. § 39-23.4(a)(2)a.

323.   In particular, following the Centric Sale in October 2018, GBG USA used the entirety of the sale proceeds to pay off its $1.2 billion-dollar debt under the Syndicated Credit Facility. However, having promised to pay the Special Dividend from those proceeds, GBGH caused GBG USA to borrow $328 million for the purpose of funding the Special Dividend. At the time of the borrowings, however, GBG USA was anticipating a likely default under the Prepetition RCF by the end of fiscal year 2019 failure to comply with the Prepetition RCF Covenants. In the

face of the default, GBGH not only forced GBG USA to fund the Special Dividend, but also to repay its own obligations under the December Shareholder Loan. This combination of events placed tremendous and untenable financial stress on GBG USA.

324.    Further, and consistent with these stressors, GBG USA was balance sheet insolvent at the time of the Special Dividend Cash Transfer. Sec. V.J, *supra.*

325.    Pursuant to 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7, Plaintiff seeks judgment against the Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium in the amounts set forth in Paragraphs 287-298, respectively, the attachment or other provisional remedy (including levy) against the assets transferred to each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium, or the proceeds of such assets now held by each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium, or other of their property, and/or to hold each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

326.    In the alternative, Plaintiff seeks relief pursuant to NY DCL Section 274 against certain of GBGH's direct shareholders, as subsequent transferees.

327.    The Special Dividend Cash Transfer was made without fair consideration when GBG USA was engaged or was about to engage in a business or transaction for which the property remaining in GBG USA's hands after the conveyance is an unreasonably small capital.

328. At the time of the Special Dividend Cash Transfer, GBG USA was insolvent, or rendered insolvent as a result of the Special Dividend Cash Transfer. *See* NY DCL §273.

329. GBG USA did not receive fair consideration in respect of the Special Dividend Cash Transfer. *See* NY DCL § 273.

330. Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium, (ii) the avoidance of the Special Dividend to each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium in respect of Special Dividend, (iv) to hold each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium liable for any damages or other remedies that may be awarded by the Court, (v) restrain the each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium from disposing of their property, and/or (vi) make any order which the circumstances of the case may require.

## COUNT III

**Constructive Fraudulent Transfers Related to the Special Dividend Cash Transfer
Pursuant to 11 U.S.C. §§ 544(b), 550(a)(1), (2), 6 Del. C. §§ 1305(a) & 1307,
N.C. Gen. Stat. §§ 39-23.5(a) & 39-23.7(a), and/or NY DCL §§ 273, 278 & 279
(Against Defendants Fung Holdings (1937) Limited, Fung Distribution International
Limited, Step Dragon Enterprise Ltd., Golden Step Limited, William Fung Kwon Lun,
King Lun Holdings Limited, First Island Developments Limited, Victor Fung Kwok King,
Spencer Theodore Fung, HSBC Trustee (C.I.) Limited, Bruce Philip Rockowitz, Hurricane
Millennium Holdings Limited)**

331.    Plaintiff restates and re-alleges the allegations of each of the prior and following
paragraphs as if fully set forth herein.

332.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured
creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor
could assert under applicable law. The claims of a number of existing unsecured creditors arose
before Special Dividend Cash Transfer occurred.

333.    Plaintiff seeks avoidance of the Special Dividend Cash Transfer and subsequent
payment of the Special Dividend from Fung Holdings, Fung Distribution, Step Dragon, Golden
Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, HSBC Trustee, Bruce
Rockowitz, and Hurricane Millennium pursuant to 11 U.S.C. §§ 544(b), 6 Del. C. § 1305(a), N.C.
Gen. Stat. § 39-23.5(a), and/or NY DCL §§ 273, 278 & 279.

334.    The value of the consideration received by GBG USA in respect of the Special
Dividend Cash Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6
Del. C. § 1305(a); N.C. Gen. Stat. § 39-23.5(a). The payment of a corporate dividend on account
of equity is not a transfer of reasonably equivalent value or fair consideration.

335.    At the time of the Special Dividend Cash Transfer, GBG USA was insolvent. *See*
6 Del. C. § 1305(a); N.C. Gen. Stat. § 39-23.5(a). At the time of the Special Dividend Cash
Transfer, the sum of GBG USA's debts was greater than all of GBG USA's assets, at a fair

valuation. Further, and consistent with these stressors, GBG USA was balance sheet insolvent at the time of the Special Dividend Cash Transfer. Sec. V.J, *supra.*

336. Pursuant to 11 U.S.C. § 550(a)(1), (2), and 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7, Plaintiff seeks judgment against each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium in the amounts set forth in Paragraphs 287-298, respectively, the attachment or other provisional remedy (including levy) against the assets transferred to each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium, or the proceeds of such assets now held by each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium, or other of their property, and/or to hold each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

337. In the alternative, Plaintiff seeks relief pursuant to 11 U.S.C. § 550(a)(1), (2), and 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7 against each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium as subsequent transferees.

338. The Special Dividend Cash Transfer was made without fair consideration when GBG USA's fair salable value of its assets was less than the amount required to pay its probable liabilities on its existing assets as they become absolute and matured. Thus, at the time of the Special Dividend Cash Transfer, GBG USA was insolvent, or rendered insolvent as a result of the

Special Dividend Cash Transfer. *See* NY DCL § 273. Further, GBG USA did not receive fair consideration in respect of the Special Dividend Cash Transfer. *See* NY DCL § 273.

339. Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of Special Dividend to each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium, (ii) the avoidance of the Special Dividend to each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium in respect of Special Dividend, (iv) to hold each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium liable for any damages or other remedies that may be awarded by the Court, (v) restrain each of Fung Holdings, Fung Distribution, Step Dragon, Golden Step, William Fung, King Lun, First Island, Victor Fung, Spencer Fung, Bruce Rockowitz, Hurricane Millennium from disposing of their property, and/or (vi) make any order which the circumstances of the case may require.

## COUNT IV
### Breach of Fiduciary Duty of Care Related to
### the Special Dividend Cash Transfer
### (Against Defendants Darling, Caldwell, Ventricelli, Smits, Carrey)

340. The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

341.     GBG USA's officers breached their fiduciary duties of care by wholly failing to obtain available information from which they would be informed of the financial impact on GBG USA of funding the Special Dividend. To the extent GBG USA's officers made any effort to inform themselves of the financial impact of paying the Special Dividend, their inquiries were limited to the impacts of the Special Dividend on GBGH.

342.     Darling, as GBG USA's former CEO, owed fiduciary duties of care to GBG USA under applicable state law with respect to the Special Dividend Cash Transfer. By participating and facilitating the Special Dividend Cash Transfer, Darling contributed to the unlawful transfer of the Special Dividend Cash Transfer to GBGH and GBGH's direct and indirect shareholders. Darling's participation in and facilitation of the Special Dividend Cash Transfer occurred even though the GBG USA Board had not approved the Special Dividend Cash Transfer at the time, and Darling, as a member of GBG USA Board, knew or should have known that the Special Dividend Cash Transfer was not authorized by the GBG USA Board. As GBG USA's CEO, Darling was responsible for the ultimate success or failure of GBG USA. All 'C-Suite' officers, including Caldwell, Ventricelli, Smits, and Carrey, reported to Darling. Thus, Darling knew, or should have known, that the Special Dividend Cash Transfer occurred at a time that GBG USA lacked sufficient statutory surplus or net profits from which to make the Special Dividend Cash Transfer.

