**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Response Due: July 24, 2024**
**Hearing: September 10, 2024 10:00 AM**

| | |
|---|---|
| In re<br><br>GBG USA Inc., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 21-11369 (MEW)<br><br>Jointly Administered |
| PETER HURWITZ, AS LITIGATION TRUSTEE OF THE GBG USA LITIGATION TRUST,<br><br>Plaintiff,<br>v.<br><br>FUNG HOLDINGS (1937) LIMITED, FUNG DISTRIBUTION INTERNATIONAL LIMITED, STEP DRAGON ENTERPRISE LIMITED, GOLDEN STEP LIMITED, WILLIAM FUNG KWOK LUN, KING LUN HOLDINGS LIMITED, FIRST ISLAND DEVELOPMENTS LIMITED, VICTOR FUNG KWOK KING, SPENCER THEODORE FUNG, HSBC TRUSTEE (C.I.) LIMITED, SOLELY IN ITS CAPACITY AS TRUSTEE OF "THE VICTOR TRUST," BRUCE PHILIP ROCKOWITZ, AND HURRICANE MILLENNIUM HOLDINGS LIMITED,<br><br>Defendants. | Adv. Pro. No. 23-01022 (MEW) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

[1] The debtors in these chapter 11 cases and the last four digits of each debtor's federal taxpayer identification number are as follows: GBG USA Inc. (2467), Jimlar Corporation (8380), GBG North America Holdings Co., Inc. (5576), Homestead International Group Ltd. (0549), IDS USA Inc. (7194), MESH LLC (8424), Frye Retail, LLC (1352), Krasnow Enterprises, Inc. (0122), Krasnow Enterprises Ltd. (0001), Pacific Alliance USA, Inc. (0435), GBG Spyder USA LLC (9108), and GBG Sean John LLC (1287). The Debtors' mailing address was GBG USA Inc., P.O. Box 4965, Greensboro, NC 27404.

# TABLE OF CONTENTS

PAGE


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 6

A. The Parties and Relevant Non-Parties. ..... 6

B. The Centric Sale Is Executed Through the Sale of Securities, and the Special Dividend Cash Transfer Is Paid in Connection with, and To Settle, this Sale. ..... 7

1. The Centric Sale Was a Sale of Securities. ..... 7

2. The Special Dividend Was Designed To Distribute the Value of the Securities That Were Sold in the Centric Sale. ..... 7

3. The Special Dividend Is Fixed Based on the Closing Price of the Centric Sale. ..... 8

4. GBG USA Makes the Special Dividend Cash Transfer as a Customer of Citibank, With Citibank Acting as GBG USA's Agent. ..... 9

C. GBG USA and GBGH Inform Their Lenders of, and Receive Their Lenders' Permission To Pay, the Special Dividend. ..... 9

D. The Controlling Shareholders Forego the Special Dividend, But Still Return the Entire Value of the Special Dividend Cash Transfer (and More) To Pay Down GBG USA Debt. ..... 10

1. The Waiver Agreement. ..... 10

2. Fung Holdings Returns $94 Million To Pay Down GBG USA's Debt. ..... 11

3. The Controlling Shareholders Forego the Special Dividend. ..... 12

4. GBGH Pays the Special Dividend To Distribute Value From the Centric Sale to Its Non-Controlling Shareholders. ..... 13

5. Fung Holdings Restores $106 Million More To Pay Down GBG USA's Debt, As the Waiver Agreement Required. ..... 13

E. Repaying the December Shareholder Loan Did Not Diminish GBG USA's Assets. ..... 14

F. GBG USA Files For Bankruptcy Over Two Years After the Challenged Transactions. ..... 17

G. The Plaintiff's Investigation and this Adversary Proceeding. ..... 17

ARGUMENT ..... 18

I. THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE DEFENDANTS. ..... 18

A. The Plaintiff Does Not Plead Minimum US Contacts Relating to the Special Dividend Cash Transfer. ..... 20

B. The Plaintiff Does Not Plead Fung Holdings' Minimum US Contacts Relating to the Repayment of the December Shareholder Loan. ..... 24

C. Claims Against HSBC Trustee Must Be Dismissed for An Additional, Independent Reason. .......... 25

1. Plaintiff Does Not Allege Any Jurisdictionally Significant Conduct by HSBC Trustee, which Forecloses Any Finding of Jurisdiction Over This Defendant. .......... 27

2. Plaintiff's Allegations Regarding Conduct by "The Victor Trust," its Management Committee, or its Beneficiaries Cannot Support Personal Jurisdiction. .......... 28

II. THE COMPLAINT FAILS TO STATE A CLAIM WITH RESPECT TO THE SPECIAL DIVIDEND CASH TRANSFER OR REPAYMENT OF THE DECEMBER SHAREHOLDER LOAN .......... 29

A. The Plaintiff Fails To State a Claim To Recover the Special Dividend Cash Transfer Because its Entire Value (and More) Was Returned to GBG USA. .......... 29

B. The Plaintiff Fails To State a Claim To Avoid or Recover GBG USA's Repayment of the December Shareholder Loan Because This Transfer Merely Returned Money that was Previously Sent to GBG USA. .......... 33

III. THE PLAINTIFF FAILS TO ALLEGE GBG USA INTENDED TO HINDER, DELAY OR DEFRAUD CREDITORS .......... 34

IV. THE PLAINTIFF'S CLAIMS TO AVOID THE SPECIAL DIVIDEND CASH TRANSFER ARE BARRED BY SECTION 546(E)'S SAFE HARBOR .......... 39

A. The Special Dividend Cash Transfer Was a Transfer Made "In Connection with a Securities Contract." It Was Also a "Settlement Payment." .......... 40

B. The Special Dividend Cash Transfer Was Made by a Financial Institution .......... 43

V. THE PLAINTIFF FAILS TO STATE A CLAIM TO RECOVER TRANSFERS RELATED TO THE SPECIAL DIVIDEND CASH TRANSFER FROM THE NON-TRANSFEREES .......... 47

A. The Non-Transferees Are Not Initial or Subsequent Transferees of the Special Dividend Cash Transfer. .......... 47

B. The Non-Transferees Are Not Entities "For Whose Benefit" the Special Dividend Cash Transfer Was Made. .......... 48

CONCLUSION .......... 50

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*In re 45 John Lofts*, *LLC*,
599 B.R. 730 (Bankr. S.D.N.Y. 2019) ..... 32

*In re Adelphia Comm'n Corp.*,
2006 WL 687153 (Bankr. S.D.N.Y. Mar. 6, 2006) ..... 33, 34

*In re Art Unlimited, LLC*,
2007 WL 2670307 (E.D. Wis. Sept. 6, 2007) ..... 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 18

*Bash v. Textron Fin. Corp.*,
2013 WL 12526002 (N.D. Ohio July 22, 2013) ..... 30

*In re Bassett*,
221 B.R. 49 (Bankr. D. Conn. 1998) ..... 32, 33

*In re Bean*,
252 F.3d 113 (2d Cir. 2001) ..... 3, 30, 32, 33

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 18

*In re Boston Generating LLC*,
617 B.R. 442 (Bankr. S.D.N.Y. 2020) ..... *passim*

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
582 U.S. 255 (2017) ..... *passim*

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ..... 27

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ..... 6

*Chapin Home for the Aging v. McKimm*,
2014 WL 12883697 (E.D.N.Y. Aug. 7, 2014) ..... 25

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ..... *passim*

*In re CM Holding, Inc.*,
264 B.R. 141 (Bankr. D. Del. 2000) ..... 48

*Crescent Res. Litig. Tr. v. Duke Energy Corp.*,
500 B.R. 464 (W.D. Tex. 2013)....................42, 43

*In re Cybridge Corp.*,
312 B.R. 262 (D.N.J. 2004)....................30

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)....................19

*In re DeBerry*,
945 F.3d 943 (5th Cir. 2019)....................30, 31, 32

*Dole Food Co. v. Patrickson*,
538 U.S. 468 (2003)....................21, 23

*Enron Cred. Recov. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011)....................42

*In re Enron Creditors Recovery Corp.*,
407 B.R. 17 (Bankr. S.D.N.Y. 2009).................... *passim*

*In re Fairfield Sentry Ltd.*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020)....................44, 45, 46

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
130 F.3d 52 (2d Cir.1997)....................47

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021)....................19

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011)....................19

*Hanson v. Denckla*,
357 U.S. 235 (1958)....................19, 25, 29

*In re Harlin*,
325 B.R. 184 (Bankr. E.D. Mich. 2005)....................30

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995)....................3, 31, 32, 33

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984)....................27

*Hurwitz v. Li & Fung (Trading) Ltd. et al.*,
No. 23-ap-1153 (Bankr. S.D.N.Y. Dec. 6, 2023)....................15, 17

*In re Incare LLC*,
2018 WL 2121799 (Bankr. E.D. Pa. May 7, 2018) ....................30, 31

*In re Jackson*,
318 B.R. 5 (Bankr. D.N.H. 2004), ....................32

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
913 F.2d 846 (10th Cir. 1990) ....................43

*In re Kingsley*,
2007 WL 1491188 (Bankr. S.D. Fla. May 17, 2007) ....................30, 32

*Kulko* v. *California Super. Ct.*,
436 U.S. 84 (1978)....................25

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)....................16

*In re Lease-A-Fleet, Inc.*,
155 B.R. 666 (Bankr. E.D. Pa. 1993) ....................34, 39

*Melamed v. Lake Cnty. Nat'l Bank*,
727 F.2d 1399 (6th Cir. 1984) ....................34

*In re MFS/Sun Life Trust-High Yield Series*,
910 F. Supp. 913 (S.D.N.Y. 1995) ....................36, 38

*In re Nine W. LBO Sec. Litig*.,
482 F. Supp. 3d 187 (S.D.N.Y. 2020)....................42, 46

*In re Nine West LBO Sec. Litig.*,
87 F.4th 130 (2d Cir. 2023) ....................45, 46

*Nostalgia Network, Inc. v. Lockwood*,
315 F.3d 717 (7th Cir. 2002) ....................32

*In re Old CarCo LLC*,
435 B.R. 169 (Bankr. S.D.N.Y. 2010).................... *passim*

*Orr v. Kinderhill Corp.*,
991 F.2d 31 (2d Cir. 1993)....................3, 33

*In re Oxford Health Invs., LLC*,
2002 WL 31031631 (Bankr. M.D.N.C. Sept. 3, 2002)....................34

*In re Patts*,
470 B.R. 234 (Bankr. D. Mass 2012) ....................30

*Phoenix Light SF Ltd. v. Bank of New York Mellon*,
66 F.4th 365 (2d Cir. 2023) ....................................................................................2

*Picard v. Ida Fishman Revocable Tr.*,
773 F.3d 411 (2d Cir. 2014)....................................................................................40, 41

*In re Polichuk*,
506 B.R. 405 (Bankr. E.D. Pa. 2014) ....................................................................31

*In re Quorum Healthcare Corp.*,
2023 WL 2552399 (Bankr. D. Del. Mar. 16, 2023)................................................40, 42

*Reed v. Luxury Vacation Home LLC*,
632 F. Supp. 3d 489 (S.D.N.Y. 2022)......................................................................29

*Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*,
10 F.4th 87 (2d Cir. 2021) .......................................................................................28

*In re Sawran*,
359 B.R. 348 (Bankr. S.D. Fla. 2007).....................................................................31, 32

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018) ...................................................................19, 20, 24

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
634 B.R. 39 (Bankr. S.D.N.Y. 2021) ......................................................................28

*Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*,
234 B.R. 293 (Bankr. S.D.N.Y. 1999) ...................................................................30, 47, 49, 50

*In re Sharp Intern. Corp.*,
403 F.3d 43 (2d Cir. 2005).......................................................................................35

*In re Sledziejowski*,
2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016) .............................................22

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018).....................................................................................2, 22, 24

*SPV Osus Ltd. v. UniCredit Bank Austria*,
2019 WL 1438163 (S.D.N.Y. Mar. 30, 2019) .........................................................20

*Steel Co. v. Citizens for a Better Environment*,
523 U.S. 83 (1998).....................................................................................................2

*In re SunEdison, Inc.*,
620 B.R. 505 (Bankr. S.D.N.Y. 2020) .....................................................................44

*Tatoian v. Junge*,
2013 WL 6195486 (D. Conn. Nov. 26, 2013) ....................25

*In re Tops Holding II Corp.*,
646 B.R. 617 (Bankr. S.D.N.Y. 2022) ....................46

*In re Tribune Fraudulent Conveyance Litig.*,
946 F.3d 66 (2d Cir. 2019) .................... *passim*

*In re Tribune Fraudulent Conveyance Litig.*,
2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ....................36

*In re Tribune Fraudulent Conveyance Litig.*,
2018 WL 6329139 (S.D.N.Y. Nov. 30, 2018) ....................35

*In re Tronox Inc.*,
464 B.R. 606 (Bankr. S.D.N.Y. 2012) ....................30, 31

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
892 F. Supp. 2d 805 (N.D. Tex. 2012) ....................43

*Walden v. Fiore*,
571 U.S. 277 (2014) .................... *passim*

**STATUTES**

6 Del. C. § 1304 ....................35

11 U.S.C. § 101 ....................40, 44

11 U.S.C. § 546 ....................39, 40

11 U.S.C. § 550 ....................30, 47

11 U.S.C. § 741 ....................40, 42

N.C. Gen. Stat. § 39-23.4(a)(1) ....................35

N.Y. EST. POWERS & TRUSTS LAW § 7-2.1 ....................28

N.Y. U.C.C. § 4-104(1)(e) ....................45

**OTHER AUTHORITIES**

76 AM. JUR. 2D *Trusts* § 306 ....................29

Fed. R. Bankr. P. 7012 ....................1, 18

Fed. R. Civ. P. 9 ....................35

Fed. R. Civ. P. 12 ........................................ 1, 18

Fed. R. Civ. P. 17 ........................................ 28

Pursuant to Fed. R. Civ. P. 12(b)(2) & (6) and Fed. R. Bankr. P. 7012, defendants Fung Holdings (1937) Limited, Fung Distribution International Limited, Step Dragon Enterprise Limited, Golden Step Limited, William Fung Kwok Lun, King Lun Holdings Limited, First Island Developments Limited, Victor Fung Kwok King, Spencer Theodore Fung, HSBC Trustee (C.I.) Limited, solely in its capacity as trustee of "The Victor Trust," Bruce Philip Rockowitz, and Hurricane Millennium Holdings Limited (together, the "**Defendants**") submit this Memorandum of Law In Support of their Motion To Dismiss the First Amended Complaint (the "**Complaint**" or "**Compl.**," (Adv. Pro. Dkt. No. 55)) filed in the above-captioned adversary proceeding (the "**Adversary Proceeding**") by Peter Hurwitz (the "**Plaintiff**"), as trustee of the GBG USA Litigation Trust.[2]

## PRELIMINARY STATEMENT

This is not a case of fraudulent intent or transactions that harmed creditors. Quite the opposite. Stripped of its rhetoric, the Complaint's factual allegations make plain that the Defendants entered transactions that resulted in an overall net gain for GBG USA, Inc. ("**GBG USA**") and its affiliated debtors in this Chapter 11 Case (the "**Debtors**") and, ultimately, their estates. Some of the Defendants even publicly declined to accept dividend payments the Plaintiff now seeks to set aside. At its core, the Complaint alleges that the Defendants sought to aid GBG USA, not defraud it or its creditors.

The Complaint also alleges, as it must, that the challenged transactions were publicly disclosed. Global Brands Group Holdings Limited ("**GBGH**"), which was GBG USA's ultimate parent, was a public company listed on the Hong Kong Stock Exchange and had shareholder

2 References to an "Adv. Pro. Dkt. No." are to the ECF docket numbers in the Adversary Proceeding. References to a "Ch. 11 Dkt. No." are to the ECF docket numbers in the above-captioned Chapter 11 case (the "**Chapter 11 Case**").

approval for its actions. What's more, the transactions the Plaintiff now challenges were conducted with transparency towards the lenders, all of whom consented to the transactions, dividends and loans at issue here.

