**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK** **Hearing: September 10, 2024 10:00 AM**

| | |
|---|---|
| In re<br><br>GBG USA Inc., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 21-11369 (MEW)<br><br>Jointly Administered |
| PETER HURWITZ, AS LITIGATION TRUSTEE OF THE GBG USA LITIGATION TRUST,<br><br>Plaintiff,<br>v.<br><br>FUNG HOLDINGS (1937) LIMITED, FUNG DISTRIBUTION INTERNATIONAL LIMITED, STEP DRAGON ENTERPRISE LIMITED, GOLDEN STEP LIMITED, WILLIAM FUNG KWOK LUN, KING LUN HOLDINGS LIMITED, FIRST ISLAND DEVELOPMENTS LIMITED, VICTOR FUNG KWOK KING, SPENCER THEODORE FUNG, BRUCE PHILIP ROCKOWITZ, AND HURRICANE MILLENNIUM HOLDINGS LIMITED,<br><br>Defendants. | Adv. Pro. No. 23-01022 (MEW) |

# DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

[1] The debtors in these chapter 11 cases (the "**Debtors**") and the last four digits of each debtor's federal taxpayer identification number are as follows: GBG USA Inc. (2467), Jimlar Corporation (8380), GBG North America Holdings Co., Inc. (5576), Homestead International Group Ltd. (0549), IDS USA Inc. (7194), MESH LLC (8424), Frye Retail, LLC (1352), Krasnow Enterprises, Inc. (0122), Krasnow Enterprises Ltd. (0001), Pacific Alliance USA, Inc. (0435), GBG Spyder USA LLC (9108), and GBG Sean John LLC (1287). The Debtors' mailing address was GBG USA Inc., P.O. Box 4965, Greensboro, NC 27404.

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 5

I. Plaintiff Fails To State a Claim with Respect to the Special Dividend Cash Transfer or Repayment of the December Shareholder Loan. ..... 5

A. Plaintiff Fails To State a Claim To Recover the Special Dividend Cash Transfer Because its Entire Value (and More) Was Returned to GBG USA. ..... 5

B. Plaintiff Fails To State a Claim To Avoid or Recover GBG USA's Repayment of the December Shareholder Loan Because This Transfer Merely Returned Money that Was Previously Sent to GBG USA. ..... 9

II. Plaintiff's Claims To Avoid the Special Dividend Cash Transfer Are Barred by Section 546(e)'s Safe Harbor. ..... 10

A. The Special Dividend Cash Transfer Was a Transfer Made "In Connection with a Securities Contract." It Was Also a "Settlement Payment." ..... 11

B. The Special Dividend Cash Transfer Was Made by a Financial Institution. ..... 14

III. Plaintiff Fails To Allege GBG USA Intended To Hinder, Delay or Defraud Creditors. ..... 16

A. Plaintiff Fails To Allege that GBG USA Made the Special Dividend Cash Transfer With Intent To Hinder, Delay or Defraud Creditors. ..... 16

B. Plaintiff Fails To Allege that GBG USA Repaid the December Shareholder Loan With Intent To Hinder, Delay or Defraud Creditors. ..... 18

V. Plaintiff Fails To State a Claim To Recover the Special Dividend Cash Transfer From the Non-Transferees. ..... 18

VI. The Court Has No Personal Jurisdiction Over Defendants. ..... 21

A. Plaintiff Does Not Plead Defendants' Minimum US Contacts Relating to the Special Dividend Cash Transfer. ..... 21

B. Plaintiff Does Not Plead Fung Holdings' Minimum US Contacts Relating to the Repayment of the December Shareholder Loan. ..... 24

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Adelphia Comm'n Corp.*,
2006 WL 687153 (Bankr. S.D.N.Y. Mar. 6, 2006) ....10

*In re Appleseed's Intermediate Holdings, LLC*,
470 B.R. 289 (Bankr. D. Del. 2012) ....14

*AT&T Corp. v. Syniverse Techs., Inc.*,
2014 WL 4412392 (S.D.N.Y. Sept. 8, 2014) ....6

*AutoOpt Networks, Inc. v. GTL USA, Inc.*,
2015 U.S. Dist. LEXIS 11306 (N.D. Tex. Jan. 30, 2015) ....22

*In re Bassett*,
221 B.R. 49 (Bankr. D. Conn. 1998) ....6, 7

*In re Bean*,
252 F.3d 113 (2d Cir. 2001) ....5, 7

*In re Bernard L. Madoff Inv. Secs. LLC*,
542 B.R. 100 (Bankr. S.D.N.Y. 2015) ....20

*In re BICOM NY, LLC*,
619 B.R. 795 (Bankr. S.D.N.Y. 2020) ....19, 20

*In re Big Apple Volkswagen, LLC*,
2016 WL 1069303 (Bankr. S.D.N.Y. Mar. 17, 2016) ....20

*In re Bonefant*,
2016 WL 1238855 (Bankr. D. Mass. Mar. 29, 2016) ....6

*In re Boston Generating LLC*,
617 B.R. 442 (Bankr. S.D.N.Y. 2020) ....14

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ....23

*In re Clarkston*,
387 B.R. 882 (Bankr. S.D. Fla. 2008) ....6

*In re Cybridge Corp.*,
312 B.R. 262 (Bankr. D.N.J. 2004) ....9

*In re DeBerry*,
945 F.3d 943 (5th Cir. 2019) ....6, 8

*In re Direct Access Partners*,
602 B.R. 495 (Bankr. S.D.N.Y. 2019) ....................17

*Enron Cred. Recov. v. Alfa, S.A.B. de C.V.*,
651 F.3d 329 (2d Cir. 2011) ....................13, 14

*In re Enron Creditors Recovery Corp.*,
407 B.R. 17 (Bankr. S.D.N.Y. 2009) ....................20

*In re Fairfield Sentry Ltd.*,
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ....................15

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
130 F.3d 52 (2d Cir. 1997) ....................20

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ....................24, 25

*Gambone v. Lite Rock Drywall*,
288 F. App'x 9 (3d Cir. 2008) ....................22

*In re Global Crossing*,
385 B.R. 52 (Bankr. S.D.N.Y. 2008) ....................14

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995) ....................10

*In re Hot-Head, Inc.*,
2014 Bankr. LEXIS 2791 (Bankr. S.D. Tex. June 26, 2014) ....................22

*In re Jackson*,
318 B.R. 5 (Bankr. D.N.H. 2004) ....................8

*In re 45 John Lofts, LLC*,
599 B.R. 730 (Bankr. S.D.N.Y. 2019) ....................7

*In re Kingsley*,
2007 WL 1491188 (Bankr. S.D. Fla. May 17, 2007) ....................6, 7

*In re Kingsley*,
518 F.3d 874 (11th Cir. 2008) ....................7, 8

*L-7 Designs Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011) ....................10

*In re Lease-A-Fleet*,
155 B.R. 666 (Bankr. E.D.Pa. 1993) ....................18

*Montoya v. Akbari-Shahmirzadi*,
2016 Bankr. LEXIS 3957 (Bankr. D.N.M. Nov. 14, 2016)....................22

*In re Nine W. LBO Sec. Litig.*,
482 F. Supp. 3d 187 (S.D.N.Y. 2020)....................13, 15

*In re Old CarCo.*,
435 B.R. 169 (Bankr. S.D.N.Y. 2010)....................16, 17

*In re Patts*,
470 B.R. 234 (Bankr. D. Mass. 2012)....................6

*In re Pearlman*,
515 B.R. 887 (Bankr. M.D. Fla. 2014)....................6, 8

*Picard v. Ida Fishman Revocable Trust*,
773 F.3d 411 (2d Cir. 2014)....................12

*In re Platinum and Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023)....................23

*In re Polichuk*,
506 B.R. 405 (Bankr. E.D. Pa. 2014)....................6

*Racher v. Lusk*,
2013 U.S. Dist. LEXIS 162193 (W.D. Okla. Nov. 14, 2013)....................22

*In re Sawran*,
359 B.R. 348 (Bankr. S.D. Fla. 2007)....................6, 8

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018)....................24

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
2022 Bankr. LEXIS 3258 (Bankr. S.D.N.Y. Nov. 18, 2022)....................22

*In re Sharp Int'l Corp.*,
403 F.3d 43 (2d Cir. 2005)....................17

*In re Sledziejowski*,
2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016)....................22

*SPV OSUS, Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)....................25

*Sugartown Worldwide LLC v. Shanks*,
2015 U.S. Dist. LEXIS 36495 (E.D. Pa. Mar. 24, 2015)....................22

*In re Tops Holding II Corp.*,
646 B.R. 617 (Bankr. S.D.N.Y. 2022) ........ 13, 14

*Walden v. Fiore*,
571 U.S. 277 (2014) ........ 21, 23

**STATUTES**

11 U.S.C. § 546 ........ *passim*

11 U.S.C. § 550 ........ *passim*

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 7012 ........ 1

Fed. R. Civ. P. 12 ........ 1

Pursuant to Fed. R. Civ. P. 12(b)(2) & (6) and Fed. R. Bankr. P. 7012, Defendants submit this Reply In Further Support of the Motion (the "**Motion**," (Adv. Pro. Dkt. No. 56)) To Dismiss Plaintiff's First Amended Complaint (the "**Complaint**" or "**Compl.**," (Adv. Pro. Dkt. No. 55)).[2]

## PRELIMINARY STATEMENT

This case does not involve fraudulent intent or harmed creditors. The Complaint's allegations show that, considered in context, the Special Dividend Cash Transfer and GBG USA's repayment of the December Shareholder Loan (the "**Challenged Transfers**") resulted in a net gain for the Debtors. Indeed, Plaintiff's allegations show that Fung Holdings replenished the *entire* $196 million Special Dividend Cash Transfer (and more) to pay down GBG USA's prepetition debt, with GBG USA incurring *no* obligations in return. The Complaint also shows that, when GBG USA repaid the $100 million December Shareholder Loan, it was merely returning funds it had received, indirectly, from Fung Holdings. Payment of the December Shareholder Loan had no impact on GBG USA's balance sheet, but rather simply facilitated the substitution of debt GBG USA owed to a trade creditor with debt it owed to its bank lenders.

