UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK (NEW YORK)

| | |
|---|---|
| IN RE: | Case No. 21-11369-mew |
| | Chapter 11 |
| GBG USA INC., | |
| Debtor. | |
| PETER HURWITZ, | Adv. Proc. No. 23-01022-mew |
| Plaintiff, | |
| v. | |
| FUNG HOLDINGS 1937 LIMITED, ET AL. | One Bowling Green New York, New York 10004 |
| Defendants. | Tuesday, September 10, 2024 10:44 a.m. |

TRANSCRIPT OF MOTION TO DISMISS ADVERSARY PROCEEDING;
CROSS-MOTION BY PLAINTIFF FOR ENTRY OF AN ORDER ALTERNATIVELY AUTHORIZING A LIMITED PERIOD OF JURISDICTIONAL DISCOVERY AND GRANTING RELATED RELIEF;
OBJECTION FILED
BEFORE THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator: Courtroom ECRO Personnel

Transcription Company: Access Transcripts, LLC
10110 Youngwood Lane
Fishers, IN 46048
(855) 873-2223
www.accesstranscripts.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff, Peter Hurwitz: | Grant & Eisenhofer P.A.<br>By: GORDON Z. NOVOD, ESQ.<br>485 Lexington Avenue<br>29th Floor<br>New York, NY 10017<br>(646-722-8500<br><br>By: FRANK "TJ" GRIFFIN, ESQ.<br>123 Justison Street<br>7th Floor<br>Wilmington, DE 19801<br>(302) 622-7000 |
| For the Defendants: | Freshfields Bruckhaus Deringer US LLP<br>By: TIMOTHY P. HARKNESS, ESQ.<br>HENRY VAUGHN HUTTEN, ESQ.<br>MADLYN GLEICH PRIMOFF, ESQ.<br>3 World Trade Center<br>175 Greenwich Street<br>51st Floor<br>New York, NY 10007<br>(212) 277-4000 |

(Proceedings commence at 10:44 a.m.)

THE COURT: GBG USA.

MR. HARKNESS: Good morning, Your Honor.

MR. NOVOD: Good morning, Your Honor.

THE COURT: Good morning.

MR. NOVOD: For the record, on behalf of the plaintiff, Mr. Peter Hurwitz, I'm Gordon Novod from the law firm of Grant & Eisenhofer PA joined today by my colleague, Mr. Frank Griffin, who Your Honor has graciously granted his pro hac application last week. Thank you, Your Honor.

MR. HARKNESS: Good morning, Your Honor. Timothy Harkness from Freshfields Bruckhaus Deringer US LLP for the defendants. With me are Henry Hutten and Madlyn Primoff.

THE COURT: Good morning, everybody. Do we still have an outstanding issue on the sealing of the documents that were filed in opposition to dismissal?

MR. NOVOD: Your Honor, candidly, it seems like quite a bit of time ago that we had that issue before the Court. We don't think that any of the particular documents should have been filed under seal, and that was the position the plaintiffs were taking at the time. Certain documents, out of an abundance of caution, were marked that way by Freshfields' other client, Fung Corporate Services Group, when they gave access to the debtor's books and records some two or three years ago. So I don't think that anything should remain under

seal, Your Honor, but I defer to the designating parties.

THE COURT: I think we resolved this as to the complaint and as to the motion itself, but we have a response to the motion that still has a lot of stuff under seal. Does any of it need to be under seal?

MR. HARKNESS: Right. I think we had asked for a little bit more time to just review everything. (Indiscernible) probably resolve all of this.

THE COURT: Okay. Please do that and please let us know, and I presume we'll wind up either cutting back on the redactions or maybe eliminating them entirely.

And I understand you've consented and actually already implemented the dismissal of the HSBC trustee. Is that right?

MR. NOVOD: That's correct, Your Honor. We've reviewed their opposition papers or their moving papers and the judgment, as we disclosed in our reply brief.

THE COURT: And the fiduciary duty and illegal dividend claims were dropped?

MR. NOVOD: These were also dropped. We reached a settlement with the directors and officers some time ago, and we've settled all claims with respect to the individual defendants as for the fiduciary duty and the unlawful dividend claims.

THE COURT: I see. So the only thing left is the

fraudulent transfer claims as to the owners?

MR. NOVOD: That's correct. So it's Counts -- in the amended complaint, it's Counts I through IX that remain pending, Your Honor. If you recall, we did file an amended complaint after the defendants moved for the motion to dismiss, and that amended complaint only now addresses the counts that are actually live and actively engaged.

THE COURT: Counts I through VI relate to the dividend-related payments and VII through IX to the payment of the shareholder debt. Is that right?

MR. NOVOD: In essence, yes, the repayment of the shareholder loan.

THE COURT: What is -- help me make sure I understand the difference between Counts I and VI. What's the difference between them?

MR. NOVOD: Sure. May I take the podium, Your Honor?

THE COURT: Of course.

MR. NOVOD: So I prepared a demonstrative for the use for the hearing today. May I approach Your Honor?

THE COURT: Sure.

MR. NOVOD: Would you like a copy?

THE COURT: Of course.

MR. NOVOD: And for the record, I've provided a copy of this to defendants' counsel.

So Your Honor, what you have before you are two

demonstratives, and we thought it would be most useful to walk you through what the transactions are, and then I'll apply the transactions to the counts in a moment. But if Your Honor could look at the second slide that we provided to you, this is the one concerning the special dividend cash transfer, and it's a basic chronology.

So you have Counts I through VI in the complaint. Counts I through III are against Mr. Spencer Fung, Bruce Rockowitz, and Millennium Holdings [sic]. Those counts are for an actual fraudulent transfer under state law, so it's either we plead all three, North Carolina, New York, and Delaware -- North Carolina's where the principal place of business of the company was; New York is obviously where this court is and where they filed; and Delaware, these are Delaware corporations; we're talking about GBG USA. So there are three counts there: actual fraudulent transfer, as well as constructive fraudulent transfer based on lack of reasonably equivalent value and insolvency -- balance sheet insolvency, that is. And then there was the third one, which is also reasonably equivalent value, and candidly, Your Honor, I'm just going to double-check to make sure I tell you the right thing.

THE COURT: It was either unreasonably small capital or --

MR. NOVOD: Yeah.

THE COURT: -- (indiscernible) margin to pay.

THE CLERK: Your Honor? I'm sorry to interrupt, Your Honor.

(Court and clerk confer)

THE COURT: All right.

MR. NOVOD: Okay. So I apologize, Your Honor.

THE COURT: No.

MR. NOVOD: So Counts I, II, and III. Count I is actual fraudulent transfer. Count II is unreasonably small capital, constructive fraudulent transfer, and Count III is insolvency -- balance sheet insolvency under, as I said before, all three state laws. And the first three counts apply to Mr. Spencer Fung, Mr. Bruce Rockowitz, and an entity called Hurricane Millennium Holdings Limited, which was an entity that was controlled by Mr. Rockowitz. So those are those three in the first three counts.

Now, Counts IV, V, and VI are against the remaining defendants who are led by Fung Holdings, who's the named defendant, as well as William Fung, his brother Victor Fung, and a variety of different shell companies. And again, it follows the same model with an actual fraudulent transfer claim under the same three state laws and then two constructive fraudulent transfer claims under the laws of the same three states, the first, of course, being unreasonably small capital and the second being insolvency. So that's Counts IV, V, and VI.

