**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br>GBG USA Inc., *et al.*,[1]<br><br>Debtors. | Chapter 11<br>Case No. 21-11369 (MEW)<br>Jointly Administered |
| PETER HURWITZ, AS LITIGATION TRUSTEE OF THE GBG USA LITIGATION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>FUNG HOLDINGS (1937) LIMITED, FUNG DISTRIBUTION INTERNATIONAL LIMITED, STEP DRAGON ENTERPRISE LTD., GOLDEN STEP LIMITED, WILLIAM FUNG KWON LUN, KING LUN HOLDINGS LIMITED, FIRST ISLAND DEVELOPMENTS LIMITED, VICTOR FUNG KWOK KING, SPENCER THEODORE FUNG, BRUCE PHILIP ROCKOWITZ, AND HURRICANE MILLENNIUM HOLDINGS LIMITED, AND HSBC TRUSTEE (C.I.) LIMITED, SOLELY IN ITS CAPACITY AS TRUSTEE OF THE "VICTOR TRUST",<br><br>Defendants. | Adversary Proceeding<br>Adv. Proc. Case No. 23-01022 (MEW) |

**PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

[1] The "Debtors" in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are as follows: GBG USA Inc. (2467), Jimlar Corporation (8380), GBG North America Holdings Co., Inc. (5576), Homestead International Group Ltd. (0549), IDS USA Inc. (7194), MESH LLC (8424), Frye Retail, LLC (1352), Krasnow Enterprises, Inc. (0122), Krasnow Enterprises Ltd. (0001), Pacific Alliance USA, Inc. (0435), GBG Spyder USA LLC (9108), and GBG Sean John LLC (1287). The Debtors' mailing address was GBG USA Inc., P.O. Box 4965, Greensboro, NC 27404.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

I. INTRODUCTION ........ 1

II. THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS ........ 1

A. THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS WITH RESPECT TO THE SPECIAL DIVIDEND CASH TRANSFER ........ 2

1. This Court Has Personal Jurisdiction Over Defendants Pursuant to the "Effects Test" ........ 2

2. GBG USA Acted as GBGH's Agent With Respect to the Special Dividend Cash Transfer ........ 5

B. THE COURT HAS PERSONAL JURISDICTION OVER FUNG HOLDINGS WITH RESPECT TO THE DECEMBER SHAREHOLDER LOAN CASH TRANSFER ........ 7

III. *Merit Management* Forecloses Defendants' Section 546(E) Defense ........ 8

1. The Special Dividend Cash Transfer Was Neither a Settlement Payment Nor Made "In Connection With" a Securities Contract ........ 12

2. The Special Dividend Cash Transfer Was Not Made "By, For (or For the Benefit of) … a Financial Institution" ........ 13

IV. Plaintiffs' Claims are Not Barred By The Section 550 "Single Satisfaction Rule" ........ 15

1. Defendants Are Not Entitled to an Offset Against the Special Dividend Cash Transfer Because Money Was Subsequently Paid to the Prepetition RCF Banks ........ 18

2. Fung Holdings is Not Entitled to Credit the Amounts Loaned to GBGH Against the December Shareholder Loan Cash Transfer by GBG USA ........ 19

V. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfandary v. Nikko Asset Mgmt. Co.*,
337 F. Supp. 3d 343 (S.D.N.Y. 2018)....................2, 4, 5

*Calder v. Jones*,
465 U.S. 783 (1984)....................2

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018)....................2, 5

*Deutsche Bank Tr. Co. Ams. v. Large Private Ben. Owners (In re Trib. Co. Fraudulent Conv. Litig.)*,
946 F.3d 66 (2d Cir. 2019)....................10, 11, 14

*Holiday v. BosGen Liquidating Trust* (*In re Boston Generating, LLC*),
No. 21-2543, 2024 WL 4234886 (2d Cir. Sept. 19, 2024) ....................11

*Ingenito v. Riri USA, Inc.*,
89 F. Supp. 3d 462 (E.D.N.Y. 2015) ....................6

*Jazini by Jazini v. Nissan Motor Co.*,
148 F.3d 181 (2d Cir. 1998)....................6

*Kirschner v. Robeco Cap. Growth Funds – Robeco BP US Premium Equities (In re Nine West LBO Sec. Litig)*,
87 F.4th 130 (2d Cir. 2023) ....................11

*Licci v. Lebanese Canadian Bank*,
732 F.3d 161 (2d Cir. 2013)....................1, 2

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
583 U.S. 366 (2018).................... *passim*

*Picard v. Ida Fishman Revocable Tr.* (*In re Bernard L. Madoff Investment Securities LLC*),
773 F.3d 411 (2d Cir. 2014)....................10

*Picard v. J. Ezra Merkin, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*
515 B.R. 117 (Bankr. S.D.N.Y. 2014)....................16

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
654 B.R. 653 (Bankr. S.D.N.Y. 2023), *leave to appeal denied*, 658 B.R. 19 (S.D.N.Y. 2024) ....................13

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
568 B.R. 481 (Bankr. S.D.N.Y. 2017)....17

*United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*,
216 F. Supp. 2d 198 (S.D.N.Y. 2002)....4

*United States Securities and Exchange Commission v. PlexCorps*,
No. 17-cv-7007, 2018 U.S. Dist. LEXIS 156308 (E.D.N.Y. Aug. 9, 2018) ....2

*United States Securities and Exchange Commission v. Sharef*,
924 F. Supp. 2d 539 (S.D.N.Y. 2013)....2

*Walden v. Fiore*,
571 U.S. 277 (2014)....3, 4

*Youseff v. Al Jazeera Media Network*,
No. 16 Civ.-6416, 2018 U.S. Dist. LEXIS 49614 (S.D.N.Y. Mar. 22, 2018) ....6

