**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>GBG USA Inc., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 21-11369 (MEW)<br><br>Jointly Administered |
| PETER HURWITZ, AS LITIGATION TRUSTEE OF THE GBG USA LITIGATION TRUST,<br><br>Plaintiff,<br>v.<br><br>FUNG HOLDINGS (1937) LIMITED, FUNG DISTRIBUTION INTERNATIONAL LIMITED, STEP DRAGON ENTERPRISE LIMITED, GOLDEN STEP LIMITED, WILLIAM FUNG KWOK LUN, KING LUN HOLDINGS LIMITED, FIRST ISLAND DEVELOPMENTS LIMITED, VICTOR FUNG KWOK KING, SPENCER THEODORE FUNG, BRUCE PHILIP ROCKOWITZ, AND HURRICANE MILLENNIUM HOLDINGS LIMITED,<br><br>Defendants. | Adv. Pro. No. 23-01022 (MEW) |

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT**

[1] The debtors in these chapter 11 cases (the "**Debtors**") and the last four digits of each debtor's federal taxpayer identification number are as follows: GBG USA Inc. (2467), Jimlar Corporation (8380), GBG North America Holdings Co., Inc. (5576), Homestead International Group Ltd. (0549), IDS USA Inc. (7194), MESH LLC (8424), Frye Retail, LLC (1352), Krasnow Enterprises, Inc. (0122), Krasnow Enterprises Ltd. (0001), Pacific Alliance USA, Inc. (0435), GBG Spyder USA LLC (9108), and GBG Sean John LLC (1287). The Debtors' mailing address was GBG USA Inc., P.O. Box 4965, Greensboro, NC 27404.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

ARGUMENT ..... 3

- I. Plaintiff's Claims To Avoid the Special Dividend Cash Trasnfer Are Barred By Section 546(e)'s Safe Harbor. ..... 3
- II. Plaintiff Cannot Recover the Special Dividend Cash Transfer Because its Entire Value (and More) Was Returned to GBG USA. ..... 8
- III. The Court Has No Personal Jurisdiction Over Defendants. ..... 12
  - A. Plaintiff Has Not Alleged that Defendants Controlled GBG USA's Payment of the Special Dividend Cash Transfer or Expressly Aimed Their Conduct at the USA. ..... 13
    - 1. There Is No Allegation that Defendants Controlled GBG USA's Payment of the Special Dividend Cash Transfer or Expressly Aimed Their Conduct at the US. ..... 13
    - 2. Plaintiff Has Not Alleged Facts that Would Justify Imputing any of GBGH's Jurisdictional Contacts to Defendants. ..... 16
  - B. Plaintiff Has Not Alleged that Fung Holdings Controlled GBG USA's Repayment of the December Shareholder Loan or Expressly Aimed any Conduct at the USA. ..... 20

CONCLUSION ..... 21

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
122 F.3d 130 (2d Cir. 1997)....................19

*AMPA Ltd. v. Kentfield Capital LLC*,
2001 U.S. Dist. LEXIS 2027 (S.D.N.Y. Feb. 27, 2001)....................18

*Anwar v. Dow Chem. Co.*,
876 F3d 841 (6th Cir. 2017)....................19

*In re Basset*,
221 B.R. 49 (D. Conn. 1998)....................12

*In re Best Prods Co., Inc.*,
168 B.R. 35 (Bankr. S.D.N.Y. 1994)....................12

*In re BLMIS*,
499 B.R. 416 (S.D.N.Y. Oct. 15, 2013)....................10

*In re Boston Generating, LLC*,
2024 U.S. App. LEXIS 23800 (2d Cir. Sept. 19, 2024).................... *passim*

*In re Boston Generating LLC*,
617 B.R. 442 (Bankr. S.D.N.Y. 2020)....................4, 7

*In re Centennial Textiles*,
220 B.R. 165 (Bankr. S.D.N.Y. 1998)....................12

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018).................... *passim*

*In re DeBerry*,
945 F.3d 943 (5th Cir. 2019)....................9

*Dep't of Econ. Dev. v. Arthur Andersen & Co.*,
747 F. Supp. 922 (S.D.N.Y. 1990)....................18

*Enron Cred. Recov. Corp. v. Alfa, S.A.B. de D.V.*,
651 F.3d 329 (2d Cir. 2011)....................5

*Gallelli v Crown Imports, LLC*,
701 F. Supp.2d 263 (E.D.N.Y. 2010)....................17

*Gater Assets Ltd. v. AO Moldovagaz*,
2 F.4th 42 (2d Cir. 2021)....................16

*Giuliano v. Barch*,
2017 WL 1234042 (S.D.N.Y. Mar. 31, 2017) ....................16

*Grove Press Inc. v. Angleton*,
649 F.2d 121 (2d Cir. 2018)....................18

*Hau Yen To v. HSBC Holdings PLC*,
700 F. App'x 66 (2d Cir. 2017) ....................17

*Holliday v. Credit Suisse Sec. (USA) LLC*,
2021 U.S. Dist. LEXIS 173359 (S.D.N.Y. Sept. 13, 2021)....................6, 7, 8

*Karabu Corp. v. Gitner*,
16 F. Supp. 2d 319 (S.D.N.Y. 1998)....................17, 18

*In re Lehman Bros. Holdings, Inc.*,
369 B.R. 415 (Bankr. S.D.N.Y. 2012)....................4

*In re Lyondell Chem. Co.*,
543 B.R. 127 (Bankr. S.D.N.Y. 2017)....................19, 20

*Merit Management v. FTI Consulting Inc.*,
583 U.S. 366 (2018).................... *passim*

*In re Nine W. LBO Sec. Litig.*,
482 F. Supp. 3d 187 (S.D.N.Y. 2020)....................4

*In re Nine W. LBO Sec. Litig.*,
87 F.4th 130 (2d Cir. 2023) ....................6

*In re Patts*,
470 B.R. 234 (Bankr. D. Mass 2012) ....................12

*Petr v. BMO Harris Bank N.A.*,
95 F.4th 1090 (7th Cir. 2024) ....................4

*Picard v. BNP Paribas S.A. et al.*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018)....................9

*Picard v. Citibank, N.A.*,
2022 WL 4493234 (Bankr. S.D.N.Y. Sept. 27, 2022)....................10

*Picard v. Ida Fishman Revocable Trust*,
773 F.3d 411 (2d Cir. 2014)....................3, 4, 5, 6

*Picard v. Lustig*,
2017 Bankr. LEXIS 4145 (Bankr. S.D.N.Y. Dec. 6, 2017)....................10

*Picard v. The Lustig Family Trust*,
568 B.R. 481 (Bankr. S.D.N.Y. 2017) ........................................................................10, 11

*Picard v. Merkin et al.*,
515 B.R. 117 (Bankr. S.D.N.Y. 2014) ..............................................................................11

*Picard v. Sage*,
654 B.R. 59 (Bankr. S.D.N.Y. 2023) ...................................................................................9

*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023) ...................................................................................... 19-20

*In re Polichuk*,
506 B.R. 405 (Bankr. E.D. Pa. 2014) ...............................................................................12

*Shostack v. Diller*,
2015 WL 5535808 (S.D.N.Y. Sept. 16, 2015)...................................................................18