343.     Darling breached his fiduciary duty of care by failing to exercise any care to obtain the material information reasonably available to him with respect to decision making for GBG USA concerning the Special Dividend Cash Transfer. In this regard, Darling failed to inform himself of Delaware law concerning the payment of dividends, and Darling failed to inform himself as to whether GBG USA had sufficient statutory surplus or net profits from which to make

the Special Dividend Cash Transfer. Darling, acting in his capacity as CEO of GBG USA, failed to seek the advice of outside counsel at Freshfields or Reed Smith concerning any of his fiduciary obligations as an officer of GBG USA with respect to the Special Dividend Cash Transfer.

344.     Caldwell, as GBG USA's former CFO, owed fiduciary duties of care to GBG USA under applicable state law with respect to the Special Dividend Cash Transfer. As GBG USA's CFO, Caldwell was the top financial executive at GBG USA, responsible for managing the financial actions of GBG USA. By participating and facilitating the Special Dividend Cash Transfer, Caldwell contributed to the unlawful transfer of funds from GBG USA to GBGH and GBGH's direct and indirect shareholders. Caldwell's participation in and facilitation of the Special Dividend Cash Transfer occurred even though the GBG USA Board never approved the Special Dividend Cash Transfer, which he knew or should have known. Caldwell worked closely with the GBG Board and reported directly to Darling. Given his role as CFO, Caldwell knew or should have known that the Special Dividend Cash Transfer occurred at a time that GBG USA lacked sufficient statutory surplus or net profits from which to make the Special Dividend Cash Transfer.

345.     Caldwell breached his fiduciary duty of care by failing to exercise any care to obtain material information reasonably available to him with respect to decision making for GBG USA concerning the Special Dividend Cash Transfer. In this regard, Caldwell failed to inform himself of Delaware law concerning the payment of dividends, and Caldwell failed to inform himself as to whether GBG USA had sufficient statutory surplus or net profits from which to make the Special Dividend Cash Transfer. Caldwell, acting in his capacity as CFO of GBG USA, also failed to seek the advice of outside counsel at Freshfields or Reed Smith concerning any of his fiduciary obligations as an officer of GBG USA with respect to the Special Dividend Cash Transfer.

346.     Ventricelli, as GBG USA's former COO, owed fiduciary duties of care to GBG USA under applicable state law with respect to the Special Dividend Cash Transfer. As GBG USA's COO, Ventricelli was responsible for overseeing the financial operations of GBG USA, and acted as the second in command at the company, reporting to only Darling. By participating and facilitating the Special Dividend Cash Transfer, Ventricelli contributed to the unlawful transfer of funds from GBG USA to GBGH and GBGH's direct and indirect shareholders. As GBG USA's COO, Ventricelli's participation in and facilitation of the Special Dividend Cash Transfer occurred even though the GBG USA Board never approved the Special Dividend Cash Transfer, which he knew or should have known. Ventricelli also knew, or should have known, that the Special Dividend Cash Transfer occurred at a time that GBG USA lacked sufficient statutory surplus or net profits from which to make the Special Dividend Cash Transfer.

347.     Ventricelli breached his fiduciary duty of care by failing to exercise any care to obtain material information reasonably available to him with respect to decision making for GBG USA concerning the Special Dividend Cash Transfer. In this regard, Ventricelli failed to inform himself of Delaware law concerning the payment of dividends, and Ventricelli failed to inform himself as to whether GBG USA had sufficient statutory surplus or net profits from which to make the Special Dividend Cash Transfer. Ventricelli, acting in his capacity as CFO of GBG USA, failed to seek the advice of outside counsel at Freshfields or Reed Smith with respect to any of his fiduciary obligations as an officer of GBG USA with respect to the Special Dividend Cash Transfer.

348.     Smits, as GBG USA's former General Counsel, Executive Vice President, and Secretary, owed fiduciary duties of care to GBG USA under applicable state law with respect to the Special Dividend Cash Transfer.

349.     Smits' duties as Secretary of GBG USA included (i) being present at all GBG USA Board meetings, (ii) being responsible for planning all GBG USA Board meetings, (iii) being responsible for creating agendas for all GBG USA Board meetings, (iv) being responsible for inviting the appropriate attendees to GBG USA Board meetings, (v) being responsible for curating the materials that were provided to the GBG USA Board, (vi) being responsible for disseminating all materials to the GBG USA Board, (vii) recording the minutes of GBG USA Board meetings, (viii) being responsible for recording the minutes of meetings of committees of the GBG USA Board, (ix) offering the GBG USA Board members the opportunity to comment and approve GBG USA Board meeting minutes, (x) being responsible for monitoring corporate governance developments that the GBG USA Board or its committee would need to know.

350.     Smits' duties as General Counsel of GBG USA included (i) advising GBG USA's executives, senior management, and the GBG Board on various matters such as legal rights, and new and existing laws, (ii) managing GBG USA's legal matters, (iii) conducting legal research concerning legal issues that are implicated by proposed GBG USA corporate actions, (iv) promulgating and creating directives of GBG USA's corporate acts and decisions, (v) liaising with outside counsel regarding their assignments.

351.     By participating and facilitating the Special Dividend Cash Transfer, Smits contributed to the unlawful transfer of funds from GBG USA to GBGH and GBGH's direct and indirect shareholders. Smits' participation in and facilitation of the Special Dividend Cash Transfer occurred even though the GBG USA Board never approved the Special Dividend Cash Transfer. Smits knew, or should have known, that the Special Dividend Cash Transfer was not authorized by the GBG USA Board, given his responsibilities as Secretary and General Counsel. Smits knew, or should have known, that the Special Dividend Cash Transfer occurred at a time that GBG USA

lacked sufficient statutory surplus or net profits from which to make the Special Dividend Cash Transfer.

352. Smits breached his fiduciary duty of care by failing to exercise any care to obtain material information reasonably available to him with respect to decision making for GBG USA concerning the Special Dividend Cash Transfer. In this regard, Smits failed to inform himself of Delaware law concerning the payment of dividends, and Smits failed to inform himself as to whether GBG USA had sufficient statutory surplus or net profits from which to make the Special Dividend Cash Transfer. Smits failed to advise Darling, Caldwell, Ventricelli, Smits, and Carrey about Delaware law concerning the payment of dividends. Smits failed to advise Darling, Caldwell, Ventricelli, Smits, and Carrey and the GBG USA Board that GBG USA should seek representation by an independent law firm with respect to the Special Dividend Cash Transfer. Smits, acting in his capacity as General Counsel and Corporate Secretary of GBG USA, failed to seek the advice of outside counsel at Freshfields or Reed Smith with respect his or any of the other GBG USA officers' fiduciary obligations to GBG USA with respect to the Special Dividend Cash Transfer.

353. Carrey, as GBG USA's former treasurer and Vice President, owed fiduciary duties of care to GBG USA under applicable state law with respect to the Special Dividend Cash Transfer. As GBG USA's Treasurer, Carrey was responsible for general financial oversight for GBG USA, funding, financial planning, and budgeting for GBG USA. In this case, Carrey also was responsible for executing the Special Dividend Cash Transfer from GBG USA to GBGH. Thus, by participating and facilitating the Special Dividend Cash Transfer, Carrey contributed to the unlawful transfer of funds from GBG USA to GBGH and GBGH's direct and indirect shareholders. Carrey's participation in and facilitation of the Special Dividend Cash Transfer

occurred even though the GBG USA Board never approved the Special Dividend Cash Transfer, which Carrey knew, or should have known. As GBG USA's Treasurer, Carrey knew, or should have known, that the Special Dividend Cash Transfer occurred at a time that GBG USA lacked sufficient statutory surplus or net profits from which to make the Special Dividend Cash Transfer.

354.    Carrey breached his fiduciary duty of care by failing to exercise any care to obtain material information reasonably available to him with respect to decision making for GBG USA concerning the Special Dividend Cash Transfer. In this regard, Carrey failed to inform himself of Delaware law concerning the payment of dividends, and Carrey failed to inform himself as to whether GBG USA had sufficient statutory surplus or net profits from which to make the Special Dividend Cash Transfer. Carrey, acting in his capacity as treasurer of GBG USA, failed to seek the advice of outside counsel at Freshfields or Reed Smith concerning any of his fiduciary obligations to GBG USA with respect to the Special Dividend Cash Transfer.