Relying on section 544(b) of the Bankruptcy Code, the Plaintiff seeks to avoid as actual or constructive fraudulent conveyances two prepetition transfers made by GBG USA and to recover these or subsequent transfers from certain former GBGH shareholders (*i.e.*, the Defendants): (1) a transfer of $196 million that GBG USA made to GBGH on March 28 and 29, 2019 (the "**Special Dividend Cash Transfer**"), which allegedly funded GBGH's payment of an April 4, 2019 special dividend (the "**Special Dividend**") to some of its shareholders, and (2) GBG USA's March 26, 2019 transfer to Fung Holdings (1937) Limited ("**Fung Holdings**") of approximately $100 million, which allegedly repaid a loan of the same amount (the "**December Shareholder Loan**") that GBGH obtained from Fung Holdings in December 2018.

The Bankruptcy Code's fraudulent transfer provisions do not support the Plaintiff's claims because they were not meant to pursue transfers that were already returned to a debtor, or that did not deplete a debtor's estate in the first place. Far from stating any viable claim, the Plaintiff's claims against the Defendants should be dismissed entirely and with prejudice for at least the following reasons.

*First*, the Plaintiff fails to allege facts sufficient to establish that this Court has personal jurisdiction over any Defendant, and all claims against them should be dismissed.[3]

---

[3] While personal jurisdiction must be resolved before proceeding to Rule 12(b)(6) issues, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S. Ct. 1003 (1998), courts in the Second Circuit have discretion to dismiss without deciding personal jurisdiction when threshold questions present a less burdensome course than deciding constitutional-jurisdiction questions. *See Phoenix Light SF Ltd. v. Bank of New York Mellon*, 66 F.4th 365, 370 (2d Cir. 2023); *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 346-47 (2d Cir. 2018) (Calabresi, J. concurring). It may be more efficient for purposes of this Motion for the Court to consider non-jurisdictional arguments first, since they

*Second*, the Plaintiff's own allegations, along with other material that may be considered on this Motion, show that neither the Special Dividend Cash Transfer nor the repayment of the December Shareholder Loan diminished GBG USA's assets or otherwise harmed its creditors.

Rather, per an agreement GBG USA negotiated with its lenders, the *full value* of the Special Dividend Cash Transfer (and more) was replenished by certain Defendants and used to pay down GBG USA's prepetition debt. Thus, GBG USA has *already* recovered the Special Dividend Cash Transfer. Because section 550(a) of the Code—the only provision the Plaintiff can rely on to seek recovery—permits the Plaintiff merely to "recover" an avoided transfer, the Plaintiff's attempt to obtain the same funds twice necessarily fails. The Plaintiff's bold attempt to reap a windfall—from the same people who declined to receive *any* part of the Special Dividend but ensured that the *entire* value of the Special Dividend Cash Transfer was returned to GBG USA nonetheless—is also outrageously inequitable and barred by section 550(d) of the Code, which "categorically limits" the Plaintiff "to a single satisfaction." *In re Bean*, 252 F.3d 113, 117 (2d Cir. 2001).

Similarly, when GBG USA repaid the December Shareholder Loan, it was only returning the same funds that it previously received, indirectly, from Fung Holdings. This round-trip, wash transaction must be "evaluated in context," *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993), and cannot support a fraudulent-transfer claim because it had no impact on "the debtor's ability to meet its obligations," *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).

*Third*, the Plaintiff fails to state a claim for an intentionally fraudulent transfer. The Complaint's allegations do not permit even a reasonable—much less the required "strong"—inference that GBG USA or its former directors and officers intended to hinder, delay or defraud

---

provide a way to dispose of the entire Complaint without the Defendant-by-Defendant, claim-by-claim analysis that is required to make determinations concerning personal jurisdiction.

creditors. Regarding the Special Dividend Cash Transfer, the Plaintiff's allegations show that, before any cash was transferred beyond the reach of a guarantor of GBG USA's loan obligations, GBG USA (i) informed its lenders (and the world generally) about the Special Dividend, (ii) got lender permission for GBGH to pay the Special Dividend, and (iii) procured commitments from certain Defendants—who were some of GBG USA's ultimate beneficial owners—not only to refrain from taking their portion of the Special Dividend, but also to replenish the *entire* value of the Special Dividend Cash Transfer to pay down GBG USA's debt. As the Plaintiff alleges, these commitments resulted in certain Defendants providing $200 million—$4 million more than the $196 million Special Dividend Cash Transfer—to pay down GBG USA's prepetition debt. These are the acts of individuals intent on aiding GBG USA, not someone intending to defraud lenders.

Similarly, if GBG USA intended to defraud creditors by repaying the December Shareholder Loan, it would make no sense to execute a round-trip, wash transaction with no impact on GBG USA's ability to satisfy its debts. But that is exactly what the repayment of the December Shareholder Loan was, which precludes any inference of fraudulent intent.

*Fourth*, the Plaintiff's claims to avoid the Special Dividend Cash Transfer are barred by the safe harbor in section 546(e) of the Code, which protects, *inter alia*, transfers made by a financial institution that are either settlement payments or are made in connection with a securities contract. The Plaintiff's allegations show that the Special Dividend Cash Transfer was intended to, and did, distribute to GBGH and certain of its shareholders the value of the securities that GBG USA sold to an unaffiliated company pursuant to a purchase and sale agreement. Thus, the Special Dividend was both a "transfer in connection with a securities contract" and a "settlement payment," satisfying the first of section 546(e)'s requirements. The Plaintiff's allegations also show that Citibank made the Special Dividend Cash Transfer while acting as an agent for its

customer GBG USA in connection with a securities contract (*i.e.*, the purchase and sale agreement). Thus, pursuant to section 101(22)(A) of the Code, GBG USA itself qualifies as a "financial institution" for purposes of section 546(e). Because the Special Dividend Cash Transfer was made by a "financial institution," section 546(e)'s final requirement is satisfied, and all the Plaintiff's claims to avoid the Special Dividend Cash Transfer are foreclosed.

*Finally*, the Plaintiff fails to state a claim to recover the Special Dividend Cash Transfer or any subsequent transfers from all but one of GBGH's "Controlling Shareholders."[4] Even if the Plaintiff could avoid the initial transfer, section 550(a) of the Code authorizes the Plaintiff to recover from only an initial or subsequent transferee, or "an entity for whose benefit" an initial transfer was made. But GBGH (which is not a defendant here) is the only alleged initial transferee of the Special Dividend Cash Transfer. And Controlling Shareholders Fung Holdings, Victor Fung, King Lun Holdings Limited, Fung Distribution International Limited, Step Dragon Enterprise Ltd, Golden Step Ltd., and the Victor Trust. (the "**Non-Transferees**") are not subsequent transferees because the Plaintiff's own allegations show that their entire allocation of the Special Dividend was withheld by GBGH as required by a pre-existing contract (*i.e.*, the Waiver Agreement, as defined below). Nor are the Non-Transferees entities for whose benefit the initial transfer was made. Whatever benefit they could theoretically have received would have come from the Special Dividend (*i.e.*, the subsequent transfer), which does not suffice. And the only "benefit" the Non-Transferees allegedly received from the Special Dividend was GBGH's promise to treat their allocation as an unsecured, interest free, subordinated loan from the Controlling Shareholders,

---

[4] The Plaintiff alleges that, "[f]or purposes of the Special Dividend," defendants Fung Holdings, Dr. William Fung, Victor Fung, King Lun Holdings Limited, Fung Distribution International Limited, Step Dragon Enterprise Ltd, Golden Step Ltd., and the Victor Trust (together, the "**Controlling Shareholders**") were "Controlling Shareholders" of GBGH. Compl. ¶ 108.

which the Plaintiff does not, and cannot, allege was ever repaid by GBGH.

None of these deficiencies are new. The Defendants raised each of these deficiencies in their first motion to dismiss. *See* Adv. Pro. Dkt. No. 41. Yet, despite having years to investigate his claims, access to over 1.6 million documents, and the chance to amend the Complaint, the Plaintiff fails to address these deficiencies. The Complaint should be dismissed with prejudice.

## BACKGROUND[5]

### A. The Parties and Relevant Non-Parties.

Before liquidating pursuant to the First Amended Joint Liquidating Plan of the Debtors, (the "**Plan**," (Ch. 11 Dkt. No. 512)), GBG USA was a Delaware corporation headquartered in New York. Compl. ¶ 34. GBG USA ran a branded apparel and brand management company. *Id.* ¶ 39. GBGH, which is in liquidation in Bermuda, was a Bermuda company headquartered in Hong Kong and publicly listed on the Hong Kong Stock Exchange. *Id.* ¶¶ 2, 4, 35. Since GBGH's listing in 2014, GBG USA was the core operating entity of the entire GBGH group of companies, while GBGH was the holding company, and ultimate parent of GBG USA. *See id.* ¶ 2, Ex. A.

The Plaintiff is the trustee of a trust established by the Plan to pursue "Preserved Claims" "on behalf of the Debtors," Plan §§ 7.05, 1.73, as their "successor in interest." Compl. ¶ 1.

The Plaintiff alleges that the Defendants "directly or indirectly" owned shares of GBGH. *See, e.g.*, *id.* ¶¶ 20-21. As Appendix A shows, Plaintiff does not allege that any Defendant is incorporated or headquartered, or resides, in the United States. *Id.* ¶¶ 20-32.[6]

---

[5] Facts in this section are drawn from allegations in the Complaint, which are accepted as true only for purposes of this Motion. Facts are also taken from material which the Complaint quotes and incorporates by reference, as well as matters of which judicial notice may be taken. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[6] The Defendants, as well as their headquarters and places of incorporation or residence, are listed in **Appendix A**. The former officers and directors of GBG USA (the "**Ds&Os**"), as well as the alleged positions they held with GBG USA, are also described in Appendix A. The Plaintiff has dismissed with prejudice all claims he asserted against the Ds&Os. *See* Adv. Pro. Dkt. No. 27.

### B. The Centric Sale Is Executed Through the Sale of Securities, and the Special Dividend Cash Transfer Is Paid in Connection with, and To Settle, this Sale.

#### 1. The Centric Sale Was a Sale of Securities.

The core facts of this case begin in 2018, with the sale by GBG USA and GBGH of GBG USA's North American licensing business to Centric Brands, Inc. (the "**Centric Sale**"). Compl. ¶¶ 4, 59; Hutten Decl.[7] Ex. A (Purchase and Sale Agreement (the "**PSA**")) (June 27, 2018).

GBG USA and GBGH effectuated the Centric Sale through a sale of securities. The PSA—which is incorporated by reference and relied on in the Complaint, *see* Compl. ¶¶ 59-60—required the Centric Sale to be executed through a corporate reorganization that (i) made each so-called "Transferred Entity" a subsidiary of a "NewCo," (2) made GBG USA the "beneficial owner of 100% of the issued and outstanding equity interests of NewCo," and (3) provided for Centric's "purchase" of these equity interests from GBG USA. Hutten Ex. A (PSA) at 1 (Recitals), §§ 2.1, 3.2(a)-(b).

#### 2. The Special Dividend Was Designed To Distribute the Value of the Securities That Were Sold in the Centric Sale.

On June 27, 2018—the same day the PSA was signed—GBGH announced in papers filed publicly with the Hong Kong Stock Exchange that the Centric Sale would allow GBGH "to repay some existing financial debt," and would "allow [s]hareholders to realise, by way of the payment of a proposed special dividend," "substantial value from their shareholdings in" GBGH. Hutten Decl. Ex. B (GBGH Announcement) at 2 (June 27, 2018). On July 18, 2018, GBGH reiterated in a Circular and "Letter from the Board"—which the Plaintiff relies on and incorporates by reference in the Complaint, *see* Compl. ¶¶ 61-62—that the Special Dividend was intended to provide "a substantial and immediate cash realization to Shareholders from the outcome of the [Centric Sale]." Hutten Decl. Ex. C. (GBGH Circular and Notice of Special Meeting) at 16 (July 18, 2018).

---

[7] References to the "Hutten Decl." and exhibits thereto are to the Declaration of Henry V. Hutten in Support of Defendants' Motion To Dismiss, which is being filed with this Memo of Law.

On August 2, 2018, at a special shareholders' meeting that took place in Hong Kong, *see id.* at 5, N-1, the holders of GBGH's (publicly traded) shares "overwhelmingly" approved "the Centric Sale and the payment of a Special Dividend following the Centric Sale." Compl. ¶¶ 64, 66, 69. As the Plaintiff admits, the Special Dividend and Centric Sale were approved simultaneously by GBGH's shareholders at this shareholder meeting, *id.* ¶¶ 63-66, and the "promise to pay the Special Dividend was a substantial factor in gaining the GBGH shareholders' approval of the Centric Sale." *Id.* ¶ 69.

The poll results from this shareholder meeting, which the Complaint quotes and incorporates by reference, *see id.* ¶¶ 64-66, show that the payment of the Special Dividend was "subject to and conditional upon the closing of the" Centric Sale, and that "the final amount of the Special Dividend" would be "subject to adjustment" if the purchase price was adjusted upon closing. Hutten Decl. Ex. D (GBGH Poll Results) at 2-3 (Aug. 2, 2018); *see also* Hutten Decl. Ex. C (GBGH Circular and Notice of Special Meeting) at 8, 22 (July 18, 2018) (stating that the Special Dividend was "subject to closing of" the Centric Sale, and that the final amount of the Special Dividend "may be subject to adjustment in the event of any adjustments to the purchase price").

**3. The Special Dividend Is Fixed Based on the Closing Price of the Centric Sale.**

The Centric Sale closed on October 29, 2018 for approximately $1.2 billion. Compl. ¶¶ 4, 71. On January 31, 2019, GBGH's Board of Directors "fixed the amount of the Special Dividend" at "$HK0.28 per share." *Id.* ¶ 104. Even assuming that, as the Plaintiff alleges, GBG USA funded the Special Dividend by drawing on its credit facilities, *see id.* ¶¶ 111-14, the minutes of the meeting of GBGH's January 31 2019 Board of Directors—which the Plaintiff relies on and incorporates by reference, *see id.* ¶¶ 104-05—still show that the final amount of the Special Dividend was fixed so that GBGH could distribute to its shareholders the value that GBG USA obtained when it sold securities pursuant to the PSA. *See* Hutten Decl. Ex. E (GBGH Board

Meeting Minutes) at 1 (Jan. 31, 2019). The Plaintiff also admits that the "precise amount of the Special Dividend" was calculated using, and was specifically based upon, the final "purchase price that was paid at closing" of the Centric Sale. Compl. ¶ 95.

#### 4. GBG USA Makes the Special Dividend Cash Transfer as a Customer of Citibank, With Citibank Acting as GBG USA's Agent.

On March 28 and 29, 2019, GBG USA's Treasurer and Vice President "directed GBG USA" to pay $196 million from its "bank account at Citibank located in New York to GBGH." *Id.* ¶¶ 118-19. The Plaintiff's allegations show that Citibank followed its customer's instructions and transferred these funds on behalf of GBG USA: "by March 29, 2019, GBG USA had transferred a total of $196 million to GBGH." *Id.* ¶ 120. The Plaintiff admits that this transfer was intended "to fund the payment of the Special Dividend," *id.* ¶¶ 118-20, and that "GBGH used proceeds of the Special Dividend Cash Transfer to pay the Special Dividend to its shareholders." *Id.* ¶ 164.

### C. GBG USA and GBGH Inform Their Lenders of, and Receive Their Lenders' Permission To Pay, the Special Dividend.

Through a credit agreement dated October 29, 2018 (the "**RCF Agreement**")—the day that the Centric Sale Closed, *see id.* ¶ 70—GBG USA and GBGH entered into an agreement with HSBC USA, Citibank, Bank of America Merrill Lynch, Mizuho Bank and Standard Chartered (together, the "**RCF Lenders**") pursuant to which the RCF Lenders provided a $375 million line of credit (the "**Prepetition RCF**"). *Id.* ¶¶ 75-76. The Prepetition RCF "replace[d]" a $1.2 billion syndicated credit facility that GBG USA repaid on "completion of the Centric Sale." *Id.* ¶ 75. "GBG USA was the sole borrower under the Prepetition RCF," and "GBGH and each of the other Debtors were guarantors." *Id.* ¶ 76.