In his opposition to Defendants' Motion (the "**Opposition**" or "**Opp.**," (Adv. Pro. Dkt. No. 61-1)), Plaintiff insists he can reap a $296 million windfall because GBG USA allegedly drew on credit lines to make the Challenged Transfers, and some of those draws remained outstanding after Fung Holdings replenished the entire Special Dividend Cash Transfer (and more). But these arguments are irrelevant, and cannot obscure the dispositive fact that, by Plaintiff's admission, and by design, the Challenged Transfers were parts of transactions that either increased GBG USA's

[2] References to an "Adv. Pro. Dkt. No." are to the ECF numbers in the Adversary Proceeding. References to a "Ch. 11 Dkt. No." are to the ECF numbers in the Chapter 11 Case. Capitalized terms not defined herein have the meaning ascribed to them in Defendants' Memorandum of Law in Support of Their Motion (the "**Memorandum**" or "**Mem**.," (Adv. Pro. Dkt. No. 57)).

net assets or had no impact on GBG USA's balance sheet. As is shown in the table below,[3] this remains true even if GBG USA drew on its credit facilities to fund the Challenged Transfers.

| Date | Step in Overall Transaction | Amount | Impact on GBG USA's Assets | Impact on GBG USA's Liabilities | Impact on GBG USA Balance Sheet (December Shareholder Loan) | Impact on GBG USA Balance Sheet (Special Dividend Cash Transfer) |
|---|---|---|---|---|---|---|
| Dec. 20, 2018 | Fung Holdings disburses the $100M December Shareholder Loan proceeds to GBGH to bridge year-end liquidity. Compl. ¶¶ 97, 103. | $100M | $0 | $0 | $0 | N/A |
| Dec. 21, 2018 | GBGH sends $100M December Shareholder Loan proceeds to GBG USA. *Id.* ¶ 103. | $100M | +$100M (new cash) | $0 | +$100M | N/A |
| Dec. 22, 2018 | GBG USA sends $100M to Millwork to pay trade debt. *See id.* ¶¶ 41-42, 103; Hutten Decl. ¶ 17 & Ex. L. | $100M | $-100M (less cash) | $-100M (in reduced debt) | $0 | N/A |
| Jan. 25, 2019 to Mar. 26, 2019 | GBG USA draws on three credit facilities to fund the Special Dividend Cash Transfer and repay the December Shareholder Loan. *See* Compl. ¶¶ 111-14. | $296M[4] | +$296M (new cash) | +$296M (new debt) | $0 | $0 |
| Mar. 26, 2019 | GBG USA sends the Proceeds of the December Shareholder Loan Back to Fung Holdings. *Id.* ¶ 123. | $100M | -$100M (reduced cash ) | $0 | $-100M | N/A |
| Mar. 28-29, 2019 | GBG USA makes the Special Dividend Cash Transfer to GBGH. *Id.* ¶¶ 118-20. | $196M | $-196M (reduced cash) | $0 | N/A | $-196M |
| Apr. 3, 2019 | Fung Holdings disburses the $94.2M New Shareholder Loan to GBGH. GBGH uses the proceeds to pay down GBG USA's Prepetition RCF. *Id.* ¶¶ 76, 160, 177. GBG USA has no obligation to repay GBGH or Fung Holdings. Hutten Decl. Ex. G | $94.2M | $0 | $-94.2M (in reduced debt) | N/A | +$94.2M |

[3] This table is also reproduced in **Appendix A** hereto so that it can be viewed on a single page.

[4] Plaintiff alleges that GBG USA drew $328 million from its credit facilities in the months leading up to its repayment of the December Shareholder Loan and the Special Dividend Cash Transfer. *See* Compl. ¶¶ 111-14. Of this amount, Plaintiff alleges that GBG USA used $100 million to repay the December Shareholder Loan, *id.* ¶ 10, and $196 million to fund the Special Dividend Cash Transfer, *id.* ¶ 7, 9. He makes no allegations about how GBG USA used the balance.

| Date | Step in Overall Transaction | Amount | Impact on GBG USA's Assets | Impact on GBG USA's Liabilities | Impact on GBG USA Balance Sheet (December Shareholder Loan) | Impact on GBG USA Balance Sheet (Special Dividend Cash Transfer) |
|---|---|---|---|---|---|---|
| May 30, 2019 | Fung Holdings disburses the $105.8M Third Shareholder Loan to GBGH. GBGH uses the proceeds to pay down GBG USA's Prepetition RCF. *Compl.* ¶¶ 179-80. GBG USA has no obligation to repay GBGH or Fung Holdings. Hutten Decl. Ex. J. | $105.8M | $0 | -$105.8M (in reduced debt) | N/A | +$105.8M |
| **Total Balance Sheet Impact of All Steps** | | | | | **$0** (GBG USA owes prepetition bank lenders $100M that it previously owed to Millwork, a trade creditor) | **+$4M** (GBG USA funded the $196M Special Dividend Cash Transfer by drawing on credit lines. Fung Holdings paid down $200M of those lines thereafter). |

For this, and for the following reasons, the Complaint and Opposition establish that Plaintiff fails to state any plausible claims, and the Complaint should be dismissed.

*First*, Plaintiff cannot state a claim to "recover" the Special Dividend Cash Transfer under section 550(a) of the Bankruptcy Code since, by his own allegations, this Transfer (and more) was already returned to GBG USA and Plaintiff cannot "recover" what was already sent back to him. Plaintiff does not challenge Defendants' argument that he fails to state a claim to "recover" these funds under section 550(a), and thus concedes the point. Section 550(d)'s "single satisfaction" rule also bars Plaintiff from seeking a double recovery. Plaintiff's arguments to the contrary have been rejected by every court that has ruled on them and are also foreclosed by Second Circuit precedent.

Similarly, binding authority holds that a transfer cannot be fraudulent if, like GBG USA's alleged repayment of the December Shareholder Loan, it does not diminish a debtor's net assets. Plaintiff's arguments in the Opposition amount to a request to ignore matter that is cognizable on

this Motion, and which shows the transaction was a wash. These arguments should be rejected.

*Second*, on the face of the Complaint, section 546(e) readily bars Plaintiff's claims based on the Special Dividend Cash Transfer. This Transfer was made in connection with a securities contract and was a settlement payment. It was also made by "financial institution" within the meaning of section 546(e). Thus, it falls within the scope of section 546(e) and Plaintiff may not avoid the Transfer. Plaintiff's arguments to the contrary ignore the alleged nature of the Special Dividend Cash Transfer and have been rejected by the Second Circuit Court of Appeals.

*Third*, the Complaint fails to allege GBG USA made any Challenged Transfer with intent to hinder, delay or defraud creditors, and its claims for actual fraud fail. Plaintiff's own allegations show that, before the Special Dividend Cash Transfer passed beyond GBGH (a guarantor of GBG USA's debt), GBG USA got lender consent for the Special Dividend, and procured commitments from certain Defendants not only to forego the Special Dividend, but also to replenish the entire amount of the Special Dividend Cash Transfer to pay down GBG USA's debt. These alleged facts preclude any inference of scienter. Plaintiff's response, in substance, simply asks the Court to ignore this critical context, in contravention of settled law, including decisions of this Court.

Likewise, if GBG USA wanted to hinder, delay or defraud creditors when repaying the December Shareholder Loan, it would not have executed a wash transaction with no effect on GBG USA's bottom line. Plaintiff's response again is to ask the Court just to ignore this crucial context.