Now, Counts VII, VIII, and IX relate to a cash transfer that occurred in connection with the repayment of the December shareholder loan. And that count is against solely Fung Holdings, the recipient of the transfer, and it follows the same model: actual fraudulent transfer and then two constructive fraudulent transfer claims.

The reason why I wanted to show you these demonstratives, Your Honor, is because the first one --

THE COURT: Let me interrupt you for a second.

(Off-the-record conversation)

THE COURT: All right. Thank you, everybody.

MR. NOVOD: Sure. So Your Honor, just off the bat, I wanted to point out I made a typo in my chart. And I hate -- I'd rather point it out. I'm embarrassed to say so, but the very top line, where there's a Mizuho transfer, it should be 50 million, not 150 million. I apologize, Your Honor. That was not intentional.

But the purpose of this demonstrative is to show how money moved in connection with the transaction. So again, this is Counts I through VI, and the general chronology here is that money moved on January 25th. 50 million was loaned on a second-lien basis from Mizuho Bank to GBG USA, which is the debtor, a Delaware corporation, based with its executive principal office in North Carolina, as well as an office in New York City.

Now, HSBC, later, made a second-lien loan of 25 million to GBG USA. And then we have the RCF Bank. That was a revolving credit facility. That was an acronym for a group of banks who were represented by the Linklaters firm, and they made a first-lien loan which was a revolving loan which was drawn down on March 11, 2019 in the amount of 253 million.

With that money, GBG USA funded two different transfers that went from GBG USA to its indirect parent company. And again, GBGH is an acronym -- Global Brand Group Holdings Limited, which was a Bermuda entity which is in administration in Bermuda at the moment. So you have here $196 million that was transferred by the debtor on March 28th and March 29th, 2019.

Now, there was a series of transactions that occurred on April 3rd -- that started April 3rd, then continued --

THE COURT: You skipped one transaction here which is distributions by GBGH to its shareholders. As I understand it, you alleged there were 280 million of distributions by GBGH?

MR. NOVOD: That's right. So GBGH, Bermuda holding company listed in Hong Kong that had both public shareholders as well as what we'll describe as shareholders that were controlled by the Fung Holdings/William Fung group. So that's not on here, but that transfer didn't happen until later. April 4th was the date of that transfer. And so money was transferred out from GBGH in the form of what they called a

special dividend in that amount of money, Your Honor.

THE COURT: So some of the money for the special dividend came from somewhere other than GBG?

MR. NOVOD: That's correct, although -- and this gets to the nuance for April 4, 2019 -- there was -- GBGH, as a holding company, only had so much money to give. So GBGH had two different distributions that occurred on April 4th. And this is -- let's put the public shareholders aside for a second, and we'll focus specifically on Fung Holdings and William Fung and then separately on Bruce Rockowitz because remember, Counts I, II, and III are Spencer Fung and Bruce Rockowitz.

THE COURT: Right.

MR. NOVOD: So the amended complaint alleges that Mr. Rockowitz received $14,503,798, and that's in 176 and 177 of the amended complaint -- paragraph numbers. And it also alleges that Mr. Spencer Fung received $59,222. That's paragraph 174 of the amended complaint. Now, they received hard cash, and that's real money that went out the door from GBGH to those individuals.

Now, in addition to that, there's the second-to-last line here, Your Honor, where GBGH transferred $4,489,787 to Fung Holdings. It's what we allege, we believe it to be true, and that's what the complaint says. And then that money itself was sent back to GBGH.

Now, what's important is that money was never sent back to the debtor. It was sent back to its indirect holding company parent.

Your Honor, just to (indiscernible) you, in Mr. Caldwell's first day -- may I approach, Your Honor, for a moment?

THE COURT: Yeah.

MR. NOVOD: So Mr. Caldwell was the CFO of GBG USA, and as part of his first-day declaration, he attached this structure chart. And so I thought it would be useful just to show you where GBG USA is, which is the green box or green oval in the middle, and then GBGH, which is the parent company, the Bermuda company. Obviously, this doesn't stretch above GBGH, but it shows you the relationship and the fact that, like -- the fact that, candidly, GBG USA was an indirect -- I think it had four different intermediate Holdcos between it and GBGH.

Now, back to the flow chart, what we know is that April 4th, 2019, $4.489 million was sent back from Fung Holdings to GBGH, and then GBGH used that $4.5 million approximately plus $87 million that GBGH never sent to Fung Holdings to pay down a bank debt.

And the reason why -- defendants have made the argument, Your Honor, that this was all wash. There was no harm and damage to GBG USA. And Your Honor asked before, where's the beef? The important beef is as follows.

THE COURT: Well, let's -- we're getting ahead of my question.

MR. NOVOD: Oh, I'm sorry.

THE COURT: Now you're responding to the motion to dismiss, but --

MR. NOVOD: Okay.

THE COURT: -- they haven't argued it, so let's halt that.

MR. NOVOD: Let me -- sure. So Your Honor, just to round the circle here, this doesn't --

THE COURT: You said the first three claims are against Spencer Fung, Mr. Rockowitz, and Hurricane?

MR. NOVOD: And Hurricane Millennium.

THE COURT: And did Hurricane -- is that a subsequent transferee of Mr. Rockowitz, or did it separately (indiscernible)?

MR. NOVOD: It's an entity controlled by Mr. Rockowitz. Paragraph 33 of our complaint includes a chart which was our best understanding of how things moved. And Mr. Rockowitz is the sole owner of Hurricane Millennium Holdings Limited, as well as he received, individually, monies both in his personal account and in a trust.

THE COURT: Well, what did Hurricane get, what are you suing them for, and did they get it directly from GBGH or through somebody else?

MR. NOVOD: It's our understanding they got it directly from GBGH, and we're suing Hurricane Millennium for $9,036,347.09.

THE COURT: Got it. All right. Thanks.

MR. NOVOD: And so -- and this is in paragraphs 175 and 176 where we break it down. Mr. Rockowitz himself, personally, received $4,592,902.34 from GBGH, as well as $874,548.53 to the Rockowitz Trust.

THE COURT: So I'm going to let them argue, but just to make sure I have your position on personal jurisdiction, none of the remaining defendants are U.S. residents?

MR. NOVOD: No remaining defendant is a U.S. domicile citizen. Mr. Rockowitz is a U.S. citizen. We believe him to be residing in Hong Kong at the moment. We have not made any allegations about general jurisdiction -- general personal jurisdiction. The extent of our personal jurisdiction arguments are specific personal jurisdictions.

THE COURT: Okay. And none of the corporations is a U.S. entity?

MR. NOVOD: That's correct, Your Honor.

THE COURT: None of them have offices in the United States?

MR. NOVOD: No. To correct the record on one thing, Your Honor, Mr. Rockowitz is Canadian. I misspoke about him being a U.S. citizen. I apologize.

None of the defendants have offices in the United States. The defendants do business in the United States either directly or through entities that they control. I believe Mr. William Fung and Mr. Victor Fung are both affiliated with Harvard University in one way or the other. Either they endowed a chair or they're involved in some adjunct business program there.