**Statutes**

11 U.S.C. § 544....9

11 U.S.C. § 545....9

11 U.S.C. § 546(e) .... *passim*

11 U.S.C. § 547....9

11 U.S.C.§ 548(a)(1)(A) ....16

11 U.S.C. § 548(a)(1)(B) ....9

11 U.S.C. § 548(b) ....9

11 U.S.C. § 550....1

11 U.S.C. § 550(d) ....15

## I. INTRODUCTION

Plaintiff Peter Hurwitz, in his capacity as Litigation Trustee of the GBG USA Litigation Trust, by and through the undersigned counsel, hereby submits this Supplemental Brief in Opposition to Defendants' Motion to Dismiss the Amended Complaint (Dkt. No.[2] 56) ("Motion to Dismiss"), which addresses issues raised with the Court during the September 10, 2024 argument on that same motion ("Motion to Dismiss Hearing"). As authorized by the Court, those issues are: (i) whether allegations that Defendants directed and controlled GBG USA's Transfers[3] in the United States are sufficient to confer personal jurisdiction; (ii) the impact of the U.S. Supreme Court's decision in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018) on Defendants' argument that the Special Dividend Cash Transfer is protected by the safe-harbor provisions of 11 U.S.C. § 546(e)); and (iii) the relevance of the *Madoff* Ponzi scheme cases to Defendants' arguments that 11 U.S.C. § 550 precludes Plaintiff from recovering the Transfers. Each is taken in turn.

## II. THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS

At the Motion to Dismiss Hearing, the Court correctly characterized the Amended Complaint ("Complaint" or "Compl.") as alleging that the Transfers "happened at [the Defendants'] direction under their control, wouldn't have happened but for the fact that they gave the instruction." September 10, 2024 Hearing Transcript ("Hearing Tr.") at 20:16-18. The question is whether such allegations[4] are sufficient to establish specific personal jurisdiction over Defendants in connection with the Transfers. The answer is an unequivocal yes.

---

2 References to "Dkt. No. __" refer to docket entries in the above-captioned adversary proceeding.

3 Capitalized terms not defined herein shall have the same meaning as in the Complaint (Dkt. No. 55).

4 On a motion to dismiss for lack of personal jurisdiction, the Court must "construe the pleadings and any supporting materials and the light most favorable to the plaintiffs." *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 167 (2d Cir. 2013).

### A. THE COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS WITH RESPECT TO THE SPECIAL DIVIDEND CASH TRANSFER

#### 1. This Court Has Personal Jurisdiction Over Defendants Pursuant to the "Effects Test"

At the Motion to Dismiss Hearing, the Court asked whether personal jurisdiction would exist over the GBGH shareholder and director defendants based on their alleged direction and control of the Transfers that occurred the United States. Under this scenario, personal jurisdiction may be exercised pursuant to the "effects test," originally articulated by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984). As the Second Circuit has stated:

> The effects test is a theory of personal jurisdiction typically invoked where…the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff. In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum.

*Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 173 (2d Cir. 2013); *see also Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018) (citing *Licci*). While harm to a plaintiff alone will not establish jurisdiction, "where a defendant 'expressly aims his conduct in the United States,' specific personal jurisdiction exists." *Alfandary v. Nikko Asset Mgmt. Co.*, 337 F. Supp. 3d 343, 365 (S.D.N.Y. 2018); *see also United States Securities and Exchange Commission v. Sharef*, 924 F. Supp. 2d 539, 545 (S.D.N.Y. 2013) ("It is well-established that a court may exercise personal jurisdiction over a foreign defendant who causes an affect in the forum by an act committed elsewhere."). "Courts in [the Second] Circuit have upheld personal jurisdiction based on the 'effects test' when (1) a defendant's 'acts caused effects in the United States', (2) the effects 'were the direct and foreseeable result of the actions abroad' and (3) 'the defendant knew or had good reason to know that the actions would have effects in the United States.'" *United States Securities and Exchange Commission v. PlexCorps*, No. 17-cv-7007, 2018 U.S. Dist. LEXIS

156308, *26-27 (E.D.N.Y. Aug. 9, 2018) (quoting *United States Securities and Exchange Commission v. Dunn*, 587 F. Supp. 2d 486, 509 (S.D.N.Y. 2008)). Accordingly, for purposes of Plaintiffs' claims regarding the Special Dividend Cash Transfer, personal jurisdiction exists where (1) the Defendants' actions caused the transfer from the United States, (2) the transfer was the direct and foreseeable result of Defendants' actions, and (3) the Defendants knew (or had good reason to know) that the transfers would occur from the United States.

The Complaint's allegations establish all three elements. As described in detail in Plaintiff's Opposition Brief (Dkt. No. 61-1, "Plaintiff's Opposition Brief" or "P. Opp. Br."), Defendants caused the Special Dividend Cash Transfer through their approval and shaping of the Special Dividend. *See* P. Opp. Br. at 20-23; *see generally* Compl. ¶¶ 2, 20, 21, 27, 61-63, 65, 68, 91-96, 104-110, 154, 174, 203, 265, 269-70, 274-78. Defendants' controlled the Special Dividend and its funding at the GBGH Shareholder level (all Defendants), at the GBGH Board level (William Fung, Bruce Rockowitz, and Fung Holdings) and at the GBGH Special Dividend Committee (William Fung and Rockowitz). *See* P. Opp. Br. at 20-23. Indeed, any argument that William Fung, Rockowitz, and Fung Holdings did not cause the Special Dividend to be funded from the United States is simply not credible, as. William Fung and Rockowitz were GBGH Directors and members of the Special Dividend Committee, and Fung Holdings was represented at every GBGH Board meeting where the Special Dividend was discussed. *Id.* With respect to the remaining elements of the effects test, the Special Dividend Cash Transfer was the direct and foreseeable result of the approval of the Special Dividend, as all Defendants knew or believed that the Special Dividend was being paid with funds from the United States.[5] *Id.* And, for the same