*In re SunEdison Inc.*,
620 B.R. 505 (Bankr. S.D.N.Y. 2020) ..................................................................................7

*In re Tops Holding II Corp.*,
646 B.R. 617 (Bankr. S.D.N.Y. 2022) ...........................................................................2, 4, 7

*In re Tribune Fraudulent Conveyance Litig.*,
946 F.3d 66 (2d Cir. 2019)................................................................................................ 6-7

*Walden v. Fiore*,
571 U.S. 277 (2014)..........................................................................................................14

*Waldman v. PLO*,
835 F.3d 317 (2d Cir. 2016)...............................................................................................14

*Wilder v. News Corp.*,
2015 U.S. Dist. LEXIS 137158 (S.D.N.Y. Oct. 7, 2015) ...........................................14, 16

*William Wrigley Jr. Co. v. Waters*,
890 F.2d 594 (2d Cir. 1989)...............................................................................................19

**STATUTES**

11 U.S.C. § 546(e) ........................................................................................................ *passim*

11 U.S.C. § 548(c) ............................................................................................................11

11 U.S.C. § 550(a) ...................................................................................................1, 2, 9, 12

11 U.S.C. § 550(d) ...................................................................................................1, 2, 9, 12

15 U.S.C. § 78fff-2(c)(1)(B) .......... 10

Securities Investor Protection Act of 1979 .......... 9, 10, 12

**OTHER AUTHORITIES**

*Connection*, WEBSTER'S 3D NEW INT'L DICTIONARY 481 (1993) .......... 5

Fed. R. Bankr. P. 7012 .......... 1

Fed. R. Civ. P. 12(b)(2) .......... 1, 20

Fed. R. Civ. P. 12(b)(6) .......... 1

GBG 2019 Annual Report (June 26, 2019) .......... 14

Motion to Withdraw the Reference, *Picard v. HSBC Bank PLC et al.*, Adv. Pro. No. 09-1364 (Bankr. S.D.N.Y. Apr. 2, 2012) (Dkt. No. 201) .......... 9, 11

Pursuant to Fed. R. Civ. P. 12(b)(2) & (6) and Fed. R. Bankr. P. 7012, Defendants respectfully submit this Supplemental Brief In Further Support of their Motion (the "**Motion**," (Adv. Pro. Dkt. No. 56)) To Dismiss Plaintiff's First Amended Complaint (the "**Complaint**" or "**Compl.**," (Adv. Pro. Dkt. No. 55)).[2]

## PRELIMINARY STATEMENT

At the September 10, 2024 hearing (the "**Hearing**") on Defendants' Motion, and in the days after, this Court authorized the parties to submit supplemental briefs on the following issues:

1. How, if at all, does the Supreme Court's decision in *Merit Management v. FTI Consulting Inc.*, 583 U.S. 366 (2018) impact whether Plaintiff's attempt to avoid the Special Dividend Cash Transfer is barred by section 546(e) of the Bankruptcy Code.
2. How, if at all, does the *In re Bernard L. Madoff Investment Securities, LLC* line of cases impact Defendants' arguments that Fung Holdings' replenishment of the entire Special Dividend Cash Transfer (and more) to pay down GBG USA's prepetition debt (a) prevents Plaintiff from stating a claim to "recover" this Transfer pursuant to section 550(a) of the Bankruptcy Code and (b) bars Plaintiff's attempt to "recover" this Transfer pursuant to the "single satisfaction" rule in section 550(d) of the Bankruptcy Code.
3. Whether Plaintiff alleged a prima facie case of jurisdiction by alleging that Defendants used their purported control over GBGH to require GBG USA to make the Special Dividend Cash Transfer, or repay the December Shareholder Loan, even if this alleged control was exercised exclusively through actions outside the USA.

Each of these issues strongly favors—and, in the case of the first issue, compels—dismissal of the Complaint.

*First*, the Second Circuit Court of Appeals, just days after the Hearing, interpreted *Merit* to require dismissal of avoidance claims in circumstances that closely mirror those that Plaintiff alleges here. *See In re Bos. Generating, LLC*, 2024 U.S. App. LEXIS 23800 (2d Cir. Sept. 19,

[2] References to an "Adv. Pro. Dkt. No." and "Ch. 11 Dkt. No." are, respectively, to the ECF numbers in the Adversary Proceeding and Chapter 11 Case. Capitalized terms not defined herein have the meaning ascribed to them in Defendants' Memorandum of Law In Support of Their Motion (the "**Memorandum**" or "**Mem**.," (Adv. Pro. Dkt. No. 57)). References to an "Opp." and "Reply" are, respectively, to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion To Dismiss (Adv. Pro. Dkt. No. 74) and Defendants' Reply Memorandum of Law In Further Support of Their Motion To Dismiss (Adv. Pro. Dkt. No. 64).

2024). In doing so, the Second Circuit necessarily rejected the contrary interpretation of *Merit* in *In re Tops Holding II Corp.* and affirmed that *Merit* does not limit the broad wording of section 546(e), or the Second Circuit's pre-*Merit* interpretation of the safe harbor, which is broad enough to cover—and preclude the Plaintiff from avoiding—the Special Dividend Cash Transfer.

*Second*, Defendants have not found any authority related to the liquidation of Bernard L. Madoff Investment Securities, LLC ("**BLMIS**") that addresses whether a trustee can state a claim to "recover" a transfer pursuant to section 550(a) of the Bankruptcy Code when the transfer, or the value thereof, has already been returned to a debtor. However, the court-approved "Net Investment Method"—which the trustee (the "**Madoff Trustee**") overseeing BLMIS' liquidation used to calculate the amount that could be recovered from BLMIS' transferees (assuming their good faith)—required the Madoff Trustee to reduce the withdrawals he sought to recover by the value of any deposits (or reinvestments) that BLMIS' customers made. In certain circumstances, the Madoff Trustee sought to recover all withdrawals that certain customers made from BLMIS over the life of their account, without any credit for deposits, if these customers allegedly lacked good faith when receiving withdrawals. However, when these customers settled with the Madoff Trustee, the Trustee agreed that these customers could assert claims to recover not only the deposits they made with BLMIS (net of withdrawals), but also to recover the funds that these customers paid to settle the Trustee's avoidance claims. In other words, upon settlement, the Trustee still gave these defendants "credit" for their reinvestments in BLMIS. Which is consistent with the overwhelming body of law holding that, if transferred property (or its value) is returned to the debtor, section 550(d)'s "single satisfaction" rule bars a trustee from seeking to "recover" it again.

*Third*, Plaintiff does not allege that any Defendants controlled GBG USA's payment of the Special Dividend Cash Transfer from the USA, or aimed any of its own conduct at the USA. At

most, Plaintiff alleges (in conclusory fashion) that "GBGH" controlled this Transfer. And even if this adequately alleged personal jurisdiction over GBGH, that would still not provide a basis for jurisdiction over Defendants because Plaintiff fails to allege facts that would allow the Court to impute GBGH's jurisdictional contacts to any Defendant. Nor does Plaintiff allege that Fung Holdings controlled GBG USA's repayment of the December Shareholder Loan, or expressly aimed any conduct at the USA. Thus, Plaintiff fails to allege jurisdiction over any Defendant.