355.    The breaches of fiduciary duties by Darling, Caldwell, Ventricelli, Smits, and Carrey, as GBG USA officers in connection with the Special Dividend Cash Transfer, were the proximate cause, and or a substantial factor, in causing GBG USA, GBG USA's Estate and its creditors, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $ 196 million.

356.    GBG USA's certificate of incorporation does not contain a provision that eliminates or limits the personal liability of Darling, Caldwell, Ventricelli, Smits, and Carrey, as officers of GBG USA for monetary damages for breach of fiduciary duties as officers of GBG USA.

<u>**COUNT V**</u>
**Breach of Fiduciary Duty of Care Related to**
**the Special Dividend Cash Transfer**
**(Against Defendants Darling and Long)**

357. The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

358. Darling, as the former Executive Director of the GBG USA Board, owed fiduciary duties of care to GBG USA under applicable state law with respect to the Special Dividend Cash Transfer.

359. Long, as a former Director and member of the GBG USA Board, owed fiduciary duties of care to GBG USA under applicable state law with respect to the Special Dividend Cash Transfer.

360. Neither Darling nor Long, as members of the GBG USA Board, approved the Special Dividend Cash Transfer.

361. The GBG USA Board did not adopt board resolutions specifically authorizing the Special Dividend Cash Transfer at any time before the transfer occurred. To the extent that any purported written authorization exists, the document was signed after the transfer was made and then backdated to be dated "as of" a date before the Special Dividend actually occurred.

362. The GBG USA Board did not consider whether it could be independent when the Special Dividend Cash Transfer occurred.

363. The GBG USA Board did not consult with outside counsel – either at Freshfields or Reed Smith – with respect to their fiduciary obligations to GBG USA concerning the Special Dividend Cash Transfer.

364. The breaches of fiduciary duties by Darling and Long, as GBG USA Board members in connection with the Special Dividend Cash Transfer, were the proximate cause, and

or a substantial factor, in causing GBG USA, GBG USA's Estate and its creditors, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $196 million.

365.     GBG USA's certificate of incorporation does not contain a provision that eliminates or limits the personal liability of Defendants Darling and Long, as directors of GBG USA for monetary damages for breach of fiduciary duties as a director.

## COUNT VI
### Breach of Fiduciary Duty of Loyalty Related to the Special Dividend Cash Transfer
### (Against Defendants Darling, Caldwell, Ventricelli, Smits)

366.     The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

367.     When the Special Dividend Cash Transfer occurred, Darling, was employed as the CEO of both GBG USA and GBGH.

368.     When the Special Dividend Cash Transfer occurred, Caldwell was employed as the CFO of both GBG USA and GBGH.

369.     When the Special Dividend Cash Transfer occurred, Ventricelli was employed as the COO of both GBG USA and GBGH.

370.     When the Special Dividend Cash Transfer occurred, Smits was employed as the General Counsel and Executive Vice President of both GBG USA and GBGH.

371.     Defendants Darling, Caldwell, Ventricelli, and Smits, as GBG USA officers, owed fiduciary duties of loyalty to GBG USA to act in good faith and in the best interests of GBG USA at all times.

372.     Defendants Darling, Caldwell, Ventricelli, and Smits, as GBG USA officers, were not independent when the Special Dividend Cash Transfer occurred.

373. The facts surrounding the Special Dividend Cash Transfer indicate that the GBG USA officers did not act with loyalty to GBG USA with a view to the best interests of GBG USA. As set forth above, GBGH committed itself to paying a Special Dividend to its own shareholders out of the proceeds of the Centric Sale. Even though the proceeds of the Centric Sale were used entirely to repay the Syndicated Credit Facility, GBG USA's officers took care to make sure GBGH's promises was kept by having GBG USA borrow over $320 million to fund GBGH's Special Dividend, without consideration of how using the loan proceeds to do so would impact GBG USA or its creditors.

374. Darling, Caldwell, Ventricelli, and Smits, serving simultaneously as officers of GBG USA and GBGH, placed the financial interests of GBGH and GBGH's shareholders above the interests of GBG USA and its stakeholders (including GBG USA's creditors) to whom each of Darling, Caldwell, Ventricelli, and Smits owed fiduciary duties.

375. Darling had a financial incentive to act in GBGH's interests with respect to the Special Dividend Cash Transfer, and was rewarded generously by William Fung with a significant bonus payment from GBGH in fiscal year 2020.

376. The breaches of fiduciary duties by Darling, Caldwell, Ventricelli, and Smits, in each of their respective capacities as officers of GBG USA Board in connection with the Special Dividend Cash Transfer were the proximate cause, and/or a substantial factor, in causing GBG USA, GBG USA's Estate and its creditors, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $ 196 million.

377. GBG USA's certificate of incorporation does not contain a provision that eliminates or limits the personal liability of Darling, Caldwell, Ventricelli, and Smits, as officers of GBG USA for monetary damages for breach of fiduciary duties as officers.

## COUNT VII
## Breach of Fiduciary Duty of Loyalty Related to
## the Special Dividend Cash Transfer
## (Against Defendants Darling and Long)

378. The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

379. Darling and Long, as GBG USA Board members, owed fiduciary duties of loyalty to GBG USA to act in good faith and in the best interests of GBG USA at all times.

380. Darling and Long, as GBG USA Board members, were not independent when the Special Dividend Cash Transfer occurred, as both simultaneously served on the GBGH Board of Directors.

381. The GBG USA Board did not create a GBG USA Board committee independent from GBGH to review and approve the Special Dividend Cash Transfer.

382. In fact, neither the GBG USA Board nor any independent committee designated by the GBG USA Board took any action whatsoever – affirmative or negative – with respect to the Special Dividend Cash Transfer before it occurred. To the extent that any purported authorization exists, it was signed well after the Special Dividend Cash Transfer occurred and was then backdated.

383. Thus, the facts surrounding the Special Dividend Cash Transfer indicate that the GBG USA Board members did not act in with loyalty to GBG USA with a view to the best interests of GBG USA. As set forth above, GBGH committed itself to paying a Special Dividend to its shareholders out of the proceeds of the Centric Sale. Even though the proceeds of the Centric Sale were used entirely to repay the Syndicated Credit Facility, GBG USA's Directors took care to make sure GBGH's promises was kept by having GBG USA borrow over $320 million in order to

make the Special Dividend Cash Transfer without consideration of how using the loan proceeds to do so would impact GBG USA or its creditors.

384. Darling and Long, serving simultaneously as GBG USA Board members and Directors of GBGH, placed the financial interests of GBGH and GBGH's shareholders above the interests of GBG USA and its stakeholders (including GBG USA's creditors) to whom each of Darling and Long owed fiduciary duties.

385. Darling and Long, serving simultaneously as GBG USA Board members and Directors of GBGH, acted for the benefit of GBGH and GBGH's shareholders instead of in the best interests of GBG USA.

386. The breaches of fiduciary duties by Darling and Long, as GBG USA Board members in connection with the Special Dividend Cash Transfer were the proximate cause, and or a substantial factor, in causing GBG USA, its Estate and its creditors, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $ 196 million.

387. GBG USA's certificate of incorporation does not contain a provision that eliminates or limits the personal liability of Defendants Darling and Long, as directors of GBG USA for monetary damages for breach of fiduciary duties as a director.