In November 2018, the directors and officers of GBGH and GBG USA began discussions with the RCF Lenders to try to resolve potential breaches of certain covenants in the RCF Agreement. *See id.* ¶¶ 130-31. Thus, the Plaintiff alleges that, "[b]y . . . March 14 2019," the "RCF

Banks were aware" that "GBGH intended to pay a Special Dividend in early April 2019," Compl. ¶¶ 133-34,[8] and therefore held "round the clock talks" with the officers and directors of GBGH and GBG USA that "focused on the conditions under which the RCF Banks would agree" to "permit GBGH to pay the Special Dividend." *Id.* ¶¶ 135-45. On April 3, 2019, the RCF Lenders, GBG USA and GBGH signed a waiver agreement (the "**Waiver Agreement**") to "ensure the payment of the Special Dividend on April 4, 2024." *Id.* ¶¶ 151-55.

Thus, before any portion of the Special Dividend Cash Transfer left the possession of GBGH—who was a guarantor of the Prepetition RCF and thus a provider of credit support—GBG USA's and GBGH's directors and officers not only informed the RCF Lenders of the Special Dividend, but also got their permission to pay it. As the Plaintiff admits, "the Special Dividend only occurred as a result of th[is] agreement with" the RCF Lenders. *Id.* ¶ 122.

### D. The Controlling Shareholders Forego the Special Dividend, But Still Return the Entire Value of the Special Dividend Cash Transfer (and More) To Pay Down GBG USA Debt.

Far from showing that GBG USA intended to defraud creditors—or even unintentionally harmed them—the Plaintiff's allegations show that, in exchange for the waivers allowing GBGH to pay the Special Dividend, GBG USA obtained commitments from the Controlling Shareholders to pay down the Prepetition RCF, and to withhold the Controlling Shareholders' entire portion of the Special Dividend. *Id.* ¶¶ 152-55. This paydown restored to GBG USA the *entire* value of Special Dividend Cash Transfer (and more). Thus, not only did the Controlling Shareholders agree to forego any benefit from the Special Dividend, they agreed to *increase* GBG USA's liquidity.

#### 1. The Waiver Agreement.

On April 3, 2019, GBG USA, GBGH and the RCF Lenders agreed that the RCF Lenders would waive certain covenants in the RCF Agreement to permit payment of the Special Dividend,

---

[8] GBG USA's creditors, including the RCF Lenders, almost surely were aware of the Special Dividend far earlier, given that it was announced publicly on June 27, 2018. *See supra* p. 7.

*see* Compl. ¶¶ 152-55; Hutten Decl. Ex. F (Waiver Agreement) § 1, so long as, *inter alia*, the following conditions precedent were satisfied:

- Fung Holdings and GBGH enter into an agreement (the "**New Shareholder Loan Agreement**") providing for an "interest free, unsecured and subordinated" loan of $94,181,882.90 from Fung Holdings to GBGH (the "**New Shareholder Loan**"). *See* Hutten Decl. Ex. F (Waiver Agreement) § 2.3; Compl. ¶ 154.
- GBGH apply the proceeds of the New Shareholder Loan to pay down the Prepetition RCF, on which GBG USA was the sole borrower. *See* Hutten Decl. Ex. F (Waiver Agreement) § 2.4; Compl. ¶¶ 154, 76.
- GBGH and the Controlling Shareholders execute a shareholder loan agreement (the "**Dividend Shareholder Loan Agreement**") "providing for the payment of the Controlling Shareholders' allocation of the Special Dividend" to GBGH in the form of an "interest free, unsecured and subordinated" loan (the "**Dividend Shareholder Loan**"). *See* Hutten Decl. Ex. F (Waiver Agreement) § 2.2; Compl. ¶ 154.
- Fung Holdings execute a deed of undertaking (the "**Deed of Undertaking**") to pay a further $94,181,882.90 to the RCF Lenders on May 31, 2019, unless amounts outstanding under the Prepetition RCF were reduced to $175 million or the Controlling Shareholders had provided the RCF Lenders with an acceptable standby letter of credit. Hutten Decl. Ex. F (Waiver Agreement) §§ 2.5, 3.2 & Ex. D (GBGH Poll Results) § 3; Compl. ¶ 154.

"GBGH provided the RCF [Lenders] with executed copies of the Dividend Shareholder Loan, New Shareholder Loan and Subordination Agreement contemporaneously with the executed Waiver [Agreement] on April 3, 2019." Compl. ¶ 163. As the Trustee admits, this was done to "ensure[e] that the Waiver Effective Date"—*i.e.*, satisfaction of the conditions precedent—occurred on April 3, 2019, "prior to the payment of the Special Dividend the following day." *Id.*

**2. Fung Holdings Returns $94 Million To Pay Down GBG USA's Debt.**

The New Shareholder Loan Agreement between Fung Holdings and GBGH is dated April 3, 2019 and required Fung Holdings to lend $94,181,882.90 to GBGH. Fung Holdings transferred these funds to GBGH on April 3, 2019, less than a week after the Special Dividend Cash Transfer. *See* Hutten Decl. Ex. G (New Shareholder Loan Agreement) §§ 3-4; Compl. ¶ 160. Critically, "the proceeds of the New Shareholder Loan were immediately applied to the amounts owed to the RCF Banks under the Prepetition RCF," Compl. ¶ 177, under which GBG USA was the "sole

borrower." Compl. ¶ 76. GBG USA is not a debtor or guarantor of the New Shareholder Loan and has *no* obligations thereunder. *See* Hutten Decl. Ex. G (New Shareholder Loan Agreement).

"The New Shareholder Loan was an interest-free, unsecured loan, and subordinated in right to payment." Compl. ¶ 161. The Plaintiff does not, and cannot, allege that GBGH (or GBG USA) ever paid any amounts due to Fung Holdings pursuant to the New Shareholder Loan.

**3. The Controlling Shareholders Forego the Special Dividend.**

The Dividend Shareholder Loan Agreement between GBGH and Fung Holdings is dated April 3, 2019 and provides for an interest free, unsecured subordinated loan of "$92,169,046.02." Hutten Decl. Ex. H (Dividend Shareholder Loan Agreement) § 3; Compl. ¶¶ 156, 158. The drawdown of this Loan occurred in two parts on April 4, 2019. First, $87,679,258.89 was "withheld by GBGH" from the Special Dividend and "treated as having been disbursed by Fung Holdings to GBGH." Hutten Decl. Ex. H (Dividend Shareholder Loan Agreement) § 4(b); Compl. ¶ 157. Second, Fung Holdings sent $4,489,787.13, "representing amounts" allegedly paid to "William Fung, his spouse, and First Island (through their brokers)" to "a GBGH designated account." Hutten Decl. Ex. H (Dividend Shareholder Loan Agreement) § 4(a); Compl. ¶ 157.

Consistent with the Controlling Shareholders' choice to forego the Special Dividend and "re-invest" their allocation in GBGH, Compl. ¶ 105, the $92,169,046.02 subject to the Dividend Shareholder Loan was the Controlling Shareholders' *entire* allocation of Special Dividend.[9] The

[9] The Plaintiff alleges that the Controlling Shareholders "elected the cash option for 2,583,959,205 of" their "GBGH shares," at "HK$0.28 per share," Compl. ¶¶ 104, 172, making the Controlling Shareholders' allocation of the Special Dividend worth HK$723,508,577.40. The Dividend Shareholder Loan Agreement also specifies that the $92,169,046.02 Dividend Shareholder Loan facility was "the equivalent of HK$723,508,577.40"—i.e., *the exact amount of the Controlling Shareholders' allocation*. Hutten Decl. Ex. H (Dividend Shareholder Loan Agreement) § 3. This "equivalent" also reflects an exchange rate of $HKD7.8497 = $1, which is within 1/100th of a Hong-Kong cent of the April 3, 2019 exchange rate ($HKD 7.8496) published by the Federal Reserve. *See* Hutten Decl. Ex. I (Federal Reserve Historic Weekly Foreign Exchange Rates) at 1 (Released April 8, 2019).

Plaintiff does not and cannot allege that GBGH ever repaid Fung Holdings or any other Controlling Shareholder for the Dividend Shareholder Loan.[10]

**4. GBGH Pays the Special Dividend To Distribute Value From the Centric Sale to Its Non-Controlling Shareholders.**

On April 4, 2019, "GBGH used proceeds of the Special Dividend Cash Transfer to pay the Special Dividend to its shareholders," Compl. ¶ 164, as was promised when the Centric Sale and Special Dividend were simultaneously approved by shareholders on August 2, 2018, and in an amount that was calculated based on the closing price of the Centric Sale. *See supra* p. 8-9.

The Plaintiff's allegations about the amount of the Special Dividend are confusing, but there is no dispute about what was actually paid. In one place, Plaintiff alleges that "the cash portion of the Special Dividend was approximately $280,526,000, as recorded on GBGH's Cash Flow Statement for the year ended March 31, 2020." Compl. ¶ 165. But elsewhere in the Complaint, Plaintiff acknowledges that this figure fails to account for, *inter alia*, the cash that GBGH withheld from the Controlling Shareholders, and admits that the "*net* cash dividend to be paid was . . . approximately $193 million." *Id.* ¶ 119 (emphasis added).[11]

**5. Fung Holdings Restores $106 Million More To Pay Down GBG USA's Debt, As the Waiver Agreement Required.**

The Waiver Agreement and Deed of Undertaking required Fung Holdings to pay the RCF Lenders roughly $94 million or secure an acceptable standby letter of credit if GBG USA's Prepetition RCF debt was not reduced to $175 million by May 31, 2019. Compl. ¶¶ 154, 178. To

---

10 Thus, the Plaintiff alleges at most that (i) of all the Controlling Shareholders, only William Fung was a transferee of the Special Dividend, and (ii) of the $92.2 million of the Special Dividend allocated to the Controlling Shareholders, only $4.5 million was transferred to any Controlling Shareholder, which amount was returned to GBGH by Fung Holdings on the day it was transferred.

11 Plaintiff's allegations about the amount of GBGH shares the Defendants owned, and upon which the Defendants' respective shares of the Special Dividend were purportedly calculated, are also inconsistent. *Compare* Compl. ¶ 31 (alleging that Mr. Rockowitz owned approximately 153k shares of GBGH) *with id.* ¶ 175 (alleging Mr. Rockowitz owned roughly 407k shares of GBGH).

achieve this reduction, GBGH and Fung Holdings entered another loan agreement (the "**Third Shareholder Loan Agreement**") dated May 30, 2019, pursuant to which Fung Holdings loaned GBGH $105,818,117.10. Compl. ¶¶ 179-80; Hutten Decl. Ex. J (Third Shareholder Loan Agreement) § 3. GBG USA is not a debtor or obligor with respect to the Third Shareholder Loan. *Id.*; Compl. ¶ 179-80. "The proceeds of the Third Shareholder Loan were used by GBGH" to pay down the Prepetition RCF—on which GBG USA was the sole borrower. Compl. ¶ 180.

The Third Shareholder Loan was also "interest-free, unsecured" and "subordinated in right to payment." *Id.* ¶ 181. The Plaintiff does not and cannot allege that GBGH (or GBG USA) repaid any amounts outstanding under the Third Shareholder Loan.

Thus, as required and contemplated by the Waiver Agreement, the New and Third Shareholder Loans resulted in exactly a $200,000,000 paydown of GBG USA's debt, without GBG USA incurring *any* obligations in return. As shown below, the net result was GBG USA receiving $4 million *more* than it transferred to GBGH in the Special Dividend Cash Transfer.




## E. Repaying the December Shareholder Loan Did Not Diminish GBG USA's Assets.

On December 18, 2018, Fung Holdings and GBGH entered a term loan agreement (the "**December Shareholder Loan**") whereby Fung Holdings loaned $100 million to GBGH. Compl.

¶¶ 102-03. *See also* Hutten Decl. Ex. K (December Shareholder Loan Agreement) § 3. Fung Holdings transferred the entire $100 million of loan proceeds "to GBGH's HSBC account in Hong Kong" on "December 20, 2018." Compl. ¶ 103. The Plaintiff admits that the very next day, on December 21, 2018, GBGH transferred this *entire* $100 million to GBG USA, without imposing any debt obligations on GBG USA in exchange these funds. *Id.*

On December 22, 2018, GBG USA transferred these proceeds to Millwork Pte Limited ("**Millwork**"), a subsidiary of GBGH. *Id.* Plaintiff's own allegations, and material cognizable on this motion, show that this transfer to Millwork paid down $100 million of GBG USA's debt. In particular, the Plaintiff alleges that, under a Buying Agency Agreement (the "**BAA**") between Millwork and a subsidiary of Li & Fung Limited ("**Li & Fung**"), Li & Fung and Millwork sourced products from vendors for the benefit of GBG USA. *See* Compl. ¶¶ 41-42. "Millwork would order products from . . . manufacturers" identified by Li & Fung, and then "take delivery of the product" for further shipment to GBG USA. *Id.* ¶ 41. "GBG USA" then "'purchased' from Millwork the products that Millwork had ordered on its behalf." *Id.*[12] "Millwork was responsible for remitting payment to Li & Fung for the invoiced amounts plus commissions" for finding the products. *Id.* ¶ 42. In other words, GBG USA was obligated to pay Millwork, who was then obligated to pay Li & Fung (or its subsidiary). The Plaintiff alleges that, pursuant to this arrangement, "GBGH and its subsidiaries owned hundreds of millions of dollars in outstanding debt to Li & Fung." *Id.*

In his original complaint, the Plaintiff freely admitted that the proceeds of the December Shareholder loan were used "to pay Li & Fung" amounts "owed to . . . vendors and suppliers"

---

[12] *See also* First Am. Compl. ¶¶ 38-39, *Hurwitz v. Li & Fung (Trading) Ltd. et al.*, No. 23-ap-1153 (Bankr. S.D.N.Y. Dec. 6, 2023) (alleging that under the BAA, "Millwork was responsible for purchasing goods for GBG USA," and that Millwork "arranged for shipment of orders to" GBG USA, after which "GBG USA would the make payment for all such orders to Millwork consistent with the terms of the invoice[s]" that Millwork issued to GBG USA).

pursuant to the BAA. *See* Original Complaint (Adv. Pro. Dkt. No. 7) ¶ 94. After Defendants moved to dismiss because the repayment of the December Shareholder Loan was a wash transaction without any material effect on GBG USA, *see* Adv. Pro. Dkt. No. 41 at 3-4, 34-35, the Plaintiff now omits that, by sending the $100 million December Shareholder Loan proceeds to Millwork, GBG USA paid down debt it owed to Millwork—and that Millwork ultimately owed to Li & Fung (or its subsidiary)—for goods purchased from vendors and suppliers. *See* Compl. ¶ 103.

But the Plaintiff took prolific pre-Complaint discovery of the Debtors' records. *See, e.g.*, Ch. 11 Dkt. Nos. 693, 793; Hutten Decl. ¶¶ 3, 5. Documents produced to Plaintiff over a year before he filed the Amended Complaint show that, after the December Shareholder Loan proceeds were "moved to GBG USA," GBG USA then "sent them t[o] Millwork (paying trade invoices) and Millwork sent them to 494 (paying trade invoices)." Hutten Decl. ¶ 17 & Ex. L (FCGS-04907721) at 1.[13] "494" is the Stock Code under which Li & Fung was listed on the Hong Kong Stock Exchange. *See* Hutten Decl. Ex. M (Hong Kong Exchange Announcement) at 1.