*Fourth*, Plaintiff's allegations show that, before GBGH paid the Special Dividend, the Non-Transferees waived their right to receive—and never received—their $87.7 million cash portion of this Dividend. Thus, the Non-Transferees are not "transferees" (initial or subsequent) of the Special Dividend Cash Transfer or entities "for whose benefit" this Transfer was made, and the Complaint fails to state a claim to recover from them under section 550(a) of the Bankruptcy Code.

In his Opposition, Plaintiff argues boldly that he is still entitled to $87.7 million in cash from the Non-Transferees because, before the Special Dividend was paid, they had a theoretical right to receive it. This bold argument too is contrary to the law, including to the decisions of this Court.

*Finally*, Plaintiff fails to allege that Defendants are subject to this Court's jurisdiction. In the Opposition, Plaintiff argues that Defendants directed, controlled and knowingly received the Challenged Transfers. The Complaint—which alleges that foreign individuals and entities acted strictly through foreign entities—does not bear this out. Moreover, this argument is based on the theory that a defendant acting outside the USA is subject to US-court jurisdiction if he knows his actions might impact a plaintiff in the USA—a theory the Supreme Court has rejected.

In sum, the Complaint fails to state any viable claim for relief and, based on the allegations Plaintiff is constrained to make, cannot be fixed. It should be dismissed in full and with prejudice.

## ARGUMENT

### I. PLAINTIFF FAILS TO STATE A CLAIM WITH RESPECT TO THE SPECIAL DIVIDEND CASH TRANSFER OR REPAYMENT OF THE DECEMBER SHAREHOLDER LOAN.

#### A. Plaintiff Fails To State a Claim To Recover the Special Dividend Cash Transfer Because its Entire Value (and More) Was Returned to GBG USA.

Plaintiff's own allegations show that, by design, the full value of the $196 million Special Dividend Cash Transfer (and more) was replenished by Fung Holdings and used to pay down GBG USA's prepetition debt. *See* Mem. at 10-14. There are two consequences of this, each of which independently bars Plaintiff's claims to recover the Special Dividend Cash Transfer: *first,* Plaintiff cannot state a claim to "recover" this Transfer under section 550(a) of the Bankruptcy Code, *see* Mem. at 30-31, and, *second*, Plaintiff's bold attempt to seek a double return of funds already recovered by GBG USA is barred by section 550(d) of the Bankruptcy Code, which limits Plaintiff to a "single satisfaction." Mem. at 30 (quoting *In re Bean*, 252 F.3d 113, 117 (2d Cir. 2001)).

In response, Plaintiff admits, as he must, that, based on his own allegations, the full amount

(and more) of the Special Dividend Cash Transfer was returned by Fung Holdings to pay down GBG USA's prepetition debt. Opp. at 14-15, 30. And, critically, Plaintiff does not challenge Defendants' contention (or the caselaw holding, *see* Mem. at 30-31) that a plaintiff cannot state a claim to "recover" a transfer within the meaning of section 550(a) of the Bankruptcy Code once that transfer has been returned to the debtor. *See* Opp. at 26-33. Plaintiff's silence on this point is dispositive. *See*, *e.g.*, *AT&T Corp. v. Syniverse Techs., Inc.*, 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (plaintiff's failure to address an issue in its opposition brief "concedes the point").

Instead, Plaintiff claims only that section 550(d)'s "single satisfaction" rule does not impose an affirmative bar on his recovery until the Special Dividend Cash Transfer "is avoided" and "there has been a recovery after that avoidance." Opp. at 26-27. But the position that "the single-satisfaction rule" in section 550(d) "does not apply to funds that were returned prior to the petition date" is contrary to and "split[s] from every . . . court to consider the question." *In re DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019). While "[s]ection 550(d) typically is used to prevent a trustee from collecting from multiple parties for the same transfer," courts also "use § 550(d) . . . to temper the harsh application of § 550(a) when the estate has already received full repayment of the challenged transfers before the bankruptcy case was filed." *In re Pearlman*, 515 B.R. 887, 896-97 & n.51 (Bankr. M.D. Fla. 2014).[5] Indeed, the Fifth Circuit has already rejected the same argument Plaintiff makes here, holding that the "text of § 550 cannot bear this strained reading." *In re DeBerry*, 945 F.3d at 948-49 (the word "satisfaction" in section 550(d) "presupposes an

[5] *Accord In re Bonefant*, 2016 WL 1238855, at *8-9 (Bankr. D. Mass. Mar. 29, 2016) (section 550(d) barred recovery of funds returned to the debtor prepetition); *In re Polichuk*, 506 B.R. 405, 435-36 (Bankr. E.D. Pa. 2014) (same); *In re Patts*, 470 B.R. 234, 242-43 (Bankr. D. Mass. 2012) (same); *In re Clarkston*, 387 B.R. 882, 891 (Bankr. S.D. Fla. 2008) (same); *In re Kingsley*, 2007 WL 1491188, at *3-6 (Bankr. S.D. Fla. May 17, 2007) (same); *In re Sawran*, 359 B.R. 348, 351-53 (Bankr. S.D. Fla. 2007) (same); *In re Bassett*, 221 B.R. 49, 55 (Bankr. D. Conn. 1998) (same).

obligation" and, "if that obligation has already been satisfied, the transferee has no further obligation—the trustee's avoidance action was satisfied before it ever commenced").[6]

Moreover, the purpose of section 550 is "to restore the estate to the financial condition that would have existed had the transfer never occurred." *In re Kingsley*, 518 F.3d 874, 877 (11th Cir. 2008). Thus, it makes no difference whether the "transferred property itself was returned to the debtor," *contra* Opp. at 27-28, when, as here, the property is fungible cash. Courts rightly invoke section 550(d) when money is returned to pay a debtor's prepetition debt. *In re Bassett*, 221 B.R. at 55 (transferee's "pay-off of the [d]ebtor's obligation on the Note released the [d]ebtor, and his future bankruptcy estate from that . . . obligation," and therefore section 550(d)'s "single satisfaction" rule barred the trustee's attempt to recover the transfer); *In re Kingsley*, 2007 WL 1491188, at *4 (when transferee paid debtor's expenses and creditors, section 550(d) barred trustee's recovery claims "to the extent the fraudulent transfer was repaid.").

Moreover, and contrary to Plaintiff's contentions otherwise, *see* Opp. n.17, Plaintiff's argument is precluded by the Second Circuit's decision in *In re Bean*, 252 F.3d 113 (2d Cir. 2001). There, the "precise question" was "whether § 550(a)(1) of the [Bankruptcy] Code requires a bankruptcy court to permit a trustee to recover" the "fair market value of property that was the subject of an avoidable transfer, even after that trustee has already recovered the equity value of the property from the transferor." *Id.* at 116. Because the trustee was entitled to recover only the equity value, and because "the [t]rustee had already recovered that amount," further recovery was

---

6 *In re 45 John Lofts, LLC*, cited Opp. at 27, is not to the contrary, since "it was unclear to the [c]ourt" that there was a return of transferred funds such that any claim to recovery under 550(a) had already been "satisfied." 599 B.R. 730, 749 (Bankr. S.D.N.Y. 2019). Thus, that court's unexplained statement that section 550(d) applies only where transfers have already been avoided under one of section 550(a)'s triggering sections and recovered under section 550(a) is dicta and, in any event, is contrary to binding Second Circuit precedent. *See infra* at 7-8.

"categorically limit[ed]" by section 550(d). *Id.* at 117. The Court also found "no fault with" the conclusion that the trustee "grossly abused his discretion" in seeking this double recovery. *Id.*

Plaintiff also argues that this Court should not invoke its equitable powers to prevent Plaintiff from recovering the Special Dividend Cash Transfer. Opp. at 28-30. But this ignores that, irrespective of the equities, Plaintiff has failed to state a claim under 550(a), and the plain text of section 550(d) bars his recovery. However, even if this Court were inclined to rely on equity, instead of the plain meaning of section 550, dismissal would still be appropriate.[7] In Plaintiff's view, he should be allowed to pursue "recovery" of the Special Dividend Cash Transfer—even though he *admitted* that Fung Holdings replenished the entire value of the Special Dividend Cash Transfer (and more) to pay down GBG USA's prepetition debt—because (a) GBG USA drew on its credit lines to fund the Special Dividend Cash Transfer, (b) some of this credit was still drawn and outstanding after Fung Holdings returned the Special Dividend Cash Transfer to pay down GBG USA's debt, and (c) GBG USA had access to smaller credit lines after the Special Dividend Cash Transfer. Opp. at 14-15, 29-30. But, as courts have already decided, this is a "true red herring[]" that "expands the analysis too far beyond the transfer[] in question." *In re Pearlman*, 515 B.R. at 899. Plaintiff's points, even if true, do not change the dispositive fact that Fung Holdings returned the full value of the Special Dividend Cash Transfer and more. *See* App. A.[8]

---

[7] *See In re Kingsley*, 518 F.3d at 878 (invoking equity to prevent trustee from recovering amounts transferee used to pay off debtor's obligations, which would be "an inequitable windfall to the bankruptcy estate"); *In re Jackson*, 318 B.R. 5, 28 (Bankr. D.N.H. 2004), *aff'd*, 459 F.3d 117 (1st Cir. 2006) (when transferee used transferred funds "to pay the [d]ebtor's bills," it was "equitable" to "credit the defendant for the expenditures she made"); *Sawran*, 359 B.R. at 350-51, 354 (when subsequent transferees used transferred funds for the debtor's rent and living expenses, they received "equitable credit . . . to prevent the estate from receiving a windfall").