THE COURT: But they don't have a -- the kind of presence in the United States which would support general jurisdiction under the Supreme Court authorities?

MR. NOVOD: That's correct, Your Honor. And we're not asserting that they submitted themselves to the general jurisdiction of the courts of the United States.

THE COURT: And whatever activities they have with Harvard are not what gave rise to your complaint.

MR. NOVOD: That's correct, Your Honor.

THE COURT: Okay. So and when you said they do business directly or indirectly, well, when you say indirectly, that means they have interests in entities that do business, not that they do business themselves, right?

MR. NOVOD: Well, they control entities that do business in the United States. Yes.

THE COURT: Okay. So --

MR. NOVOD: Their dominion and control.

THE COURT: -- you argue that they controlled GBG and

GBGH, both the transferor and the transferee, and that that's enough for personal jurisdiction. Is that essentially the whole basis of your personal jurisdiction claim? Is there anything else?

MR. NOVOD: Well, you can break it down --

THE COURT: They knew where the money came from, except that's just -- those are just parts of it. Essentially, you're saying that they arranged a transfer from the United States knowing it came from the United States originally, and that's enough jurisdiction.

MR. NOVOD: Yeah, a single transaction, and it was through their agent who did so. And we attached to my exhibit -- to my declaration that we filed a document supporting the fact that they were the ones, through Mr. -- I forgot his name offhand, but through a gentleman -- Jason Young, I think -- that they were the ones who controlled exactly where the money came from.

We're not talking here about -- in order to have the dividends that GBGH was going to pay to its shareholders, it needed to get the money from somewhere. The only place to get it was from the U.S. debtors who could borrow against the remaining value of their business in order to borrow the money to be able to fund that intercompany transfer.

THE COURT: How was this all accounted for on the company's books and records?

MR. NOVOD: We haven't --

THE COURT: How did it get from GBG to GBGH?

MR. NOVOD: It's a good question, Your Honor. There is no -- ordinarily, in complex transactions like this where you'd have a U.S. subsidiary, in particular, a Delaware subsidiary that's going to upstream money to the capital structure, you'd have a specific approval that was done by the GBG USA board where they would often say we relied on the financial condition of the company --

THE COURT: I understand that. But usually, when cash moves, the accountants do something.

MR. NOVOD: Yeah.

THE COURT: They book it somehow. They call it an intercompany transfer, a dividend, I don't know.

MR. NOVOD: Good question, Your Honor. We don't know specifically. If Your Honor may recall, we've had an issue that's been ongoing with the sister -- I wouldn't say the sister company, but another Fung-controlled company concerning access to the debtor's books and records. We don't have, necessarily, those specific records that are going to show how these are booked. But what I will say is that --

THE COURT: In your chart here, for the December transactions, you list the transfers from GBGH to GBG on December 21 as capital contributions. Is that how they were accounted for at the time or --

MR. NOVOD: No, that's our view based on the facts and based on what we've alleged in our complaint. There was no loan agreement. There was no set definition.

If Your Honor looks -- and this gets to the -- the defendants cite to the Adelphia Communications case in their reply brief at page 10. And that case, itself, refers to a Sixth Circuit test from Autostyle Plastics, 269 F.3d 726, which lists -- and this is a Sixth Circuit, 2001 -- listing out ten factors to determine whether something's a loan or capital contribution.

And here, factor number 1, there was no loan agreement. That's a capital contribution.

Factor number 2, was there a fixed maturity date for the transfer? No.

Was there a fixed rate of interest? No.

These were transfers to indirect shareholders? Yes.

There was no security given for it? That's what it is.

GBG USA could obtain the financing from somewhere else.

So you have, you know, seven or eight different factors out of that ten-factor test that all say this is a capital contribution. And candidly, Your Honor, I think that's an issue of fact that I think we can determine today. But our view -- and this goes to Count VII, VIII, and IX -- is that the

money was contributed by the Bermuda company to the U.S. entity, no strings attached. It was contributed there, and it wasn't booked as a loan. And so when the money flowed back -- and it, candidly, skipped GBGH as described on here -- they weren't repaying a loan. They were sending money up that had already been a capital contribution.

So the question -- and I don't want to preargue the argument, but it's not a wash transaction because when somebody gives the capital contribution, you can't just take it back and then say there was no harm to the debtor.

The harm to the debtor was, if they really wanted this to be a loan, when those four different contributions happened on December 21, 2018, they would've been booked as loans if they intended it to be a loan. You know, after all, you have the Delaware statute of frauds, and this certainly meets the criteria where you need a written agreement.

THE COURT: Well, we don't know how they were actually booked on the ledgers.

MR. NOVOD: Based on everything we saw -- we don't know how it's booked on the ledger, but we know there's no loan agreement. And we also know, based on the emails -- which we had the CFO's emails, we had the CEO's emails, we had the general counsel's emails -- there's no loan agreement whatsoever here, so there's no real indicia of a loan which, candidly, Your Honor, I think those are issues of fact that

wouldn't necessarily be probative, and our allegation, the complaint that they were capital contributions should govern the day today.

So that's Count VII, VIII, and IX, though, just to be clear, Your Honor.

THE COURT: All right. Let me hear from the movants. Thanks.

MR. NOVOD: Thank you, Your Honor.

MR. HARKNESS: Good morning, Your Honor.

THE COURT: Good morning.

MR. HARKNESS: Well, Your Honor's clearly read the papers, so I'm not going to replow any ground. I'll try to avoid doing so.

I think we'd boil it down to a few things, going -- starting with the discussion of jurisdiction. I think you're familiar with the jurisdictional allegations in the case, and when you step back from the briefing, the fundamental issue we're having with the argument the plaintiffs are making here is weeding out the Walden case from their analysis. At the end of the day, Walden, a 2014 case, and all the cases that come after it focus on the conduct of the parties and whether or not defendants purposely availed themselves, did something in the United States. And here, all the allegations really are showing conduct that is happening in Hong Kong between a company like Fung Holdings, as an example, and GBG Holdings,

not directly with USA.

So fundamentally, the problem with the jurisdictional allegations is there is no U.S. conduct that relates to the transfers.

THE COURT: Well, the transfers are U.S. conduct, aren't they?

MR. HARKNESS: Let's take them one at a time. The first transfer --

THE COURT: The transfers from GBG.

MR. HARKNESS: From GBG USA to GBG [sic] -- -- that's conduct of the debtors sending the money to GBGH. So when you're talking about the dividend transfer, what you don't have is any of the defendants doing anything to make that transfer happen. You have a --

THE COURT: But wait a minute. How can you say that? I mean, the allegation is that it happened at their direction under their control, wouldn't have happened but for the fact that they gave the instruction. Nobody's contending that somebody at GBG had the bright idea without talking to anybody to just send a bunch of money to GBGH, right?

MR. HARKNESS: Yeah, and I truncated my response there. It should've been nothing that the defendants did was in the United States. And that's the fundamental holding of Walden. It's not what did you do? It's what did you do in the United States?

THE COURT: That wasn't a fraudulent transfer claim, right?

MR. HARKNESS: Pardon me?

THE COURT: Walden wasn't a fraudulent transfer claim, right?