[5] Defendants have argued at all times that the Court's exercise of personal jurisdiction would be improper under *Walden v. Fiore,* 571 U.S. 277 (2014). In *Walden*, Nevada filed suit in Nevada against DEA agents in Georgia who had allegedly conducted an unlawful search and seizure of their property in Georgia, and the only ostensible connection to Nevada was the residence of the plaintiffs. *Id.* at 288. However, as the Court recognized at the Motion

reasons, Defendants knew or had reason to know that the Special Dividend Cash Transfer would occur. *Id.*

On similar facts, courts have concluded personal jurisdiction may exist over the owners and managers of foreign nationals by virtue of their indirect direction and control of activity occurring in the United States. For example, in *Alfandary, supra,* a group of plaintiffs sued three Japanese entities: (i) Nikko Asset Management Co., Ltd. ("Nikko"); (ii) Nikko's majority shareholder, Sumitomo Mitsui Trust Bank, Limited ("SMTB"), which managed Nikko; and (iii) Sumitomo Trust Holdings, Inc. ("SMTH"), which owned 100% of SMTB. *Alfandary*, 337 F. Supp. 3d at 350-51. The plaintiffs alleged that these defendants (and Nikko's CEO) engaged in scheme to defraud them by rendering worthless certain stock acquisition rights ("SARs") that they had received while working for Nikko's U.S. subsidiary, Nikko Asset Management of America, Inc. ("NAMA"). *Id.* at 351-53. The defendants moved to dismiss the complaint on grounds of *forum non conveniens* and lack of personal jurisdiction. *Id.* at 349. With respect to the latter, the Court held that it had personal jurisdiction over SMTB and SMTH for all claims[6] by virtue of their alleged management and control over both Nikko and NAMA from Japan, on the basis of both conspiracy jurisdiction and the "effects test." *Id.* at 364. The court explained that plaintiffs had alleged that "SMTB and SMTH had extensive control over Nikko [and its CEO]," including that

---

to Dismiss hearing, *Walden* is not a fraudulent transfer case. Hearing Tr. at 21:1-5. Here, the tortious conduct (i.e., the transfers) that Defendants are alleged to have caused took place in the United States, rendering *Walden* inapposite. *See, e.g. United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 215-16 (S.D.N.Y. 2002) (in a dispute between a New York plaintiff and Canadian defendants, Canadian law applied to the fraudulent transfer claims because the "the conveyance alleged by [plaintiff] to be fraudulent…took place in Canada.")

[6] In *Alfandary,* the court held that it had personal jurisdiction over all defendants with respect to the claims of two plaintiffs because NAMA had entered into "Separation Agreements" with those plaintiffs "on behalf of Nikko, [Nikko's CEO], SMTB and SMTH." *Alfandary,* 337 F. Supp. 3d at 360.

"SMTB directors on Nikko's board [] were actively involved in approving Nikko's budget and overseeing Nikko's daily operations…." *Id.* With respect to the effects test, the Court concluded:

> The above-described conduct of SMTH and SMTB, including the exercise of operational and managerial control over Nikko and NAMA from Japan, as well as their participation in and support of the fraudulent repurchase scheme, was "expressly aimed" at the United States…..Because the employee stock purchase plans were issued to, and repurchased from, employees in New York, the "effects" of such conduct was to be felt in New York. Under these circumstances, where Defendants are alleged to be primary participants in a fraudulent scheme aimed at New York, specific personal jurisdiction is properly exercised.

*Id.* at 365. *Alfandery* is similar to the scenario presented here, where foreign shareholders and managers of a foreign corporation acting in the United States (through a subsidiary) are subject to personal jurisdiction in the United States by virtue of their control of conduct in the United States.

**2. GBG USA Acted as GBGH's Agent With Respect to the Special Dividend Cash Transfer**

In their Reply Brief in Support of Their Motion to Dismiss (Dkt. No. 64, "D. Reply Br."), Defendants argue that the Court lacks personal jurisdiction over them because Defendants merely authorized GBGH to pay the Special Dividend, and GBGH separately required GBG USA to make the Special Dividend Cash Transfer. *See* D. Reply Br. at 21; *see also* Dkt. No. 57 (Defendants' Memorandum of Law in Support of their Motion to Dismiss or "D. Br.") at 23. Thus, as Defendants tell it, only GBGH had contacts with the United States in connection with the Special Dividend Cash Transfer (by requiring GBG USA to make the transfer). *Id.* When the Court correctly noted that the Complaint alleges that Defendants controlled *both* GBGH and GBG USA, Defendants' counsel stated that under *Schwab*, "you need more than just a parent-subsidiary relationship to impute the contacts of GBGH back to the shareholders. You need *agency,* some disregard of corporate form, that kind of thing, which we do not have here." Hearing Tr. at 24:4-9. Defendants' counsel then conceded that "agency is a viable theory," but reiterated that, in Defendants' view,

"you need an agency relationship that's more than the corporate relationship that's described in this Complaint." *Id.* at 24:11-16.

Defendants ignore, however, that the Complaint's allegations establish that GBG USA did indeed act as GBGH's agent in effectuating the Special Dividend Cash Transfer as a matter of law. In the Second Circuit, a subsidiary is deemed to be the agent of the parent where the subsidiary "does all the business which [the parent corporation] could do were it here by its own officials." *Jazini by Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (citation omitted). Put differently, a U.S. subsidiary acts as the agent of a foreign parent where its services are "sufficiently important to the foreign corporation that its own official would perform those services in the subsidiary's absence." *Youseff v. Al Jazeera Media Network*, No. 16 Civ.-6416, 2018 U.S. Dist. LEXIS 49614, at *23-24 (S.D.N.Y. Mar. 22, 2018) (quoting *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir. 1967)). A plaintiff demonstrates that a subsidiary was doing all the business of the parent by establishing that the subsidiary's "activities were for the benefit of and with the knowledge and consent of the [parent-company] defendant, and that the [parent-company] defendant exercised some control over the subsidiary in the matter that is the subject of the lawsuit." *Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 476 (E.D.N.Y. 2015).