For these reasons, and those stated in Defendants' prior briefing, the Complaint fails to state any viable claim for relief and, based on the allegations Plaintiff is constrained to make, cannot be fixed. It should be dismissed in full and with prejudice.

## ARGUMENT

### I. PLAINTIFF'S CLAIMS TO AVOID THE SPECIAL DIVIDEND CASH TRANSFER ARE BARRED BY SECTION 546(e)'s SAFE HARBOR.

Plaintiff's own allegations show that the Special Dividend Cash Transfer falls within the scope of section 546(e)'s safe harbor, and therefore Plaintiff "may not avoid" it. 11 U.S.C. § 546(e); Mem. 39-47; Reply 10-16. *Inter alia*, this Transfer was intended to, and did, fund the Special Dividend that GBGH sent to certain of its shareholders[3] to distribute the value of the equity stake (of which GBGH shareholders were the ultimate beneficial owners) that GBG USA disposed of pursuant to the PSA, which is a securities contract. Mem. 7-9, 13. Thus, the Special Dividend Cash Transfer was both a "settlement payment" and a transfer made "in connection with a securities contract." 11 U.S.C. § 546(e); Mem. 39-43; Reply 10-14.

At the Hearing, the Court asked whether the "low bar," *Picard v. Ida Fishman Revocable Trust*, 773 F.3d 411, 420-21 (2d Cir. 2014), set by the Second Circuit for satisfying section 546(e)'s

---

[3] Certain of GBGH's shareholders, including the "Controlling Shareholder" Defendants, decided approximately three months before GBG USA made the Special Dividend Cash Transfer not to receive any cash from the Special Dividend. *See* Compl. ¶¶ 105-08; *contra* Hearing Tr. at 31:6-8.

"in connection with" requirement and the Second Circuit's "capacious interpretation," *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 199 (S.D.N.Y. 2020), of the term "settlement payment" in section 546(e) continue to apply in light of the Supreme Court's decision in *Merit Management v. FTI Consulting Group*, 583 U.S. 366 (2018). Hearing Tr. at 39:12-41:18.[4]

They do. When the Hearing occurred, courts in this District differed about whether *Merit* required a transfer that was a component part of a larger securities transaction to be viewed in isolation when applying section 546(e)'s criteria, or whether these criteria should be evaluated with reference to the larger securities transaction of which the transfer was a component part. *Compare In re Bos. Generating LLC*, 617 B.R. 442, 491-92 (Bankr. S.D.N.Y. 2020) (*Merit* required the court to evaluate whether a challenged transfer was safe harbored in light of the overall transaction of which it was a part) *with In re Tops Holding II Corp.*, 646 B.R. 617, 685-86 (Bankr. S.D.N.Y. 2022) (finding *Merit* required the opposite approach). However, after the Hearing, and as explained below, the Second Circuit resolved this split by affirming not only that the Second Circuit's broad interpretation of section 546(e) continues to apply after *Merit*, but also that *Merit* required these broad standards to be applied in light of the broader context of an overarching, integrated transaction. *See Bos. Generating*, 2024 U.S. App. LEXIS 23800. This not only dictates the outcome here, it is also consistent with *Merit* and the Second Circuit precedent that *Merit* did not disturb, as shown below.

In particular, and before *Merit*, the Second Circuit relied on the plain language of section 546(e) to hold that, for a transfer to be made "in connection with" a securities contract, it need only be "'related to' or 'associated with' [a] securities contract." *Fishman*, 773 F.3d at 421 (quoting

---

[4] The Court also asked if the passage of time between the October 29, 2018 closing of the PSA and the March 28-29, 2019 Special Dividend Cash Transfer broke the connection between this Transfer and the PSA. *See* Hearing Tr. 38:10-39:10. It did not. *See In re Lehman Bros. Holdings, Inc.*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ("The 'in connection with' requirement of section 546(e) does not contain any temporal . . . requirement . . . ."); *Petr v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1101 (7th Cir. 2024) (the "passage of time, however long, does not categorically eliminate any connection").

*Connection*, WEBSTER'S 3D NEW INT'L DICTIONARY 481 (1993)).[5] Likewise, relying on the Bankruptcy Code's broad definition of "settlement payment," the Supreme Court defined the term to include, *inter alia*, any "transfer of cash . . . made to complete [a] securities transaction." *Enron Cred. Recov. Corp. v. Alfa, S.A.B. de D.V.*, 651 F.3d 329, 334-35, 339 (2d Cir. 2011).

*Merit* did not disturb this precedent. In *Merit*, the only question before the Court was if the transfer at issue was made by a "financial institution" for purposes of section 546(e): "the parties d[id] not ask th[e] Court to determine" whether the transfer was "a 'settlement payment' or made in connection with a 'securities contract,' nor [wa]s that determination necessary for resolution of the question presented." *Merit*, 583 U.S. at n.5.[6] In determining whether a transfer was made by a "financial institution," the Supreme Court held that, for section 546(e) to apply, its criteria must be met for "the overarching transfer that the trustee seeks to avoid." *Id.* at 378.

In reaching this conclusion, the Supreme Court observed that, under the text of 546(e):

> The transfer that . . . 'the trustee may not avoid' is specified to be 'a transfer that *is*' either a 'settlement payment' or made 'in connection with a securities contract.' Not a transfer that involves. Not a transfer that comprises. But a transfer that is a securities transaction covered under § 546(e). . . . In other words, to qualify for protection under the securities safe harbor, § 546(e) provides that the otherwise avoidable transfer itself be a transfer that meets the safe-harbor criteria.

*Id.* at 380-81 (quoting 11 U.S.C. § 546(e)) (emphasis in original).

Plaintiff may claim that this language requires a transfer itself to be a "securities transaction" to be safe harbored—and therefore limits *Fishman's* broad interpretation of section

---

[5] The Second Circuit also declined to read any further limits into the "in connection with" requirement, including "that the transfer be made 'pursuant to,' or 'in accordance with the terms of,' or 'as required by,' [a] securities contract." *Fishman*, 773 F.3d at 422. Congress "could have raised" the "low bar" for the "required relationship between the securities contract and the transfer sought to be avoided" by adding these limits to the statute. *Id.* "[B]ut it did not." *Id.*

[6] In addition, and unlike Defendants here, *see* Mem. 43-47; Reply 14-15, no parties contended that the debtor in *Merit* "qualified as a financial institution by virtue of its status as a 'customer' under § 101(22)(A)" of the Code, so the Court did not address that issue. *Merit*, 583 U.S. at n.2.

546(e)'s "in connection with a securities contract" requirement. But this would imbue the term "securities transaction" in the passage above with more weight than it can bear.[7] Rather this passage can, and should, be interpreted to mean only what the Supreme Court said: to be safe harbored, the overarching transfer a trustee seeks to avoid must be "a securities transaction *covered under § 546(e)*." *Id.* at 380 (emphasis added). And both the Supreme Court in *Merit* and section 546(e) tell us what "securities transaction[s]" are covered: "either a 'settlement payment' or [a transfer] made 'in connection with a securities contract.'" *Id.* (quoting 11 U.S.C. § 546(e)).