## COUNT VIII
### Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174
### (Against Darling and Long)

388. The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

389. Each of Darling and Long were directors of GBG USA when the Special Dividend Cash Transfer was made in April 2019.

390.    The Special Dividend Cash Transfer occurred when GBG USA lacked adequate statutory surplus or adequate "net profits", in violation of applicable law, including 8 Del. C. § 170 and § 173.

391.    As of March 31, 2019, GBG USA lacked adequate "surplus," as required by Delaware law, to pay a corporate dividend in connection with the Special Dividend Cash Transfer.

392.    As of March 31, 2019, GBG USA lacked adequate "net profits," as required by Delaware law, to pay a corporate dividend in connection with the Special Dividend Cash Transfer.

393.    Pursuant to 8 Del. C. § 174, each of Darling and Long are jointly and severally liable to GBG USA (and the Litigation Trust) for payment of an illegal dividend.

394.    GBG USA and its creditors have been damaged as a proximate result of the illegal dividend.

## COUNT IX
### Actual Fraudulent Transfers Related to the Payment of the December Shareholder Loan Cash Transfer Pursuant to 11 U.S.C. §§ 544(b), 550(a)(1), (2), 6 Del. C. §§ 1304(a)(1) & 1307, N.C. Gen. Stat. §§ 39-23.4(a)(1) & 39-23.7(a), and/or NY DCL §§ 276, 276-a, 278 & 279 (Against Defendant Fung Holdings (1937) Limited)

395.    Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

396.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the December Shareholder Loan Cash Transfer occurred.

397.    Plaintiff seeks avoidance of the December Shareholder Loan Cash Transfer from Fung Holdings pursuant to 11 U.S.C. §§ 544(b), 6 Del. C. § 1304(a)(1), N.C. Gen. Stat. § 39-23.4(a)(1), and/or NY DCL §§ 276, 276-a, 278 & 279.

398. The December Shareholder Loan Cash Transfer was a transfer to an insider of GBG USA. *See* 6 Del. C. § 1304(b)(1); N.C. Gen. Stat. § 39-23.4(b)(1). Fung Holdings was an insider of GBG USA at the time of the December Shareholder Loan Cash Transfer was made for the reasons set forth in Paragraphs 175-188.

399. The value of the consideration received by GBG USA in respect of the December Shareholder Loan Cash Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6 Del. C. § 1304(b)(8); N.C. Gen. Stat. § 39-23.4(b)(8). The borrower / obligor on the December Shareholder Loan was GBGH, not GBG USA. Thus, GBG USA had no obligation to pay GBGH's debts.

400. The Special Dividend Cash Transfer occurred shortly before or shortly after a substantial debt was incurred. *See* 6 Del. C. § 1304(b)(10); N.C. Gen. Stat. § 39-23.4(b)(10). GBG USA incurred substantial debts before making the December Shareholder Loan Cash Transfer. *See* 6 Del. C. § 1304(a)(2); N.C. Gen. Stat. § 39-23.4(a)(2). The debts that GBG USA incurred included:

- On January 25, 2019, GBG USA borrowed $ 50 million under the Mizuho Facility, drawing down on that facility in full;

- On March 7, 2019, GBG USA borrowed $25 million under the HSBC Facility, drawing down on that facility in full; and

- On March 11, 2019, GBG USA borrowed $253 million under the Prepetition RCF.

401. Fung Holdings is not a good-faith transferee of the December Shareholder Loan Cash Transfer because it knew or should have known of the fraudulent intent underlying the December Shareholder Loan Cash Transfer. Fung Holdings knew that the borrowing party on the December Shareholder Loan was GBGH, and thus that GBG USA was paying an obligation that was not its own. Fung Holdings also had knowledge of the fraudulent intent through William Fung.

402.    Pursuant to 11 U.S.C. §550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of no less than $100 million against Fung Holdings, the attachment or other provisional remedy (including levy) against the assets transferred to Fung Holdings, or the proceeds of such assets now held by Fung Holdings, or other property of Fung Holdings, and/or to hold Fung Holdings liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

403.    In the alternative, Plaintiff seeks relief pursuant to NY DCL Section 276 against Fung Holdings.

404.    The consideration received by GBG USA in return for the December Shareholder Loan Cash Transfer was inadequate and not reasonably equivalent value. The satisfaction of the amounts due under the December Shareholder Loan was not satisfaction of an antecedent debt of GBG USA.

405.    GBG USA and Fung Holdings (GBGH's largest shareholder) had a close relationship at the time of the December Shareholder Loan Transfer. The December Shareholder Loan Cash Transfer was made to an insider of GBG USA.

406.    Moreover, GBG USA, through the Conflicted Directors, controlled GBG USA in a variety of ways.

407.    GBG USA engaged in a series of transactions and/or course of conduct after the incurring of debt, coupled with the onset of financial difficulties, at the time of the December Shareholder Loan Cash Transfer.

408.    The December Shareholder Loan Cash Transfer occurred after the incurrence of significant indebtedness.

409. Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of December Shareholder Loan Cash Transfer to Fung Holdings, (ii) the avoidance of the December Shareholder Loan Cash Transfer to Fung Holdings, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Fung Holdings in respect of the December Shareholder Loan Cash Transfer Cash Transfer, (iv) to hold Fung Holdings liable for any damages or other remedies that may be awarded by the Court, (v) restrain Fung Holdings from disposing of their property, and/or (vi) make any order which the circumstances of the case may require, including a judgment of no less than $100 million against Fung Holdings.

410. Plaintiff also seeks attorneys' fees under NY DCL section 276-a.

## COUNT X
**Constructive Fraudulent Transfers Related to the December Shareholder Loan Cash Transfer to 11 U.S.C. §§ 544(b), 550(a)(1), (2), 6 Del. C. §§ 1304(a)(2) & 1307, N.C. Gen. Stat. §§ 39-23.4(a)(2) & 39-23.7(a), and/or NY DCL §§ 274, 278 & 279 (Against Defendant Fung Holdings (1937) Limited)**

411. Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

412. Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the December Shareholder Loan occurred.

413. Plaintiff seeks avoidance of the December Shareholder Loan Cash Transfer from Fung Holdings pursuant to 11 U.S.C. §§ 544(b), 6 Del. C. § 1304(a)(2), N.C. Gen. Stat. § 39-23.4(a)(2), and/or NY DCL §§ 274, 278 & 279.

414. The value of the consideration received by GBG USA in respect of the December Shareholder Loan Cash Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6 Del. C. § 1304(a)(2); N.C. Gen. Stat. § 39-23.4(a)(2). The borrower and obligor on the December Shareholder Loan was GBGH, not GBG USA. Thus, GBG USA had no obligation to pay GBGH's debts. Thus, the satisfaction of the amounts due under the December Shareholder Loan was not satisfaction of an antecedent debt of GBG USA.

415. At the time of the December Shareholder Loan Cash Transfer, GBG USA was engaged or was about to engage in a business or transaction for which the remaining assets of GBG USA were unreasonably small in relation to the business or transaction. *See* 6 Del. C. § 1304(a)(2)a; N.C. Gen. Stat. § 39-23.4(a)(2)(a).

416. Specifically, between the time of the December Shareholder Loan and the payment of the Special Dividend, GBGH caused GBG USA to borrow over $320 million in loans to fund the Special Dividend. At the same time, GBG USA was anticipating a likely default under the Prepetition RCF on or before March 31, 2019 for failure to comply with the Prepetition RCF Covenants. Notwithstanding the substantial borrowings and potential default, GBGH directed GBG USA not only to fund the Special Dividend but also to pay Fung Holdings to satisfy GBGH's own obligations under the December Loan. In combination, the borrowings and forced expenditures placed tremendous financial stress on GBG USA.