On March 26, 2019, GBG USA "funded GBGH's repayment of the December Shareholder Loan," by sending "$100 million plus any interest owed under the December Shareholder Loan from the United States directly to Fung Holdings." Compl. ¶ 123. Because GBG USA first received the $100 million proceeds from Fung Holdings, and then used these proceeds to offset $100 million of its intracompany debt to Millwork, GBG USA's net position was +$100 million

---

[13] Because the Plaintiff had actual notice of this transfer, and it is integral to his claims, it is proper to consider on this Motion the document showing that GBG USA paid down its debt when it transferred the proceeds of the December Shareholder Loan to Millwork. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 421-22 (2d Cir. 2011) (considering "five e-mail[s]" defendants attached to a Rule 12(c) motion because the plaintiff "had notice" of them before defendants filed them and they were "integral to" the "exchange that [plaintiff] identified as the basis for its [c]omplaint"). Indeed,"[p]laintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on a 12(b)(6) motion." *Id.* at 422.

just before repaying the December Shareholder Loan to Fung Holdings. Therefore, repayment of this amount had no material net effect on GBG USA. This can be seen in the following diagram:




**F. GBG USA Files For Bankruptcy Over Two Years After the Challenged Transactions.**

GBG USA operated for nearly 2.5 years after the Special Dividend Cash Transfer and the repayment of the December Shareholder Loan before it commenced the Chapter 11 Case on July 29, 2021, *see* Ch. 11 Dkt. No. 1. As Plaintiff concedes, GBG USA had to contend with the business implications of the Covid-19 pandemic, which the Plaintiff alleges "was catastrophic for" the Debtors, for over a year prior to GBG USA's bankruptcy. *See* Am. Compl. ¶ 183, *Hurwitz v. Li & Fung (Trading) Ltd. et al.*, No. 23-ap-1153(Bankr. S.D.N.Y Dec. 6, 2023) (Dkt. No. 18).

**G. The Plaintiff's Investigation and this Adversary Proceeding.**

Since the Plan was confirmed in February of 2022, the Plaintiff had "reasonable access to the Debtors' books and records" to "investigat[e] and pursu[e] the Preserved Claims." Plan Art. 7.05(e). The Plaintiff also received over 1.6 million documents from the service provider hosting the corporate records of GBG USA and GBGH, the vast majority of which were produced by January 2023. *See* Hutten Decl. ¶ 5. The Plaintiff also received documents from GBGH's liquidators. *See* Ch. 11 Dkt. Nos. 693, 793.

The Plaintiff filed his complaint on March 16, 2023. Defendants moved to dismiss, and the Plaintiff filed the Amended Complaint on May 10, 2024—over a year after receiving documents

from GBG USA's service provider. Relying on section 544(b) of the Code, the Plaintiff seeks to avoid and recover payments allegedly made to Defendants in connection with the Special Dividend Cash Transfer (Counts I-VI), asserting that it was an actual (Counts I, IV) and constructive (Counts II-III, V-VI) fraudulent transfer. Also relying on section 544(b), the Plaintiff seeks to avoid and recover GBG USA's repayment of the December Shareholder Loan (Counts VII-IX), contending that it constitutes an actual (Count VII) and constructive (Counts VII-IX) fraudulent transfer.

## ARGUMENT

This Court must dismiss a claim under FRCP 12(b)(2) where a plaintiff has failed to "mak[e] legally sufficient allegations of jurisdiction" over the defendant. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81-82 (2d Cir. 2018). This Court must dismiss a claim under FRCP 12(b)(6) and Bankruptcy Rule 7012(b), "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). The Plaintiff's allegations "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and provide "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Unlike factual allegations, legal conclusions "are not entitled to the assumption of truth." *Id.* at 679.

### I. THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE DEFENDANTS.

Of the Complaint's many shortcomings, the first is its failure to plead personal jurisdiction over any Defendant. Plaintiff has simply not met his burden to show "that jurisdiction exists" over each "particular [d]efendant," and "with respect to each claim asserted." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82-84 (2d Cir. 2018).

Plaintiff's attempt to plead specific jurisdiction fails as to each Defendant.[14] While the specific jurisdictional allegations vary among some Defendants, the fundamental shortcoming is the same: Plaintiff has not alleged sufficiently that the Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Plaintiff focuses on GBG USA's in-forum activity, but the law requires the minimum contacts necessary to show purposeful availment "must arise out of contacts that the 'defendant *himself*' creates with the forum[.]" *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Thus, the plaintiff (*i.e.*, GBG USA) "cannot be the only link between the defendant and the forum." *Id.* at 285. For jurisdiction to attach, the defendant's forum activity also must "*[give] rise to the episode-in-suit*." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (emphasis in original); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (explaining that plaintiff's suit "must arise out of or relate to the defendant's contacts with the forum" (internal quotation marks omitted)). Contacts that are "fortuitous," "attenuated," or result from "the unilateral activity of" another person do not suffice. *Walden*, 571 U.S. at 286.

Because the Plaintiff seeks to recover subsequent transfers of allegedly voidable transfers, the jurisdictional analysis "focuses on [Defendants' alleged] U.S. contacts related to the [alleged] receipt of the . . . subsequent transfers at issue." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018). Such alleged contacts here include purportedly dictating the terms of the Special Dividend Cash Transfer from Hong Kong, attending a shareholder meeting and voting to approve the Special Dividend in Hong Kong, and receipt of

[14] Plaintiff does not contend that Defendants are subject to this Court's general jurisdiction, for good reason. As shown in Appendix A, none are alleged to have a principal place of business in, be incorporated in, or have a residence or domicile in the US. *See Daimler AG v. Bauman*, 571 U.S. 117, 136-37 (2014). So Defendants' jurisdictional arguments focus on specific jurisdiction.

the Special Dividend abroad while knowing it came from the USA. These contacts did not "create a substantial connection with" the USA, *id.* at 189, so there is no jurisdiction over the Defendants.

HSBC Trustee (C.I.) Limited ("**HSBC Trustee**") is not subject to personal jurisdiction for an additional (and even more basic) reason. The Amended Complaint has dropped altogether its prior allegations that HSBC Trustee has jurisdictionally significant contacts with the United States, and replaced them with allegations that certain *beneficiaries* of The Victor Trust had such contacts. These misdirected allegations cannot form the basis for a constitutional exercise of personal jurisdiction over *HSBC Trustee* in this case.

### A. The Plaintiff Does Not Plead Minimum US Contacts Relating to the Special Dividend Cash Transfer.

The Plaintiff's jurisdictional theory concerning the Special Dividend Cash Transfer rests on the faulty reasoning that Defendants voted to authorize GBGH to pay the Special Dividend "using purported proceeds of the Centric Sale from GBG USA," and therefore supposedly "knew" or "intended" that their alleged Special Dividend payments "originated with GBG USA in the United States of America." *See* Compl. ¶¶ 270, 272-79. This fails for at least two reasons.[15]

*First*, the Plaintiff fails to allege that the Defendants had *any* contact with, or purposeful activity directed to, the US. The Notice of the Special General Meeting at which GBGH's shareholders approved GBGH's Special Dividend specifies that this meeting would take place in "Hong Kong." Hutten Decl. Ex. C (Notice of Special General Meeting) at N-1, N-2 (July 18,

[15] While Plaintiff's jurisdictional allegations as to all Defendants are insufficient, they are nonexistent for some. The Plaintiff simply concludes, without supporting factual allegations, that Fung Distribution International Limited has "sufficient minimum contacts with the United States of America to establish personal jurisdiction." Compl. ¶ 264. This does not suffice. *See SPV Osus Ltd. v. UniCredit Bank Austria*, 2019 WL 1438163, at *9 (S.D.N.Y. Mar. 30, 2019) ("a 'conclusory statement' that is only 'a restatement, with slight changes, of the legal standard' for exercising personal jurisdiction is inadequate to make a *prima facie* showing" (quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998)).

2018); *see also* Compl. ¶¶ 64, 66 (quoting the proposed shareholder resolutions included in this Notice). The Plaintiff alleges further that the Defendants "cast votes *at* that Special General Meeting" to approve the Special Dividend, "either personally" or by "prox[y]." Compl. ¶ 68 (emphasis added). Thus, as in *Walden*, the "relevant conduct occurred entirely" outside the US, and "the mere fact that [this] conduct affected [a] plaintiff[]," *i.e.*, GBG USA, "with connections to the" US "does not suffice to authorize jurisdiction." *Walden*, 571 U.S. at 289-91 (no jurisdiction where, as here, the defendant "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to" the relevant forum); *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 265, 268 (2017) (no jurisdiction when "all the conduct giving rise to" the claims "occurred elsewhere").[16]

*Second*, the Plaintiff cannot salvage this dispositive lack of contact by claiming that the Defendants voted for GBGH to pay the Special Divided with "the proceeds of the Centric Sale," and therefore knew, when receiving the Special Dividend, that the funds "originated with GBG USA in the United States of America." Compl. ¶¶ 270, 272-79. Plaintiff alleges two things that gut this argument: (a) except for William Fung, the Controlling Shareholders received no Special Dividend, *see supra* p. 12-13 & n. 10; and (b) the Special Dividend *was not* funded with the proceeds for the Centric Sale, but rather from GBG USA's draw on its credit facilities, Compl. ¶ 5, 7, 111-14, which contradicts the Plaintiff's claim about the origin of the Special Dividend funds. And, regarding the latter, Plaintiff cannot save its deficient jurisdictional allegations by concluding

---

[16] Indeed, the Defendants' alleged US contacts are far more attenuated than those that the Supreme Court has already deemed insufficient, since the Plaintiff alleges at most that the shareholder vote approving the Special Dividend authorized, but did not require, GBGH to take action, and the later actions of GBGH—*not the Defendants*—then caused GBG USA to pay the Special Dividend Cash Transfer. *See, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) (a "corporation and its shareholders are distinct entities").

that Defendants "knew," "intended" or "expected" that the money GBG USA drew from its credit facilities to fund the Special Dividend came from the United States, *see id.* ¶¶ 75, 104, 107, 121, 267, 272-79. Indeed, some lenders that allegedly funded this drawdown are based in Hong Kong, *e.g.*, *id.* ¶ 84, and Plaintiff makes no allegations about the location(s) of the bank accounts from which the drawdowns were funded, or the location of the accounts to which the drawn funds were deposited. *Id.* ¶¶ 111-14.

More importantly, even if Defendants "knew" that the Special Dividend funds originated from the US, this still would not establish minimum US contacts, given that it was GBGH or GBG USA, and not the Defendants, that created the US nexus.[17] *See Walden*, 571 U.S. at 291 (fact that the cash at issue "originated in" the forum was insufficient because, as here, that "connection was not created by" the defendant); *In re Sledziejowski*, 2016 WL 6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016) (transfer of funds made by third party from US to Polish entities did not create a contact between Polish entities and US sufficient to establish personal jurisdiction when Polish entities did not make the transfer).[18] Moreover, Defendants Step Dragon, Golden Step, King Lun

---

[17] Indeed, the Plaintiff alleges that GBGH negotiated and executed the PSA, and only after did the Defendants "approve" it and "authorise" GBGH to "implement" the Centric Sale. Compl. ¶¶ 58-64. Likewise, GBGH's shareholders merely authorized, but did not require, GBGH to pay the Special Dividend, and gave GBGH's directors "sole and absolute discretion" to decide whether and how the Dividend was paid—including to decide how it was funded. Hutten Decl. Ex. C (Notice of Special Gen. Meeting) at N-2 (July 18, 2018); Compl. ¶¶ 66, 68. The Plaintiff also alleges it was GBG USA's own Treasurer—*not any Defendant*—who "directed" that the Special Dividend Cash Transfer be made from GBG USA's account in New York. Compl. ¶¶ 118-19.

[18] *See also SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 344-45 (2d Cir. 2018) ("handful of communications and transfers of funds" were "too tenuous to support the exercise of specific jurisdiction"); *Charles Schwab*, 883 F.3d at 87 (allegation that defendants "knew" that their conduct would "produce substantial and foreseeable effects in the United States" failed to establish minimum contacts when, as here, the conduct occurred entirely outside the US) (internal quotation marks omitted); *Walden*, 571 U.S. at 289 (reversing decision that relied on defendant's "knowledge of [plaintiffs'] 'strong forum connections'" and "foreseeable harm in Nevada" to find jurisdiction there, since that "impermissibly allow[ed] a plaintiff's contacts with the defendant" to "drive the jurisdictional analysis").

and Hurricane Millennium are alleged to have this knowledge only "through" their shareholders or settlor, *see* Compl. ¶¶ 274-75, 277-78, which does not suffice. *See Dole*, *supra* n. 16.

Plaintiff's other related theories similarly fail.

- Plaintiff's contention that this Court has specific jurisdiction over the Controlling Shareholders because they were allegedly "able to" and "did" "dictate the terms of the Special Dividend Cash Transfer to GBG USA through GBGH," Compl. ¶¶ 265, 269, 271, 273-75, is a bald conclusion unsupported by any allegation of fact and cannot suffice to allege personal jurisdiction, *e.g.*, *Charles Schwab*, 883 F.3d at 86 ("bare allegation" that non-US defendants "controlled or otherwise directed" the US activities of their subsidiaries was insufficient).[19]

- Similarly, the Plaintiff does not and cannot allege that, in the course of their alleged conduct, the Controlling Shareholders took any action in the US, sent any communication to the US, or projected themselves into the US. Rather, the Plaintiff alleges that the Controlling Shareholders dictated the terms of the Special Dividend Cash Transfer "through GBGH," *e.g.* Compl. ¶¶ 269, 271, a Bermuda company headquartered in Hong Kong. Thus, the Plaintiff's theory, even if true, shows that the Controlling Shareholders acted entirely outside of the US, and that, at most, their (unidentified) actions then caused GBGH to dictate the Special-Dividend-Cash-Transfer terms to GBG USA. This is not enough to assert personal jurisdiction in the US. *See Walden*, 571 U.S. at 286 ("insufficient to rely on" a defendant's "attenuated contacts" or the "unilateral activity" of another) (internal quotation marks omitted).

- The Plaintiff's theory that, through participating in the meetings of GBGH's Board of Directors and Special Dividend Committee, William Fung "dictated the terms of the Special Dividend Cash Transfer on GBG USA," Compl. ¶ 265, and Bruce Rockowitz "approved of GBGH's direction that the Special Dividend be paid by GBG USA," *id.* ¶ 276, similarly fails. The mere allegation that Messrs. Fung and Rockowitz authorized the Special Dividend at non-US meetings falls short as it fails to allege that they were physically present in, sent any communications to, or otherwise projected themselves into the US. *See Bristol-Myers Squibb*, 582 U.S. at 268; *Walden*, 571 U.S. at 291. There are no allegations that Messrs. Fung or Rockowitz could, or did, influence the source of funds used by GBG USA when it allegedly drew on its credit facilities to fund the Special Dividend; much less are there allegations that Messrs. Fung or Rockowitz took any action in the US, sent any communication to the US, or projected themselves into the US in connection with GBG USA's draws on these facilities.

Thus, Plaintiff fails to allege facts that, if true, would establish personal jurisdiction over any Defendant regarding the Special Dividend Cash Transfer and Counts I-VI should be dismissed.

---

[19] The Plaintiff's bare conclusion is also contradicted by the shareholder resolution approving the Special Dividend, which shows that GBGH's shareholders merely authorized the Special Dividend, while giving GBGH's directors "sole and absolute discretion" over whether and how to pay it. *See* Hutten Decl. Ex. C (Notice of Special General Meeting) at N-2 (July 18, 2018).

### B. The Plaintiff Does Not Plead Fung Holdings' Minimum US Contacts Relating to the Repayment of the December Shareholder Loan.