[8] *See In re DeBerry*, 945 F.3d at 950-51 (rejecting the argument that, even though the transferred funds were returned, the estate was depleted by other transactions related to the challenged transfer, and therefore 550(d) and the court's equitable powers should not preclude recovery; finding that "[i]f the [debtors] frittered the money away" after the transferred funds were returned, "it has

**B. Plaintiff Fails To State a Claim To Avoid or Recover GBG USA's Repayment of the December Shareholder Loan Because This Transfer Merely Returned Money that Was Previously Sent to GBG USA.**

Based on the Complaint and material the Court may consider on this Motion, it is clear that when GBG USA repaid the December Shareholder Loan, it was merely returning funds that it previously received, indirectly, from Fung Holdings. Mem. at 14-17, 33-34. This wash transaction did not deplete GBG USA's assets, but merely substituted a $100 million debt to a trade creditor with a debt of the same amount to GBG USA's prepetition bank lenders. *See id.*; *supra* at 2-3. As a result, Plaintiff fails to state a claim that it was a fraudulent transfer. *See* Mem. at 33-34.

In response, Plaintiff admits that GBG USA received the proceeds of the December Shareholder Loan before returning them to Fung Holdings. Opp. at 8, 30-31. Yet Plaintiff claims he still can recover GBG USA's repayment of these proceeds to Fung Holdings (and reap a $100 million windfall) simply because (i) GBG USA had no formal legal obligation to repay the proceeds to Fung Holdings, and (ii) after receiving the $100 million December Shareholder Loan proceeds, GBG USA transferred them to Millwork, such that when it repaid the same amount to Fung Holdings three months later, its assets were purportedly diminished. Opp. at 31-33.

But Plaintiff would have this Court ignore that the funds advanced by Fung Holdings were used by GBG USA to pay down its debt to Millwork when GBG USA sent the $100 million to Millwork. Thus, before repaying the December Shareholder Loan to Fung Holdings, GBG USA had $100 million more in net assets than it did before receiving the December Shareholder Loan. *See* Mem. 14-17.[9] As a result, GBG USA's repayment of the December Shareholder Loan was a

---

nothing to do with the fraudulent transfer"); *In re Cybridge Corp.*, 312 B.R. 262, 272 (D.N.J. 2004) (rejecting trustee's argument that allowing an "equitable credit" for returned funds would diminish the estate because "every penny [the transferee] took out [of the estate] has also been put back in").

[9] Plaintiff does not dispute that, for more than a year before filing the Complaint he had possession and notice of the document, attached as Exhibit L to the Hutten Declaration, showing that GBG USA paid down its debt when it transferred the proceeds of the December Shareholder

wash with no impact on GBG USA's net assets. *See supra* at 2-3 & App. A. And a transfer "cannot be a fraudulent conveyance" if "it does not adversely affect the debtor's ability to meet its overall obligations." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995).

In addition, *contra* Opp. at 31-33, whether GBG USA had a legal obligation to re-transfer the funds back to Fung Holdings is irrelevant. *See In re Adelphia Comm'n Corp.*, 2006 WL 687153, at *14 (Bankr. S.D.N.Y. Mar. 6, 2006) (rejecting argument, like Plaintiff's here, that when money was transferred to a debtor it "became [the debtor's] property . . . such that the re-transfer" back to the entity from which the funds originated "constituted a fraudulent conveyance"). Rather, the "relevant inquiry is whether the transfer had a net effect on the assets or liabilities" of the debtor. *Id.* Where, as here, the "estate was not diminished" by a transaction, it is "not a fraudulent conveyance." *Id.* (the "fact that money was transferred to [the debtor] on a transient basis before being transferred back to [the initial source of funding] does not make the conveyance fraudulent").

## II. PLAINTIFF'S CLAIMS TO AVOID THE SPECIAL DIVIDEND CASH TRANSFER ARE BARRED BY SECTION 546(e)'s SAFE HARBOR.

On the face of the Complaint, the Special Dividend Cash Transfer falls within the scope of

---

Loan to Millwork. *See* Mem. at 16 & n.13; Opp. n.21. Nor could he, given that he purports to have reviewed the books and records produced to him before filing the Complaint, *see* Opp. at 38, which includes Exhibit L. *See* Hutten Decl. ¶ 17. Yet he claims that this Court should not consider the document on this Motion because he did not reference it or incorporate it by reference in the Complaint. Opp. n.21. Not so. "A complaint is . . . deemed to include . . . documents that, although not incorporated by reference, are" as here, "integral to the complaint." *L-7 Designs Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011). Moreover, even if Plaintiff did not rely on this particular document in drafting the Complaint, he certainly had notice of the information therein, and relied on that information. Plaintiff admitted in his original complaint that GBG USA used the proceeds of the December Shareholder Loan to pay down its debt, but then strategically removed this allegation after Defendants moved to dismiss because the repayment of the December Shareholder Loan was a wash transaction without any material effect on GBG USA. *See* Mem. at 15-16; Original Complaint (Adv. Pro. Dkt. No. 7) ¶ 94. Plaintiff's "failure to include matters of which as [a] pleader[] [he] had notice and which were integral to [his] claim—and that [he] apparently most wanted to avoid—may not serve as a means of forestalling th[is] [C]ourt's decision on a [12(b)(6)] motion." *L-7 Designs Inc.*, 647 F.3d at 422.

section 546(e) of the Code and thus, Plaintiff "may not avoid" it. 11 U.S.C. § 546(e); Mem. at 39-47. Plaintiff argues that this safe harbor does not apply because the Special Dividend Cash Transfer is not a qualifying transfer and did not involve a qualifying institution. Both contentions are wrong.

### A. The Special Dividend Cash Transfer Was a Transfer Made "In Connection with a Securities Contract." It Was Also a "Settlement Payment."

The Special Dividend Cash Transfer was made "in connection with a securities contract" and a "settlement payment," 11 U.S.C. § 546(e), satisfying the first of section 546(e)'s conditions.

<u>*Transfer "in connection with a securities contract.*</u>" Plaintiff does not contest that the PSA governing the Centric Sale was a "securities contract." Opp. at 40-47. Nor does Plaintiff disagree that the Centric Sale was designed to "allow [GBGH's] [s]hareholders to realise" value "by way of" the Special Dividend, *see* Hutten Decl. Ex. B at 2, which would provide "a substantial . . . cash realization . . . from the outcome of the" Centric Sale. Hutten Decl. Ex. C at 16. Plaintiff does not (and cannot) contest that the Special Dividend and Centric Sale were approved at the same special shareholder meeting by GBGH's shareholders on August 2, 2018, *see* Compl. ¶¶ 63-69, with the "promise to pay a Special Dividend" being, in Plaintiff's own words, "a substantial factor" in the "shareholders' approval of the Centric Sale." *Id.* ¶ 69. Plaintiff does not disagree that the Special Dividend was "[s]ubject to and conditional upon [the] closing of" the Centric Sale. Hutten Decl. Ex. D at 2-3. Nor does, or can, Plaintiff contest that the "precise amount of the Special Dividend" was specifically based on the final "purchase price that was paid at closing" of the Centric Sale. Compl. ¶¶ 95, 104. And, critically, Plaintiff does not (and cannot) contest that the Special Dividend Cash Transfer was intended to, and did, fund the "actual amount of the net cash" portion of the Special Dividend. *Id.* ¶¶ 118-20, 164; *see also* Mem. at 41-46. In other words, there is no dispute that (i) GBGH's shareholders approved the Centric Sale so that they could realize the value of the securities that GBG USA disposed of—and which they ultimately beneficially owned—pursuant

to the PSA, a securities contract, and (ii) the Special Dividend Cash Transfer was intended to, and did, distribute the value of those securities to certain of GBGH's shareholders.

This easily meets the "low bar" for showing that the Special Dividend Cash Transfer was made "in connection with" a securities contract, which, in the words of the Second Circuit, merely requires this Transfer to be "broadly related to" or "associated with" the PSA. *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411, 420-21 (2d Cir. 2014); *see also* Mem. at 40-42.