MR. HARKNESS: It was not. It was about money, and fundamentally what happened in Walden is that there's cash being held by a law enforcement officer in Georgia. The folks in Nevada -- the plaintiffs in Nevada are saying that's my money, and if you continue to hold it, you're hurting me here. And the Court says, no, you have to show -- you can't bring someone to Nevada, even though the harm allegedly is being suffered by someone in Nevada.

Here, it's the same thing. I think if you have U.S. conduct --

THE COURT: But it would be more like this case if the sheriff in Georgia had issued instructions to a Nevada bank about what to do with the money.

MR. HARKNESS: I think what we have here is we don't have instructions --

THE COURT: It's not really the kind of facts that the Supreme Court dealt with, right?

MR. HARKNESS: I think not squarely, but if you continue on with the analysis of Walden, in this case, what you have are people who are in Hong Kong. All their conversations,

all their voting is happening in Hong Kong, these defendants. There are some conference calls, allegedly, that include people in the United States, but fundamentally, these are Hong Kong companies interacting with another Hong Kong company to affect the Centric sale, and part of that Centric sale is going to be the dividend that ultimately was given to the noncontrolling shareholders.

THE COURT: But in the Supreme Court case, somebody in Georgia took money that was already in Georgia, right? Didn't issue any instructions to anybody outside the State of Georgia. Didn't do anything that, you know, exercised control on anything outside of the State of Georgia.

Maybe the vote happened in Hong Kong, but the allegation is that the vote -- and not just the vote -- the instructions to implement that decision were exercises of control over property in the United States by people who had the power because of the corporate hierarchy to do that. You know, I'm sure they didn't, like, obey corporate forms and send notes down the chain of command to please say, do this, do this, do this. The allegation is they just caused it to happen because they were the ones who had the indirect 100 percent ownership, and so they directed it and it happened.

So that's fundamentally different than the cases you're talking about, right?

MR. HARKNESS: Respectfully, Your Honor, I don't

believe so because I think here what we lack is --

THE COURT: They didn't just say let's do a dividend and let somebody figure out how that's going to happen in a way that wound up having some effect on the United States. They gave an instruction, right? They gave a instruction that the U.S. entity transfer funds.

MR. HARKNESS: They gave an instruction that GBGH issue -- fundamentally issue a dividend, and it was going to be through -- either directly or indirectly through the financing that you see here relating to the Centric sale. So that is true. There was a --

THE COURT: But that's not what -- you know, the allegations of the complaint don't stop by saying that the instruction was to GBGH and no further. The allegation of the complaint is that the instruction was to GBG to make these transfers to enable what they wanted GBGH to do. Right? That's what the complaint alleges.

MR. HARKNESS: Yeah, it does say that, Your Honor, but it does not go so far as to say that GBGH was the actual agent of the controlling shareholders. I think that you need a --

THE COURT: Does it have to be a need -- does it have to be -- you know, GBGH was the parent of GBG, but however -- whatever the words you use, what they say was that these people controlled both GBG and GBGH and caused -- and used that

control to make this happen. And I don't think there's any credible allegation that anybody else caused it to happen, right?

MR. HARKNESS: Your Honor, I think that when you look at cases like the Charles Schwab case that we cited, you need more than just a parent-subsidiary relationship to impute the contacts of GBGH back to the shareholders. You need agency, some disregard of the corporate form, allegations of veil piercing, that kind of thing, which we do not have here. You -- because under Second Circuit law, after Walden, certainly jurisdiction via agency is a viable theory. You can -- if I send someone to another jurisdiction to go do something for me, I'm subject to that jurisdiction's -- the power of that jurisdiction's court. But you need an agency relationship that's more than the corporate relationship that's described in this complaint.

THE COURT: Corporations act through people or other entities, and when a corporation is wholly owned, one of the people that the corporation can act through is its parent corporation, can't it? It can -- the parent corporation has power to direct just as a director would. So when a parent corporation does that, why isn't that a U.S. act? It may or may not be, but the cases you cite really don't deal with this kind of situation.

MR. HARKNESS: I think they're fundamentally going

back to the Walden Case. It's about whether or not you're intentionally protecting yourself if the defendants are going into the jurisdiction. And once you have this -- a lack of an agency relationship, which respectfully, I don't believe that they've pleaded, then that jurisdictional link is broken, and the people --

THE COURT: So what the question boils down to is, if the allegation is you used your control of a U.S. company to cause it to commit what the Supreme Court has, in other contexts, characterized as essentially a tort of fraudulent transfer, is that enough? Have you essentially injected yourself into the United States for that purpose by using your control to have -- to make a U.S. entity make the fraudulent transfer to ultimately yourself?

MR. HARKNESS: And I think when you're talking about a structure like this one where control isn't -- you don't have a 100 percent shareholder of GBGH, you have actually -- it's a publicly held company, so you have many shareholders. You have a public vote. It's in the allegations of the complaint. So you don't have quite the kind of control you just hypothesized. You have a public vote via the Hong Kong-listed company then effectuating a dividend. So think that's a very big difference between the hypothetical you posed and the facts that are alleged in the complaint.

THE COURT: So that may be a factual problem they

have, but it's not what they've alleged, right? They've alleged that there was direct -- these people had direct control over GBGH and GBG. The allegation.

MR. HARKNESS: I think the allegations are a little softer than that, but the -- and I think that when you read the totality of the complaint, particularly when you look at the documents to which they refer, the Centric sale circular, that kind of thing, you see that this is a public vote of public shareholders. The shareholders who are defendants here are not the only ones who voted for this. So I think that that's a fairly large difference that is within the four corners of the complaint.

THE COURT: What percentage of GBGH was owned by the defendants here?

MR. HARKNESS: I don't have the exact percentage. I know one of them was about 30 percent, but I don't know the exact numbers.

THE COURT: Was it a majority?

MR. HUTTEN: That's not alleged.

MR. HARKNESS: Yeah, I don't believe that's alleged.

THE COURT: I didn't ask you whether it was alleged. What --

MR. HARKNESS: Yeah, I don't have the --

THE COURT: (Indiscernible) what was it?

MR. HARKNESS: Yeah, I don't have the exact number

before me.

THE COURT: You don't know? Okay.

MR. HARKNESS: So moving on from the jurisdictional argument --

THE COURT: But I think that's what it all boils down to. I'm not sure that the -- you've cited some cases that -- some of which, predate Walden and are from some other jurisdictions, and you've cited other cases that aren't really fraudulent transfer claims. It's just a question of -- if the allegation is that you caused it to happen using your control over both the transferor and transferee to make it happen with the expectation that you would receive some of the benefits yourself, is that enough for jurisdiction, right?

MR. HARKNESS: And I would respectfully submit, Your Honor, that under Charles Schwab and some of the other cases we cite, you need to have an actual agency relationship established with the individuals who are going into the United States to engage in conduct.

THE COURT: Okay.

MR. HARKNESS: And without that, I think that's not enough.