The Complaint's allegations meet this test. <u>First</u>, the Special Dividend Cash Transfer was "for the benefit of" of GBGH, which needed and used the cash to fund the Special Dividend. Compl. ¶¶ 7, 115-120. <u>Second</u>, GBG USA's payment of the Special Dividend Cash Transfer was done with the knowledge and consent of GBGH. *Id.*, ¶¶ 118-119. As one example, GBGH and GBG USA's Chief Financial Officer, Mark Caldwell, was copied on the emails directing Special Dividend Cash Transfer. *Id.* ¶¶ 15, 118-19. <u>Third</u>, GBGH exercised control over GBG USA in making the Special Dividend Cash Transfer, because GBGH caused the transfer to occur in the

first instance. *E.g., id.* ¶ 7. Moreover, at the time of the Special Dividend Cash Transfer, GBGH and GBG USA were controlled by the same set of officers. *Id.* ¶¶ 14-18.

Therefore, under Second Circuit law, GBG USA acted as GBGH's agent with respect to the Special Dividend Cash Transfer, such that GBG USA's actions in the United States can be imputed back to GBGH. Accordingly, when Defendants' directed GBGH to act, they were directing GBGH to act *in the United States* through GBG USA, as all Defendants knew that the Special Dividend would be funded with money from the United States. *See* P. Opp. Br. at 20-23 (citing allegations of the Complaint). The Court can exercise personal jurisdiction over Defendants because GBG USA acted as GBGH's agent.

### B. THE COURT HAS PERSONAL JURISDICTION OVER FUNG HOLDINGS WITH RESPECT TO THE DECEMBER SHAREHOLDER LOAN CASH TRANSFER

At the Motion to Dismiss Hearing, the bulk of the discussion regarding personal jurisdiction related to the Special Dividend Cash Transfer claims (Counts I-VI), which are asserted against all Defendants. However, the Court must separately assess Plaintiffs' claims related to the December Shareholder Loan Cash Transfer (Counts VII-IX), which are asserted only against Fung Holdings. There are multiple reasons for the Court to conclude it has personal jurisdiction over Fung Holdings for the purposes of Plaintiffs' claims related to the December Shareholder Loan Cash Transfer. As set forth in Plaintiff's Opposition to Defendants' Motion to Dismiss and in the materials submitted therewith, Fung Holdings has sufficient minimum contacts in the United States in connection with the December Shareholder Loan Cash Transfer. Those contacts included that Fung Holdings negotiated and entered into the December Shareholder Loan Agreement through communications with and conduct in the United States, and Fung Holdings communicated with GBG USA in the United States in connection with the repayment of the loan. *Id.* at 24-25 (citing Complaint and documents submitted with Opposition Brief).

In addition, personal jurisdiction exists pursuant to the effects test. With their Opposition Brief, Defendants submitted an email demonstrating that Jason Yeung, Fung Holdings' Chief Compliance Officer, communicated with GBG USA regarding the December Shareholder Loan Cash Transfer. Dkt. No. 74-5. The email demonstrates that Fung Holdings was communicating with GBG USA to repay the December Shareholder Loan with money from the United States, that Fung Holdings knew that the consequences of those communications would be felt by GBG USA in the United States, and, of course, that the transfer would affect GBG USA in the United States. Sec. I.A.2. *supra.* Moreover, both Fung Holdings and GBGH were controlled by the Fung family[7], further evidencing that Fung Holdings knew that GBG USA would be repaying GBGH's December Shareholder Loan with funds from GBG USA in the United States. Accepting the Complaint's allegations as true and viewing them in the light most favorable to Plaintiff, the Court has personal jurisdiction over Fung Holdings in connection with the December Shareholder Loan Cash Transfer.

## III. *MERIT MANAGEMENT* FORECLOSES DEFENDANTS' SECTION 546(E) DEFENSE

In their Motion to Dismiss, Defendants argue that Plaintiff's claims relating to the Special Dividend Cash Transfer are subject to Section 546(e)'s 'safe harbor' provision. *See* D. Br. at 39-43; D. Reply Br. at 10-15. More specifically, Defendants argue that the Special Dividend Cash Transfer was either (i) made in connection with a securities contract, or (ii) a settlement payment. *Id.* In both instances, Defendants contend that the March 28-29, 2019 Special Dividend Cash Transfer was sufficiently connected to the October 29, 2018 Centric Sale[8] as to warrant protection.

---

[7] For example, at all relevant times, William Fung was both the Chairman of the GBGH Board of Directors and the Vice Chairman of Fung Holdings. Compl. ¶¶ 20-21.

[8] As set out in the Complaint, the "Centric Sale" refers to the October 29, 2018 sale of GBG USA's North American Licensing Business to Centric Brands. Compl. ¶¶ 58-60, 69-71.

*Id.* During the Motion to Dismiss Hearing, the Court asked counsel for Defendants whether this argument could be squared with the Supreme Court's decision in *Merit Management. See* Hearing Tr. at 39:25-40:17. The answer to the Court's question is "no." *Merit Management* instructs that the connection between the Special Dividend Cash Transfer and the Centric Sale is far too attenuated to warrant protection under Section 546(e).