Thus, *Merit* holds that the overarching transfer a trustee seeks to avoid must satisfy the "qualifying transaction" prong of section 546(e). But *Merit* did not discuss, much less modify, the standards for evaluating what a "settlement payment" is, or whether a transfer is "made in connection with a securities contract." As a result, *Merit* did not narrow the broad reading of these terms required by Second Circuit precedent.[8] Accordingly, the Second Circuit has rightly continued to apply its broad, binding precedent—based on the plain text of section 546(e)—to determine if a transfer is a settlement payment, or is made in connection with a securities contract.[9]

---

[7] This reading would require the suspect assumption that the Court intended to excise from section 546(e) the requirement that a transfer must be safe harbored if, *inter alia*, it is made "in connection with a securities contract," 11 U.S.C. § 546(e), and replace it with the requirement that a transfer must itself be a securities transaction—which contradicts the statute's text. *See Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 U.S. Dist. LEXIS 173359, at *16-19 (S.D.N.Y. Sept. 13, 2021) (rejecting an attempt to limit the Second Circuit's broad interpretation of the in-connection-with requirement, since the "limitation finds no support in Section 546(e)'s text"), *aff'd* 2024 U.S. App. LEXIS 23800 (2d Cir. Sept. 19, 2024). If the Supreme Court intended such violence to the statute, it would have said so.

[8] Nor did *Merit* overrule, *sub silentio*, the Second Circuit's holding that section 546(e) has no requirement that a transfer be made "as required by," "pursuant to," or "in accordance with the terms of" a securities contract to receive the protection of section 546(e). *Fishman*, 773 F.3d at 422.

[9] *See Bos. Generating*, 2024 U.S. App. LEXIS 23800, at *6-7 (affirming bankruptcy and district courts' decisions that subsidiary's transfer was made in connection with a securities contract when the subsidiary made the transfer "to fund" redemption payments its parent intended to make to its equity holders pursuant to a tender offer); *In re Nine West LBO Sec. Litig.*, 87 F.4th 130, 150 (2d Cir. 2023) (transfers providing merger consideration to shareholders whose shares were cancelled pursuant to a merger agreement in an LBO were settlement payments because, *inter alia*, they were made "for the purpose of effectuating the LBO"); *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 80-

Moreover, courts in the Second Circuit, as well as the Second Circuit itself (most recently in *Boston Generating* last month), have interpreted *Merit* to preclude a trustee's attempt to isolate a component part of the overarching transfer from its context, seek to avoid only that component part, and thereby evade section 546(e).[10] These courts have reasoned that *Merit* requires section 546(e) to "appl[y] to the *overarching* transfer that the trustee seeks to avoid not any component part of that transfer," *Bos. Generating*, 2024 U.S. App. LEXIS 23800, at *7 (emphasis in original); *SunEdison*, 620 B.R. at 513 (similar), and therefore a trustee may not seek to "circumvent the safe harbor by carving up an integrated securities transaction consisting of multiple component parts" and trying to avoid only a single part. *Holliday*, 2021 U.S. Dist. LEXIS 173359, at *13; *SunEdison*, 620 B.R. at 513-14 (similar). As a result, a transfer must be safe harbored if, in the context of an overall "integrated securities transaction," the transfer meets the safe harbor's requirements. *See Holliday*, 2021 U.S. Dist. LEXIS 173359, at *14-15 (cash transfer from the debtor to its parent company was a settlement payment and made in connection with a securities transaction because it was intended to, and did, fund the payments that the parent made to its equity holders pursuant to a tender offer);[11] *Sun Edison*, 620 B.R. at 516 (debtor's transfer of securities to an SPV so the

81 (2d Cir. 2019) (transfers were made "in connection with" a securities contract because they were made to satisfy obligations incurred pursuant to a contract for the debtor's repurchase of its securities).

[10] *See Bos. Generating*, 617 B.R. at 491-92 (when a debtor transferred cash to its parent to fund the parent's tender offer, *Merit* required evaluation of section 546(e)'s criteria with respect to the entire transaction, rather than only the "step one" transfer) *aff'd sub nom. Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 U.S. Dist. LEXIS 173359 (S.D.N.Y. Sept. 10, 2021) *aff'd* 2024 U.S. App. LEXIS 23800 (2d Cir. Sept. 19, 2024); *In re SunEdison Inc.*, 620 B.R. 505, 513-15 (Bankr. S.D.N.Y. 2020) (when debtor transferred securities to an SPV so the SPV could, in turn, pledge and transfer its interests in the securities to a collateral agent in order to collateralize the SPV's notes that funded the debtor's parent's purchase of equity interests, *Merit* required section 546(e)'s criteria to be applied through the lens of the entire "integrated transaction," and not only to the first leg of the transfer).

[11] The court in *Tops* declined to follow this "integrated" transaction approach, and criticized it as contrary to *Merit*. *See* 646 B.R. at 685-86. However, after it did so, the Second Circuit affirmed the Bankruptcy and District Courts' decisions in *Boston Generating*, and held that *Merit* required these courts to evaluate the safe harbors with respect to the overarching transaction as a whole, and that, therefore, "the bankruptcy court was correct in rejecting the [t]rustee's contention that the elements of

SPV could, in turn, pledge the securities to collateralize notes issued by the SPV to fund the debtor's parent's purchase of equity pursuant to a securities contract was made "in connection with" that contract because "it was the means of effecting the partial payment of the purchase price under the" contract). Thus, *Merit* not only leaves untouched the Second Circuit's broad standards for evaluating a qualifying transfer under section 546(e), it also requires courts to examine the broader context of the overarching transaction, and not only a component step thereof, to see if these broad standards are met.[12]

Under this analysis, the Special Dividend Cash Transfer is easily a qualifying transaction under section 546(e). Plaintiff's allegations, and other material cognizable on Defendants' Motion, establish beyond doubt that GBG USA intended to, and did, make the Special Dividend Cash Transfer to fund GBGH's Special Dividend, in which GBGH paid certain of its shareholders the value of the securities (of which they were the ultimate beneficial owners) that GBG USA sold to Centric Brands pursuant to the PSA, which is indisputably a securities contract. *See* Mem. 7-9, 13. Thus, the Special Dividend Cash Transfer was (i) a transfer of cash that was "made to complete a securities transaction," and therefore a "settlement payment," *id.* 42-43, and (ii) "associated with" and "related to" the PSA, and thus "made in connection with" a securities contract." *Id.* 40-42.

## II. PLAINTIFF CANNOT RECOVER THE SPECIAL DIVIDEND CASH TRANSFER BECAUSE ITS ENTIRE VALUE (AND MORE) WAS RETURNED TO GBG USA.

As Defendants showed, Mem. 10-14; Reply 5-8, Plaintiff's allegations show that, by design, Fung Holdings replenished the full value of the Special Dividend Cash Transfer (and more) to retire GBG USA's prepetition debt. There are two consequences of this: (i) Plaintiff cannot state

---

the safe harbor protection should be analyzed independently with respect to each 'component part' of [that t]ransaction." *Bos. Generating*, 2024 U.S. App. LEXIS 23800, at *6-7.

[12] *See Holliday*, 2021 U.S. Dist. LEXIS 173359, at *14-15 (rejecting trustee's argument that a dividend from a subsidiary to a parent was not "itself a settlement payment" because that would, contrary to *Merit*, ignore that that the transfer was intended to, and did, fund its parent's tender offer).

a claim to "recover" this Transfer under section 550(a) of the Code, Mem. 30-31, Reply 6; and (ii) Plaintiff's bold attempt to reap a double return of funds that have been restored is barred by section 550(d) of the Code, which limits Plaintiff to a "single satisfaction." Mem. 30; Reply 6-8.