417. Further, consistent with these financial stressors, GBG USA was balance sheet insolvent at the time of the December Shareholder Loan Cash Transfer. Sec. V.J, *supra.*

418. Pursuant to 11 U.S.C. §550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of no less than $100 million against Fung Holdings, the attachment or other provisional remedy (including levy) against the assets transferred to Fung

Holdings, or the proceeds of such assets now held by Fung Holdings, or other property of Fung Holdings, and/or to hold Fung Holdings liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

419.    In the alternative, Plaintiff seeks relief pursuant to NY DCL Section 274 against Fung Holdings.

420.    The December Shareholder Loan Cash Transfer was made without fair consideration when GBG USA was engaged or was about to engage in a business or transaction for which the property remaining in GBG USA's hands after the conveyance is an unreasonably small capital.

421.    Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of December Shareholder Loan Cash Transfer to Fung Holdings, (ii) the avoidance of the December Shareholder Loan Cash Transfer to Fung Holdings, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Fung Holdings in respect of the December Shareholder Loan Cash Transfer, (iv) to hold Fung Holdings liable for any damages or other remedies that may be awarded by the Court, (v) restrain Fung Holdings from disposing of their property, and/or (vi) make any order which the circumstances of the case may require.

## COUNT XI
**Constructive Fraudulent Transfers Related to the December Shareholder Loan Cash
Transfer to 11 U.S.C. §§ 544(b), 550(a)(1), (2), 6 Del. C. §§ 1305(a) & 1307,
N.C. Gen. Stat. §§ 39-23.5(a) & 39-23.7(a), and/or NY DCL §§ 273, 278 & 279
(Against Defendant Fung Holdings (1937) Limited)**

422.    Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

423.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before December Shareholder Loan Cash Transfer occurred.

424.    Plaintiff seeks avoidance of the December Shareholder Loan Cash Transfer from Fung Holdings pursuant to 11 U.S.C. §§ 544(b), 6 Del. C. § 1305(a), N.C. Gen. Stat. § 39-23.5(a), and/or NY DCL §§ 273, 278 & 279.

425.    The value of the consideration received by GBG USA in respect of the December Shareholder Loan Cash Transfer was not reasonably equivalent to the value of the cash transferred. *See* 6 Del. C. § 1305(a); N.C. Gen. Stat. § 39-23.5(a). The consideration received by GBG USA in return for the December Shareholder Loan Cash Transfer was inadequate and not reasonably equivalent value. Thus, the satisfaction of the amounts due under the December Shareholder Loan was not satisfaction of an antecedent debt of GBG USA.

426.    At the time of the December Shareholder Loan Cash Transfer, GBG USA insolvent. *See* 6 Del. C. § 1305(a); N.C. Gen. Stat. § 39-23.5(a). At the time of the December Shareholder Loan Cash Transfer, the sum of GBG USA's debts was greater than all of GBG USA's assets, at a fair valuation. Further, and consistent with these stressors, GBG USA was balance sheet insolvent at the time of the December Shareholder Loan Cash Transfer. Sec. V.J, *supra*.

427.    Pursuant to 11 U.S.C. §550(a)(1), (2), 6 Del. C. § 1307 and/or N.C. Gen. Stat. § 39-23.7(a), Plaintiff seeks a judgment of no less than $100 million against Fung Holdings, the attachment or other provisional remedy (including levy) against the assets transferred to Fung Holdings, or the proceeds of such assets now held by Fung Holdings, or other property of Fung

Holdings, and/or to hold Fung Holdings liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

428. In the alternative, Plaintiff seeks relief pursuant to NY DCL Section 273 against Fung Holdings.

429. The December Shareholder Loan Cash Transfer was made without fair consideration when GBG USA's fair salable value of its assets was less than the amount that is required to pay its probably liability on its existing assets as they become absolute and matured. Thus, at the time of the December Shareholder Loan Cash Transfer, GBG USA was insolvent, or rendered insolvent as a result of the December Shareholder Loan Cash Transfer. *See* NY DCL §273. Further, GBG USA did not receive fair consideration in respect of the December Shareholder Loan Cash Transfer. *See* NY DCL § 273.

430. Pursuant to 11 U.S.C. § 550(a)(1), (2), and NY DCL sections 278 and 279, Plaintiff seeks, to the extent necessary to satisfy Plaintiff's claims brought in this Complaint, (i) the avoidance of the conveyance of December Shareholder Loan Cash Transfer to Fung Holdings, (ii) the avoidance of the December Shareholder Loan Cash Transfer to Fung Holdings, (iii) the attachment or other provisional remedy (including levy) against the assets transferred to Fung Holdings in respect of the December Shareholder Loan Cash Transfer, (iv) to hold Fung Holdings liable for any damages or other remedies that may be awarded by the Court, (v) restrain the Defendants from disposing of their property, and/or (vi) make any order which the circumstances of the case may require.

## COUNT XII
### Breach of Fiduciary Duty of Care Related to
### the December Shareholder Loan Transfer
### (Against Defendants Darling, Caldwell, Ventricelli, Smits, Carrey)

431.    The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

432.    GBG USA's officers breached their fiduciary duties of care by wholly failing to obtain available information from which they would be informed of the financial impact on GBG USA of paying GBGH's obligations under the December Shareholder Loan. To the extent GBG USA's officers made any effort to inform themselves of the financial impact of paying the December Shareholder Loan, their inquiries were limited to the impacts on GBGH.

433.    Darling, as GBG USA's former CEO, owed fiduciary duties of care to GBG USA under applicable state law with respect to the December Shareholder Loan Transfer. By directing and facilitating the December Shareholder Loan Cash Transfer, Darling contributed to the unlawful transfer of GBG USA's funds to Fung Holdings. Darling's participation in and facilitation of the December Shareholder Loan Cash Transfer occurred even though the GBG USA Board had not approved the December Shareholder Loan Cash Transfer at the time, and Darling, as a member of GBG USA Board, knew or should have known that the December Shareholder Loan Cash Transfer was not authorized by the GBG USA Board. As GBG USA's CEO, Darling was responsible for the ultimate success or failure of GBG USA. All 'C-Suite' officers, including Caldwell, Ventricelli, Smits, and Carrey, reported to Darling. Thus, Darling knew, or should have known, that the December Shareholder Loan Cash Transfer occurred at a time that GBG USA lacked sufficient funds from which to make the Special Dividend Cash Transfer.

434.    Darling breached his fiduciary duty of care by failing to exercise any care to obtain the material information reasonably available to him with respect to decision making for GBG

USA concerning the December Shareholder Loan Cash Transfer. In this regard, Darling failed to inform himself as to applicable Delaware law and whether GBG USA had sufficient funds from which to make the December Shareholder Loan Cash Transfer. Darling, acting in his capacity as CEO of GBG USA, failed to seek the advice of outside counsel at Freshfields or Reed Smith concerning the December Shareholder Loan Cash Transfer.

435. Caldwell, as GBG USA's former CFO, owed fiduciary duties of care to GBG USA under applicable state law with respect to the December Shareholder Loan Cash Transfer. As GBG USA's CFO, Caldwell was the top financial executive at GBG USA, responsible for managing the financial actions of GBG USA. By participating and facilitating the December Shareholder Loan Cash Transfer, Caldwell contributed to the unlawful transfer of the GBG USA's funds to Fung Holdings. Caldwell's participation in and facilitation of the December Shareholder Loan Cash Transfer occurred even though the GBG USA Board never approved the December Shareholder Loan Cash Transfer, which he knew, or should have known. As GBG USA's CFO, Caldwell also knew, or should have known, that the December Shareholder Loan Cash Transfer occurred at a time that GBG USA lacked sufficient funds from which to make the December Shareholder Loan Cash Transfer.