The Plaintiff admits that Fung Holdings and GBGH—non-US companies located in Hong Kong—were the only parties to the December Shareholder Loan Agreement. *See* Compl. ¶ 102. The Plaintiff does not and cannot allege that the persons negotiating and executing the December Shareholder Loan on behalf of Fung Holdings did so from any place other than in Hong Kong. *See* Compl. ¶¶ 98-103.[20] The Plaintiff also admits that Fung Holdings funded this Loan by transferring money to GBGH's "account in Hong Kong." *Id.* ¶ 103. The Plaintiff does not allege that Fung Holdings played *any* role in requiring GBG USA to repay the December Shareholder Loan on behalf of GBGH, or that Fung Holdings took *any* action—much less action in or projected into the US—to facilitate GBG USA's repayment.[21] Rather, the Plaintiff alleges that "*GBGH* . . . required GBG USA to repay GBGH's obligations," *id.* ¶ 10 (emphasis added), and that, on March 26, 2019, *GBG USA's* Treasurer "directed that GBG USA send $100 million . . . directly to Fung Holdings" after receiving approval to do so from GBG USA's CEO and CFO, *id.* ¶ 123.

Thus, the sole basis that the Plaintiff asserts for this court's jurisdiction over Fung Holdings is that it "accepted the repayment of the December Shareholder Loan directly from GBG USA, despite its[] knowledge that GBGH was the borrower." *Id.* ¶ 270. But the passive receipt in Hong

[20] The Plaintiff alleges at most that an officer of Fung Holdings "provided"—presumably via e-mail—a "board paper" regarding the December Shareholder Loan to certain Ds&Os in the US. *See* Compl. ¶ 98. That does not suffice since (i) the Plaintiff's claims arise out of Fung Holdings' alleged *receipt* of GBG USA's repayment of the December Shareholder Loan, and not the negotiation or execution of the Loan, *see Madoff*, 594 B.R. at 190 and (ii) a single e-mail (out of the 1.6 million documents the Plaintiff possesses) describing the December Shareholder Loan cannot establish personal jurisdiction in any event. *See SPV Osus Ltd.*, 882 F.3d at 344-45.

[21] Indeed, the December Shareholder Loan Agreement has Hong Kong choice-of-law, -forum and -jurisdiction clauses, and provides that "[n]either party may assign any of its rights or transfer any of its rights or obligations" without "the prior written consent of the other party." Hutten Decl. Ex. K (Dec. Shareholder Loan Agreement) §§ 10, 12-13. The Plaintiff does not allege that Fung Holdings consented to any transfer of GBGH's obligations.

Kong of funds that GBG USA decided—or was required by GBGH—to repay is not a contact that Fung Holdings purposefully made with, or even projected into, the US. Rather, the only US connection is the independent activity of GBG USA, and this "unilateral activity" clearly "cannot satisfy the requirement of contact with the forum State." *Hanson*, 357 U.S. at 253-54 (no jurisdiction in Florida over a Delaware trustee that conducted no "activities within the forum," since the "unilateral activity" of the trust's settlor "c[ould] not remedy the absence of such an act."); *Bristol-Myers Squibb*, 582 U.S. at 268; *Walden*, 571 U.S. at 291; *Kulko* v. *California Super. Ct.*, 436 U.S. 84, 93 (1978) (impermissible to subject one parent to suit in a state where the other parent unilaterally chose to spend time while having custody of child pursuant to agreement).[22] And, as explained above, the allegation that Fung Holdings knew that GBG USA was sending funds owed to it by GBGH, Compl. ¶ 270, even accepted as true, cannot salvage the fatal lack of any allegation that Fung Holdings made its own purposeful contact with the US. *See Walden*, 571 U.S. at 289; *Charles Schwab*, 883 F.3d at 86.

Thus, the Plaintiff fails to allege personal jurisdiction over Fung Holdings regarding GBG USA's repayment of the December Shareholder Loan and Counts VII-IX should be dismissed.

**C. Claims Against HSBC Trustee Must Be Dismissed for An Additional, Independent Reason.**

Claims against HSBC Trustee must be dismissed for lack of personal jurisdiction for the reasons set forth in Sections I(A) and (B) above. But personal jurisdiction over this particular Defendant is lacking for an additional and even more fundamental reason: Plaintiff directs its jurisdictional allegations to trust *beneficiaries* rather than the entity it has sued, HSBC Trustee.

---

[22] *Accord Chapin Home for the Aging v. McKimm*, 2014 WL 12883697, at *6 (E.D.N.Y. Aug. 7, 2014) (receipt of funds does not constitute purposeful action to warrant exercise of personal jurisdiction); *Tatoian v. Junge*, 2013 WL 6195486, at *6 (D. Conn. Nov. 26, 2013) (passive receipt of funds from in-forum plaintiff cannot confer jurisdiction).

Plaintiff's pleading thus runs counter to bedrock principles of personal jurisdiction.

In the original complaint (Adv. Pro. Dkt. No. 7), Plaintiff alleged that HSBC Trustee was subject to personal jurisdiction because it owned shares of GBGH or other Defendants, Original Compl. ¶¶ 23, 28-29, 50, 162, received a portion of the Special Dividend from the USA, *id.* ¶ 260, had the power to and did dictate the terms of the Special Dividend payment, *id.*, and attended GBGH shareholder meetings and voted for the approval of the Special Dividend payment, *id.*

In its motion to dismiss, HSBC Trustee explained that these allegations were not only legally insufficient but also had no basis in fact, because HSBC Trustee is merely a corporate trustee, without a beneficial interest in any relevant entities or the power or authority to purposefully direct suit-related conduct to the United States. Mot. to Dismiss 25 (Adv. Pro. Dkt. No. 53). Acknowledging these facts, Plaintiff now abandons altogether any allegation that HSBC Trustee took jurisdictionally significant actions in, or directed to, the United States. It instead argues that the "The Victor Trust" directed conduct to the forum "[t]hrough William and Victor Fung." Compl. ¶ 273. Accordingly, Plaintiff now concludes that "The Victor Trust"—not HSBC Trustee—"could have reasonably anticipated being sued in the United States of America in connection with the Special Dividend Cash Transfer." *Id.*

The Amended Complaint is even further from establishing jurisdiction over HSBC Trustee than its predecessor. It is black letter law that to establish jurisdiction over a defendant (including a defendant that is a trustee), a plaintiff must point to jurisdictional contacts attributable to that defendant—not third parties. *Walden*, 571 U.S. at 284. Plaintiff's effort to establish jurisdiction over HSBC Trustee by pointing to actions taken by William and Victor Fung is fundamentally misguided. And even if Plaintiff intended to target "The Victor Trust" rather than HSBC Trustee, that still would require jurisdictionally significant conduct by HSBC Trustee. New York courts

consistently recognize that express trusts are not themselves legal entities with the capacity to be sued. Rather, courts must look to the *trustee* when assessing personal jurisdiction in disputes seeking judgments against trust assets.

Given the absence of any allegation that HSBC Trustee, acting on behalf of The Victor Trust, took jurisdictionally significant actions in the United States, claims against HSBC Trustee must be dismissed.

**1. Plaintiff Does Not Allege Any Jurisdictionally Significant Conduct by HSBC Trustee, which Forecloses Any Finding of Jurisdiction Over This Defendant.**

As the Supreme Court has reiterated on many occasions, fundamental principles of due process require that a plaintiff establish a basis for personal jurisdiction over "each defendant" named in an action. *See, e.g.*, *Bristol-Myers Squibb*, 582 U.S. at 268. When asserting specific jurisdiction, this requires sufficient minimum contacts between each defendant and the forum; the contacts of third parties do not suffice. *See, e.g.*, *Walden*, 571 U.S. at 284 ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State."); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (court looks to contacts "from actions by the defendant *himself* that create a substantial connection with the forum State" not the "unilateral activity of another party or third person" (internal quotation marks omitted)).

Here, Plaintiff has named HSBC Trustee as a Defendant and therefore must show that *HSBC Trustee* has the requisite minimum contacts with the United States. But the Amended Complaint no longer even attempts to allege such contacts. Indeed, it has replaced allegations in the original complaint regarding conduct by HSBC Trustee with allegations regarding conduct by

other entities, including Defendants William and Victor Fung, "The Victor Trust" itself, and the Trust's "Management Committee"—which Plaintiff concedes that HSBC Trustee is not a member of. *See* Compl. ¶¶ 28, 273. Without any allegation that *HSBC Trustee* directed any conduct (much less suit-related conduct) to the forum, the Amended Complaint gives this Court no basis from which to conclude that it could constitutionally assert personal jurisdiction over HSBC Trustee. *See Bristol-Myers Squibb*, 582 U.S. at 268; *Walden*, 571 U.S. at 284.

### 2. Plaintiff's Allegations Regarding Conduct by "The Victor Trust," its Management Committee, or its Beneficiaries Cannot Support Personal Jurisdiction.

Plaintiff's clarification in the Amended Complaint that it sues HSBC Trustee "solely in its capacity as Trustee of The Victor Trust and solely to the extent HSBC Trustee holds The Victor Trust's Assets" (Compl. ¶ 28) does not relieve it of its obligation to establish jurisdiction over HSBC Trustee. Indeed, New York law is clear that, to adjudicate a claim against a trust, courts must have personal jurisdiction over the trustee.

An action cannot be maintained against a defendant that lacks the "[c]apacity to [] be sued." Fed. R. Civ. P. 17(b). In the context of a trust, capacity to be sued is determined by "the law of the state where the court is located"; here, New York. *See Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 97 (2d Cir. 2021) (quoting § 17(b)(3)). Under New York law, "an express trust vests in the trustee the legal estate," N.Y. EST. POWERS & TRUSTS LAW § 7-2.1, and therefore it is the trustee—not the trust itself—that has the capacity to sue or be sued, *see Revitalizing Auto*, 10 F.4th at 97-98; *see also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 634 B.R. 39, 48 (Bankr. S.D.N.Y. 2021) (dismissing trust *sua sponte* because under New York law, applicable through § 17(b)(3), trust was a legal fiction without capacity to be sued).

As such, it is the trustee's contacts—not those of the trust, its beneficiaries, or any other third party—that control for personal jurisdiction. *See Hanson*, 357 U.S. at 238 (holding that

Florida law deemed trustees indispensable parties in trust controversies, and the Florida court did not have power to adjudicate the matter because it did not have personal jurisdiction over out-of-state trustee); *Reed v. Luxury Vacation Home LLC*, 632 F. Supp. 3d 489, 510 (S.D.N.Y. 2022) (when a plaintiff sues the trustee in its capacity as trustee, the court must have personal jurisdiction over the trustee, not the trust); 76 AM. JUR. 2D *Trusts* § 306 ("a court must have personal jurisdiction over a trustee in order to enter a ruling affecting the corpus of the trust" and a "nonresident trustee may not be called upon to defend in an action involving the trust unless it has minimum contacts" with the forum (internal quotation marks omitted)).

Thus Plaintiff's claims against HSBC Trustee "solely to the extent [it] holds The Victor Trust's assets" (Compl. ¶ 28) still require a showing that *HSBC Trustee* has sufficient claim-specific contacts with the United States for this Court to exercise personal jurisdiction. And Plaintiff has abandoned any attempt to do so.

The Court plainly does not have personal jurisdiction over HSBC Trustee, and claims against this Defendant must therefore be dismissed.

## II. THE COMPLAINT FAILS TO STATE A CLAIM WITH RESPECT TO THE SPECIAL DIVIDEND CASH TRANSFER OR REPAYMENT OF THE DECEMBER SHAREHOLDER LOAN

Even if this Court had personal jurisdiction over Defendants, which it does not, the claims against them should be dismissed. Based on the Plaintiff's own allegations, the entire value of the Special Dividend Cash Transfer (and more) was returned to GBG USA. And GBG USA's repayment of the December Shareholder Loan did not diminish GBG USA's estate. Thus, all of the Plaintiff's claims—each of which is based on the Special Dividend Cash Transfer or repayment of the December Shareholder Loan—fail.

### A. The Plaintiff Fails To State a Claim To Recover the Special Dividend Cash Transfer Because its Entire Value (and More) Was Returned to GBG USA.

Section 550(a) of the Bankruptcy Code provides the Plaintiff's sole means of recovery if he shows that a transfer is avoidable. *See Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999) (noting that "[o]nce the grounds for setting aside a transfer have been shown, the [t]rustee faces the second hurdle of establishing a means of recovery under § 550(a)" and dismissing section 544(b) claims for failure "to state a claim" "under § 550(a)").[23] And section 550(d) of the Code "categorically limits" recovery under section 550(a) "by stating that 'the trustee is entitled to only a single satisfaction under subsection (a) of this section.'" *In re Bean*, 252 F.3d 113, 117 (2d Cir. 2001) (quoting 11 U.S.C. § 550(d)). The Second Circuit has therefore held that section 550(d) prohibits "recovery" under section 550(a) when, as here "the [t]rustee had already recovered" the property that the debtor transferred. *Id.* at 116, 117.[24]

Moreover, section 550(a) permits a trustee to "recover" an avoidable transfer, *see* 11 U.S.C. § 550(a), which prevents trustees from seeking a "duplicate" return of funds that have already been given back. *See In re DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019) ("To 'recover' means '[t]o get

---

23 *Accord In re Tribune Fraudulent Conveyance Litig.*, 946 F.3d 66, 83 (2d Cir. 2019) (section 544(b) claim is "a claim arising under federal law" that "has its own . . . measure of damages" provided by "11 U.S.C. § 550"); *In re Tronox Inc.*, 464 B.R. 606, 616 (Bankr. S.D.N.Y. 2012) ("a trustee's recovery under § 544(b) is governed by § 550"); *In re Incare LLC*, 2018 WL 2121799, at *15 n.25 (Bankr. E.D. Pa. May 7, 2018) ("The remedy for recovery under § 544(b) is found in 11 U.S.C. § 550, not state law."); *Bash v. Textron Fin. Corp.*, 2013 WL 12526002, at *2 (N.D. Ohio July 22, 2013) (holding that "[o]nce it is determined that a transfer can be avoided under Section 544, Section 550 determines recovery" and rejecting recommendation that state-law remedies were available); *In re Harlin*, 325 B.R. 184, 191-92 (Bankr. E.D. Mich. 2005) (holding, with respect to a 544(b) claim, that "once the transfer is avoided, the liability of the party who benefitted from the transfer is controlled by 11 U.S.C. § 550, *not* state law").

24 *Accord In re DeBerry*, 945 F.3d 943, 949 (5th Cir. 2019) (where a claim to recover a transfer "has already been satisfied, the transferee has no further obligation" and "the trustee's 'avoidance action was satisfied before it was ever commenced'"); *In re Patts*, 470 B.R. 234, 243 (Bankr. D. Mass 2012) (where "the transfer the [t]rustee seeks to avoid has already been undone and the undiminished value of the transferred asset has been restored to the bankruptcy estate," further recovery would be "a windfall to the estate and a prohibited double recovery under 11 U.S.C. § 550(d)"); *In re Kingsley,* 2007 WL 1491188, at *3-4 (Bankr. S.D. Fla. May 17, 2007), *aff'd*, 518 F.3d 874 (11th Cir.2008) (same); *In re Cybridge Corp.,* 312 B.R. 262, 271 (D.N.J. 2004) (same).

back or regain in full or in equivalence.' . . . Obtaining a duplicate of something is not getting it back; it's getting a windfall. . . . Once the fraudulently transferred property has been returned, the bankruptcy trustee cannot 'recover' it again using § 550(a).") (quoting *Recover*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

Finally, courts have "used their equitable powers" to "reduce the estate's recovery by the value of consideration paid by a transferee, even in cases of actual fraud." *In re Tronox*, 464 B.R. at 618 (collecting authority).[25] Thus, the Second Circuit requires that amounts recoverable "must be reduced" to prevent "an unjustified double recovery." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 640 (2d Cir. 1995).

Here, less than two months after GBG USA made the Special Dividend Cash Transfer of $196 million, Fung Holdings contributed $200 million to pay down the Prepetition RCF, on which GBG USA was the *sole* borrower, as required by the Waiver Agreement that GBG USA negotiated with the RCF Lenders. The net result was not only the replenishment of the *entire* $196 million to GBG USA, but also *a $4 million increase* in GBG USA's assets, with Fung Holdings effectively funding the Special Dividend Cash Transfer.[26]

Thus, the Plaintiff's "avoidance action" with respect to the Special Dividend Cash Transfer

---

[25] The "sole purpose" of the Code's fraudulent transfer statutes "is to preserve the assets of the estate for the benefit of creditors." *In re Polichuk*, 506 B.R. 405, 435 (Bankr. E.D. Pa. 2014). "If the estate already has recovered the property (or its value)," allowing "any further remedy" would be a "double recovery" which is "not a result that the drafters of" section 550 "could have intended." *Id.*; *accord Incare*, 2018 WL 2121799, at *16; *In re Sawran*, 359 B.R. 348, 353-54 (Bankr. S.D. Fla. 2007).