Plaintiff claims this "low bar" is not met because (i) the shareholder resolutions approving the Centric Sale and Special Dividend authorized, but did not require, GBGH to pay a Special Dividend, (ii) the PSA itself did not require the Special Dividend to be paid, and (iii) the cash GBG USA allegedly used to fund the Special Dividend Transfer was not traceable to cash it received from closing the PSA, but rather came from a drawdown of GBG USA's credit facilities. Opp. at 41-42. But the Second Circuit has already rejected the same arguments. In *Picard v. Fishman*, the trustee argued that Bernard Madoff's transfers to his withdrawing brokerage customers were not safe harbored by section 546(e) because they were funded by incoming customer deposits, and were not proceeds from the securities transactions contemplated by the securities contracts between Madoff and his withdrawing customers. 773 F.3d at 421-22. The Second Circuit rejected this argument because section 546(e) contains no requirement "the transfer be made 'pursuant to,' or 'in accordance with the terms of,' or 'as required by,' the securities contract." *Id.* at 422.

Rather, all that is needed is "that the transfer have a connection to the securities contract." *Fishman*, 773 F.3d at 421-22. Here, GBGH's shareholders approved the Centric Sale to realize the value of securities that GBG USA would sell (and which they beneficially owned) pursuant to the PSA (a securities contract). And the Special Dividend Cash Transfer was meant to, and did, distribute the value of those securities to GBGH shareholders once they were sold. That provides

the needed "connection," even if the Transfer was not funded with the proceeds of the Centric Sale. *See id.* (when Madoff agreed to transact in securities for his customers, and customers placed funds in accounts relying on that agreement, withdrawals from the accounts were made "in connection with a securities contract" even though no securities transactions occurred and the withdrawals were not funded with proceeds of any such transactions).[10]

Settlement payment. The Second Circuit adopts a "capacious interpretation" of the term "settlement payment," *In re Nine W. LBO Sec. Litig*., 482 F. Supp. 3d 187, 199 (S.D.N.Y. 2020), that includes any "transfer of cash or securities made to complete [a] securities transaction," *Enron Cred. Recov. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 334 (2d Cir. 2011). Plaintiff's allegations show that the Special Dividend Cash Transfer was a step in a larger transaction in which GBGH's shareholders authorized GBG USA to sell securities in the Centric Sale in exchange for a cash distribution, *i.e.*, the Special Dividend, in an amount equal to the value of those securities. *See* Mem. at 7-9, 13, 41-43. Thus, the Special Dividend Cash Transfer—which Plaintiff *admits* was intended to, and did, fund the "actual amount of the net cash" portion of the Special Dividend, Compl. ¶¶ 118-20, 164—was "made to complete" the securities transaction authorized by GBGH's shareholders. *Enron*, 651 F.3d at 334. It was therefore a "settlement payment." *Id.*

Even so, Plaintiff claims that the Special Dividend Cash Transfer was not a settlement payment, but rather a simple vanilla dividend like those paid to shareholders on account of stock they retain after a dividend. *See* Mem. at 44-45. That is, of course, contradicted by Plaintiff's own allegations showing that the Special Dividend Cash Transfer was intended to, and did, send value to certain of GBGH's shareholders in exchange for the equity interests (of which they were the

[10] Plaintiff's reliance on *In re Tops Holding II Corp.*, *see* Opp. at 42-43, does not help Plaintiff since the court in that decision did not analyze whether the transfers were made "in connection with" a securities contract. *See* 646 B.R. 617, 677-86 (Bankr. S.D.N.Y. 2022).

ultimate beneficial owners) that were disposed of in, and no longer inured to their benefit after, the Centric Sale. *See In re Boston Generating LLC*, 617 B.R. 442, 492-93 (Bankr. S.D.N.Y. 2020) (dividend payment was both a "settlement payment" and made "in connection with a securities contract" because it was not "a true dividend to shareholders who retained their equity following the dividend," but was, as here "a transfer in exchange for the [security holders'] equity interest").[11]

Plaintiff also argues that the Special Dividend Cash Transfer was not "made to complete a securities transaction." Opp. at 45. In support, he contends that "all right, title and equity interests in GBG USA's North American licensing business were transferred to Centric Brands on the date of closing" of the Centric Sale and thus, the "'securities transaction' was complete" on closing. Opp. at 45. This ignores that payment to GBGH's shareholders for the equity stake that GBG USA disposed of in the Centric Sale is also a securities transaction. *See* Mem. at 42-43. Moreover, Plaintiff's attempt to cabin the term "settlement payment" to a payment that involves the transfer of title to a security is one that the Second Circuit has already rejected. *See Enron*, 651 F.3d at 337, (rejecting the argument that a "settlement payment" includes "only transactions in which title to the securities changes hands"). Here, the Special Dividend Cash Transfer was meant to, and did, send value to some of GBGH's shareholders (and GBG USA's ultimate beneficial owners) in exchange for the equity stake they disposed of in the Centric Sale. Compl. ¶¶ 118-20, 164. This was "made to complete a securities transaction," and thus, a settlement payment. Mem. at 42-43.

### B. The Special Dividend Cash Transfer Was Made by a Financial Institution

The Complaint shows that when GBG USA made the Special Dividend Cash Transfer,

---

[11] *In re Global Crossing*, *In re Tops Holding II Corp.*, and *In re Appleseed's Intermediate Holdings, LLC*, cited Opp. at 44, are all distinguishable because, unlike here, the debtor's ultimate beneficial owners did not dispose of any equity stake in exchange for their dividend. *See In re Global Crossing*, 385 B.R. 52, 59-60 (Bankr. S.D.N.Y. 2008); *Tops II*, 646 B.R. at 639-40, 679-80; *In re Appleseed's Intermediate Holdings, LLC*, 470 B.R. 289, 294 (Bankr. D. Del. 2012).

Citibank, a financial institution, was "acting as an agent for a customer," *i.e.*, GBG USA, "in connection with a securities contract," and "that customer counts as a 'financial institution,' for the purposes of the § 546(e) safe harbor." *Nine W.*, 482 F. Supp. 3d at 199. Thus, the Special Dividend Cash Transfer was "made by" a "financial institution," and the final requirement of section 546(e) is met. *See* Mem. at 43-47. In response, Plaintiff claims that, without more factual development, it is not clear that GBG USA was Citibank's customer, or that Citibank was acting as GBG USA's agent with respect to the Special Dividend Cash Transfer. *See* Opp. at 46-47.

Not so. Plaintiff alleges that GBG USA's Treasurer ordered the Special Dividend Cash Transfer to be paid from GBG USA's "bank account at Citibank located in [New York] to GBGH" and that Citibank followed these instructions. Compl. ¶¶ 118-19. This shows that GBG USA was a customer who held an account with Citibank and paid Citibank for account-related services, including wire transfers. *See id.* ¶ 116 (alleging "[t]he Special Dividend Cash Transfer was wired directly from GBG USA . . . to GBGH"); *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *7 (Bankr. S.D.N.Y. Dec. 14, 2020) (debtors were customers of Citco Bank because they "held accounts with Citco Bank from which the [challenged transfers] were paid").

The same allegations show that Citibank was GBG USA's agent in connection with the Special Dividend Cash Transfer. Citibank would not have transferred $196 million from GBG USA's account without instructions from GBG USA giving it authority to do so. Citibank wired the funds, showing it agreed to accept these instructions. As in *Fairfield Sentry*, Plaintiff's "admission that [the transfers] were paid by [Citibank] establishes the necessary agency" since it is "implausible to infer that [Citibank] made the [challenged] payments to specific [persons] in specific amounts absent the [Debtors'] directions to do so" and "[Citibank] accepted those directions" by making the payments. 2020 WL 7345988, at *7 (ruling on a motion to dismiss).

Thus, the Special Dividend Cash Transfer was "made by" a "financial institution," and the second—and final—requirement of section 546(e) is satisfied.

## III. PLAINTIFF FAILS TO ALLEGE GBG USA INTENDED TO HINDER, DELAY OR DEFRAUD CREDITORS.

### A. Plaintiff Fails To Allege that GBG USA Made the Special Dividend Cash Transfer With Intent To Hinder, Delay or Defraud Creditors.