Turning to some of the other arguments, Your Honor -- and I appreciate the time that you've taken -- first, we put in our reply brief a different version of the charts that Mr. Novod has handed up, and when you look at that chart -- we

have it in the -- we put it as an appendix; it would be all in one page -- you know, it's very clear that -- in our view, that the money that allegedly went to the controlling shareholders here actually made its way back with regard to the dividend to the balance sheet --

THE COURT: Let me ask you --

MR. HARKNESS: -- and actually benefited the --

THE COURT: Let me ask you a few -- let me ask you a few questions about that. In the Madoff cases, right, there have been scores of feeder funds that did transactions with Madoff where they would withdraw $10 million one day, pay $20 million the next day, withdraw $10 million again. And the Madoff trustee sued them all for all of their withdrawals with no credits for the subsequent reinvestments of cash, taking the position that it wasn't necessarily the same cash, or I'm not sure what. And my understanding is those claims were all allowed.

So you talk about this as though it's a settled rule of law that you kind of get to offset for anything you put back, but that's not the way it's been done in the Madoff cases, is it?

MR. HARKNESS: I think it's -- in the Madoff cases -- now I'm having -- thinking about the last 16 years of my life on the Madoff cases. So what we've been doing in those cases -

THE COURT: I spent a good part of my life before I

became a judge on the Madoff cases.

MR. HARKNESS: So we all have that --

THE COURT: I will say to this particular feature of the Madoff cases always bothered me and even wrote an article about it, but that's the way it proceeded. That's the theory on which it proceeded.

MR. HARKNESS: And what you have there when you go -- roll the tape slightly forward, which is why this case is different, is you ultimately had to engage in a tracing analysis to understand the ins and outs to understand whether or not they were truly fraudulent transfers. So --

THE COURT: Madoff it was so obvious. You know, you had one entity that had an account and took ten million out and put ten million back and got no credit for it. Clearly the same entity. Clearly the same dollar amounts. What the feeder funds would do is if they needed -- when they received additional investments of their own, they sent it to Madoff and they had to redeem investments. They took money out of Madoff. In fact, some of them did it differently. Some of them would cancel it at their level and just send the net to Madoff and some of them would just pass through every transaction, and the Madoff trustee just treated every withdrawal like it was a fraudulent transfer and no credit for any money he put back.

MR. HARKNESS: And when he started to look at the -- through 550 at the subsequent transferees, which is the closer

analytic here, what we had to do, what we've done in a number of the cases, is deal with a tracing analysis to see whether or not you could see a transfer going in or out in a way that harmed the debtor in that case.

And what we have here is a much simpler record and a clearer set of allegations that show the ins and out --

THE COURT: Nothing would be simpler than the Madoff record. Nothing could be simpler, and there was no credit there. So I can't remember if there were reported decisions about that being the way to do it, but there was no credit in Madoff. People who wound up never actually having had more than $300 million at risk with Madoff or basically accused of having received $400 million of transfer from Madoff. That was the outcome.

MR. HARKNESS: And the difference here, Your Honor, is this was a negotiated set of transfers back in when you're talking about the dividend.

THE COURT: Well, not -- you know, let me -- first of all, let me straighten out one thing. You say several times in your papers that this somehow negates the intent to defraud, but the allegations in the complaint are that the money made its way out of GBG and to GBGH before the banks essentially intercepted it and stopped you from doing what you originally intended to do. So that doesn't really negate the intent that motivated the GBG transfer, right?

MR. HARKNESS: I think that is one allegation of the complaint, but when you look at all of the allegations of the complaint the concept of centric sale related dividend was publicly disclosed in 2018. So for months the banks knew about these intentions --

THE COURT: The agreement to return money back not take some dividends, pay down the loan, that all happened after GBG paid money to GBGH.

MR. HARKNESS: I think that the negotiations have been, according to the allegations of the complaint, have been going on prior to that. The agreement did get signed after that and you have an agreement --

THE COURT: But it doesn't as a result -- on a motion to dismiss it does not negate the intent that's alleged, the alleged -- the allegation that there was an intent to send all this money up to all of the shareholders. You say it negates it, is that from at the time of the transfer the shareholders didn't intend to take the money. That's not what the complaint says and it's not what the sequence of events say. It sounds like you intended to take it until the banks wouldn't let you.

MR. HARKNESS: Well, respectfully, Your Honor, I believe that the totality of the allegations in the complaint show that this was a process that was known to the banks. The fact that there were issues with loan covenants prior to this transfer was something that was being discussed, according to

the allegations of the complaint.

So there is a record here of disclosure of the intent to have a centric related dividend payment, and I know there are allegations in the complaint about the timing there. But the point is the idea of GBGH would be issuing a dividend is something that was known to the creditors, and that's really our primary point.

THE COURT: Okay. But as to the allegation that the money was returned, putting the Madoff thing side, essentially what you've done is lump all the defendants together and say that collectively the defendants returned as much money for the benefit of GBG as the dividend transfer by GBG was in the first place. But there were a number of individual recipients of dividends from GBGH. Why, for example, if Fung Holdings contributed money back should that negate the claim or amount to a return of the funds at a different dividend received?

MR. HARKNESS: It's just the math, the way the math works out, Your Honor. I think that what we have here is a group of defendants that allegedly received transfers and then we have a group who aren't alleged to have received anything.

THE COURT: But look, you know, there's an -- I'll take Mr. Rockowitz. They say he got $14 million. So if he got $14 million and he didn't return $14 million, why should the fact that Fung Holdings' returned other money be a defense to him?

MR. HARKNESS: I think to the extent that they are acting in -- as a group, the alleged controlling shareholders, if the money is not harming the estate, and that's fundamentally --

THE COURT: They're not sued jointly and severally. They're sued individually.

MR. HARKNESS: No, and I understand that, Your Honor, and I think that Mr. Rockowitz's -- the bigger issue, after Mr. Rockowitz's claim, is the jurisdictional point. There's no allegation that he actually controlled anything.

THE COURT: What you're really saying is that he gets a pass and just somebody else return money. What support is there for that?

MR. HARKNESS: I do not have a case that stands for that proposition, Your Honor.

THE COURT: And then you said that the money that was returned was the money that GBG sent to GBGH. Well, there was other money, that the GBH dividend was funded only partly by the transfer from GBG. The total dividend was $280 million. A hundred and ninety-two of that came out of money it got from GBG.

MR. HARKNESS: I think the --

THE COURT: How do I trace, to use your words, just what went back to whom?

MR. HARKNESS: I think the net dividend ended up

being one ninety-three, but the -- you know, we -- I think we show how --

THE COURT: And that dividend meaning --

MR. HARKNESS: Because it didn't go to everyone. The dividend, there were a number of shareholders that didn't get, through the waiver agreement, didn't actually receive a dividend. And so there was the $4 million and change that accidentally went to Mr. Fung, and Fung Holdings put that back.

THE COURT: But let's --

MR. HARKNESS: But for many others, they didn't receive any --

THE COURT: If Fung Holdings got, just for sake of argument, a hundred and -- or was going to get $100 billion from GBGH, but GBGH got its money partly from GBG, partly from other sources, how do I know how much of the GBG money was in what was supposed to go to Fung Holdings, as opposed to other money, and how do I trace -- so from your purposes as to say that the whole transfer has been negated?

MR. HARKNESS: Through the waiver agreement and the allegations relating to the waiver agreement, the amount of money that the RCF lenders wanted the controlling shareholders to --

THE COURT: You're just focusing on dollar amounts, and you're willing to say that as a matter of law in a motion to dismiss those dollar amounts should first be treated as

though they were the amounts that GBG gave to GBGH, rather than as the other cash that GBG was distributing from other sources. How do I -- how do I do that? How -- right?