As the Court is aware, Section 546(e) provides a safe-harbor from claims to avoid transfers pursuant to 11 U.S.C. §§ 544, 545, 547, 548(a)(1)(B), and 548(b) where the transfer is (i) "[a] *settlement payment* … made by or to (or for the benefit of) … a financial institution [or] a financial participant,…" and/or (ii) "made by or to (or for the benefit of) … a financial institution [or] a financial participant, *in connection with a … securities contract*,…" 11 U.S.C. § 546(e) (emphasis added). In its unanimous *Merit Management* decision, the Supreme Court explained that the scope of the Section 546(e) is limited to the transfer that the plaintiff seeks to avoid:

> The language of 11 U.S.C.[] § 546(e), the specific context in which that language is used, and the broader statutory structure all support the conclusion that ***the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions***.

*Merit Management*, 583 U.S. at 378 (emphasis added). The Supreme Court's proclamation was made in the context of an argument that a corporation's acquisition of a competitor's stock was made "by, to or for the benefit of a financial institution" simply because the money and shares flowed through banks. *Id.* The Supreme Court held that the "transfer that the trustee [sought] to avoid" – the acquisition itself – was not subject to the safe harbor simply because components of that transfer were made through financial institutions. *Id.* at 378, 386.

While *Merit Management* is often cited for the proposition that a transfer is not protected by Section 546(e) simply because the transfer includes financial conduits, less attention has been paid to the Supreme Court's ensuing limitation. The Supreme Court continued:

> ***The transfer that the "the trustee may not avoid" is specified to be "a transfer that is" either a "settlement payment" or made "in connection with a securities contract." § 546(e) (emphasis added). Not a transfer that involves. Not a transfer that comprises. But a transfer that is a securities transaction covered under § 546(e).*** The provision explicitly equates the transfer that the trustee may otherwise avoid with the transfer that, under the safe harbor, the trustee may not avoid. In other words, to qualify for protection under the securities safe harbor, § 546(e) [] provides that the otherwise avoidable transfer itself be a transfer that meets the safe-harbor criteria.
>
> * * *
>
> ….the [Bankruptcy] Code "creates both a system for avoiding transfers and a safe harbor from avoidance—logically these are two sides of the same coin." … Given that structure, ***it is only logical to view the pertinent transfer under § 546(e) as the same transfer that the trustee seeks to avoid pursuant to one of its avoiding powers***.

*Id.* at 380–81 (emphasis added). As the Court recognized at the Motion to Dismiss Hearing, this limiting instruction flies in the face of arguments that a transfer subject to an avoidance claim is entitled to Section 546(e) protection if it has *any* connection to a securities contract, no matter how remote. *See* Hearing Tr. at 40:21-41:14

When the Court asked counsel for Defendants' how to square their Section 546(e) argument with *Merit Management*, counsel for Defendants stated that "I square it with the breadth with which the provisions have been read by the Second Circuit before and after." *Id*. at 40:14-20. However, *Merit Management* rejected the expansive interpretation of Section 546(e) pronounced in *Picard v. Ida Fishman Revocable Tr.* (*In re Bernard L. Madoff Investment Securities LLC*), 773 F.3d 411 (2d Cir. 2014) and other cases, which stood for the proposition that Section 546(e) could

be applied to any transfer that was "related to or associated with" a securities contract. 773 F.3d at 421-22.

Post *Merit Management*, the Second Circuit has not critically addressed the Supreme Court's direction that Section 546(e) protects only those transfers that are settlement payments or securities contracts. For instance, in *Deutsche Bank Tr. Co. Ams. v. Large Private Ben. Owners (In re Trib. Co. Fraudulent Conv. Litig.)*, 946 F.3d 66 (2d Cir. 2019) ("*Tribune II*"), the Second Circuit concluded, post *Merit Management*, that the purchases and redemption of Tribune shares which were part of the leveraged buyout and were themselves securities contracts, thereby satisfying Section 546(e)'s requirement that a transfer be the "in connection with a securities contract." *Id.* at 80-81 (without discussion of *Merit Management*). Similarly, in *Kirschner v. Robeco Cap. Growth Funds – Robeco BP US Premium Equities (In re Nine West LBO Sec. Litig)*, 87 F.4th 130 (2d Cir. 2023), the Second Circuit concluded that a merger agreement at issue was itself a securities contract, based on the breadth of the Bankruptcy Code's definition of "securities contract." *Id.* at 149-50 (without discussion of *Merit Management*). Most recently, the Second Circuit issued a *per curiam* opinion in *Holiday v. BosGen Liquidating Trust* (*In re Boston Generating, LLC*), No. 21-2543, 2024 WL 4234886 (2d Cir. Sept. 19, 2024) that neither addressed nor contradicted *Merit Management*. As such, there is no post-*Merit Management* Second Circuit decision that supports reading Section 546(e) with the breadth that Defendants demand.

### 1. The Special Dividend Cash Transfer Was Neither a Settlement Payment Nor Made "In Connection With" a Securities Contract

Defendants argue that the "Special Dividend Cash Transfer" between Debtor GBG USA and GBGH was made "in connection with a securities contract" and/or was a "settlement payment." D. Br. at 40; D. Reply Br. at 12.

*Merit Management* instructs that the starting point for the Court's analysis is the Special Dividend Cash Transfer itself. As the Supreme Court put it, that transfer must be either a settlement payment or in connection with a securities contract: *"not a transfer that involves. Not a transfer that comprises. But a transfer that is a securities transaction covered under § 546(e).*" *Merit Management*, 583 U.S. at 380 (emphasis added). This quickly disposes of Defendants' argument that the Special Dividend Cash Transfer was a "settlement payment," defined as a "transfer of cash or securities meant to complete a securities transaction." *See* D. Br. at 42 (citing cases); *see also* P. Opp. Br. at 42. Here, the only "securities transaction" that the Defendants can identify is the October 29, 2018 Centric Sale between GBG USA and Centric Brands (*see* P. Opp. Br. at 42), which was completed nearly five months before the March 28-29, 2019 Special Dividend Cash Transfer between GBG USA and GBGH. *See* Compl. ¶¶ 70, 118-120. The Special Dividend Cash Transfer did not "complete" the Centric Sale in any way.