During the Hearing, the Court asked whether adversary proceedings brought in the liquidation of BLMIS pursuant to the Securities Investor Protection Act of 1979 ("**SIPA**") should alter this result, since the Madoff Trustee sought in certain of those adversary proceedings to recover withdrawals that certain feeder funds made from BLMIS "with no credits for subsequent reinvestment of cash." Hearing Tr. at 28:8-17, 30:7-14. They should not.

*First,* Defendants have been unable to find any BLMIS-related court order or opinion that considers whether a trustee can *state a claim* to "recover" transfers pursuant to section 550(a) of the Bankruptcy Code when, as here, the transfers have been returned to a debtor prepetition. *See In re DeBerry*, 945 F.3d 943, 947 (5th Cir. 2019) ("Once the fraudulently transferred property has been returned, the bankruptcy trustee cannot 'recover' it again using § 550(a).").

*Second*, there is not a well-developed body of law addressing section 550(d)'s "single satisfaction" rule in the BLMIS-related cases. *See* Motion To Withdraw the Reference, *Picard v. HSBC Bank PLC*, Adv. Pro. No. 09-1364 (Bankr. S.D.N.Y. Apr. 2, 2012) (Dkt. No. 201 at ¶ 15) (in "avoidance actions brought under the Bankruptcy Code, later transfers back to the debtor have been credited against the amount the estate may recover from transferees" but "no court has addressed whether such provisions should apply in a SIPA liquidation"). To the extent BLMIS opinions address section 550(d), many affirm the rule's application without substantial analysis.[13]

[13] *Picard v. Sage*, 654 B.R. 59, 67-68 (Bankr. S.D.N.Y. 2023) ("There is no dispute that the Trustee is limited to 'a single satisfaction' under § 550(a)"); *Picard v. BNP Paribas S.A.*, 594 B.R. 167, 186 (Bankr. S.D.N.Y. 2018) ("In light of the settlement for the full amount of the Trustee's remaining initial transfer claims against Ascot, the Court issued an Order to Show Cause" to explain why "claims to recover subsequent transfers" should "not be dismissed" per § 550(d)'s "'single satisfaction' rule").

In two adversary proceedings, a court rejected BLMIS customers' arguments that the Trustee's fraudulent transfer claims should be reduced by amounts that were purportedly returned to BLMIS by a different customer. *See Picard v. Citibank, N.A.*, 2022 WL 4493234, at *8 (Bankr. S.D.N.Y. Sept. 27, 2022); *Picard v. Lustig*, 2017 Bankr. LEXIS 4145, at *2-3, *19-20 (Bankr. S.D.N.Y. Dec. 6, 2017). But these courts did not find that a prepetition return of funds to BLMIS should not reduce the quantum of the Trustee's claims. Rather, SIPA required the Madoff Trustee to establish a separate "customer property" estate from which BLMIS' customers could recover "to the extent of their respective net equities." *See* 15 U.S.C. § 78fff-2(c)(1)(B). Pursuant to the "Net Investment Method" used to calculate each customer's net equity, *In re BLMIS*, 499 B.R. 416, 420-21 (S.D.N.Y. Oct. 15, 2013), each BLMIS customer, assuming its good faith, was entitled to a "credit" for money it returned to BLMIS. *Lustig*, 2017 Bankr. LEXIS 4145, at *12; *In re BLMIS*, 499 B.R. at 420-21.[14] Because this credit belonged to the customer that actually returned the transfers, and not to the defendants, these defendants could not rely on another customer's return of funds to reduce the Madoff Trustee's claims against them, since doing so would "force the BLMIS estate to give a second round of credits based on the same deposits." *Picard v. The Lustig Family Trust*, 568 B.R. 481, 487-89 (Bankr. S.D.N.Y. 2017); *Lustig*, 2017 Bankr. LEXIS 4145 at *14-15 (similar); *Citibank*, 2022 WL 4493234, at *8 (similar). These concerns are not present here. Fung Holdings never received any portion of the Special Dividend Cash Transfer, Mem. 12-13, 47-50, and neither Fung Holdings nor GBGH seeks to recover from GBG USA's

[14] Pursuant to the Net Investment Method, "a customer's 'net equity'[wa]s calculated by . . . crediting the amount of cash deposited by the customer into his or her [BLMIS] account, less any amounts withdrawn from it." *In re BLMIS*, 499 B.R. at 420. A "customer who withdrew less than she deposited over the course of her investment with [BLMIS] ha[d] a net-equity claim and may be entitled to disbursements from the customer property estate." *Id.* at 420-421. Similarly, "the Trustee . . . engaged in the same 'netting' process" and "brought avoidance actions" only "for the amount in excess of . . . deposits against" investors "who withdrew more money . . . than they deposited." *Id.* at 421.

estate the $200 million that Fung Holdings provided, and GBGH used, to pay down GBG USA's prepetition debt. Thus, there is no issue of providing multiple "credits" for a single return of funds.

*Finally*, the Madoff Trustee sued certain BLMIS "feeder funds," alleging that they did not receive withdrawals from BLMIS in good faith, and that therefore, pursuant to section 548(c) of the Code, they should not benefit from their subsequent reinvestments in BLMIS. *See Madoff*, 499 B.R. at 420 (explaining that the Net Investment Method "assum[ed] the customer's good faith"). In certain of these lawsuits, the Trustee sought to give "no credit" for "reinvestments in calculating the amounts of the Trustee's fraudulent transfer and preference claims." *E.g.*, Motion To Withdraw the Reference, *Picard v. HSBC Bank PLC et al.*, Adv. Pro. No. 09-1364 (Bankr. S.D.N.Y. Apr. 2, 2012) (Dkt. No. 201 at ¶¶ 13-14). Defendants have been unable to find any court order or opinion addressing whether the Madoff Trustee's fraudulent transfer claims against feeder funds (or any other transferee) accused of lacking good faith should have been reduced to account for reinvestments of principal.[15] However, the Trustee's settlements with certain of these funds shows that the Madoff Trustee ultimately did give credit for reinvestment to at least some feeder funds, as well for any settlement payments that net losers made in resolution of the Trustee's fraudulent conveyance claims. *See Lustig*, 568 B.R. at 488-89 (explaining that, upon the Senator Fund's agreement to return withdrawals it made over the life of its BLMIS account, the Trustee agreed to allow Senator's net equity claim in an amount equal to "88.6 of" Senator's claimed deposits net of withdrawals and "100% of [Senator's] settlement payment"); *id.* at 488 (describing a similar settlement arrangement between the Madoff Trustee and Rye Broad Market Fund).