436. Caldwell breached his fiduciary duty of care by failing to exercise any care to obtain material information reasonably available to him with respect to decision making for GBG USA concerning the December Shareholder Loan Cash Transfer. In this regard, Caldwell failed to inform himself of applicable Delaware law and failed to inform himself as to whether GBG USA had sufficient funds from which to make the December Shareholder Loan Cash Transfer. Caldwell, acting in his capacity as CFO of GBG USA, failed to seek the advice of outside counsel at Freshfields or Reed Smith with respect to the December Shareholder Loan Cash Transfer.

437.     Ventricelli, as GBG USA's former COO, owed fiduciary duties of care to GBG USA under applicable state law with respect to the December Shareholder Loan Cash Transfer. As GBG USA's COO, Ventricelli was responsible for overseeing the finance operations of GBG USA, and acted as the second in command at GBG USA, having a hand in everything concerning GBG USA. By participating and facilitating the December Shareholder Loan Cash Transfer, Ventricelli contributed to the unlawful transfer of the Special Dividend Cash Transfer to Fung Holdings. As GBG USA's COO, Ventricelli's participation in and facilitation of the December Shareholder Loan Cash Transfer occurred even though the GBG USA Board never approved the December Shareholder Loan Cash Transfer, which he knew, or should have known. Ventricelli also knew, or should have known, that the December Shareholder Loan Cash Transfer occurred at a time that GBG USA lacked sufficient funds from which to make the December Shareholder Loan Cash Transfer.

438.     Ventricelli breached his fiduciary duty of care by failing to exercise any care to obtain material information reasonably available to him with respect to decision making for GBG USA concerning the December Shareholder Loan Cash Transfer. In this regard, Ventricelli failed to inform himself of applicable Delaware law and whether GBG USA had sufficient funds from which to make the December Shareholder Loan Cash Transfer. Ventricelli, acting in his capacity as CFO of GBG USA, failed to seek the advice of outside counsel at Freshfields or Reed Smith with respect to the December Shareholder Loan Cash Transfer.

439.     Smits, as GBG USA's former General Counsel, Executive Vice President, and Secretary, owed fiduciary duties of care to GBG USA under applicable state law with respect to the December Shareholder Loan Cash Transfer.

440. Smits' duties as Secretary of GBG USA included (i) being present at all GBG USA Board meetings, (ii) being responsible for planning all GBG USA Board meetings, (iii) being responsible for creating agendas for all GBG USA Board meetings, (iv) being responsible for inviting the appropriate attendees to GBG USA Board meetings, (v) being responsible for curating the materials that were provided to the GBG USA Board, (vi) being responsible for disseminating all materials to the GBG USA Board, (vii) recording the minutes of GBG USA Board meetings, (viii) being responsible for recording the minutes of meetings of committees of the GBG USA Board, (ix) offering the GBG USA Board members the opportunity to comment and approve GBG USA Board meeting minutes, (x) being responsible for monitoring corporate governance developments that the GBG USA Board or its committee would need to know.

441. Smits' duties as General Counsel of GBG USA included (i) advising GBG USA's executives, senior management, and the GBG Board on various matters such as legal rights, and new and existing laws, (ii) managing GBG USA's legal matters, (iii) conducting legal research concerning legal issues that are implicated by proposed GBG USA corporate actions, (iv) promulgating and creating directives of GBG USA's corporate acts and decisions, (v) liaising with outside counsel regarding their assignments.

442. By participating in and facilitating the December Shareholder Loan Cash Transfer, Smits contributed to the unlawful transfer of the December Shareholder Loan Cash Transfer to Fung Holdings. Smits' participation in and facilitation of the December Shareholder Loan Cash Transfer occurred even though the GBG USA Board never approved December Shareholder Loan Cash Transfer, which Smits knew, or should have known, given his responsibilities as Secretary and General Counsel. Smits also knew, or should have known, that the Special Dividend Cash

Transfer occurred at a time that GBG USA lacked sufficient funds from which to make the Special Dividend Cash Transfer.

443. Smits breached his fiduciary duty of care by failing to exercise any care to obtain material information reasonably available to him with respect to decision making for GBG USA with respect to the December Shareholder Loan Cash Transfer. In this regard, Smits failed to inform himself of applicable Delaware law, and whether GBG USA had sufficient funds from which to make the December Shareholder Loan Cash Transfer. Smits failed to advise Darling, Caldwell, Ventricelli, Smits, and Carrey about applicable Delaware law concerning the obligations of subsidiaries for loans taken out by their indirect parent corporation. Smits failed to advise Darling, Caldwell, Ventricelli, Smits, and Carrey and the GBG USA Board that GBG USA should seek representation by an independent law firm with respect to the December Shareholder Loan Cash Transfer. Smits, acting in his capacity as General Counsel and Corporate Secretary of GBG USA, failed to seek the advice of outside counsel at Freshfields or Reed Smith with respect his or any of the other GBG USA officers' fiduciary obligations to GBG USA concerning the December Shareholder Loan Cash Transfer.

444. Carrey, as GBG USA's former treasurer and Vice President, owed fiduciary duties of care to GBG USA under applicable state law with respect to the December Shareholder Loan Cash Transfer. As GBG USA's Treasurer, Carrey was responsible for general financial oversight for GBG USA, funding, financial planning, and budgeting for GBG USA. In this case, Carrey also was responsible for executing the December Shareholder Loan Cash Transfer from GBG USA to Fung Holdings. Thus, by participating and facilitating the December Shareholder Loan Cash Transfer, Carrey contributed to the unlawful transfer of the December Shareholder Loan Cash Transfer to Fung Holdings. Carrey's participation in and facilitation of the December Shareholder

Loan Cash Transfer occurred even though the GBG USA Board never approved the December Shareholder Loan Cash Transfer, which Carrey knew, or should have known. As GBG USA's Treasurer, Carrey also knew, or should have known, that the December Shareholder Loan Cash Transfer occurred at a time that GBG USA lacked sufficient funds from which to make the December Shareholder Loan Cash Transfer.

445. Carrey breached his fiduciary duty of care by failing to exercise any care to obtain material information reasonably available to him with respect to decision making for GBG USA concerning December Shareholder Loan Cash Transfer. In this regard, Carrey failed to inform himself of applicable Delaware law, and whether GBG USA had sufficient funds from which to make the Special Dividend Cash Transfer. Carrey, acting in his capacity as treasurer of GBG USA, failed to seek the advice of outside counsel at Freshfields or Reed Smith concerning the December Shareholder Loan Cash Transfer.

446. The breaches of fiduciary duties by Darling, Caldwell, Ventricelli, Smits, and Carrey, as GBG USA officers in connection with the December Shareholder Loan Cash Transfer were the proximate cause, and or a substantial factor, in causing GBG USA, GBG USA's Estate and its creditors, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $100 million.

447. GBG USA's certificate of incorporation does not contain a provision that eliminates or limits the personal liability of Darling, Caldwell, Ventricelli, Smits, and Carrey, as officers of GBG USA for monetary damages for breach of fiduciary duties as officers of GBG USA.

## COUNT XIII
### Breach of Fiduciary Duty of Care Related to
### the December Shareholder Loan Cash Transfer
### (Against Defendants Darling and Long)

448.    The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

449.    Defendant Darling, as the former Executive Director of the GBG USA Board, owed fiduciary duties of care to GBG USA under applicable state law with respect to the December Shareholder Loan Cash Transfer.

450.    Defendant Long, as a former Director and member of the GBG USA Board, owed fiduciary duties of care to GBG USA under applicable state law with respect to the December Shareholder Loan Cash Transfer.

451.    The amounts owed under the December Shareholder Loan were not an antecedent debt of GBG USA. Rather, the amounts owed under the December Shareholder Loan were an antecedent debt of GBGH.

452.    Neither Defendant Darling nor Defendant Long, as members of the GBG USA Board, approved the December Shareholder Loan Cash Transfer.