[26] Fung Holdings provided this $200 million in the form of the New and Third Shareholder Loans. However, GBGH—*not* GBG USA—was the sole borrower on both Loans, *see* Compl. ¶¶ 150, 170, and GBG USA incurred no obligations therefrom. *See* Hutten Decl. Ex. G (New Shareholder Loan Agreement); Ex. J (Third Shareholder Loan Agreement). The Plaintiff does not (and cannot) allege that GBG USA repaid any portions of the New and Third Shareholder Loans on behalf of GBGH. Thus, the New and Third Shareholder Loans resulted in a $200 million paydown of GBG USA's debt without imposing *any* obligations on GBG USA.

"was satisfied before it was ever commenced." *DeBerry*, 945 F.3d at 949. *In re Kingsley* is on point. There, a transferee used transferred funds, *inter alia*, to pay off the debtors' prepetition obligations to creditors. 2007 WL 1491188, at *1, nn.3-4 (Bankr. S.D. Fla. May 17, 2007). The Eleventh Circuit affirmed the bankruptcy court's ruling that the trustee could not recover the amounts that the transferee had used to pay off the debtors' obligations. 518 F.3d 874, 878 (2008). As here, allowing recovery of the pre-petition transfer "would result in an inequitable windfall to the bankruptcy estate." *Id.*; *In re Bassett*, 221 B.R. 49, 55 (Bankr. D. Conn. 1998) (transferee's "pay-off of the [d]ebtor's obligation on the Note released the [d]ebtor, and his future bankruptcy estate from that . . . obligation," and therefore section 550(d)'s "single satisfaction" rule barred the trustee's attempt to recover the transfer); *In re Jackson*, 318 B.R. 5, 28 (Bankr. D.N.H. 2004), *aff'd*, 459 F.3d 117 (1st Cir. 2006) (when a transferee used transferred funds "to pay the [d]ebtor's bills," it was "equitable" to "credit the defendant for the expenditures she made" on the debtor's behalf); *Sawran*, 359 B.R. at 350-51, 354 (when transferees used transferred funds for the debtor's rent and living expenses, they received "equitable credit . . . to prevent the estate from receiving a windfall").[27]

Thus, the Plaintiff fails to state a claim to recover transfers associated with the Special Dividend Cash Transfer and Counts I-VI should be dismissed in their entirety. *See Bassett*, 221

---

[27] The Seventh Circuit has held that, in cases of actual fraud, a transferee's use of transferred funds to pay a debtor's expenses did not preclude recovery from the transferee. *Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 719-20 (7th Cir. 2002). But, as shown below, the Plaintiff fails to allege actual fraud here and, in any event, recovery in that case was based *only* on state law and not on section 550 of the Code, *id.* at 718—the *sole* means by which the Plaintiff can recover here. One district court has stated, in dicta, that a return of transferred property to the debtor "would not necessarily prevent a recovery" under section 550. *In re 45 John Lofts*, *LLC*, 599 B.R. 730, 749 n.6 (Bankr. S.D.N.Y. 2019). This dictum is contrary to binding Second Circuit authority, *see Bean*, 252 F.3d at 117; *HBE Leasing Corp.*, 48 F.3d at 640, as well as to the overwhelming authority outside this Circuit.

B.R. at 55 (where the "pay-off of the Debtor's obligation" was equal in value to the alleged transfer, trustee could not recover from *any* alleged transferee); *Bean*, 252 F.3d at 116-17 (affirming district court's decision "dismissing the . . . complaint" when the "[t]rustee . . . already recovered" the transferred property and finding "no fault with the district court's conclusion" that the "[t]rustee had grossly abused his discretion" by, *inter alia*, seeking a duplicate recovery).

**B. The Plaintiff Fails To State a Claim To Avoid or Recover GBG USA's Repayment of the December Shareholder Loan Because This Transfer Merely Returned Money that was Previously Sent to GBG USA.**

With regard to the repayment of the December Shareholder Loan, Plaintiff seeks a windfall through the recovery of a transfer that merely restored funds to the person who first provided them, and that did not diminish the Debtors' assets—which the Code does not allow. *See In re Adelphia Comm'n Corp.*, 2006 WL 687153, at *14-15 (Bankr. S.D.N.Y. Mar. 6, 2006) (the "relevant inquiry is whether the transfer had a net effect on the assets or liabilities" of the debtor; where the "estate was not diminished" by a transaction, it is not a fraudulent conveyance) (internal quotation marks omitted). This is especially true when one reviews this transfer in its proper context. *See Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("an allegedly fraudulent conveyance must be evaluated in context; [w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications") (internal quotation marks omitted); *HBE Leasing Corp.*, 48 F.3d at 635 (explaining that "multilateral transactions may under appropriate circumstances be collapsed and treated as . . . a single transaction" and that such a transaction "cannot be a fraudulent conveyance" if "it does not adversely affect the debtor's ability to meet its overall obligations") (internal quotation marks omitted).

Here, the $100 million proceeds of the December Shareholder Loan were disbursed by Fung Holdings to GBGH on December 20, 2021. GBGH transferred these proceeds in their entirety to GBG USA the next day. When GBG USA transferred this $100 million to Millwork, it

paid down GBG USA's intracompany debt to Millwork in the same amount, such that GBG USA still had $100 million more in net assets than it did before receiving the proceeds of the December Shareholder Loan. As a result, when GBG USA later repaid the December Shareholder Loan proceeds to Fung Holdings, it merely returned these proceeds to their original source, and returned itself to the same position it was in before it received these proceeds. This "did not diminish" GBG USA's assets, and the Plaintiff's claims to avoid and recover the repayment of the December Shareholder Loan must therefore be dismissed. *Adelphia*, 2006 WL 687153, at *14-15 (a "round-trip transaction" was not a "fraudulent conveyance because Adelphia was the source of the money used to make the transfer and [the debtor's] assets were not diminished" when the debtor returned the money to Adelphia); *In re Lease-A-Fleet, Inc.*, 155 B.R. 666, 675-77 (Bankr. E.D. Pa. 1993) (no fraudulent transfer claims against defendant that was both the source and ultimate recipient of the transferred funds because, as here, "the monies involved were not diverted from their availability to pay the [d]ebtor's" creditors); *In re Oxford Health Invs., LLC*, 2002 WL 31031631, at *6-8 (Bankr. M.D.N.C. Sept. 3, 2002) (no fraudulent transfer claims when defendant CHMC "was the source of the funds used to make the contested payments to CHMC").[28]

## III. THE PLAINTIFF FAILS TO ALLEGE GBG USA INTENDED TO HINDER, DELAY OR DEFRAUD CREDITORS

Plaintiff's attempts to avoid the Special Dividend Cash Transfer and repayment of the December Shareholder Loan as intentional fraudulent transfers fail because the Complaint's

---

[28] *Accord Melamed v. Lake Cnty. Nat'l Bank*, 727 F.2d 1399, 1402 (6th Cir. 1984) (dismissing fraudulent transfer claim because alleged fraudulent transfer "did not diminish the assets of the debtor which were available to its creditors"); *In re Art Unlimited, LLC*, 2007 WL 2670307, at *10 (E.D. Wis. Sept. 6, 2007) (where alleged transfers "resulted in no loss" to the debtor's estate, "no fraudulent transfer occurred," and "no recovery against [the alleged transferee] [wa]s possible"). *Cf. In re Old CarCo LLC*, 435 B.R. 169, 187 (Bankr. S.D.N.Y. 2010) (the "[c]omplaint fail[ed] to state a claim" for a fraudulent conveyance because "it d[id] not include" the "significant value received by [the debtor] pursuant to the overall transaction").

factual allegations fail to support any coherent inference of fraudulent intent, much less the "strong inference" required by Rule 9. This is true whether this Court applies Delaware, North Carolina, or New York law. *See* Compl. at Counts I, IV, VII.

To state a claim under these states' laws, the Plaintiff must show that the "debtor made the transfer" with the "intent to hinder, delay, or defraud creditors." 6 Del. C. § 1304(a)(1); N.C. Gen. Stat. § 39-23.4(a)(1); *In re Sharp Intern. Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("To prove actual fraud under [N.Y. D.C.L.] § 276, a creditor must show intent to defraud on the part of the transferor.") (citation omitted). "As actual intent to hinder, delay, or defraud constitutes fraud, it must be pled with specificity, as required by Fed. R. Civ. P. 9(b)." *Sharp.*, 403 F.3d at 56 (citation omitted). To do this, the Plaintiff must, *inter alia*, "allege facts that give rise to a strong inference of fraudulent intent." *In re Old CarCo LLC*, 435 B.R. 169, 191 (Bankr. S.D.N.Y. 2010) (citation omitted); *In re Tribune Fraudulent Conveyance Litig.*, 2018 WL 6329139, at *6 (S.D.N.Y. Nov. 30, 2018) (same).[29] While the Plaintiff may rely on the so-called "badges of fraud" to do this, *see Old CarCo*, 435 B.R. at 191, the "context dictates" the "significance of" these badges. *Id.* Thus, a "strong" inference of scienter is available only when, "assess[ing] the complaint in its entirety and tak[ing] into account plausible opposing inferences," the inference of fraudulent intent "is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tribune*, 2018 WL 6329139, at *6 (citations omitted).

Plaintiff's intentional fraud claims fail for two chief reasons.

---

[29] While some courts have relaxed Rule 9's heightened pleading standard when a trustee has not had an opportunity to take discovery, such relaxation is not appropriate where, as here, "discovery was conducted that allowed access to numerous documents" and "there was ample opportunity to investigate any potential claims prior to filing the Complaint." *Old CarCo*, 435 B.R. at 192 (rejecting a trustee's argument that "it should be allowed to avail itself of the more relaxed standard for pleading fraud"); *accord Tribune*, 2018 WL 6329239, at *6.

*First*, regarding the Special Dividend Cash Transfer, the Plaintiff's allegations undermine any inference of fraud because they show there was full disclosure of the transaction and because the so-called "Controlling Shareholders" did not profit from it. Indeed, the Complaint's own allegations establish that before the Special Dividend was paid by GBGH (who was a guarantor of the Prepetition RCF), GBG USA's officers and directors informed the Prepetition RCF Lenders of the upcoming Special Dividend, *see* Compl. ¶¶ 130-34, 143-46, and these Lenders signed the Waiver Agreement to "ensure the payment of the Special Dividend," *id.* ¶¶ 151-55. And months before the Special Dividend Cash Transfer, the so-called "Controlling Shareholders" and ultimate beneficial owners of GBG USA chose to forego their *entire* allocation of the Special Dividend. *Id.* ¶¶ 105-08. Moreover, the Waiver Agreement, which GBG USA negotiated with the RCF Lenders before the Special Dividend was paid, required Fung Holdings—a wholly owned subsidiary of GBG USA's ultimate beneficial owners—to return the *entire* value of the Special Dividend Cash Transfer (and more) to pay down GBG USA's creditors. *Id.* ¶¶ 152-54.

Given this context, the Complaint's supposed badges of fraud provide no support for an inference that GBG USA, or its directors and officers, intended to defraud creditors:

- The allegation that the Special Dividend Cash Transfer was made to "insiders," *id.* ¶¶ 185-98, does not support an inference of scienter because, as the Plaintiff admits, the Controlling Shareholders *declined* to receive their share of the Special Dividend. *See* Compl. ¶ 108. *Cf. Tribune*, 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017) ("any inference of scienter that could be drawn from" the "receipt of a miniscule fraction of" the transfers was "weak at best"). It was also these so-called "insiders" who replenished the entirety of the Special Dividend Cash Transfer to pay down GBG USA's debts, negating any inference of fraudulent intent. *See Old CarCo*, 435 B.R. at 194 (parent's "continued . . . substantial investment" in the debtor post-transfer rendered any inference of scienter "implausible"); *In re MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995) ("Any suggestion of fraudulent intent is belied by the continued investment" from insiders after the alleged transfers took place).

- The contention that GBG USA did not receive "reasonably equivalent" value in return for the Special Dividend Cash Transfer, *see* Compl. ¶¶ 199-201, is contradicted by the Plaintiff's own allegations showing that, per the Waiver Agreement, GBG USA received a $200 million pay-down of its debt following the $196 million Special Dividend Cash Transfer, *see Old CarCo*, 435 B.R. at 192 (no inference of scienter where "[a]s a result of the integrated transaction,"

"billions of dollars of value flowed to" the debtor).[30]

- The claim that "GBG USA incurred substantial debts before making the Special Dividend Cash Transfer," Compl. ¶ 207, is not probative of scienter given the substantial paydown of GBG USA's debt that occurred just after the Special Dividend Cash Transfer. No rational person who intends to defraud creditors by drawing on credit lines seeks for these funds to be returned to creditors shortly thereafter.

- The allegation that the RCF Lenders threatened to sue GBG USA when negotiating the Waiver Agreement, *id.* ¶ 204, ignores that this threat was made *after* GBG USA made the Special Dividend Cash Transfer on March 28 and 29, 2019, *see id.* ¶¶ 203-04 (alleging that the RCF Lenders threatened to sue "during the course of" meetings "between March 30, 2019 and April 3, 2019"). GBG USA plainly could not have made this Transfer in an effort to moot a lawsuit that was not yet even threatened.[31]

- The Plaintiff's speculation that the Special Dividend Cash Transfer was "likely" concealed from the RCF Lenders and trade creditors, *see* Compl. ¶¶ 147, 203-06, is entitled to no weight because "fraud allegations cannot be based upon 'information and belief'" except when "the facts are peculiarly within the knowledge of the opposing party," which, as explained above, is not true here. *E.g.*, *Old CarCo*, 435 B.R. at 191 (citation omitted). And even if this speculation was true, it would still not support an inference of scienter. The Plaintiff's own allegations establish that before the Special Dividend Cash Transfer left the possession of GBGH—a guarantor of the Prepetition RCF against whom the RCF Lenders had recourse—GBG USA informed the RCF Lenders of, and got their consent for, the payment of the Special Dividend. Of course, the Special Dividend was also announced publicly no later than June 27, 2018, as described above.

- The Plaintiff complains that GBG USA used the proceeds of the Centric Sale to repay a $1.2 billion syndicated credit facility, and thus had "no money available for the Special Dividend Cash Transfer." Compl. ¶ 208. The Plaintiff complains further that GBG USA still funded the $196 million Transfer with "substantial borrowings," and "without regard to" the financial health of GBG USA. Compl. ¶ 208. But this ignores the Plaintiff's own allegations that the lines of credit GBG USA allegedly drew from to fund the Special Dividend Cash Transfer were those it obtained "to replace the . . . $1.2 billion term loan that [GBG USA] repaid on the

---

[30] The Plaintiff's related allegation that GBG did not know whether the Controlling Shareholders would end up paying down GBG USA's debt when it made the Special Dividend Cash Transfer, *see* Compl. ¶¶ 200-01, also fails to support an inference of scienter. No one transferring funds with the intent to hinder, delay or defraud creditors would, within days of the transfer, negotiate and execute an agreement requiring the transferred funds to be replenished in full for creditors' benefit—as admittedly happened here. *Id.* ¶¶ 152-55; *see also Old CarCo.*, 435 B.R. at 182-83, 194 (dismissing actual fraud claims with prejudice for failure to allege scienter, and rejecting the argument that the return of billions in value to the debtor should be discarded when, at the time of the transfer, the debtor did not "kn[o]w that there would be any subsequent capital infusion" and the return of funds to the debtor was not "a precondition of the [debtor's] transfer").