Plaintiff's allegations show that, before the Special Dividend Cash Transfer left the possession of GBGH (which guaranteed GBG USA's loan obligations), GBG USA's directors and officers (i) informed its lenders (and the world generally) of the Special Dividend, (ii) got lender permission for GBGH to pay the Special Dividend, and (iii) procured commitments from certain Defendants—some of GBG USA's ultimate beneficial owners—not only to refrain from taking their share of the Special Dividend, but also to replenish the *entire* value of the Special Dividend Cash Transfer to pay down GBG USA's debt. *See* Mem. at 9-14, 36. Plaintiff admits that these commitments resulted in Fung Holdings returning $200 million—$4 million more than Special Dividend Cash Transfer—to pay down GBG USA's debt. *See id.* These are the acts of individuals intent on aiding GBG USA, not someone intending to defraud creditors. Thus, Plaintiff fails to plead facts that would allow this Court to draw *any* inference that GBG USA intended to hinder, delay or defraud creditors, much less the strong inference required by Rule 9(b). *See id.* at 34-38.[12]

---

[12] Plaintiff does not dispute that, before filing the Complaint in May 2024, he had access for more than a year to over 1.6 million documents pulled from the files of GBG USA's directors and officers. *See* Hutten Decl. ¶ 5; Opp. at 15 & n.22. He also admits he has taken discovery from the liquidator of GBGH. *See* Opp. at 15. Yet he still complains that he has had to "fight tooth and nail" to get "access to a subset of the Debtor's own records." Opp. at n.22. Not so. More than two years ago, an IT services company that GBG USA hired to store its books and records offered to turn over the entirety of these documents, so long as Plaintiff paid the costs. *See* Ch. 11 Dkt. No. 875 at 7-8; Ch. 11 Dkt. No. 877-5 at 1-2. Plaintiff chose not to. *See* Ch. 11 Dkt. No. 875 at 7-8; Ch. 11 Dkt. No. 877-5 at 1. That hardly means Plaintiff lacked the opportunity to collect and investigate the Debtors' files (beyond the trove of data he already has) before filing the Complaint. Thus, there is no reason to relax Rule 9(b)'s particularity requirements here. *See In re Old CarCo*, 435 B.R. 169, 192 (Bankr. S.D.N.Y. 2010) ("no justification to relax" Rule 9(b)'s pleading standards when,

In response, Plaintiff contends that, because he has formulaically listed the presence of five so-called badges of fraud, the Court should ignore the allegations described above. *See* Opp. at 34-35. That is contrary to this Court's instruction that each "badge of fraud must be judged" in "light of what reasonable implications can be drawn from it in a particular case." *In re Direct Access Partners, LLC*, 602 B.R. 495, 544-45 (Bankr. S.D.N.Y. 2019) (Wiles, J.); *accord Old CarCo*, 435 B.R. at 191 ("context dictates the significance of" each alleged badge). This Court should reject Plaintiff's request to ignore that his allegations, as a whole, show that the far more compelling—and only reasonable—inference is that GBG USA had no fraudulent intent. *See* Mem. at 36-38.

As a fallback, Plaintiff claims that the totality of circumstances show indicia of fraud because GBG USA drew funds from its credit lines to fund the Special Dividend Cash Transfer, and some of this credit was still drawn and outstanding after Fung Holdings returned the Special Dividend Cash Transfer (and more) to pay down GBG USA's debt. Opp. at 14-15, 29-30. This fails. Plaintiff seeks to void the Special Dividend Cash Transfer—not GBG USA's draws on its credit lines—and, under Second Circuit precedent, it is this transaction about which Plaintiff must allege scienter. *See In re Sharp Int'l Corp.*, 403 F.3d 43, 56-57 (2d Cir. 2005) (when the alleged fraud "relate[d] to the manner in which [the debtor] obtained new funding from" creditors, and not the debtor's "subsequent payment of part of the proceeds to" the defendant, the Court affirmed dismissal of plaintiff's claim that the latter was an actually fraudulent transfer; as here, the plaintiff "inadequately allege[d] fraud with respect to the transaction that [it] seeks to void").[13]

And even if GBG USA drew on credit lines to fund the Special Dividend Cash Transfer, it

---

as here, the trustee had "access to other interested parties" and "numerous documents," and had "ample opportunity to investigate any potential claims prior to filing the [c]omplaint").

[13] Plaintiff's discussion of the badges of fraud in his Opposition relies on the premise that GBG USA was harmed by drawing on credit lines to fund the Special Dividend Cash Transfer, even though the full amount (and more) was returned. *See* Opp. at 35-38. That is premise is wrong. *See* App. A.

still, by Plaintiff's own allegations, (i) informed its creditors of the Special Dividend, Compl. ¶¶ 130-34, 143-46, (ii) got their permission for it, *id.* ¶¶ 151-55, and (iii) ensured that, before the Special Dividend Cash Transfer left the possession of a guarantor supporting GBG USA's debt, GBG USA had a promise from Fung Holdings to return the entire Special Dividend Cash Transfer *so that it could pay down GBG USA's debt*. *Id.* ¶¶ 152-54. These facts do not support any inference of fraudulent intent.

### B. Plaintiff Fails To Allege that GBG USA Repaid the December Shareholder Loan With Intent To Hinder, Delay or Defraud Creditors.

Plaintiff's own allegations show that GBG USA's repayment of the December Shareholder Loan merely returned funds that originated from Fung Holdings, and was therefore a wash without any material effect on GBG USA. *See* Mem. at 38-39. If GBG USA sought to defraud creditors, it would not have executed a transaction with no impact on GBG USA's ability to pay them. *Id.*

In response, Plaintiff claims repayment of the December Shareholder Loan was not a wash, and thus, GBG USA repaid the Loan for less than equivalent value to an insider when GBG USA was distressed. Opp. 39-40. But, as shown above, repayment of this Loan was a wash according to Plaintiff's own Complaint. Which guts Plaintiff's argument and forecloses any inference of scienter. *In re Lease-A-Fleet*, 155 B.R. 666, 675 (Bankr. E.D. Pa. 1993) (no scienter when "money passed through the [d]ebtor with no gain and no loss in the [d]ebtor's ability to pay its creditors").[14]

## V. PLAINTIFF FAILS TO STATE A CLAIM TO RECOVER THE SPECIAL DIVIDEND CASH TRANSFER FROM THE NON-TRANSFEREES.

In their Motion, Defendants showed that, based on Plaintiff's allegations, the Non-

---

[14] Plaintiff also claims that GBG USA drew on its credit lines to fund the repayment of the December Shareholder Loan, which, according to Plaintiff, suggests fraudulent intent for the reasons discussed in the section just above. *See* Opp. at 40. This too fails to support any inference of scienter, for the same reasons discussed in section III.A. At most, GBG USA simply substituted a $100M debt to a trade creditor with $100M debt to bank lenders. *See supra* pp. 2-3; App. A.

Transferees never received their $87.7 million portion of Special Dividend, and thus never received any proceeds of the Special Dividend Cash Transfer that Plaintiff seeks to avoid. *See* Mem. at 10-11, 12-13. Thus, the Non-Transferees are neither "transferee[s]" or persons "for whose benefit" the Special Dividend Cash Transfer was made, *see* 11 U.S.C. 550(a)(1)&(2), and Plaintiff fails to state a claim to recover from them under to section 550 of the Code. *See* Mem. at 47-50.

In response, Plaintiff concedes that the Non-Transferees never received *any* proceeds from the Special Dividend Cash Transfer. Opp. at 48-50. The Trustee also admits that, through the Waiver Agreement and Dividend Shareholder Loan Agreement—which were executed *before* GBGH paid the Special Dividend, *see* Mem. at 10-11—the Non-Transferees waived any right to receive the Special Dividend. *See* Opp. at 48-50. Still, Plaintiff claims that he can recover $87.7 million *in cash* from the Non-Transferees because, instead of receiving a cash dividend, they received only an unsecured, interest free, subordinated IOU. *See id.* Which was never paid.

This strains credulity. In Plaintiff's view, the Non-Transferees had "dominion and control" over their portion of the Special Dividend because they had a theoretical right to receive that Dividend, and exercised that right when they "agreed to accept" their portion of the Special Dividend as debt. Opp. at 49. But this legal theory that has no "grounding in the realities of the underlying transaction." *In re BICOM NY, LLC*, 619 B.R. 795, 799 (Bankr. S.D.N.Y. 2020) (Wiles, J.) (rejecting the argument that a bank account holder's legal right to control funds in her account made her a transferee when "in the real world she had no such control at all").[15] The Non-Transferees never had a right to (and never did) possess the proceeds of the Special Dividend Cash Transfer, had no right to "put [these proceeds] to [their] own purposes," and thus are not

[15] Moreover, Plaintiff is incorrect. Material referenced in the Complaint, and cognizable on this Motion shows that Fung Holdings was the only lender with respect to the Dividend Shareholder Loan, and GBGH had no obligation to repay any other Non-Transferee. *See* Hutten Decl. Ex. H.

transferees. *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 57 (2d Cir. 1997). Never having bare possession of these proceeds, the Non-Transferees lacked even the rights that courts find insufficient for "dominion and control." *See id.* at 59 (recipient lacked dominion and control, and was not a transferee, when "it had no discretion or authority to do anything else but transmit the money, which is just what it did"); *BICOM*, 619 B.R. at 799 (when defendant received funds into a joint bank account, and the joint account holder simultaneously issued an offsetting check in the same amount, the defendant was not a transferee because, as here, "the transaction did not actually make any funds available" to the defendant).[16]

Plaintiff also argues that the Non-Transferees are persons "for whose benefit [the initial] transfer was made," 11 U.S.C. § 550(a)(1), because the Special Dividend "provided the means to receive an $87.6 million award as debt" and, because by agreeing to accept their portion of the Special Dividend as debt, the Non-Transferees purportedly helped GBGH avoid an event of default under the Prepetition RCF. *See* Opp. at 48. But, as shown above, materials referenced in the Complaint show that only one Non-Transferee received any "award as debt." *Id.* And, to be an entity "for whose benefit" a transfer "was made," the benefit the entity receives "must result from the initial transfer." *In re Enron Creditors Recovery Corp.*, 407 B.R. 17, 32-33 (Bankr. S.D.N.Y. 2009). To the extent any Non-Transferee received a benefit under Plaintiff's theory, it resulted from its agreement that GBGH could withhold its allocation of the subsequent Special Dividend.