MR. HARKNESS: I'm saying that through the waiver agreement there's an agreement with the creditors as to how much money is supposed to go back.

THE COURT: Exactly. How much, but not which money, right? There's no agreement that what's going back is the money, the cash that GBG gave to GBGH, but you want me to argue that what was done was a return of the money. I mean, you don't get an offset. Nobody's -- nobody agrees that you have an offset right for a 550 claim. What you're saying is that you returned what you got. Maybe you'll argue I shouldn't try to trace the actual cash, that cash is fungible, but there was a big pot here, right? It didn't all -- it isn't the case that all of the money came from GBG, and so doesn't that mean you can't say as a matter of law in a motion to dismiss that all of what you declined as a dividend, or returned as a dividend, was the cash that came from GBG?

MR. HARKNESS: I don't think that that needs to be the analysis. Fundamentally, if the -- if the debtor, which is what we show in our chart, is fundamentally in the same place, or in this case with regard to the dividend, better off by $4 million, there's no harm to the entity and so, therefore, the idea that there's a fraudulent transfer is negated. Their

balance sheet's the same position, $4 million better off after this series of transfers is done.

THE COURT: All right. I understand your argument.

MR. HARKNESS: All right. Your Honor, with that, unless there are other questions as to the rest of our arguments, I will pass then to Mr. Novod.

THE COURT: Hang on a second. Let me see if --

MR. HARKNESS: We have a safe harbor argument which we have not talked about.

THE COURT: As to the shareholder transfer, you're really saying that what they did was return money that they got six months earlier, as though that can never be a wrongful transaction for fraudulent transfer purposes. But if they're right, if the money came in as equity, then it is a fraudulent transfer, right?

MR. HARKNESS: I think that -- and Mr. Novod was referring to the discussion in Adelphia that was -- it was a summary judgment case and there were fact issues. I agree with him on that. When you read into the Adelphia case, there are different transfers where money went Adelphia to the debtor and then back to Adelphia. You can show temporally that the money went in, then what happened to the money, and then came out. And what the Court held was that there was no harm to the debtor and therefore no fraudulent transfer.

THE COURT: Well, it all depends on how money is

going in and out, right? I mean if -- if the money that came in from GBGH in December had come with a loan agreement, right, and if the money going out in June wasn't sent directly up to Fung Holdings, it was sent to GBGH as a loan repayment and the GBGH paid Fung, then you would be arguing that, look, it was just a repayment of a loan.

But if money that came in in December was a capital contribution, was equity, then returning it absolutely was a fraudulent transfer. You don't return equity. To say on a motion to dismiss that the fact that the money was just a return without figuring out what the original transaction was, it's not enough to dismiss the claim, right? You don't automatically get to return money that you received. If it was equity, it's equity. It's there for the payment of creditor claims.

MR. HARKNESS: And the reason we believe it fits under the Adelphia analysis towards the end of the case that did not go into the nuance that you just did is because of the allegation that the purpose of the $100 million coming in in December was to help deal with trade creditors, and the allegation in the complaint is the money was in fact used to pay trade creditors and then subsequently returned.

THE COURT: A parent company can make an equity contribution to enable the subsidiary to pay its creditors, right?

MR. HARKNESS: That's true.

THE COURT: So the fact that the amount that GBG then transferred six months later to GBGH, you know, matches this dollar amount, that doesn't really mean that there's no fraudulent transfer claim, does it?

MR. HARKNESS: Under the Adelphia case, when you can show that there's no net detriment to the debtor then there is no conversable claim and that's the section of that case we're relying upon.

THE COURT: All right. On the 546(e) issue, how much time passed between the Centric sale and the two distributions we're talking about here?

` MR. HARKNESS: I think it was several months. I don't have the exact date.

UNIDENTIFIED: I think if I remember right it's probably seven months, right?

MR. NOVOD: May I address the Court, Your Honor?

THE COURT: Yeah.

MR. NOVOD: I think it was October 28th or 29th of 2018 is when the Centric sale closed.

MR. HARKNESS: Yeah, thank you.

MR. NOVOD: Then the first of the money moved March 28th, 29th of 2019 with respect to funding of the special dividend, and then the special dividend was paid out April 4th from GBGH to its shareholders. So that's the general sequence.

THE COURT: So I understand that what GBGH announced, told people was that it was going to just make a distribution based on the proceeds of the Centric sale. But the allegation of the complaint is that all of those proceeds were used to pay down other debts and that none of the amounts that were actually used to pay -- to make the payment from GBG to GBGH actually came from the Centric sale.

So how would I, or how should I decide that those transfers that were actually made were in connection with the Centric sale?

MR. HARKNESS: Well, I think you --

THE COURT: What you're asking is flat out contrary to what Judge Drain did in Tops, right?

MR. HARKNESS: Well, I don't think it was as clear in Tops. I think this is closer to Fishman. So where you have -- you know, you have in the Madoff's context, you know, literally fictitious securities transactions. But what we're dealing with, I believe, is shareholders who are not before the Court, non-controlling shareholders that did get the dividend voting in favor of a transaction, and part of that transaction included a dividend, them getting a dividend, you know, months later. And because the dividend was paid and this transfer facilitated the dividend, it's related to a securities transaction. Fundamentally, that's the argument.

THE COURT: How is that consistent with Merit

Management? You know, in Merit Management, the Supreme Court said that all of 546(e) is just a limitation on the theories you can use to undo a fraudulent transfer so that if you're not seeking to undo a transfer that was received by a financial institution, then 546(e) doesn't apply. And in fact, in commenting on the in connection with language, the Supreme Court said that there are some theories under which you can sue people -- well, I'm sorry, it was for the benefit of language in connection with. What they said was it had to be -- the transfer had to be a securities transaction for the in connection with language to apply. Not just related to, had to be a transaction that was a securities transaction with a financial participant.

So I know that those cases in the Second Circuit, I know some of them have continued to be cited, but I'm curious how you square that with what the Supreme Court said in Merit Management.

MR. HARKNESS: I square it with the breadth with which the provisions have been read by the Second Circuit before and after. That's the --

THE COURT: Yeah, but you know it seems to me that the cases -- nobody has really cited whether that prior -- that pre Merit Management interpretation of those words really works under Merit Management, right? Just continued to cite the cases as though -- and the presumption is that 546(e), when it

says, "In connection with," is meant to be just kind of a broad, free-ranging release of liability to anything that has any kind of connection or relation to a securities transaction.

The Supreme Court said no. Supreme Court said that it's just a limitation that applies depending on the theory on which you are trying to undo a transaction, and it's right there in the opinion. It says it has to be a securities transaction, not related to a securities transaction, not a component of, not arising from, has to be a securities -- the transfer itself has to be one that is a payment in a securities transaction. It's right there in the opinion.

I don't know how those older Second Circuit decisions and the cases that have continued to cite them can be squared with that.

MR. HARKNESS: We're happy to brief that issue, if you'd like us to, Your Honor.

THE COURT: You're welcome to. You're both welcome to.