This leaves Defendants' argument that the Special Dividend Cash Transfer was made "in connection with a securities contract." P. Opp. Br. at 41-42; D. Reply Br. at 11-12. Relying primarily on *Picard, supra,* Defendants argue that the Special Dividend Cash Transfer was "in connection with" the Centric Sale because it was "in some way 'related to or associated with [that] securities contract.'" P. Opp. Br. at 40.[9] But, as noted above, this expansive view of Section 546(e)

---

[9] *See also* D. Reply Br. at 12 (citing *Picard* for the proposition that Special Dividend Cash Transfer was made "in connection with" a securities contract because it was "broadly related to" and/or "associated with" the Centric Sale).

was rejected in *Merit Management.* To qualify for Section 546(e) protection, the Special Dividend Cash Transfer must itself be a securities transaction, not a transaction that "involves" or "comprises" such a transaction. *Merit Mgmt.,* 546 U.S. at 380.

Simply put, under *Merit Management*, the Special Dividend Cash Transfer cannot be said to be "in connection with" a securities contract because it was *not* a securities contract, full stop. *Id.* Moreover, the relationship between the Special Dividend Cash Transfer and Centric Sale is hopelessly remote because, among other things, (i) the Centric Sale closed on October 29, 2018, with all right, title and equity in GBG USA's licensing business passing to Centric Brands (Compl. ¶ 70), (ii) the proceeds of the Centric Sale were entirely used by GBG USA to pay off its then outstanding Syndicated Credit Facility (*id.* ¶ 71), (iii) the Centric Sale agreement did not reference (much less require) payment of a Special Dividend, after closing (*id.* ¶ 60), and (iv) no GBGH shareholder resolution required payment of a Special Dividend following the Centric Sale (*id.* ¶ 69); *see also* P. Opp. Br. at 41-42. On these facts, *Merit Management* does not permit Defendants to rewrite Section 546(e) to bring the Special Dividend Cash Transfer within its scope.

Finally, the fact that the Trustee seeks to recover the proceeds of the Special Dividend Cash Transfer from Defendants as subsequent transferees is irrelevant to the application of Section 546(e). *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 654 B.R. 653, 675 (Bankr. S.D.N.Y. 2023), *leave to appeal denied*, 658 B.R. 19 (S.D.N.Y. 2024) ("The safe harbor is not applicable to subsequent transfers. 'By its terms, the safe harbor is a defense to the avoidance of the initial transfer'") (quoting *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018)).

### 2. The Special Dividend Cash Transfer Was Not Made "By, For (or For the Benefit of) … a Financial Institution"

The Special Dividend Cash Transfer also fails to qualify for the Section 546(e) safe harbor

because it was not made "by, to (or for the benefit of)…a financial institution." Briefly, Defendants argue that the Special Dividend Cash Transfer includes a qualifying institution because GBG USA transferred its money from an account at Citibank. D. Br. at 43-47; D. Reply Br. at 14-16. As a result, in their Motion to Dismiss papers, the Parties focused on whether the relationship between GBG USA and Citibank (as alleged in the Complaint) was sufficient to render Citibank a qualifying financial institution for purposes of Section 546(e). *See* P. Opp. Br. at 45-47. Here, because GBG USA's funds are alleged to have been transmitted from its ordinary debtor/creditor account at Citibank (Compl. ¶¶ 118-19), Citibank does not meet the "qualifying institution" threshold.

*Merit Management* provides additional grounds for concluding that the Special Dividend Cash Transfer was not "by, for (or for the benefit of")" a qualifying institution. As the Second Circuit has observed, the Supreme Court clarified in *Merit Management* that Section 546(e) does "not protect transfers in which financial institutions serve[] as mere conduits." *Tribune II*, 946 F.3d at 77. The Supreme Court framed the issue as follows:

> Specifically, this Court is asked to determine how the safe harbor operates in the context of a transfer that was executed via one or more transactions, *e.g.,* a transfer from A → D that was executed via B and C as intermediaries, such that the component parts of the transfer include A → B → C → D. If a trustee seeks to avoid the A → D transfer, and the § 546(e) safe harbor is invoked as a defense, the question becomes: When determining whether the § 546(e) securities safe harbor saves the transfer from avoidance, should courts look to the transfer that the trustee seeks to avoid (*i.e.,* A → D) to determine whether that transfer meets the safe-harbor criteria, or should courts look also to any component parts of the overarching transfer (*i.e.,* A → B → C → D)? The Court concludes that the plain meaning of § 546(e) dictates that the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid.

*Merit Mgmt.*, 583 U.S. at 369–70. As explained above, *Merit Management* concerned a corporate acquisition that was accomplished by, among other things, the buyer arranging for Credit Suisse

to provide $55 million in financing, and wiring that $55 million to Citizens Bank of Pennsylvania. *Id.* at 375-76. Looking only at the transfer to be avoided (buyer→seller), the Supreme Court held that the involvement of these financial intermediaries did not render the transfer "by, to (or for the benefit of)" a financial institution. *Id.* at 377. So too here.

Here, the Special Dividend Cash Transfer was made from ("A") GBG USA ***to*** ("B") a Citibank account ***to*** ("C") an HSBC account ***to*** ("D") GBGH.[10] *See* Compl. ¶¶ 118, 119. It is undisputed that neither GBG USA nor GBGH are financial institutions. As in *Merit Management,* Plaintiff seeks to avoid the overarching (A→D) transfer, such that the involvement of (B) Citibank and (C) HSBC is irrelevant for purposes of Section 546(e). This is another reason that the defense fails.