Thus, though there does not seem to be a BLMIS decision that directly addresses the issue,

---

[15] Courts did, however, find that the Madoff Trustee could *not* disallow these net losers' net equity claims against BLMIS' customer property estate on the basis that they allegedly knew BLMIS was a fraud. *See*, *e.g.*, *Picard v. Merkin et al.*, 515 B.R. 117, 153-56 (Bankr. S.D.N.Y. 2014).

the prevalence in the BLMIS cases of providing credit for reinvestment supports the overwhelming body of non-SIPA case law holding that a trustee cannot recover a transfer when that transfer (or its value) has been returned to the Debtor. Mem. 29-33, Reply 5-8. Indeed, "[f]raudulent transfer laws" are "remedial, rather than punitive." *In re Best Prods Co., Inc.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994). Thus, "[s]ection 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *In re Cent. Textiles*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998). If, as here, "the debtor has received the property back, the debtor's estate has not been diminished, creditors have not been prejudiced and there is no reason for the trustee to invoke the avoidance power." *In re Polichuk*, 506 B.R. 405, 435 (Bankr. E.D. Pa. 2014).[16]

Thus, Fung Holdings' return of the full value of the Special Dividend Cash Transfer to pay down GBG USA's debt precludes Plaintiff from stating a claim to "recover" that Transfer, and the Trustee's attempt to recover the Transfer is barred by section 550(d)'s "single satisfaction" rule.

## III. THE COURT HAS NO PERSONAL JURISDICTION OVER DEFENDANTS.

Plaintiff has failed to allege that any Defendants had any contact with, or purposeful activity directed to, the USA in connection with GBG USA's Special Dividend Cash Transfer. Mem. 20-23. Moreover, Plaintiff cannot salvage this lack of contact by claiming that Defendants

[16] This is true even if certain Defendants retained their share of the Special Dividend, since it was Fung Holdings, not GBG USA or its creditors, that effectively funded that Dividend. *See In re Basset*, 221 B.R. 49, 55 (D. Conn. 1998) ("Because Marilou has fully satisfied the Debtor's bankruptcy estate to the extent of its legitimate avoidance, and because the [trustee] is entitled to only a single satisfaction . . . , recovery from Carlo is likewise inappropriate."). These Defendants do not get a "pass"; rather, Plaintiff cannot state a claim to "recover" the Special Dividend as a result of the full return of the initial transfer that GBG USA's creditors required. Moreover, GBG USA's estate remains undiminished even if the cash Fung Holdings returned was not from the same "pot" that moved with the Special Dividend Cash Transfer. *In re Patts*, 470 B.R. 234, 243 (Bankr. D. Mass 2012) (if "the transfer the [t]rustee seeks to avoid has already been undone and the undiminished *value of the transferred asset* has been restored to the . . . estate," further recovery would be "a windfall to the estate and a prohibited double recovery under 11 U.S.C. § 550(d).") (emphasis added); *Polichuk*, 506 B.R. at 435 ("If the estate already has recovered the property (*or its value*)," allowing a "further remedy" would be a "double recovery" which is "not a result that the drafters of" section 550 "could have intended.") (emphasis added).

"directed" the Special Dividend Cash Transfer because Plaintiff alleges at most that Defendants, acting outside the USA, authorized GBGH to issue the Special Dividend, and GBGH then required GBG USA to make the Special Dividend Cash Transfer. *See id.* That bootstrapping—which is based not on Defendants' own contacts—cannot support personal jurisdiction. Reply 21-24.

The Court also lacks jurisdiction over Fung Holdings regarding GBG USA's repayment of the December Shareholder Loan. Plaintiff does not allege that Fung Holdings played *any* role in making GBG USA repay the December Shareholder Loan, or took any action—much less action in or projected into the US—to facilitate this repayment. Mem. 24-25; Reply 24-25.

At the Hearing, the Court asked whether Plaintiff has nonetheless made out a prima facie case of jurisdiction by alleging that Defendants used their purported control over GBGH to require GBG USA to make the Special Dividend Cash Transfer, or repay the December Shareholder Loan. Hearing Tr. 25:7-14; 51:24-53:5. For the reasons below, Plaintiff has not.

### A. Plaintiff Has Not Alleged that Defendants Controlled GBG USA's Payment of the Special Dividend Cash Transfer or Expressly Aimed Their Conduct at the USA.

Plaintiff does not allege that any Defendant controlled GBG USA's Special Dividend Cash Transfer or "expressly aimed" its conduct at the US. At most, Plaintiff baldly concludes that "GBGH" did so. Thus, Plaintiff cannot rely on the so-called "effects test" to establish personal jurisdiction. And, even crediting Plaintiff's conclusion that GBGH controlled the Special Dividend Cash Transfer, Plaintiff's allegations do not pass the demanding tests necessary to impute GBGH's jurisdictional contacts to Defendants, particularly since Plaintiff "must establish" (and this Court must evaluate) "jurisdiction with respect to each claim asserted" and each "particular Defendant." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018).

#### 1. There Is No Allegation that Defendants Controlled GBG USA's Payment of the Special Dividend Cash Transfer or Expressly Aimed Their Conduct at the US.

Plaintiff fails to allege that any Defendant controlled GBG USA's payment of the Special

Dividend Cash Transfer or expressly aimed its conduct at the US. Under the "effects test" theory of jurisdiction, non-US conduct may give rise to personal jurisdiction if a defendant "expressly aimed" tortious conduct "at the forum." *Charles Schwab*, 883 F.3d at 87. However, it does not suffice for conduct to be aimed only at a person; the conduct must be aimed expressly at the forum itself. *Walden v. Fiore*, 571 U.S. 277, 289 (2014) (defendant's "actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections"). In addition, "foreseeability" of the effects at issue "will not suffice," *Charles Schwab*, 883 F.3d at 87, and even "knowledge that a plaintiff resides in a specific jurisdiction would be insufficient" when "the defendant does nothing in connection with the tort in that jurisdiction." *Waldman v. PLO*, 835 F.3d 317, 338 (2d Cir. 2016). Rather, a defendant must "expressly aim[] to cause" an "effect in the forum." *Wilder v. News Corp.*, 2015 U.S. Dist. LEXIS 137158, at *21 (S.D.N.Y. Oct. 6, 2015). Plaintiff fails to meet this high standard.

*First*, Plaintiff alleges that Defendants, who were minority GBGH shareholders,[17] voted in Hong Kong—with GBGH's other shareholders—to authorize, but not require, GBGH to pay the Special Dividend. Mem. 20-22. The resolution Defendants voted for gave GBGH's "Directors" the "sole and absolute discretion" to (i) decide if, how and in what quantum the Special Dividend would be paid, and (ii) perform any act that was "necessary, desirable, appropriate or expedient" to pay the Special Dividend. Hutten Decl. Ex. C (Notice of Special General Meeting) at N-2 (July 18 2018). In addition, four subsidiaries of GBGH sat between GBGH and GBG USA. *See* Compl. at Ex. A. Thus, as minority shareholders, Defendants did not control even GBGH's, much less GBG USA's, acts concerning the Special Dividend Cash Transfer. Even less did they "expressly

---

[17] Defendants collectively owned, directly or indirectly, only approximately 40% of GBGH's publicly traded shares as of April 4, 2019. *See* GBG 2019 Annual Report at 74-76 (June 26, 2019) *available at* https://www.hkexnews.hk/listedco/listconews/sehk/2019/0725/ltn20190725277.pdf.

aim" their vote at the USA. But this vote is the sole jurisdictional allegation against Fung Distribution, Step Dragon, Golden Step, King Lun, and Hurricane Millennium, *see* Compl. ¶¶ 195, 270, 274-78; Mem. 22-23, Reply 23, and Plaintiff fails to allege jurisdiction over these Defendants.