453.    The GBG USA Board did not adopt board resolutions specifically authorizing the December Shareholder Loan Cash Transfer.

454.    The GBG USA Board did not consider whether the it could be independent when the December Shareholder Loan Cash Transfer occurred.

455.    The GBG USA Board did not consult with outside counsel – either at Freshfields or Reed Smith – with respect to the December Shareholder Loan Cash Transfer.

456.    The breaches of fiduciary duties by Darling and Long, as GBG USA Board members in connection with the December Shareholder Loan Cash Transfer were the proximate

cause, and or a substantial factor, in causing GBG USA, GBG USA's Estate and its creditors, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $100 million.

457.    GBG USA's certificate of incorporation does not contain a provision that eliminates or limits the personal liability of Defendants Darling and Long, as directors of GBG USA for monetary damages for breach of fiduciary duties as a director.

**COUNT XIV**
**Breach of Fiduciary Duty of Loyalty Related to**
**the December Shareholder Loan Cash Transfer**
**(Against Defendants Darling, Caldwell, Ventricelli, Smits)**

458.    The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

459.    When December Shareholder Loan Cash Transfer occurred, Darling, was employed as the CEO of both GBG USA and GBGH.

460.    When the December Shareholder Loan Cash Transfer occurred, Caldwell was employed as the CFO of both GBG USA and GBGH.

461.    When the December Shareholder Loan Cash Transfer occurred, Ventricelli was employed as the COO of both GBG USA and GBGH.

462.    When the December Shareholder Loan Cash Transfer occurred, Smits was employed as the General Counsel and Executive Vice President of both GBG USA and GBGH.

463.    Defendants Darling, Caldwell, Ventricelli, and Smits, as GBG USA officers, owed fiduciary duties of loyalty to GBG USA to act in good faith and in the best interests of GBG USA at all times.

464.    Defendants Darling, Caldwell, Ventricelli, and Smits, as GBG USA officers, were not independent when the December Shareholder Loan Cash Transfer occurred.

465. The facts surrounding the December Shareholder Loan Cash Transfer indicate that the GBG USA officers did not act in with loyalty to GBG USA with a view to the best interests of GBG USA. Simply put, GBG USA was not a party to the December Shareholder Loan; rather, the December Shareholder Loan was an obligation of GBGH. Given GBG USA's precarious financial situation at the time, it made little sense to make a $100 million payment, and GBG USA would not have done so if GBGH not demanded it.

466. The amounts owed under the December Shareholder Loan were not an antecedent debt of GBG USA. Rather, the amounts owed under the December Shareholder Loan were an antecedent debt of GBGH.

467. Darling, Caldwell, Ventricelli, and Smits, serving simultaneously as GBG USA officers and officers of GBGH, placed the financial interests of GBGH and GBGH's shareholders above the interests of GBG USA and its stakeholders (including GBG USA's creditors) to whom each of Darling, Caldwell, Ventricelli, and Smits owed fiduciary duties.

468. The breaches of fiduciary duties by Darling, Caldwell, Ventricelli, and Smits, in each of their respective capacities as officers of GBG USA Board in connection with the December Shareholder Loan Cash Transfer were the proximate cause, and/or a substantial factor, in causing GBG USA, GBG USA's Estate and its creditors, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $100 million.

469. GBG USA's certificate of incorporation does not contain a provision that eliminates or limits the personal liability of Darling, Caldwell, Ventricelli, and Smits, as officers of GBG USA for monetary damages for breach of fiduciary duties as officers.

## COUNT XV
## Breach of Fiduciary Duty of Loyalty Related to
## the December Shareholder Loan Cash Transfer
## (Against Defendants Darling and Long)

470. The Plaintiff restates and re-alleges the allegations of each of the prior and following paragraphs as if fully set forth herein.

471. Defendants Darling and Long, as GBG USA Board members, owed fiduciary duties of loyalty to GBG USA to act in good faith and in the best interests of GBG USA at all times.

472. Defendants Darling and Long, as GBG USA Board members, were not independent when the December Shareholder Loan Cash Transfer occurred.

473. The GBG USA Board did not create a GBG USA Board committee independent from GBGH to review and approve the December Shareholder Loan Cash Transfer.

474. In fact, neither the GBG USA Board nor any independent committee designated by the Board took any action whatsoever – affirmative or negative – with respect to the December Shareholder Loan Cash Transfer until GBG USA made the transfer.

475. The amounts owed under the December Shareholder Loan were not an antecedent debt of GBG USA. Rather, the amounts owed under the December Shareholder Loan were an antecedent debt of GBGH.

476. The facts surrounding the December Shareholder Loan Cash Transfer indicate that the GBG USA Board members did not act in with loyalty to GBG USA with a view to the best interests of GBG USA. Simply put, GBG USA was not a party to the December Shareholder Loan; rather, the December Shareholder Loan was an obligation of GBGH. Given GBG USA's precarious financial situation at the time, it made little sense to make any $100 million payment, and GBG USA unlikely would have done so had GBGH not demanded it.

477. Darling and Long, serving simultaneously as GBG USA Board members and directors of GBGH, placed the financial interests of GBGH and GBGH's shareholders above the interests of GBG USA and its stakeholders (including GBG USA's creditors) to whom each of Darling and Long owed fiduciary duties.

478. Darling and Long, serving simultaneously as GBG USA Board members and directors of GBGH, acted for the benefit of GBGH and GBGH's shareholders instead of in the best interests of GBG USA.

479. The breaches of fiduciary duties by Darling and Long, as GBG USA Board members in connection with the December Shareholder Loan Cash Transfer were the proximate cause, and or a substantial factor, in causing GBG USA, GBG USA's Estate and its creditors, including the beneficiaries of the Liquidating Trust, to suffer losses of at least $100 million.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests that this Court enter judgment against defendants as follows:

a) On the First Cause of Action, entry of a judgment against Defendants Fung Holdings (1937) Limited, Fung Distribution International Limited, Step Dragon Enterprise Ltd., Golden Step Limited, William Fung Kwon Lun, King Lun Holdings Limited, First Island Developments Limited, Victor Fung Kwok King, Spencer Theodore Fung, HSBC Trustee, Bruce Philip Rockowitz, Hurricane Millennium Holdings Limited and HSBC Trustee (C.I.) Limited by this Court that the payment of the Special Dividend Cash Transfer is avoided pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1304(a)(1), N.C. Gen. Stat. § 39-23.4(a)(1), and/or NY DCL §§ 276, 276-a, 278 & 279, and entering a judgment against each of the following Defendants, pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307, N.C. Gen. Stat. § 39-23.7(a), and/or NY DCL § 279 allowing recovery of at least the following amounts on account of the Special Dividend Cash Transfer, in an amount (i) $74,235,959 against Fung Holdings (1937) Limited, (ii) $7,133,749 against Fung Distribution International Limited, (iii) $1,793,931 against Step Dragon Enterprise Ltd., (iv) $931,468 against Golden Step Limited, (v) $41,952,504 against William Fung Kwon Lun, (vi) $74,235,959 against King Lun Holdings Limited, (vii) $7,487,771 against First Island Developments Limited, (viii) $50,314,460 against Victor Fung Kwok King, (ix) $50,222 against Spencer Theodore Fung, (x) $14,503,798 against Bruce Philip Rockowitz, (xi) $9,036,347

against Hurricane Millennium Holdings Limited, (xii) $50,214,072 against HSBC Trustee (C.I.) Limited;