[31] Nor could the April 4, 2019 Special Dividend reflect such an effort, since, on April 3, 2019, the RCF Lenders signed the Waiver Agreement to ensure the Special Dividend could be paid.

completion of the Centric Sale." Compl. ¶¶ 71, 75, 81, 84, 87. GBG USA's $1.2 billion debt payoff, followed by a draw of $196 million on facilities that replaced that paid-off debt, had the net effect of *retiring* over a billion dollars of GBG USA debt. Which, of course, is flatly inconsistent with an intent to harm creditors.

Thus, the Plaintiff's conclusion that "the totality of circumstances demonstrates" fraudulent intent, *see* Compl. ¶ 208, fails to withstand even modest scrutiny, and is overwhelmed by the contrary inference that jumps from the face of the Complaint. If GBG USA intended to hinder, delay, or defraud creditors by making the Special Dividend Cash Transfer, the *very last thing it would do* would be to inform its creditors about the Special Dividend before it was paid by GBGH (and thus transferred beyond the reach of a guarantor) and get creditor consent for the Special Dividend, all while declining to transfer material value to the Controlling Shareholders and ensuring that the *entire* value of the Special Dividend Cash Transfer (and more) would be returned by GBG USA's ultimate beneficial owners to *pay down* GBG USA's creditors. The far more compelling—and only reasonable—inference is that GBG USA had no fraudulent intent. *See MFS/Sun Life Tr.*, 910 F. Supp. at 935 (defendants' actions were "contrary" to an inference of scienter when the transaction was not secretive and when defendants maintained a "continued investment in the company."); *Old CarCo*, 435 B.R. at 192-93 (allegations "d[id] not support an inference of fraud" when, *inter alia*, the transaction was not secret, and the defendants maintained a significant investment in the company).

*Second*, GBG USA's repayment of the December Shareholder Loan was nothing more than a return of funds that originated from Fung Holdings and was therefore a wash without any material effect on GBG USA. This negates any inference of fraudulent intent:

- Even if the repayment to Fung Holdings was to a statutory "insider," *see* Compl. ¶ 188, GBG USA was simply returning the proceeds of the December Shareholder Loan to the entity that initially disbursed them for GBG USA's benefit.
- GBG USA received the $100 million proceeds of the December Shareholder Loan before repaying the same to Fung Holdings, which contradicts the Plaintiff's contention that the

repayment "is not a transfer of reasonably equivalent value or fair consideration." *Id.* ¶ 202.

- The Plaintiff's claim that GBG USA "incurred substantial debts before" repaying the December Shareholder Loan, *id.* ¶ 207, is not probative of scienter given that this repayment did not impact GBG USA's ability to repay creditors.

At bottom, if GBG USA intended to defraud creditors, it would not have executed a wash transaction that had no effect on GBG USA's ability to pay them. *See Lease-A-Fleet*, 155 B.R. at 675 (no scienter where "money passed through the [d]ebtor with no gain and no loss in the [d]ebtor's ability to pay its creditors" and no "real effect on the Debtor's solvency").

In sum, the Plaintiff fails to allege facts that allow for even a plausible inference of scienter—much less a strong one—with respect to the Special Dividend Cash Transfer and the repayment of the December Shareholder Loan. Counts I and IX should therefore be dismissed.

## IV. THE PLAINTIFF'S CLAIMS TO AVOID THE SPECIAL DIVIDEND CASH TRANSFER ARE BARRED BY SECTION 546(e)'s SAFE HARBOR

Plaintiff has not only failed to plead properly its claims to avoid the Special Dividend, these claims are also specifically barred by section 546(e)'s Safe Harbor. Counts I through VI, which seek to avoid the Special Dividend Cash Transfer pursuant to section 544(b) of the Code, are barred by section 546(e), which states in relevant part that:

> Notwithstanding section[] 544 . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to . . . a . . . financial institution . . . or that is a transfer made by or to . . . a . . . financial institution . . . in connection with a securities contract . . . that is made before the commencement of the case . . . .

11 U.S.C. § 546(e). This safe harbor applies if: (1) there is a qualifying transfer, *i.e.*, either a "settlement payment" or a "transfer made . . . in connection with a securities contract," that (2) was "made by or to (or for the benefit of)" a covered entity, including a "financial institution." *Id.; In re Boston Generating LLC*, 617 B.R. 442, 481 (Bankr. S.D.N.Y. 2020) (same). The Plaintiff's allegations show that both requirements are met for the Special Dividend Cash Transfer. Thus, the

Plaintiff "may not avoid" this transfer, and Counts I-VI must be dismissed.[32]

**A. The Special Dividend Cash Transfer Was a Transfer Made "In Connection with a Securities Contract." It Was Also a "Settlement Payment."**

The Special Dividend Cash Transfer was both a transfer "made in connection with a securities contract" and a "settlement payment," 11 U.S.C. § 546(e), satisfying the first of section 546(e)'s two requirements.

*Transfer "in connection with a securities contract."* Section 741(7) of the Code, to which section 546(e) refers, defines "securities contract" with "extraordinary breadth," *Picard v. Ida Fishman Revocable Tr.*, 773 F.3d 411, 417 (2d Cir. 2014), to include contracts "for the purchase, sale, or loan of a security." 11 U.S.C. § 741(7)(A)(i). The Code defines a "security" to include "stock" or any "other claim or interest commonly known as a 'security.'" 11 U.S.C. § 101(49)(A)(ii)&(xiv). Here, the Centric Sale was achieved by GBG USA's sale of "equity interests" to Centric Brands. *See* Hutten Ex. A (PSA) at 1 (Recitals), § 2.1. The PSA—the contract governing this sale—was thus a securities contract. *In re Quorum Healthcare Corp.*, 2023 WL 2552399, at *5-6 (Bankr. D. Del. Mar. 16, 2023) (contract was a "securities contract" when it provided for payment "in return for certain assets, including stock and other equity interests").

A transfer is made "in connection with a securities contract" if it is some way "related to or associated with the securities contract." *Fishman*, 773 F.3d at 421 (citation omitted). Thus, "[s]ection 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided," which "only requires that a covered transfer be broadly related

[32] Section 546(e)'s safe harbor applies to all fraudulent transfer claims, with the sole exception of intentional fraudulent transfer claims brought "under section 548(a)(1)(A)" of the Code. 11 U.S.C. § 546(e). Therefore, section 546(e) bars both the Plaintiff's constructive and intentional fraudulent transfer claims brought pursuant to section 544. *See In re Boston Generating*, 617 B.R. at 479-80 (collecting authority for the proposition that 546(e) bars state-law intentional fraudulent transfer claims brought pursuant to section 544).

to a 'securities contract.'" *Id.* at 420, 422. There is no requirement "that the transfer be made pursuant to," or "as required by, the securities contract." *Id.* at 422. Rather, "Congress merely required that the transfer have a connection with the securities contract . . . ." *Id.*

This "low bar" is satisfied here because the Special Dividend Cash Transfer was intended to (and did) distribute to GBGH and certain of its shareholders the value that GBG USA received by selling securities pursuant to the PSA. The Centric Sale was designed to "allow [its] shareholders to realise" value "by way of" the Special Dividend, *see* Hutten Decl. Ex. B (GBGH Announcement) at 2 (June 27, 2018), including "a substantial . . . cash realization . . . from the outcome of the" transaction. Hutten Decl. Ex. C (GBGH Circular and Notice of Special Meeting) at 16 (July 18, 2018). Based on this, the Special Dividend and Centric Sale were approved simultaneously by GBGH's shareholders on August 2, 2018, *see* Compl. ¶¶ 63-69, with the "promise to pay a Special Dividend" being "a substantial factor" in the "shareholders' approval of the Centric Sale." *Id.* ¶ 69. The Special Dividend was "[s]ubject to and conditional upon the closing of" the Centric Sale. Hutten Decl. Ex. D, (GBGH Poll Results at the Special General Meeting), at 2-3 (Aug. 2, 2018). The "precise amount of the Special Dividend" was specifically based on the final "purchase price that was paid at closing" of the Centric Sale. Compl. ¶¶ 95, 104. And, critically, the Special Dividend Cash Transfer was intended to, and did, fund the "actual amount of the net cash" portion of the Special Dividend. *Id.* ¶¶ 118-20, 164.

Thus, the Special Dividend Cash Transfer was "related to or associated with" the PSA and was made in connection with a securities contract. *Fishman*, 773 F.3d at 421. Unsurprisingly, transfers that distribute value that was obtained in return for selling securities pursuant to a contract are made "in connection with" a securities contract. *See id.* at 421-22 (broker's distribution to customers of funds that the customers had deposited in reliance on the broker's promise to transact

in securities was made "in connection with a securities contract"); *Tribune*, 946 F.3d at 80-81 (transfers made to distribute value of shares cancelled pursuant to a merger agreement were "in connection with" a securities contract); *Quorum*, 2023 WL 2552399, at *6 (dividend paid from a debtor to its parent in return for the parent's sale of equity interests "was made pursuant to a securities contract"); *Crescent Res. Litig. Tr. v. Duke Energy Corp.*, 500 B.R. 464, 471-77 (W.D. Tex. 2013) (a $1.2 billion "distribution or dividend" from a subsidiary was made "in connection with a securities contract" because it was part of a series of transactions that provided value to the ultimate parent for the disposal of equity interests in the subsidiary pursuant to a contract); *cf. Boston Generating*, 617 B.R. at 486-87 (transfer from a subsidiary to its parent was made in connection with a securities contract because it "funded" redemption payments the parent made pursuant to a tender offer);[33] *id.* at 494 (the "low bar" for the "in connection with" requirement was "easily met" for a parent's dividend to members that was paid as part of an "integrated transaction" involving the dividend and redemptions made pursuant to a tender offer).

<u>*Settlement payment*</u>. The Code defines a "settlement payment" to include a "preliminary," "interim," "partial" or "final" "settlement payment," or "other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). The Second Circuit adopts a "capacious interpretation" of this term, *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 199 (S.D.N.Y. 2020), that includes any "transfer of cash or securities made to complete [a] securities transaction," *Enron Cred. Recov. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334-35 (2d Cir. 2011).[34]

---

[33] While *Boston Generating* involved a transfer from a subsidiary that funded the parent's purchase of securities pursuant to a contract, *see* 617 B.R. at 486, that makes no difference here. A transfer that, as here, distributes to a parent the value that a subsidiary gets from selling securities pursuant to a securities contract is equally "related to" or "associated with" that contract.

[34] The Second Circuit has cited with approval the VNR Investor's Dictionary, which defines a settlement payment as the "finishing up of a transaction *or group of transactions*." *Enron*, 651 F.3d at 337 (emphasis added). The Tenth Circuit has done the same. *See Kaiser Steel Corp. v.*

The Special Dividend Cash Transfer easily fits within this definition. It was undoubtedly a "transfer of cash." *See* Compl. ¶¶ 118-20; *Boston Generating*, 617 B.R. at 485 ("wiring of funds" from subsidiary's bank account to parent's bank account was "a transfer of cash"). The Special Dividend Cash Transfer was also a component part of an integrated transaction starting with the sale of securities in the Centric Sale and ending with the distribution of the value of those securities to GBGH and some of its shareholders. Thus, it was "made to complete a securities transaction." *Crescent Res.*, 500 B.R. at 471-75 (a subsidiary's transfer of funds to its direct parent, for further payment to its ultimate parent, was a settlement payment because "it was a necessary transfer in the completion of" a multi-step securities transaction by which the ultimate parent was compensated for the sale of equity in the subsidiary); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 815-17 (N.D. Tex. 2012) (a subsidiary's transfer to its parent was a "settlement payment" because it "completed a securities transaction" in which the parent sold its equity-security holdings in a second subsidiary); *Boston Generating*, 617 B.R. at 485-86 (transfer from subsidiary to its parent company was a "settlement payment" because it funded the parent's redemption of its shares); *id.* at 493 (dividend to shareholders was a "settlement payment" when it was paid "as part of a single, integrated transaction to settle" the parent's repurchase of its shares and, as here, "return value to" the parent's owners).

### B. The Special Dividend Cash Transfer Was Made by a Financial Institution

The Special Dividend Cash Transfer satisfies the second requirement for section 546(e) protection because it was "made by" a covered entity, namely a "financial institution." The Bankruptcy Code defines a "financial institution" as, in relevant part:

> an entity that is a commercial or savings bank . . . and, when any such . . . *entity is acting as agent* or custodian *for a customer* (whether or not a 'customer', as defined in section 741) *in connection with a securities contract* (as defined in section 741)

---

*Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir. 1990).

*such customer*.

11 U.S.C. § 101(22)(A) (emphasis added). Thus, the Code defines a "financial institution" to include not only a "commercial or savings bank," but also a customer of such bank that is "acting as agent" for the customer "in connection with a securities contract." *Id.*; *Tribune*, 946 F.3d at 78. GBG USA satisfies that standard here with respect to the Special Dividend Cash Transfer.

*First*, GBG USA made the Special Dividend Cash Transfer by wiring funds from an account it maintained with "Citibank" in New York. Compl. ¶¶ 118-19. Citibank is a "commercial or savings bank."[35]

*Second*, GBG USA was Citibank's customer. The Second Circuit gives the term "customer" its "ordinary meaning," as "someone who buy goods or services." *Tribune*, 946 F.3d at 78-79. Here, the Plaintiff alleges that GBG USA's Treasurer ordered the Special Dividend Cash Transfer to be paid from GBG USA's "bank account at Citibank located in [New York] to GBGH" and that Citibank followed these instructions. Compl. ¶¶ 118-19. This shows that GBG USA held an account with Citibank, and paid Citibank for account-related services, including wire transfers. *See id.* ¶ 116 (alleging the Special Dividend Cash Transfer "was wired directly from GBG USA . . . to GBGH"); *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *7 (Bankr. S.D.N.Y. Dec. 14, 2020) (debtors were customers of Citco Bank because they "held accounts with Citco Bank from which the [challenged transfers] were paid"); *Boston Generating*, 617 B.R. at 456, 487 (debtor was a "customer" of US Bank when it maintained a depository account with US Bank and "caused

[35] *See* Office of the Comptroller of the Currency, National Banks as of March 31, 2024 at https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/index-financial-institution-lists.html. The Court may take judicial notice of the OCC's list of US banks, as the Second Circuit did in deciding that Computershare was a bank. *Tribune*, 946 F.3d at 78, 80; *In re SunEdison, Inc.*, 620 B.R. 505, 516 (Bankr. S.D.N.Y. 2020) (entity was a "financial institution" when it was listed on the OCC's website); *Boston Generating*, 617 B.R. at 489 (same).

US Bank to transfer" funds from its account to its parent's depository account).[36]

*Third*, Citibank was acting as GBG USA's agent with respect to the Special Dividend Cash Transfer. Establishing agency requires only "(1) the principal's manifestation of intent to grant authority to the agent," "(2) agreement by the agent" and (3) "the principal['s] . . . mainten[ance] [of] control over key aspects of the undertaking." *Tribune*, 946 F.3d at 79.