---

[16] Plaintiff "bears the burden of establishing that the assets at issue are estate property" when "seeking to recover a fraudulent transfer from a subsequent transferee under § 550(a)(2)." *In re Big Apple Volkswagen, LLC*, 2016 WL 1069303, at *19 (Bankr. S.D.N.Y. Mar. 17, 2016). Plaintiff cannot carry this burden when he admits that the Non-Transferees received no part of the Special Dividend Cash Transfer. *See In re Bernard L. Madoff Inv. Secs. LLC*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) (granting motion to dismiss when plaintiff failed to allege "the initial transferees even made subsequent transfers to the [s]ubsequent [t]ransferees," or that the initial transferees "made the subsequent transfers rather than simply keep the initial transfers for themselves").

That benefit did not result from the Special Dividend Cash Transfer.

Thus, Plaintiff cannot recover the Special Dividend Cash Transfer from the Non-Transferees pursuant to section 550(a), and Counts I through VI against them must be dismissed.

## VI. THE COURT HAS NO PERSONAL JURISDICTION OVER DEFENDANTS.

### A. Plaintiff Does Not Plead Defendants' Minimum US Contacts Relating to the Special Dividend Cash Transfer.

Plaintiff alleges that the Court has personal jurisdiction over Defendants because they voted to authorize GBGH to pay the Special Dividend with "proceeds of the Centric Sale from GBG USA," and therefore "knew" or "intended" that their Special Dividend payments "originated with GBG USA in the" USA. Compl. ¶¶ 270, 272-79. As Defendants have shown, these allegations fail because Plaintiff does not allege that, in voting for the Special Dividend, Defendants had *any* contact with, or purposeful activity directed to, the USA. *See* Mem. at 20-23; *Walden v. Fiore*, 571 U.S. 277, 289-91 (2014) (no jurisdiction where the defendant "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to" the forum state).

Still, Plaintiff claims that Defendants are subject to jurisdiction because they "directed or had knowledge of the nature of the" Special Dividend Cash Transfer. Opp. at 19. That fails. Plaintiff alleges, at most, that Defendants, acting only outside the United States, authorized GBGH to issue the Special Dividend, and GBGH then required GBG USA make the Special Dividend Cash Transfer. *See* Mem. at 20-23. But that bootstrapping—which is based not on Defendants' own US contacts but on their alleged attenuated, indirect contact with GBG USA—cannot support personal jurisdiction after *Walden*. *See Walden*, 571 U.S. at 291 ("[I]t is the defendant, not the plaintiff or third parties, who must create contacts with the forum state."). This is true even if Defendants knew or intended that their actions might impact GBG USA in the USA. *See id.* at 289 (defendant "did not create sufficient contacts with [the forum] simply because he allegedly directed

his conduct at plaintiffs whom he knew had [forum] connections"). Plaintiff's theory is foreclosed by Supreme Court precedent requiring that, for specific jurisdiction to exist, the suit "must arise out of contacts that the 'defendant *himself*' creates with the forum." *Id.* at 284.[17]

The cases that Plaintiff cites, *see* Opp. at 19 & n.8, provide no help for him. Those cases involved (i) defendants' own forum contacts resulting in their receipt of a challenged transfer,[18] or (ii) knowing receipt of an initial transfer that a defendant received directly from a US debtor.[19] By contrast here, (a) all suit-related activity allegedly took place abroad, Mem. at 20-23, (b) the Defendants who allegedly received the Special Dividend did so as subsequent transferees of GBGH—a Hong-Kong based company, and (c) many Defendants never received *any* proceeds of the Special Dividend Cash Transfer, even as subsequent transferees, *id.* at 12-13 & n.10.

As a result, Plaintiff's arguments regarding particular Defendants, *see* Opp. at 20-23, fail, as they are all based on the mistaken premise that Defendants can be subject to jurisdiction without creating their own US contacts. In particular:

---

[17] *Accord In re Sledziejowski*, 2016 WL 6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016) ("knowing receipt of funds" conveyed from the US in an alleged fraudulent transfer did not confer personal jurisdiction since that forum contact was created by the transferor, not the defendant).

[18] *See AutoOpt Networks, Inc. v. GTL USA, Inc.*, 2015 U.S. Dist. LEXIS 11306, at *16-17 (N.D. Tex. Jan. 30, 2015) (defendants' "directives to transfer the funds" they received "were given during meetings conducted in Texas"); *Racher v. Lusk*, 2013 U.S. Dist. LEXIS 162193, at *9-10 (W.D. Okla. Nov. 14, 2013) (defendants "operated" the in-forum nursing home that was accused of fraudulently transferring funds to the defendants); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 2022 Bankr. LEXIS 3258, at *7-10 (Bankr. S.D.N.Y. Nov. 18, 2022) (defendant directed its investment into a US brokerage account, met with investment advisors in the US, and used US correspondent banks to receive the challenged transfers from the US account); *Sugartown Worldwide LLC v. Shanks*, 2015 U.S. Dist. LEXIS 36495, at *14 (E.D. Pa. Mar. 24, 2015) (defendants were directors of the US debtor that "directed substantial payments to themselves").

[19] *See Gambone v. Lite Rock Drywall*, 288 Fed. App'x 9, 13-14 (3d Cir. 2008) (initial transferee "engag[ed] in a sham transaction" and "participated in a fraudulent conveyance"); *In re Hot-Head, Inc.*, 2014 Bankr. LEXIS 2791, at *8 (Bankr. S.D. Tex. June 26, 2014) (defendant received an alleged fraudulent initial transfer directly from the US debtor); *Montoya v. Akbari-Shahmirzadi*, 2016 Bankr. LEXIS 3957, at *8-9 (Bankr. D.N.M. Nov. 14, 2016) (defendant received initial transfer directly from US debtor engaged in "wrongful conduct").

- Plaintiff's conclusion that Messrs. Fung and Rockowitz "directed" the Special Dividend or "knew and intended that the Special Dividend would be paid from the USA," *see* Opp. at 19, 20, is not supported by any allegation of fact. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86 (2d Cir. 2018) ("bare allegation" that non-US defendants "controlled or otherwise directed" their US subsidiaries was insufficient). But even if this conclusion was alleged properly, it would fail. *See Walden*, 571 U.S. at 289-91 (fact that the seized cash at issue "originated in" Nevada, and that defendant "knew" that plaintiff would be harmed in Nevada from the cash seizure, was insufficient because, as here, that "connection was not created by" the defendant). The allegations that Messrs. Fung and Rockowitz authorized the Special Dividend at *GBGH* board and committee meetings abroad and supervised *GBGH* press releases regarding the Special Dividend (published on the Hong Kong Stock Exchange), *see* Opp. at 20-21; Hutten Decl. Ex. C, also fail to show that Messrs. Fung or Rockowitz were physically present in, sent any communications to, or projected themselves into the USA.

- Plaintiff's theory that officers of Fung Holdings attended GBGH board meetings outside of the US at which the Special Dividend was discussed, *see* Opp. at 21-22, fails to establish personal jurisdiction over Fung Holdings for the same reason.[20] And, even if the passive act of receiving a subsequent transfer from a Hong Kong-based company with knowledge of its alleged fraudulent nature could support personal jurisdiction here (it cannot), *see* Opp. at 21-22, the Court *still* would not have jurisdiction because Plaintiff *admits* that Fung Holdings never received any portion of the Special Dividend, *see* Opp. at 47-48.

- The Trustee's theory of jurisdiction over Victor and Spencer Fung fares even worse. Aside from alleging that they voted for GBGH to pay the Special Dividend at a shareholder meeting in Hong Kong, the Trustee contends only that these persons were "in a position to" and "did" dictate the terms of the Special Dividend. *See* Opp. at 22-23; Compl. ¶¶ 271, 273-75. These conclusions are unsupported by factual allegations. And Plaintiff admits that Victor Fung never received any proceeds of the Special Dividend Cash Transfer. Opp. at 47-48.

- Finally, Fung Distribution, Step Dragon, Golden Step, King Lun, First Island and Hurricane Millennium—the first four of which are not alleged to have received any proceeds from the Special Dividend Cash Transfer, *see* Opp. at 14, 48—are alleged to know that the Special Dividend originated from the USA only "through" the activities of their shareholders or settlor, *see* Compl. ¶¶ 274-75, 277-78; Opp. at 23, which does not suffice. *See* Mem. at 22-23. But even if Plaintiff had alleged sufficiently that these entities' shareholders or settlor had any relevant US contacts (he has not), his speculation that these entities "appear" to exist only to hold their shareholders' or settlor's shares in GBGH, *see* Opp. at 23, fails to plead facts that, if true, would justify imputing to them any US contacts of their principals. *See In re Platinum and Palladium Antitrust Litig.*, 61 F.4th 242, 275 (2d Cir. 2023) (plaintiff failed to allege alter ego theory of personal jurisdiction because, *inter alia*, the "involvement of a sole or majority shareholder in a corporation is not sufficient alone" to "disregard the corporate entity").