MR. HARKNESS: I don't think any -- I don't think that --

THE COURT: I should point out I have another case where I'm going to have to decide this issue that has been pending for a while. It seems to me to be a real problem.

MR. HARKNESS: Thank you, Your Honor.

THE COURT: Okay.

MR. NOVOD: Again for the record, Gordon Novod on behalf of the plaintiff. Your Honor, I'm happy to address a few of the points that were raised in your colloquy with Mr. Harkness, or I'm happy to answer your questions, however you'd like to proceed.

THE COURT: Why don't you go ahead.

MR. NOVOD: Sure. Just to round out the circle on 546(e), I mean, you've addressed now the first component of it, which is really to say is there a qualifying transaction, and you didn't hit upon the second part whether there's -- and by the way, we think that there is no qualifying transaction.

The Centric transaction, basically there were two resolutions at the time. This is all pled in the complaint. But there were two resolutions at the time and one said, you know, shall we close the Centric sale, and the other said shall we pay a dividend. And those resolutions, neither of them bind nor consider nor are truly in the way that courts have looked at 546(e), truly related to, as Your Honor has mentioned in reading Merit Management, the transaction.

THE COURT: Some of the language, you know, they almost take the in connection with language out of Section 10(b) and --

MR. NOVOD: Right.

THE COURT: -- and maybe even some of them go further than the courts have done in the securities field, to tell you

the truth.

MR. NOVOD: Right.

THE COURT: And they argue that any kind of relationship is enough. I just --

MR. NOVOD: There has to be a line somewhere, and the Supreme Court is saying that.

THE COURT: Yeah. I think that not enough attention has been made to what the Supreme Court said.

MR. NOVOD: Yeah. And just to the other point about their being a qualifying institution, it's important to note that the complaint alleges the simple debtor/creditor relationship between the debtor, GBG USA, and Citibank, nothing more. We don't plead any agency with Citibank. Citibank wasn't given the right.

So just by way of example, in most fraudulent transfer cases, and we look at the LPL cases for example, in Tribune or in LyondellBasell or in even Boston Gen, you have a -- you have an agency relationship that's established that is the financial institution where the financial institution invested with reconciling accounts or determining net present value or things such as that. And I think it was in the Fairfield Sentry case where FICOBank, and this is again -- the case is Fairfield Sentry, 2020 Westlaw 734, 5988 at Page 7. But that particular case, and it's cited in the defendant's reply at Page 15.

But in FICOBank, FICOBank was acting as the funds administrator and their job was to calculate the fund's net asset value per share and issue corresponding certificates to affiliates in order to calculate a redemption payment. That was a big responsibility. That's an agency relationship. There's something more there.

And simply here what we have is you have Citibank that is being told by GBG USA we're giving you an instruction to send a wire full stop.

THE COURT: Well, in Merit Management, there was a stock purchase, clearly a securities transaction. The way the stock purchase was effected was that the buyer asked its bank to transfer money to another bank that was asking as -- acting as escrow agent. The seller gave the securities to the escrow agent. The escrow agent bank received cash, gave it to the seller and gave the stock to the buyer.

The Supreme Court said that was not covered by 546(e).

MR. NOVOD: Right. And here --

THE COURT: That was the financial institution's work being sued. But, you know, was there an agency relationship between the escrow agent and the seller of the stock? There was an escrow agreement.

MR. NOVOD: Yeah. Something much --

THE COURT: Calling it an escrow agent.

MR. NOVOD: Right.

THE COURT: So I have trouble reconciling a lot of the other stuff that's kind of lingered after Merit Management that seems to be going on without talking about what the Supreme Court said.

MR. NOVOD: Right, but you didn't -- to just the more fundamental point, Your Honor, the Supreme Court, and we -- if the defendants choose to brief the issue, we're happy to brief the issue as well for Your Honor if you think that would be helpful.

But that being said, more specifically, you really do require that second component and who is the financial institution here? It's not the transferer or debtor. It's not the transferee, GBG USA. The closest the defendants say is it's Citibank because Citibank sent the wire from one entity to the other entity and that's it, full stop.

And so without that, 546(e) just simply doesn't apply, and it doesn't apply to either transaction. They haven't really focused on the December transaction either, the December loan repayment which occurred in March, but it's the same point. And just because -- they sort of make a tangential argument that when the Centric business was sold, the subsidiary of GBG USA sold equity interest and therefore it was the sale of the indirect equity interest of the subsidiary, GBG USA that somehow invokes 546(e). I just think that's a --

that's a step too far.

They brought up the question of Adelphia Communications, Your Honor, when talking about really the issue about the wash transaction. But Adelphia's careful to note -- I mean, that was a designated entity. The fact specific, you had Adelphia business, which was one debtor at the time. Then, you had Adelphia Communications, separately administered debtor. And in the Adelphia Communications world, they set up a special designated entity, which I think was a female-owned entity for certain purposes and because that entity didn't have its own cash, they would routinely day of wash money in and out of that -- that box in the capital structure. And the specific transactions there were they had a check -- the first thing was that there was a check from Adelphia's accounts payable department to an Adelphia sub-account, and then there was a transfer from that Adelphia sub-account to Devan, which was the name of the designated entity box, that account, and then there was a subsequent retransfer from that Devan account to the Adelphia account to cover the check that was written. So you're really talking about just, I hate to say it, but moving debt chairs. They're sort of just different accounting entries that were all at the same time.

And here our transactions are separated by months. When we talk about -- and this is one of the things I would beg Your Honor to listen to, there's a lot of -- I always think

about it as which box got the cash. The defendants talk about it and they talked a lot about it. Mr. Harkness talked a lot about GBGH. Well, GBGH is the transferee, not the transferer. So whether GBGH got the money back or not is really irrelevant to the question of whether GBG USA got the money back.

So specifically on the December transaction, and like we don't have to tread over the capital contribution grounds, Your Honor, but we think that's an issue of fact and we certainly think that the complaint alleges enough that it was a capital contribution, not a loan. But the money itself never went from GBG USA to GBGH. It skipped GBGH and went directly back to Fung Holdings to repay GBGH's indebtedness.

THE COURT: Because GBGH directed that the money be paid to satisfy an obligation of GBGH.

MR. NOVOD: That's one way to look at it. I mean, the Fung Holding people controlled everything through -- for themselves and through their agents. So you often times had --

THE COURT: It's not just one way to look at it. It's what you alleged.

MR. NOVOD: That's right. And but what I was also going to add to add more color and context here was that the directors and officers at GBGH also were directors and officers of the debtor, GBG USA, at times.

But when talking about the special dividend cash transfer chronology, one thing that's been lost in the whole

wash transaction argument, there really was damage done to the debtor here. And the damage done to the debtor was the debtor had a revolving cash -- excuse me, a revolving credit facility, which meant it could borrow money and it could borrow money when it needed it to fund its business.

And so there was this transaction that was done and there were questions and there was issues of a potential default that were raised, and the -- GBG USA was involved in a dialogue with its predecessor, with its revolving credit facility banks. But unbeknownst to the banks, that transfer occurred where they transferred $196 million without telling them.