## IV. PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE SECTION 550 "SINGLE SATISFACTION RULE"

On their Motion to Dismiss, Defendants contend that all of Plaintiffs' claims are barred by 11 U.S.C. § 550(d)'s "single satisfaction rule" on the grounds that GBG USA recovered the value of both Transfers prior to the Petition Date. *See* D. Br. at 29-33; D. Reply Br. at 5-10. With respect to the Special Dividend Cash Transfer, Defendants argue that GBG USA recovered its value because subsequent to the Special Dividend Cash Transfer, GBGH and Fung Holdings paid down debt owed by both GBG USA and GBGH to the RCF Banks. D. Br. at 29-32; D. Reply Br. at 5-9. With respect to the December Shareholder Loan Cash Transfer, Defendants argue that Fung Holdings is entitled to a credit for the amount it loaned to GBGH months before the December

[10] Were the Court to adopt Defendants' expansionist view of an "overarching transfer" from the Centric Sale through the Special Dividend, it would appear roughly as follows: (A) Centric Brands ***to*** (B) Centric Brands bank account ***to*** (C) GBG USA bank account ***to*** (D) GBG USA ***to*** (E) Syndicated Credit Facility banks; ***then followed by*** Newly borrowed funds from (F) Prepetition RCF Banks ***to*** (G) GBG USA ***to*** (H) Citibank ***to*** (I) HSBC ***to*** (J) GBGH ***to*** (K) GBGH Shareholders. Notably, this chain of events occurs over a period of five months and includes a complete break in the transfer of funds -- *i.e.*, the funds paid by GBG USA to the Syndicated Credit Facility Banks in October 2018 were not involved in any of the subsequent transfers.

Shareholder Loan Cash Transfer, such that GBG USA's repayment of GBGH's loan obligation was a "wash transaction." D. Br. at 33-34; D. Reply Br. at 9-10.

At the Motion to Dismiss Hearing, the Court questioned Defendants' counsel as to whether these Section 550(d) defenses were consistent with a line of *Madoff* cases concerning feeder funds, where the bankruptcy trustee sought to avoid transfers irrespective of whether the funds had subsequently reinvested amounts equivalent to the withdrawals. As the Court stated:

> [L]et me ask you a few questions about that. In the *Madoff* cases, there have been scores of feeder funds that did transactions with Madoff where they would withdraw $10 million one day, pay $20 million the next day, withdraw $10 million again. And the *Madoff* trustee sued them all for all of their withdrawals with no credits for the subsequent reinvestments of cash, taking the position that it wasn't necessarily the same cash…And my understanding is those claims were all allowed. So you talk about this as though it's a settled rule of law that you kind of get to offset for anything you put back, but that's not the way it's been done in the *Madoff* cases, is it?

Hearing Tr. at 28:8-21. The Court (prior to assuming judicial duties) raised a similar hypothetical in a 2011 Law 360 article titled "*Ponzi Schemes and Avoidance Actions: 3 Issues*." There, the Court asked the reader to assume that a fund investing in the Madoff Ponzi scheme made a series of investments totaling $140 million and withdrawals totaling $50 million, resulting in a net investment of $90 million. However, following the collapse of the Madoff scheme, a bankruptcy trustee subsequently sued to recover the $50 million in withdrawals. The Court asked "[d]oes this make sense?"

Despite his diligence, Plaintiff has been unable to identify any reported *Madoff* opinion squarely addressing the merits of the Court's hypothetical.[11] Nonetheless, Plaintiff submits that

---

[11] To the extent Defendants have identified such cases, Plaintiff reserves the right to request leave from the Court to file an additional submission to address those cases.

With respect to "feeder funds" referenced at oral argument (Hearing Tr. at 28:8-18), Plaintiff does not believe that *Picard v. J. Ezra Merkin, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*515 B.R. 117 (Bankr. S.D.N.Y. 2014) is on point. That case involves constructive fraudulent transfer claims as well as state law actual fraudulent transfer

the Court need not struggle with the issue because the facts of this case are entirely different. In the Court's hypothetical, there are a series of dollar for dollar exchanges between a transferor and a transferee, resulting in net gain or loss to the transferee. Here, however, there is no allegation in the Complaint that transferor GBG USA received any money from the transferee Defendants or GBGH after the Transfers. *See* P. Opp. Br. at 27-28. Thus, there is no true "offset." Defendants instead seek credit for amounts that they (or GBGH) paid to *third parties*, on the grounds that those third-party payments provided a benefit to GBG USA.

As the Court correctly observed at the Motion to Dismiss hearing, there is no settled law that supports Defendants' position. *See* Hearing Tr. at 28:18-21. The "single satisfaction rule" of Section 550(d) is meant to limit a plaintiff who sues multiple transferees from recovering amounts in excess of the avoided transfer. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 489 (Bankr. S.D.N.Y. 2017). In their Motion to Dismiss papers, Defendants have not cited a single case concluding that Section 550(d) precludes a plaintiff from recovering an avoided transfer because the transferee has made payments to third parties that purportedly benefit the transferor. *See* P. Opp. Br. at 26-33. At best, Defendants have identified a handful of cases in which Section 550(d) was invoked where the transferee returned the transfer (or its value) to the transferor prior to the petition date. *Id.* The other few cases Defendants cite rely on the Court's invocation of equitable powers, which is inappropriate at this stage. *Id.* Further, as demonstrated below, Defendants are not entitled to "offset" their third-party payments against the Transfers, because GBG USA was harmed by the Transfers irrespective of those payments to GBGH.

claims that were subject to Section 546(e), as well as actual fraudulent transfer claims under 11 U.S.C.§ 548(a)(1)(A). Judge Bernstein addressed Section 548(c), holding while there is no Section 548(c) defense available for "net profits" because there is no value exchanged in profiting from a Ponzi scheme, Section 548(c) could apply to the recovery of principal because there is an exchange of value. But none of that lines up with our facts here because at issue are dividend payments without good faith, and the subsequent transfers of money referenced by Defendants are to GBGH (GBG USA's parent company) after being threatened with a lawsuit.