*Second*, while Plaintiff alleges that some Defendants engaged in non-US activities beyond voting to authorize the Special Dividend, these allegations still fail. In particular:

- Victor Fung and Spencer Fung allegedly "had perfect knowledge of the planning and execution of the Special Dividend" when they "voted in favor of" or "approved" the "receipt of a Special Dividend from GBG USA" in the USA, Opp. 22-23 (citing the Complaint);
- Fung Holdings was allegedly the "largest" (but not a majority) shareholder of GBGH, one of its representatives allegedly "attended" GBGH board meetings in Hong Kong "at which the Special Dividend was discussed" and was "involved in negotiations with [the] RCF [Lenders]" prior to the Special Dividend, *id.* at 21-22 (citing the Complaint); and
- William Fung and Bruce Rockowitz, as GBGH Board members, allegedly "participated in the meetings of the GBGH Board and GBGH Special Dividend Committee" in Hong Kong "where the Special Dividend was shaped." *Id.* at 20 (citing the Complaint).

These allegations, even if true, show only that three (of eleven) Defendants did anything more than approve, or vote for, the Special Dividend. Even as to these three Defendants, Plaintiff alleges only that Fung Holdings "attended" GBGH Board meetings at which the Special Dividend was discussed, and that Messrs. Fung and Rockowitz "participated" in GBGH Board or Special Dividend Committee meetings at which the Special Dividend was "shaped."

This fails to show any Defendant expressly aimed its conduct at the USA. Rather, Plaintiff alleges that unspecified persons at "GBGH required GBG USA to make the Special Dividend Cash Transfer." Compl. ¶ 200.[18] Indeed, Plaintiff's allegations about GBG USA's actual payment of the Special Dividend Cash Transfer, *see* Compl. ¶¶ 115-22, do not claim that any Defendant directed GBG USA to make the Transfer. This is telling since Plaintiff knows who was "copied on the e-

---

[18] *See also* Compl. ¶ 6 ("GBGH . . . used GBG USA as the vehicle to borrow the funds to" pay the Special Dividend); *id.* ¶ 9 ("GBGH . . . initiated the process by which GBG USA transferred $196 million to GBGH"); *id.* ¶ 309 ("GBGH caused GBG USA to borrow" to fund "the Special Dividend").

mail directing this transfer," *id.* ¶ 119, and alleges that Brandon Carrey—*GBG USA's* Treasurer and Vice President, *id.* ¶ 19—"directed GBG USA to transfer" the Special Dividend Cash Transfer, and that only a single GBGH officer (who is not a Defendant) was copied on the e-mail. *Id.* ¶¶ 118-19. Plaintiff's allegations thus fail to show that any Defendant—as opposed to a GBGH or GBG USA officer who Plaintiff alleges actually interacted with GBG USA, *see id.* ¶ 119—controlled GBG USA's Special Dividend Cash Transfer, or expressly aimed any of their actions at the USA. *Wilder*, 2015 U.S. Dist. LEXIS 137158, at *35 (no jurisdiction under the effects test when plaintiffs did "not plead[] facts demonstrating that [the director defendant] was in contact with, or directly supervised, the individuals who drafted and/or issued the press release" at issue).[19]

**2. Plaintiff Has Not Alleged Facts that Would Justify Imputing any of GBGH's Jurisdictional Contacts to Defendants.**

Since Plaintiff has failed to allege that any Defendant created sufficient US contacts of its own, he must show that it is appropriate to impute the US contacts of GBGH to each "particular [d]efendant," *Charles Schwab*, 883 F.3d at 82-84, for the Court to have personal jurisdiction. But it is "[b]lack letter corporate law" that "a corporation and its . . . shareholders are distinct entities," *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 58 (2d Cir. 2021), and that "jurisdiction over . . . individual officers and directors must be based on their individual contacts with the forum state." *Giuliano v. Barch*, 2017 WL 1234042, at *6 (S.D.N.Y. Mar. 31, 2017). And even if Plaintiff had alleged that GBGH had adequate US contacts, he has still alleged no facts that justify setting aside these fundamental presumptions of separateness between GBGH and the Defendants.

[19] Even accepting, *arguendo*, Plaintiff's claim that his allegations show that Messrs. Fung and Rockowitz "knew and intended that the Special Dividend would be paid by GBG USA from its [US] accounts," Opp. at 20, this would still not suffice without allegations that Messrs. Fung or Rockowitz themselves directed GBG USA personnel to make the Special Dividend Cash Transfer, which are lacking here. *See Charles Schwab*, 883 F.3d at 87 (allegation that Defendants "surely knew the brunt of the injury would be felt" in the forum failed to confer jurisdiction under the effects test).

*First, Plaintiff fails to allege that GBGH was any Defendant's agent*. Under federal common law, an agent's jurisdictional contacts may be imputed to a principal if "the alleged agent acted in [the forum] for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Charles Schwab*, 883 F.3d at 85. However, "[t]o make a prima facie showing of 'control,'" Plaintiff must allege that Defendants "were primary actors in the transaction in [the USA] that gave rise to the litigation," and "must sufficiently detail the [D]efendant[s'] conduct so as to persuade a court that the [D]efendant was a 'primary actor' in the specific matter in question." *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 323-24 (S.D.N.Y. 1998). "[C]ontrol cannot be shown based merely upon a defendant's title or position within the corporation." *Id.*

Here, Plaintiff fails to allege facts showing that GBGH was under any Defendant's "control" when it allegedly "required" GBG USA to fund the Special Dividend. Compl. ¶ 200. As to Defendants' vote in favor of the Special Dividend, Defendants—minority shareholders—merely voted (along with GBGH's other shareholders) to authorize, but not require, GBGH to pay the Dividend, and gave GBGH's directors "absolute discretion" as to how and whether to do so. *See supra* p. 14. That fails to show that Defendants controlled *any* aspects of the Special Dividend, much less that they controlled GBGH when it "required" GBG USA to fund this Dividend.[20]

Even regarding the Defendants who allegedly did more than vote for the Special Dividend, Plaintiff alleges at most that Fung Holdings merely "attended" GBGH Board meetings in Hong Kong at which the Dividend was discussed, and that Messrs. Fung and Rockowitz "participated" in GBGH Board or Special Dividend Committee meetings in Hong Kong at which the Dividend

[20] *See Hau Yen To v. HSBC Holdings PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (no agency when Plaintiff failed to allege principal's control over the alleged agent); *Gallelli v Crown Imports, LLC*, 701 F. Supp.2d 263, 275 (E.D.N.Y. 2010) ("mere fact that [defendant] is a minority shareholder" was "not enough to establish the control necessary to show an agency relationship").

was shaped. *See supra* p. 15. That is insufficient. *AMPA Ltd. v. Kentfield Capital LLC*, 2001 U.S. Dist. LEXIS 2027, at *5, *9 (S.D.N.Y. Feb. 27, 2001) ("voting at a meeting of AMPA's Board of Directors in Israel" did not confer agency jurisdiction); *Dep't of Econ. Dev. v. Arthur Andersen & Co.*, 747 F. Supp. 922, 929 (S.D.N.Y. 1990) ("[defendant's] vote to ratify the . . . contract at a Northern Ireland board meeting" did not suffice). Plaintiff alleges only that it was GBG USA's *own* Treasurer who instructed GBG USA to make the Special Dividend Cash Transfer. *Supra* p. 16. That fails to show that Defendants "were primary actors in the *transaction in [the USA]* that gave rise to" this lawsuit. *Karabu*, 16 F. Supp. at 323-24; *Shostack v. Diller*, 2015 WL 5535808, at *5 (S.D.N.Y. Sept. 16, 2015) (no jurisdiction when plaintiff asserted "no facts alleging that the individual defendants had any direct involvement in the actions giving rise to th[e]" lawsuit).