b) On the Second Cause of Action, entry of a judgment against Defendants Fung Holdings (1937) Limited, Fung Distribution International Limited, Step Dragon Enterprise Ltd., Golden Step Limited, William Fung Kwon Lun, King Lun Holdings Limited, First Island Developments Limited, Victor Fung Kwok King, Spencer Theodore Fung, Bruce Philip Rockowitz, Hurricane Millennium Holdings Limited and HSBC Trustee (C.I.) Limited by this Court that the payment of the Special Dividend Cash Transfer is avoided pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1304(a)(2), N.C. Gen. Stat. § 39-23.4(a)(2), and/or NY DCL §§ 274, 278 & 279, and entering a judgment against each of the following Defendants, pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307, N.C. Gen. Stat. § 39-23.7(a), and/or NY DCL § 279 allowing recovery of at least the following amounts on account of the Special Dividend Cash Transfer, in an amount (i) $74,235,959 against Fung Holdings (1937) Limited, (ii) $7,133,749 against Fung Distribution International Limited, (iii) $1,793,931 against Step Dragon Enterprise Ltd., (iv) $931,468 against Golden Step Limited, (v) $41,952,504 against William Fung Kwon Lun, (vi) $74,235,959 against King Lun Holdings Limited, (vii) $7,487,771 against First Island Developments Limited, (viii) $50,314,460 against Victor Fung Kwok King, (ix) $50,222 against Spencer Theodore Fung, (x) $14,503,798 against Bruce Philip Rockowitz, (xi) $9,036,347 against Hurricane Millennium Holdings Limited, (xii) $50,214,072 against HSBC Trustee (C.I.) Limited;

c) On the Third Cause of Action, On the Second Cause of Action, entry of a judgment against Defendants Fung Holdings (1937) Limited, Fung Distribution International Limited, Step Dragon Enterprise Ltd., Golden Step Limited, William Fung Kwon Lun, King Lun Holdings Limited, First Island Developments Limited, Victor Fung Kwok King, Spencer Theodore Fung, Bruce Philip Rockowitz, Hurricane Millennium Holdings Limited, and HSBC Trustee (C.I.) Limited by this Court that the payment of the Special Dividend Cash Transfer is avoided pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1304(a)(2), N.C. Gen. Stat. § 39-23.4(a)(2), and/or NY DCL §§ 274, 278 & 279, and entering a judgment against each of the following Defendants, 11 U.S.C. § 550(a)(1), (2), pursuant to 6 Del. C. § 1307, N.C. Gen. Stat. § 39-23.7(a), and/or NY DCL § 279 allowing recovery of at least the following amounts on account of the Special Dividend Cash Transfer, in an amount (i) $74,235,959 against Fung Holdings (1937) Limited, (ii) $7,133,749 against Fung Distribution International Limited, (iii) $1,793,931 against Step Dragon Enterprise Ltd., (iv) $931,468 against Golden Step Limited, (v) $41,952,504 against William Fung Kwon Lun, (vi) $74,235,959 against King Lun Holdings Limited, (vii) $7,487,771 against First Island Developments Limited, (viii) $50,314,460 against Victor Fung Kwok King, (ix) $50,222 against Spencer Theodore Fung, (x) $14,503,798 against Bruce Philip Rockowitz, (xi) $9,036,347 against Hurricane Millennium Holdings Limited, (xii) $50,214,072 against HSBC Trustee (C.I.) Limited;

d) On the Fourth Cause of Action, entry of a judgment against Defendants Darling, Caldwell, Ventricelli, Smits, and Carrey by this Court in an amount to be determined at trial, but in an amount of at least $196 million, plus pre-judgment interest;

e) On the Fifth Cause of Action, entry of a judgment against Defendants Darling and Long by this Court in an amount to be determined at trial, but in an amount of at least $196 million, plus pre-judgment interest;

f) On the Sixth Cause of Action, entry of a judgment against Defendants Darling, Caldwell, Ventricelli, Smits, and Carrey by this Court in an amount to be determined at trial, but in an amount of at least $196 million, plus pre-judgment interest;

g) On the Seventh Cause of Action, entry of a judgment against Defendants Darling and Long by this Court in an amount to be determined at trial, but in an amount of at least $196 million, plus pre-judgment interest;

h) On the Eighth Cause of Action, pursuant to 8 Del. C. § 174, entry of a judgment against Defendants Darling and Long by this Court in an amount to be determined at trial, but in an amount of at least $196 million, plus pre-judgment interest;

i) On the Ninth Cause of Action entry of a judgment against Defendants Fung Holdings(1937) Limited by this Court that the payment of the December Shareholder Loan Cash Transfer is avoided pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1304(a)(1), N.C. Gen. Stat. § 39-23.4(a)(1), and/or NY DCL §§ 276, 276-a, 278 & 279, and entering a judgment against Fung Holdings (1937) Limited, pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307, N.C. Gen. Stat. § 39-23.7(a), and/or NY DCL § 279 allowing recovery of at least the following amounts on account of the December Shareholder Loan Cash Transfer, in an amount no less than $100 million;

j) On the Tenth Cause of Action, entry of a judgment against Defendants Fung Holdings (1937) Limited by this Court that the payment of the December Shareholder Loan Cash Transfer is avoided pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1304(a)(2), N.C. Gen. Stat. § 39-23.4(a)(2), and/or NY DCL §§ 274, 278 & 279, and entering a judgment against Fung Holdings (1937) Limited, pursuant to 11 U.S.C. § 550(a)(1), (2), 6 Del. C. § 1307, N.C. Gen. Stat. § 39-23.7(a), and/or NY DCL § 279 allowing recovery of at least the following amounts on account of the December Shareholder Loan Cash Transfer, in an amount no less than $100 million;

k) On the Eleventh Cause of Action, entry of a judgment against Defendants Fung Holdings (1937) Limited by this Court that the payment of the December Shareholder Loan Cash Transfer is avoided pursuant to 11 U.S.C. § 544(b), 6 Del. C. § 1306(a), N.C. Gen. Stat. § 39-23.5(a), and/or NY DCL §§ 273, 278 & 279, and entering a judgment against Fung Holdings (1937) Limited, pursuant to 11 U.S.C.

§ 550(a)(1), (2), 6 Del. C. § 1307, N.C. Gen. Stat. § 39-23.7(a), and/or NY DCL § 279 allowing recovery of at least the following amounts on account of the December Shareholder Loan Cash Transfer, in an amount of no less than $100 million;

l)  On the Twelfth Cause of Action, entry of a judgment against Defendants Darling, Caldwell, Ventricelli, Smits, and Carrey by this Court in an amount to be determined at trial, but in an amount of at least $100 million, plus pre-judgment interest;

m) On the Thirteenth Cause of Action, entry of a judgment against Defendants Darling and Long by this Court in an amount to be determined at trial, but in an amount of at least $100 million, plus pre-judgment interest;

n)  On the Fourteenth Cause of Action, entry of a judgment against Defendants Darling, Caldwell, Ventricelli, Smits, and Carrey by this Court in an amount to be determined at trial, but in an amount of at least $100 million, plus pre-judgment interest;

o)  On the Fifteenth Cause of Action, entry of a judgment against Defendants Darling and Long by this Court in an amount to be determined at trial, but in an amount of at least $100 million, plus pre-judgment interest;

p)  awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

q)  awarding Plaintiff post-judgment interest at the maximum rate permitted by law; and

r)  awarding Plaintiff such other and further relief as this Court deems just and proper.

Dated: March 16, 2023

**GRANT & EISENHOFER P.A.**

*/s/ Gordon Z. Novod*
Gordon Z. Novod
Thomas Walsh
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com
        twalsh@gelaw.com

and

Frank H. Griffin (*pro hac vice* application to be filed)
123 Justison Street
Wilmington, Delaware 19801
Tel: 302-622-7000
Email: fgriffin@gelaw.com

*Special Counsel for Plaintiff, Peter Hurwitz, as Trustee of the GBG USA Litigation Trust*

**Exhibit A**

# GBG USA Inc. Structure Chart