Here, the allegations showing GBG USA was Citibank's customer also show that Citibank was GBG USA's agent when wiring the Special Dividend Cash Transfer. *See In re Nine West LBO Sec. Litig.*, 87 F.4th 130, 145 (2d Cir. 2023) (Section 101(22)(A) requires courts to "look to each transfer and determine 'when' a bank 'is acting as agent' for its customer for a transfer, assuming, of course, the transfer is made in connection with a securities contract."). Citibank would not have transferred $196 million from GBG USA's account without instructions from GBG USA giving it authority to do so. Citibank wired the funds, showing its agreement to accept GBG USA's instructions. GBG USA controlled "key aspects of the undertaking," *Tribune*, 946 F.3d at 80, including the amount transferred, the identity of the transferee, and the account receiving the transferred funds, while Citibank necessarily had discretion over how to execute the transfer within these parameters. Thus, Citibank was acting as GBG USA's agent when it wired the Special Dividend Cash Transfer. *See Tribune*, 946 F.3d at 80 (Computershare acted as agent when the debtor deposited funds with the entity with instructions to pay tendering shareholders, and the bank made the payments); *Fairfield Sentry*, 2020 WL 7345988, at *7 (plaintiffs' "admission that the [transfers] were paid by Citco Bank establishes the necessary agency" since it was "implausible to infer that Citco Bank made the redemption payments to specific [persons] in specific amounts

---

[36] Moreover, under New York law, "[a]n account holder is a 'customer' of the bank." *Fairfield Sentry*, 2020 WL 7345988, at *7 (N.Y. U.C.C. § 4-104(1)(e)—which governs "Bank Deposits and Collections"—defines a "customer" as "any person having an account with a bank.").

absent the [debtors'] directions to do so" and "Citco Bank accepted those directions" by making the payments); *Boston Generating*, 617 B.R. at 487-88 (US bank acted as debtor's agent when the debtor gave it instructions to transfer funds from its US Bank depository account to a bank account held by the debtor's parent, and US Bank accepted the instructions).[37]

*Finally*, Citibank acted as agent "in connection with a securities contract" because GBG USA asked Citibank to wire the Special Dividend Cash Transfer as part of its plan to upstream the value of the securities GBG USA sold pursuant to the PSA, which is a securities contract. *See* Compl. ¶ 119; *Boston Generating*, 617 B.R. at 456-57, 488 (US Bank acted as debtor's agent in connection with a securities contract when it accepted debtor's instruction to make "an upstream transfer of monies to [the debtor's parent] . . . to fund" stock redemptions related to a tender offer); *Fairfield Sentry*, 2020 WL 7345988, at *7 (Citco Bank acted as debtors' agents in connection with a securities contract when it accepted their request to make transfers from the Debtors' Citco Bank account to persons redeeming their shares pursuant to a subscription agreement).

Thus, Citibank was "acting as an agent for a customer," *i.e.*, GBG USA, "in connection with a securities contract," and "that customer counts as a 'financial institution,' for the purposes of the § 546(e) safe harbor." *Nine W.*, 482 F. Supp. 3d at 199. The Special Dividend Cash Transfer

---

[37] In *In re Tops Holding II Corp.*, the court held that, because "the relation between a bank and its depositor" is one in which the bank "impliedly contracts to pay the depositor's checks," a bank did not act as its depositor's agent when making transfers at its request. 646 B.R. 617, 686-87 (Bankr. S.D.N.Y. 2022). But the argument that a contract service provider cannot be an agent pursuant to section 546(e) has rightly been rejected, since "a fiduciary relationship is not itself a necessary prerequisite to establishing agency." *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 200 (S.D.N.Y. 2020) (citing Restatement (Third) of Agency § 1.01 cmt. e), *rev'd on other grounds*, 87 F.4th 130. The *Tops* decision is also contrary to the Second Circuit's holding in *Tribune,* in which an agency relationship existed because the debtor deposited funds into a bank, asked the bank to transfer the funds, and the bank agreed. *See Tribune*, 946 F.3d at 80; *Nine W.*, 482 F. Supp. 3d at 200 (argument that a bank is a mere non-agent contractor when making a transfer at its depositor's direction "is foreclosed by *Tribune*").

was therefore "made by" a "financial institution," and the second—and final—requirement of the section 546(e) is satisfied.

The safe harbor therefore extends to—and forecloses—the Plaintiff's claims to avoid the Special Dividend Cash Transfer, and Counts I-VI of the Complaint must be dismissed.

## V. THE PLAINTIFF FAILS TO STATE A CLAIM TO RECOVER TRANSFERS RELATED TO THE SPECIAL DIVIDEND CASH TRANSFER FROM THE NON-TRANSFEREES

The Plaintiff's claims to recover from the Non-Transferees as subsequent transferees of the Special Dividend Cash Transfer also fail because, by the Plaintiff's own allegations, the Non-Transferees never received the Special Dividend. Section 550 of the Bankruptcy Code—which provides the *only* remedy available to the Plaintiff if he shows the Special Dividend Cash Transfer is avoidable, *see supra* pp. 30-31 & n. 23—states that "to the extent a transfer is avoided under section 544," the Plaintiff "may recover" from only one of three persons: (1) "the initial transferee of such transfer," 11 U.S.C. § 550(a)(1), (2) "the entity for whose benefit such [initial] transfer was made," *id.*, or (3) any immediate or mediate transferee of such initial transferee," 11 U.S.C. § 550(a)(2); *accord Stratton Oakmont*, 234 B.R. at 312. Here, the Complaint shows that the Non-Transferees are not transferees of the Special Dividend Cash Transfer and are not persons for whose benefit this transfer was made.

### A. The Non-Transferees Are Not Initial or Subsequent Transferees of the Special Dividend Cash Transfer.

The "minimum requirement of status as a 'transferee' is dominion and control over" the transferred property such that the recipient has "the right to put the [property] to one's own purposes." *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 57 (2d Cir.1997) (citations omitted). Regarding the circa $92 million of the Special Dividend subject to the Dividend Shareholder Loan (which, as shown above, was the Controlling

Shareholders' entire allocation of the Special Dividend), the Complaint fails to allege that the Non-Transferees had any such dominion or control.

*First*, $87,679,258.89 of the Controlling Shareholders' Special Dividend allocation was "withheld by GBGH and treated" as a loan "disbursed by Fung Holdings to GBGH." Compl. ¶¶ 156-57, 172. The Plaintiff does not and cannot allege that this "interest free, unsecured" and subordinated loan was ever repaid. *Id.* ¶ 148.

*Second*, the Complaint alleges that the balance of the Controlling Shareholders' allocation of the Special Divided—$4,489,787.13—was transferred to, *inter alia*, only a single Controlling Shareholder, and not to any of the Non-Transferees. Compl. ¶¶ 157, 172.[38] Accordingly, the Non-Transferees never had even bare possession of these funds, much less "dominion and control" over any funds that GBGH transferred in connection with the Special Dividend, and the Plaintiff has failed to allege that they are "transferees" from whom he can recover pursuant to section 550(a) of the Code. *See In re CM Holding, Inc.*, 264 B.R. 141, 157 (Bankr. D. Del. 2000) (no recovery when there was nothing "to suggest that [the defendant] ever received the funds" from a transfer).

### B. The Non-Transferees Are Not Entities "For Whose Benefit" the Special Dividend Cash Transfer Was Made.

The Complaint also shows that the Non-Transferees are not entities for whose benefit the Special Dividend Cash Transfer was made. To be an entity "for whose benefit" a transfer "was made," the "section 550(a)(1) benefit" that entity receives "must result from the initial transfer." *In re Enron Creditors Recovery Corp.*, 407 B.R. 17, 32-33 (Bankr. S.D.N.Y. 2009), *rev'd on other*

[38] Thus, of the circa $92 million of the Special Dividend allocated to the Controlling Shareholders, the Plaintiff has alleged only that $4.5 million was ever transferred to any Controlling Shareholder. In addition, the Plaintiff admits that, pursuant to the Waiver Agreement and Dividend Shareholder Loan Agreement, which were executed *before* GBGH paid the Special Dividend, even this $4.5 million was returned by Fung Holdings "to a designated account" of GBGH on the same day the Special Dividend was paid. *See* Compl. ¶¶ 156-57, 172.

*grounds*, 422 B.R. 423 (S.D.N.Y. 2009); *see also Stratton Oakmont*, 234 B.R. at 314 (same).[39] The entity must also receive a benefit that "is direct, ascertainable and quantifiable, and must correspond to, or be commensurate with, the value of the" transferred property. *Enron*, 407 B.R. at 32 (citations omitted). Here, the Plaintiff's allegations, if true, fall far short of showing that the Non-Transferees received any such benefit from the Special Dividend Cash Transfer.

*First*, the Non-Transferees did not receive the required "direct" benefit from the initial transfer. Rather, the Plaintiff alleges that the Special Dividend Cash Transfer was made "directly" to GBGH. Compl. ¶¶ 116. While the Special Dividend Cash Transfer funded the "actual amount of the net cash" portion of the Special Dividend, *id.* ¶ 109, this is an indirect benefit that does not suffice, *see Stratton Oakmont*, 234 B.R. at 314-15 (defendant was not an entity for whose benefit a transfer was made when, as here "the [t]rustee has not alleged" that the defendant "benefitted from" the initial transfers).

*Second*, even if the Non-Transferees had received a "direct" benefit from the Special Dividend Cash Transfer (they did not), they certainly received no benefit that was "ascertainable and quantifiable" or "commensurate with, the value of the property" transferred. *Enron*, 407 B.R. at 32. Rather than receiving their allocation of the Special Dividend, the Non-Transferees received an IOU from GBGH. *See* Compl. ¶¶ 146-49. The Plaintiff does not allege that GBGH ever paid this debt, and an unrealized right to repayment of an unsecured, interest free, subordinated loan is far too attenuated to be an "ascertainable and quantifiable monetary benefit." *Enron*, 407 B.R. at 36-37 (defendant was not an "entity for whose benefit" a transfer was made when "there [wa]s a significant measure of uncertainty" as to whether the transfer would benefit the defendant).

---

[39] The "prototype that illustrates the concept of an entity for whose benefit a transfer is made is a guarantor" whose liability decreases when a borrower repays a loan. *Enron*, 407 B.R. at 32-33.

Thus, the Plaintiff fails to allege facts that, if true, show that he can recover from the Non-Transferees any transfers that are related to the Special Dividend Cash Transfer. Counts I-VI as to the Non-Transferees must therefore be dismissed. *See Stratton Oakmont*, 234 B.R. at 314 (granting motion to dismiss section 544 claims when, as here "the [t]rustee has not alleged any facts which would permit a recovery pursuant to § 550(a)").

**CONCLUSION**

For the reasons above, this Court should dismiss with prejudice all claims against the Defendants, and order other and further relief as the Court deems just and proper.

Dated: New York, New York
June 24, 2024

Respectfully submitted,

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**

By: *s/ Timothy P. Harkness*
Timothy P. Harkness
Madlyn Gleich Primoff
Henry V. Hutten

3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
timothy.harkness@freshfields.com
madlyn.primoff@freshfields.com
henry.hutten@freshfields.com

*Attorneys for Defendants Fung Holdings (1937) Limited, Fung Distribution International Limited, Step Dragon Enterprise Limited, Golden Step Limited, William Fung, King Lun Holdings Limited, First Island Developments Limited, Victor Fung, Spencer Theodore Fung, Bruce Philipp Rockowitz and Hurricane Millennium Holdings Limited*

**MAYER BROWN LLP**

By: *s/ Mark G. Hanchet*
Mark G. Hanchet
Robert W. Hamburg

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
Facsimile: (212) 262-1910
mhanchet@mayerbrown.com
rhamburg@mayerbrown.com

*Attorneys for Defendant HSBC Trustee (C.I.) Limited*

# APPENDIX A
# TABLE OF DEFENDANTS AND Ds&Os

## DEFENDANTS

| Name | Place of Incorporation | Headquarters | Residence | Other Allegations |
|---|---|---|---|---|
| Fung Holdings (1937) Limited ("**Fung Holdings**")*[1] | Hong Kong. ¶ 21.[2] | Hong Kong. | N/A | The Plaintiff alleges that Fung Holdings is a former shareholder of Global Brands Group Holdings ("**GBGH**"). ¶ 21. |
| Dr. William Fung* | N/A | N/A | Hong Kong. | The Plaintiff alleges that Dr. Fung is the Vice-Chairman of Fung Holdings and is a former Chairman of the Board of Directors of GBGH. The Plaintiff also alleges that Dr. Fung is a former shareholder of GBGH. ¶ 20. |
| Fung Distribution International Limited* | British Virgin Islands. ¶ 24. | Not alleged. | N/A | The Plaintiff alleges that Fung Distribution is a former shareholder of GBGH. ¶ 24. |
| Step Dragon Enterprise Limited* | British Virgin Islands. ¶ 25. | Not alleged. | N/A | The Plaintiff alleges that Step Dragon is beneficially owned by Dr. William Fung and is a former shareholder of GBGH. ¶ 25. |
| Golden Step Limited* | Liberia. | Not alleged. | N/A | The Plaintiff alleges that Golden Step is a former shareholder of GBGH. ¶ 26. |

[1] An asterisk (*) denotes status as an alleged "Controlling Shareholder." *See* ¶ 156.

[2] References to a "¶" number are to the paragraphs in the Complaint (Adv. Pro. Dkt. No. 7).

| **Name** | **Place of Incorporation** | **Headquarters** | **Residence** | **Other Allegations** |
|---|---|---|---|---|
| HSBC Trustee (C.I.) Limited (“**HSBC Trustee**”) | Channel Islands. ¶ 28. | Not alleged. | N/A | The Plaintiff alleges that HSBC Trustee serves as the trustee of a trust established for the benefit of Victor Fung’s family, and owned shares of GBGH. ¶ 28. |
| King Lun Holdings Limited.* | British Virgin Islands. ¶ 23. | Not alleged. | N/A | The Plaintiff alleges that King Lun Holdings was owned by Dr. William Fung and HSBC Trustee, and was an indirect shareholder of GBGH. ¶ 23. |
| Victor Fung* | N/A | N/A | Hong Kong. ¶¶ 21, 27. | The Plaintiff alleges that Victor Fung is the Chairman of Fung Holdings, and that Victor Fung is a former shareholder of GBGH. ¶ 27. |
| First Island Developments Limited | British Virgin Islands. ¶ 29. | Not alleged. | N/A | The Plaintiff alleges that First Island is a wholly owned subsidiary of HSBC Trustee and a former shareholder of GBGH. ¶ 29. |
| Spencer Theodore Fung | N/A | N/A | Hong Kong. ¶ 30. | The Plaintiff alleges that Spencer Fung is the CEO of Li & Fung Limited. ¶ 30. The Plaintiff also alleges that Spencer Fung is a former shareholder of GBGH. ¶ 30. |
| Bruce Philip Rockowitz | N/A | N/A | Hong Kong. ¶ 31. | The Plaintiff alleges that Bruce Rockowitz is the former Vice Chairman of GBGH and was its CEO prior to October 30, 2018. ¶ 31. The Plaintiff also alleges that Mr. Rockowitz is a former shareholder of GBGH. ¶ 31. |

| **Name** | **Place of Incorporation** | **Headquarters** | **Residence** | **Other Allegations** |
|---|---|---|---|---|
| Hurricane Millennium Holdings Limited | British Virgin Islands. ¶ 32. | Not alleged. | N/A | The Plaintiff alleges that Hurricane Millennium is a trust established for the benefit of Mr. Rockowitz's family members, as well as a former shareholder of GBGH. ¶ 32. |

**Ds&Os**

| **Name** | **Alleged Role(s) With GBG USA** |
|---|---|
| Richard Nixon Darling | The Plaintiff alleges that Mr. Darling was the CEO of GBG USA and Executive Director of the Board of Directors of GBG USA from October 2018 through February 24, 2022, the "**Effective Date**" of the Plan. ¶ 14. |
| Mark Joseph Caldwell | The Plaintiff alleges that Mr. Caldwell was GBG USA's CFO from December 2018 through the Effective Date of the Plan. ¶ 15. |
| Ronald Ventricelli | The Plaintiff alleges that Mr. Ventricelli was GBG USA's COO and President from December 2018 through the Effective Date of the Plan. ¶ 16. |
| Robert K. Smits | The Plaintiff alleges that Mr. Smits was GBG USA's General Counsel, Executive Vice President, and Secretary from January 2013 through the Effective Date of the Plan. The Plaintiff also alleges that during the relevant time period Mr. Smits was also a Director of GBG USA. ¶ 17. |
| Stephen Harry Long | The Plaintiff alleges that Mr. Long was a member of GBG USA's Board of Directors from July 2014 to June 2021. ¶ 18. |
| Brandon Carrey | The Plaintiff alleges that Mr. Carrey was GBG USA's Treasurer and Vice President from April 13, 2015 through July 26, 2021. ¶ 19. |