---

[20] Plaintiff argues Fung Holdings' personnel were "intricately involved in negotiations with the RCF [Lenders] located in the United States prior to the Special Dividend." Opp. at 22. But to the extent Plaintiff makes allegations about the location of these negotiations, he alleges, as he must, that they took place "in Hong Kong." Compl. ¶ 133.

Thus, Plaintiff fails to allege personal jurisdiction over any Defendant with respect to the Special Dividend Cash Transfer, and Counts I through VI should be dismissed as to all Defendants.

**B. Plaintiff Does Not Plead Fung Holdings' Minimum US Contacts Relating to the Repayment of the December Shareholder Loan.**

As Defendants demonstrated, Plaintiff does not allege that Fung Holdings (a non-US company based in Hong Kong) played any role in requiring GBG USA to repay the December Shareholder Loan on behalf of GBGH, or took any action—much less action in or projected into the US—to facilitate GBG USA's repayment of this Loan. *See* Mem. at 24-25.

In response, Plaintiff claims that the Court has jurisdiction because (i) Fung Holdings was represented by lawyers "in Hong Kong and the United States" when negotiating the December Shareholder Loan, (ii) Fung Holdings had four e-mail exchanges with GBGH officers located in the USA when negotiating the December Shareholder Loan, (iii) before executing the December Shareholder Loan Agreement, an officer of Fung Holdings provided GBGH (a Hong-Kong based company) a "board paper" and attended a GBGH board meeting at which the December Shareholder Loan was discussed, and (iv) a Fung Holdings employee sent an e-mail to a dual GBG USA/GBGH officer in the USA, asking to "work out the logistics" of the repayment. Opp. at 24-25. That is wrong, even accepting these contentions as true (for purposes of this Motion only).

Aside from one e-mail to one person in the US asking about "the logistics" of repayment, these contacts concern *negotiation* of the December Shareholder Loan. But Plaintiff's claims concern the *repayment* of that Loan, and thus do not "arise out of or relate to" these contacts, *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021), and do not support jurisdiction. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) (where a plaintiff attempts to "recover avoidable transfers," the "jurisdictional analysis focuses on the [d]efendants' U.S. contacts related to the receipt of the . . . transfers at issue").

When, as here, a "defendant has had only limited contacts" with the US, a plaintiff's claims will arise from or relate to the contacts "only if" they "proximately caused" plaintiff's injury. *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018); *cf. Ford Motor Co.*, 592 U.S. at 365 (finding "relating to" jurisdiction, without requiring a causal connection between the forum contacts and the injury, when defendant "systemically served a market in the [forum states] for the . . . vehicles that plaintiffs allege . . . injured them"). Here, a small handful of e-mails that include even fewer people in the USA is hardly the "systematic[]" contact that can justify jurisdiction without a proximate causal connection between the forum contacts and the alleged injury. *Ford Motor Co.*, 592 U.S. at 365. And the negotiation of the December Shareholder Loan *between GBGH and Fung Holdings* did not proximately cause any injury to GBG USA, especially since GBG USA received the proceeds of this Loan without any obligation to repay them. Compl. ¶ 103.

Thus, the only alleged forum contact that arguably "arises from or relates to" Plaintiff's claim to recover the repayment of the December Shareholder Loan is a single e-mail—out of 1.6 million documents Plaintiff possesses, *see* Hutten Decl. ¶ 5—in which a Fung Holdings employee asked a dual GBG USA/GBGH officer located in the USA to "work out the logistics" of repayment. *See* Opp. at 24-25. This is far less than what the Second Circuit has already held is "too tenuous to support . . . specific jurisdiction." *SPV Osus*, 882 F.3d at 344-45 ("At bottom, the contacts alleged by [plaintiff] . . . amount to a handful of communications and transfers of funds. These limited contacts are insufficient to allow the exercise of specific personal jurisdiction . . . .").

Thus, Plaintiff fails to allege personal jurisdiction over Fung Holdings regarding GBG USA's repayment of the December Shareholder Loan, and Counts VII-IX should be dismissed.

## **CONCLUSION**

For the reasons above, and those in the opening Memorandum, the Court should dismiss with prejudice all claims against Defendants, and order other and further relief as is just and proper.

Dated: New York, New York
August 30, 2024

Respectfully submitted,

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**

By: *__/s/ Timothy P. Harkness__*
Timothy P. Harkness
Madlyn Gleich Primoff
Henry V. Hutten

3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
timothy.harkness@freshfields.com
madlyn.primoff@freshfields.com
henry.hutten@freshfields.com

*Attorneys for Defendants Fung Holdings (1937) Limited, Fung Distribution International Limited, Step Dragon Enterprise Limited, Golden Step Limited, William Fung, King Lun Holdings Limited, First Island Developments Limited, Victor Fung, Spencer Theodore Fung, Bruce Philipp Rockowitz and Hurricane Millennium Holdings Limited*

# APPENDIX A

## Timeline and Balance-Sheet Impact of Challenged Transfers

[*Table On Following Page*]

| Date | Step in Overall Transaction | Amount | Impact on GBG USA's Assets | Impact on GBG USA's Liabilities | Impact on GBG USA Balance Sheet (December Shareholder Loan) | Impact on GBG USA Balance Sheet (Special Dividend Cash Transfer) |
|---|---|---|---|---|---|---|
| Dec. 20, 2018 | Fung Holdings disburses the $100M December Shareholder Loan proceeds to GBGH to bridge year-end liquidity. Compl. ¶¶ 97, 103. | $100M | $0 | $0 | $0 | N/A |
| Dec. 21, 2018 | GBGH sends $100M December Shareholder Loan proceeds to GBG USA. *Id.* ¶ 103. | $100M | +$100M (new cash) | $0 | +$100M | N/A |
| Dec. 22, 2018 | GBG USA sends $100M to Millwork to pay trade debt. *See id.* ¶¶ 41-42, 103; Hutten Decl. ¶ 17 & Ex. L. | $100M | $-100M (less cash) | $-100M (in reduced debt) | $0 | N/A |
| Jan. 25, 2019 to Mar. 26, 2019 | GBG USA draws on three credit facilities to fund the Special Dividend Cash Transfer and repay the December Shareholder Loan. *See* Compl. ¶¶ 111-14. | $296M[1] | +$296M (new cash) | +$296M (new debt) | $0 | $0 |
| Mar. 26, 2019 | GBG USA sends the Proceeds of the December Shareholder Loan Back to Fung Holdings. *Id.* ¶ 123. | $100M | -$100M (reduced cash ) | $0 | $-100M | N/A |
| Mar. 28-29, 2019 | GBG USA makes the Special Dividend Cash Transfer to GBGH. *Id.* ¶¶ 118-20. | $196M | $-196M (reduced cash) | $0 | N/A | $-196M |
| Apr. 3, 2019 | Fung Holdings disburses $94.2M New Shareholder Loan to GBGH. GBGH uses the proceeds to pay down GBG USA's Prepetition RCF. *Id.* ¶¶ 76, 160, 177. GBG USA has no obligation to repay GBGH or Fung Holdings. *See* Hutten Decl. Ex. G | $94.2M | $0 | $-94.2M (in reduced debt) | N/A | +$94.2M |
| May 30, 2019 | Fung Holdings Disburses the $105.8M Third Shareholder Loan to GBGH. GBGH uses the proceeds to pay down GBG USA's Prepetition RCF. *Compl.* ¶¶ 179-80. GBG USA has no obligation to repay GBGH or Fung Holdings. *See* Hutten Decl. Ex. J. | $105.8M | $0 | -$105.8M (in reduced debt) | N/A | +$105.8M |
| **Total Balance Sheet Impact of All Steps** | | | | | **$0** (GBG USA owes prepetition bank lenders $100M that it previously owed to Millwork, a trade creditor) | **+$4M** (GBG USA funded the $196M Special Dividend Cash Transfer by drawing on credit lines. Fung Holdings paid down $200M of those credit lines thereafter). |

[1] Plaintiff alleges that GBG USA drew $328 million from its credit facilities in the months leading up to its repayment of the December Shareholder Loan and the Special Dividend Cash Transfer. *See* Compl. ¶¶ 111-14. Of this amount, Plaintiff alleges that GBG USA used $100 million to repay the December Shareholder Loan, *id.* ¶ 10, and $196 million to fund the Special Dividend Cash Transfer, *id.* ¶ 7, 9. He makes no allegations about how GBG USA used the $32 million balance.