And so Mr. Harkness spoke about the fact that the special dividend was announced to the world and they voted on it, but that only talked about the fact that GBGH was going to make the dividend, not that the money would be taken from GBG USA under the nose of HSBC, who is a lender who never knew anything, or under the nose of Mizuho, or -- and I probably said it wrong, but it's how I say it, or under the nose of the RCF banks. And so the RCF banks then come back and say, whoa, what are you doing here, you've taken all this money out and we need that money to go back in. But their request, as a subset of lenders, which by the way our trust represents everybody. RCF lenders are part of that group, but so is Mizuho. So is CitiGroup. So is HSCC. So is Associated Brands. Your Honor

approved at a settlement stipulation settling their claim for $40 million. There are other unsecured creditors who have been harmed here.

So money was actually taken off the table. So if the debtor had the ability to borrow money, after this whole set of transactions with the money flowing out unbeknownst to the RCF banks, they then cut back and restricted the availability. So the worst thing that you can do for a struggling company is starve that company of the cash it needs to run its business.

So even though the money technically was used by GBGH, because remember it flowed back to GBGH and the GBGH paid off its guaranteed debt, and they paid off their guaranteed debt, which had a byproduct of benefiting the debtor, GBG USA.

THE COURT: It's a primary obligation of --

MR. NOVOD: It's a primary, of course. But the question then becomes why did GBGH give the money to GBG USA to do -- to pay of their debt or use it as it pleased.

THE COURT: GBG had already transferred it. I mean --

MR. NOVOD: Right.

THE COURT: Clearly, they've got an argument to make and I have to decide whether it's really an argument for a motion to dismiss or not, but it's an argument that the way all this happened, essentially the banks stopped the money from going out from GBG by requiring that that amount be used to pay

down the debt.

MR. NOVOD: Yeah, but that all happened after under their nose they made the transfer. I mean, that's what the complaint alleges that -- you know, that that's why it happens.

Your Honor, just to close the loop on a few other points --

THE COURT: It's not a frivolous argument

MR. NOVOD: Okay.

THE COURT: Right?

MR. NOVOD: It's complicated and it comes back to again the question of reducing the availability that was available and how that all works out. But when your Honor observed there were people at the table during that bargaining, and the people at the table at the bargaining decided exactly what was going to be happening, what wasn't going to be happening, but that doesn't mean that all the debtors/creditors were there at the table. They certainly weren't there. This wasn't disclosed to them. It gets to the concealment point.

THE COURT: Yeah, but there was the -- there was -- the secured claimant was the creditor who was really being hurt by the $192 million. They intercepted the money and said pay it back. That's what they're saying.

MR. NOVOD: That's what they're saying, sure.

THE COURT: Yeah.

MR. NOVOD: But they're also saying that they said

pay it back and pay down and we're going to now permanently reduce the amount that we previously agreed to only in October of 2018, that we would provide as far as a revolving credit facility to the debtor. So you had a situation where they suddenly said -- the revolving credit facility banks have said we don't want to have this exposure, we're going to narrow our exposure, and as a result of the process of taking money out of the company, they have given those banks the opportunity --

THE COURT: Well, but now you're arguing --

MR. NOVOD: -- to reduce their exposure.

THE COURT: -- consequential damage, which you haven't pleaded and I don't --

MR. NOVOD: No, we're not arguing that.

THE COURT: -- I don't think you get out of fraudulent transfer.

MR. NOVOD: That's right. We're only arguing fraudulent transfer claim here.

THE COURT: Right.

MR. NOVOD: To the point of the badges of fraud and intent, we certainly alleged at least four or five badges of fraud. The concealment badge wasn't alleged with respect to the December transfer loan repayment, although I think it could. If we were given the opportunity to plead we would.

THE COURT: Let me ask you a question. On the jurisdiction issue, are there cases where controlling

shareholders have directed companies to do something and the courts have considered, probably in Delaware but maybe elsewhere, whether that action by the controlling shareholder subjects the controlling shareholder to jurisdiction in the United States?

MR. NOVOD: May I have a moment to confer with my colleague.

(Counsel confer)

MR. NOVOD: Your Honor, I'd -- we'd like to brief that question if it would be helpful to Your Honor. I'm not in a position today to give you an opinion about it. We think that it --

THE COURT: I think it's very much analogous, maybe not perfect, but it's close, probably closer than what we've talked about otherwise and -- so the idea would be if a foreign owner of a U.S. company uses its control --

MR. NOVOD: Agent.

THE COURT: -- correct, then something happened at the subsidiary, can it be sued in the United States based on that exercise of control and direction to the U.S. subsidiary or does it fall, as the defendants say, into the category of something that was just a foreign action that had a U.S. effect, or as you say is that an action in the United States that has an effect that may be tortious and that may subject people to jurisdiction.

MR. NOVOD: Your Honor, we'll certainly brief that question for Your Honor. We do think that it's likely that it will mirror the agency type of argument, but we'll get you --

THE COURT: Whatever it is, let's see what the answer is.

MR. NOVOD: Yeah. Your Honor, I was just going to address one or two other points. And, candidly, I think we've covered a lot of --

THE COURT: Have you guys had any settlement discussions about any of this? Because you've got jurisdictional arguments. You've got these other defenses that you need to surmount about whether the second payment was really a debt instead of equity that was being repaid. You've got the issue of whether the banks basically stopped the transfer and got the money back to your benefit. Have you had any settlement talks about anything?

MR. NOVOD: There wasn't an appetite early on. I know the plaintiff always has an appetite to talk about settlement. I think in light of today's hearing, I would encourage the defendant to have an appetite and -- I mean, certainly I can represent to Your Honor that the plaintiff is always interested in talking about whether this can be consensually resolved here otherwise.

So, Your Honor, (indiscernible) said, just to round the loop on a few things. Again, the fact that -- I think I've

covered enough grounds, Your Honor. I don't need to belabor the point, and I think Your Honor understands. If there are additional questions, we're happy to answer them.

THE COURT: How long do you need to address the -- what I've asked for here on the jurisdictional point, and I think you said you wanted to submit more authorities on 546(e)?

MR. NOVOD: Your Honor, the parties have proposed 30 days and that would allow us also to have that conversation about settlement and to see if there's any potential legs to that.

THE COURT: Okay. Thirty days, you got it.

MR. NOVOD: Candidly, I have to look at the Jewish calendar, Your Honor. I'm Jewish and --

THE COURT: Just look at it and give me a date and --

MR. NOVOD: Okay.

THE COURT: -- anything in the --

MR. NOVOD: Rosh Hashanah and Yom Kippur are in October 3rd and 4th, and the 10th through 12 --

UNIDENTIFIED: Yom Kippur's the 12th.

MR. NOVOD: I know.

THE COURT: Go ahead and figure it out. Do you want 45? That's fine.

MR. NOVOD: Okay.

THE COURT: Just let me know when the date is.

MR. NOVOD: Will do, Your Honor. Thank you again.

THE COURT: All right. Anything else for today then?

MR. NOVOD: Not from the plaintiffs, Your Honor.

THE COURT: Thank you.

(Proceedings concluded at 2:06)

* * * * *

**C E R T I F I C A T I O N**

I, Alicia Jarrett, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Alicia J. Jarrett

______________________________

ALICIA JARRETT, AAERT NO. 428 DATE: September 13, 2024

ACCESS TRANSCRIPTS, LLC