### 1. Defendants Are Not Entitled to an Offset Against the Special Dividend Cash Transfer Because Money Was Subsequently Paid to the Prepetition RCF Banks

With respect to the Special Dividend Cash Transfer, Defendants argue that Plaintiffs' cannot recover the transfer because "value" equivalent to the Special Dividend Cash Transfer was subsequently returned to GBG USA in the form of GBGH and Fung Holdings' repayment of debt. D. Br. at 31-32. Briefly, the relevant facts are as follows. On March 28-29, 2019, Defendants caused GBG USA to make the $196 million Special Dividend Cash Transfer to GBGH. Compl. ¶¶ 118-120. The RCF Banks subsequently learned that GBG USA had made the Special Dividend Cash Transfer, and prepared to sue GBGH for default under the Credit Agreement. *Id.*, ¶¶ 142-43; Dkt. No. 74-6. To stave off being sued by the RCF Banks *and* to permit payment of the Special Dividend, Defendants caused GBG USA and GBGH to enter into a "Waiver to Credit Agreement" with the RCF Banks that, in substance, provided that GBGH and Fung Holdings would pay down amounts owed on the Prepetition RCF facility subsequent to the payment of the Special Dividend. Compl. ¶¶ 152-55. GBGH and Fung Holdings subsequently made those payments such that the debt owed under the $375 million Prepetition RCF was permanently reduced to just under $175 million by the end of May 2019. *Id.* ¶¶ 177-82; Dkt. No. 58-6 (Waiver to Credit Agreement) § 1.2.1.

Thus, subsequent to the Special Dividend Cash Transfer, neither GBGH nor any of the Defendants ever paid any amount of money back to GBG USA. **Accordingly, unlike the Court's *Madoff* hypothetical, there is no amount to "offset" against that $196 million transfer. Simply put, Defendants did not reinvest anything in GBG USA.**

Defendants' nonetheless argue that – as a matter of law – they are entitled to offset amounts paid to the third-party banks against the $196 million Special Dividend Cash Transfer. D. Br. at 29-32; D. Reply Br. at 5-9. This argument fails, because the transfer of $196 million to the RCF

Banks was not equivalent to paying $196 million to GBG USA. As part of the Waiver to Credit Agreement, the RCF Banks required not only that Prepetition RCF debt be repaid, but also that the $375 million Prepetition RCF facility be permanently reduced to under $175 million. That permanent reduction resulted in GBG USA losing access to $200 million in capital which could have otherwise been used to fund operations and/or address liquidity issues. Unlike the *Madoff* hypothetical, GBG USA never received a dollar for dollar exchange in value. Further, Defendants ignore that GBGH and Fung Holdings were also liable on the debt to the RCF Banks (by virtue of the guarantee of Prepetition RCF and the Waiver to Credit Agreement) such that the payments to the RCF Banks were really for GBGH / Fung Holdings benefit.

### 2. Fung Holdings is Not Entitled to Credit the Amounts Loaned to GBGH Against the December Shareholder Loan Cash Transfer by GBG USA

With respect to the December Shareholder Loan Cash Transfer, the issue is not setoff. Rather, Fung Holdings argues that it is entitled to credit the amounts it loaned to GBGH against the December Shareholder Loan Cash Transfer (which Fung Holding accepted in satisfaction of the amounts loaned under the GBGH loan). *See* D. Br. at 34-35; D. Reply Br. at 9-10. More specifically, Fung Holdings contends that because GBGH freely provided GBG USA with the proceeds of the December Shareholder Loan, GBG USA's repayment of GBGH's December Shareholder Loan was a "wash" transaction. *Id.*

Defendants' arguments fail on the facts and law. On the facts, GBG USA's re-payment of the December Shareholder Loan to Fung Holdings did not create a "wash" transaction for the simple reason that only GBGH had an obligation to repay the loan while GBG USA had no such obligation. GBGH provided the December Shareholder Loan proceeds to GBG USA free and clear of any obligation to repay those amounts to either GBGH or Fung Holdings. *See* Compl. ¶¶ 10, 103. Thus, far from being a "wash" transaction, requiring GBG USA to repay the December

Shareholder Loan resulted in a net reduction of GBG USA's assets. On the law, Defendants have cited only to a handful of cases where the facts presented involved a series of regular, repeated transfers among related entities that the Court's characterized as a "wash." But none of those cases have any relevance to the facts presented in this case. *See* P. Opp. Br. at 30-33.

In sum, the Court's hypothetical questions spurred by claims made in the *Madoff* cases (which involved transfers in Ponzi schemes) bear no resemblance to the facts presented in this case. Defendants did not "reinvest" anything in GBG USA, and are not entitled to "offset" amounts paid to third parties against the transfers they received from GBG USA.

## V. CONCLUSION

For the foregoing reasons, and those previously stated in their opposition brief, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss the Amended Complaint.

Dated: October 21, 2024

**GRANT & EISENHOFER P.A.**

*/s/ Gordon Z. Novod*
Gordon Z. Novod
Thomas Walsh
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
Email: gnovod@gelaw.com
twalsh@gelaw.com

and

Frank H. Griffin (admitted *pro hac vice*)
123 Justison Street
Wilmington, Delaware 19801
Tel: 302-622-7000
Email: fgriffin@gelaw.com

*Special Counsel for Plaintiff, Peter Hurwitz, as Trustee of the GBG USA Litigation Trust*