In addition, an agency relationship cannot arise between GBGH and the "Controlling Shareholders"—"Fung Holdings, William Fung, Victor Fung . . . King Lun, Fung Distribution, Step Dragon, Golden Step and the Victor Trust," Compl. ¶ 108—because GBGH was *not* working "for the benefit of" these Defendants. *Schwab*, 883 F.3d at 85. Plaintiff admits the Controlling Shareholders decided roughly three months before GBG USA made the Special Dividend Cash Transfer to forego receiving any cash from the Special Dividend. Compl. ¶¶ 105-08. Thus, when GBGH allegedly "required GBG USA to make the Special Dividend Cash Transfer," *id.* ¶ 200, "to fund the Special Dividend," *id.* ¶ 9, it was not acting for the Controlling Shareholders' benefit. *See Grove Press Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 2018) (no agency relationship when Plaintiff failed to allege that the principal derived a benefit from the activity of the alleged agent).

<u>*Second, GBGH was not any Defendant's alter ego*</u>. Under the demanding standard required by federal common law, "the corporate veil will be pierced only when it can be demonstrated that the [corporate] form has been used to achieve fraud, or when the corporation has been so

dominated by an individual . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989).[21] Even for jurisdictional purposes, veil piercing requires "total and exclusive domination of the corporation" by its owners. *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 276 (2d Cir. 2023). For an alter ego analysis between a company and its individual shareholder(s) and directors, "courts have considered" the following factors:

> (1) the absence of corporate formalities normally attendant on corporate existence, such as issuance of stock, election of directors, keeping of corporate records, and so forth; (2) inadequate capitalization; (3) the intermingling of corporate and personal finances; and (4) the amount of business discretion displayed by the purported alter ego corporation.

*In re Lyondell Chem Co.*, 543 B.R. 127, 146 (Bankr. S.D.N.Y.).

Here, Plaintiff does not allege that any Defendant abused GBGH's corporate form to perpetrate a fraud. And Defendants owned only a minority of GBGH's shares. *See supra* n. 17. GBGH issued stock on the Hong Kong Stock Exchange, Compl. ¶ 35, kept extensive corporate records cited by the Plaintiff, *e.g.*, *id.* ¶¶ 62-63, 91-95, 104, 108, 110, 128, had its own counsel advising it on the Special Dividend, *id.* ¶¶ 73-74, and elected directors who formed special committees to consider the Special Dividend. *Id.* ¶¶ 91-92. Plaintiff does not allege that GBGH was inadequately capitalized, intermingled assets with shareholders or failed to exercise business discretion.[22] Thus, a claim that GBGH was any Defendant's alter ego is far weaker than claims that courts have rejected as inadequate. *E.g.*, *Platinum*, 61 F.4th at 276 (company was not an alter

[21] While the question is not settled, the weight of authority holds that, when a plaintiff asserts alter ego jurisdiction, courts should apply "the law governing the interpretation of the applicable jurisdictional statute" or "federal due process jurisprudence, or both." *In re Lyondell Chem. Co.*, 543 B.R. 127, 139 (Bankr. S.D.N.Y. 2017); *Anwar v. Dow Chem. Co.*, 876 F3d 841, 848-49 (6th Cir. 2017) (applying federal common law). Which results in federal common law applying here.

[22] *See Lyondell*, 543 B.R. at 139 (trustee did not allege adequately that a non-US parent company was the alter ego of its controlling shareholder when the trustee did not allege that the parent "ever failed to exercise its business discretion" in connection with the "distribution" the trustee sought to avoid and recover); *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 132, 135 (2d Cir. 1997) (it was clear error to find an alter ego relationship without evidence of comingling of assets).

ego of defendants even when the company was "financially dependent on [d]efendants," had only a limited business purpose and defendants "placed employees on [the company's board]); *Lyondell*, 543 B.R. at 145-46 (company was not an alter ego of its parent when the parent "wholly-owned" the company, and both entities had "significant overlap of management and personnel.").

**B. Plaintiff Has Not Alleged that Fung Holdings Controlled GBG USA's Repayment of the December Shareholder Loan or Expressly Aimed any Conduct at the USA.**

Plaintiff's allegations do not show that Fung Holdings even influenced GBG USA's repayment of the December Shareholder Loan. Much less do they show that Fung Holdings controlled this repayment, or intended for its conduct to have an impact in the USA.

Plaintiff alleges that, when GBG USA repaid the December Shareholder Loan, Fung Holdings owned only approximately 31% of GBGH's shares. Compl. ¶ 21. There is no allegation in the Complaint, or any material submitted with Plaintiff's opposition to Defendants' Rule 12(b)(2) motion, showing that Fung Holdings controlled GBG USA's repayment of the December Shareholder Loan, or expressly aimed any conduct at the USA to cause GBG USA's repayment. Mem. 24-25; Reply 24-25. In fact, Plaintiff alleges that "*GBGH* required GBG USA to repay GBGH's obligations," Compl. ¶ 10 (emphasis added),[23] and that *GBG USA's* treasurer "directed that GBG USA send $100 million . . . directly to Fung Holdings" after receiving approval to do so from *GBG USA's* CEO and CFO, *id.* ¶ 123. At most, Plaintiff identified a single e-mail from a Fung Holdings employee to a dual GBGH/GBG USA officer asking to "work out the logistics" of the repayment of the December Shareholder Loan. Opp. 24-25; Reply 24. This request would have been unnecessary if Fung Holdings controlled the repayment of the December Shareholder Loan.

In sum, Plaintiff fails to allege that this Court has jurisdiction over any Defendant.

[23] Plaintiff does not contend, or allege facts that show, GBGH—a publicly traded company—is the alter ego of Fung Holdings, or that GBGH was acting as Fung Holdings' agent regarding repayment of the December Shareholder Loan. So there is no basis to impute GBGH's contacts to Fung Holdings.

## CONCLUSION

For the reasons above, and those in Defendants' opening Memorandum and Reply, the Court should dismiss with prejudice all of Plaintiff's claims against Defendants, and order other and further relief as is just and proper.

Dated: New York, New York
October 21, 2024

Respectfully submitted,

**FRESHFIELDS US LLP**

By: *\/s/ Timothy P. Harkness*
Timothy P. Harkness
Madlyn Gleich Primoff
Henry V. Hutten

3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
timothy.harkness@freshfields.com
madlyn.primoff@freshfields.com
henry.hutten@freshfields.com

*Attorneys for Defendants Fung Holdings (1937) Limited, Fung Distribution International Limited, Step Dragon Enterprise Limited, Golden Step Limited, William Fung, King Lun Holdings Limited, First Island Developments Limited, Victor Fung, Spencer Theodore Fung, Bruce Philip Rockowitz and Hurricane Millennium Holdings Limited*