**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| **GBG USA Inc.,** *et al.,* | : | **Case No. 21-11369 (MEW)** |
|  | : |  |
| Debtors. | : | **Jointly Administered** |

-------------------------------------------------------------------x
| | | |
|---|---|---|
| **PETER HURWITZ, AS LITIGATION TRUSTEE** | : | |
| **OF THE GBG USA LITIGATION TRUST,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Adv. Pro. No. 23-01022 (MEW)** |
| | : | |
| **FUNG HOLDINGS (1937) LIMITED, FUNG** | : | |
| **DISTRIBUTION INTERNATIONAL LIMITED,** | : | |
| **STEP DRAGON ENTERPRISE LIMITED,** | : | |
| **GOLDEN STEP LIMITED, WILLIAM FUNG** | : | |
| **KOWK LUN, KING LUN HOLDINGS LIMITED,** | : | |
| **FIRST ISLAND DEVELOPMENTS LIMITED,** | : | |
| **VICTOR FUNG KWOK KING, SPENCER** | : | |
| **THEODOR FUNG, BRUCE PHILIP** | : | |
| **ROCKOWITZ, HURRICANE MILLENNIUM** | : | |
| **HOLDINGS LIMITED, and HSBC TRUSTEE** | : | |
| **(C.I.) LIMITED, SOLELY IN ITS CAPACITY AS** | : | |
| **TRUSTEE OF THE "VICTOR TRUST,"** | : | |
| | : | |
| **Defendants.** | : | |

-------------------------------------------------------------------x

<u>**DECISION ON DEFENDANTS' MOTION TO DISMISS**</u>

A P P E A R A N C E S :

GRANT & EISENHOFER P.A.
New York, New York and Wilmington, Delaware
*Special Counsel for Plaintiff Peter Hurwitz as Trustee of the GBG USA Litigation Trust*
    By: Gordon Z. Novod, Esq.
        Thomas Walsh, Esq.
        Frank H. Griffin, Esq.

FRESHFIELDS BRUCKHAUS DERINGER US LLP
New York, New York
*Attorneys for Defendants other than HSBC Trustee (C.I.) Limited*
   By: Timothy P. Harkness, Esq.
       Madlyn Gleich Primoff, Esq.
       Henry V. Hutten, Esq.

MAYER BROWN LLP
New York, New York
*Attorneys for HSBC Trustee (C.I.) Limited*
   By: Mark G. Hanchet, Esq.
       Robert W. Hamburg, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiff Peter Hurwitz is the Litigation Trustee (the "**Trustee**") of the GBG USA Litigation Trust, which was established by the confirmed plan of reorganization of GBG USA, Inc. ("**GBG**") and certain of GBG's affiliates who were debtors in these chapter 11 cases. The Defendants are entities who allegedly controlled GBG and/or who allegedly received (either directly or as subsequent transferees) funds that GBG transferred in March 2019. The challenged transfers are: (1) transfers of $196 million that GBG made to an indirect parent company, Global Brands Group Holding Ltd. ("**GBGH**"), on March 28, and 29, 2019, which GBGH allegedly used in a dividend that GBGH paid to its owners; and (2) a payment of $100 million that GBG paid on March 26, 2019 directly to Fung Holdings (1937) Limited (**Fung Holdings**"), an entity that allegedly held indirect control of GBGH, in repayment of a debt that GBGH owed to Fung Holdings. The Trustee contends that the transfers were fraudulent on a variety of theories, and seeks recovery from the defendants as subsequent transferees (in the case of the $196 million transfers to GBGH) or as an initial transferee (in the case of the $100 million transfer to Fung Holdings).

Defendants contend that this Court lacks personal jurisdiction over them. They also argue that the Trustee cannot properly seek recovery of the GBG transfers because (a) the $196 million

that GBG transferred to GBGH allegedly was "returned" when GBGH paid down a loan under which GBG was the borrower and GBGH was the guarantor, and (b) the loan repayment to Fung Holdings merely "returned" money that Fung Holdings had previously loaned to GBGH and that GBGH had then transferred to GBG. Defendants further contend that the Amended Complaint fails to allege an intent to hinder, delay or defraud creditors; that the $196 million transfers that GBG made to GBGH were protected by section 546(e) of the Bankruptcy Code; and that certain of the Defendants were not initial or subsequent transferees.

The original Complaint asserted that certain individuals who were officers and directors of GBG (Richard Nixon Darling, Mark Joseph Caldwell, Ronald Ventricelli, Robert K. Smits, Stephen Harry Long and Brandon Carrey) had breached fiduciary duties that they owed to GBG. Those claims were settled and have been omitted from the Amended Complaint, though those defendants' names remain in the caption. The Trustee has also agreed to dismiss claims against HSBC Trustee (C.I.) Limited as trustee of the Victor Trust, and that dismissal was accomplished through a stipulation filed on August 16, 2024. (ECF No. 63.) The Trustee otherwise has opposed the motion to dismiss.

## **Pleading Standards**

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, which incorporates Federal Rule of Civil Procedure 12(b)(6), provides for the dismissal of an adversary proceeding if a complaint fails to state a claim upon which relief may be granted. In reviewing a motion to dismiss a court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000). However, the factual allegations in a complaint must be supported by more than

mere conclusory statements. *Twombly*, 550 U.S. at 555. The allegations must be sufficient "to raise a right to relief above the speculative level" and provide more than a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "show[n] . . . that the pleader is entitled to relief." *Id.* at 679; *see also id.* at 682 (allegations in a complaint are insufficient if there is an "obvious alternative explanation" for the conduct alleged that is more "likely") (internal quotation marks and citation omitted).

If a complaint refers to agreements or other documents, it is proper for the Court to consider those documents in ruling on a motion to dismiss. *Grant v. Cnty. of Erie*, 542 Fed. Appx. 21, 23 (2d Cir. 2013) ("In its review [of a Rule 12(b)(6) motion to dismiss], the court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents "integral" to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence."); *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d. Cir. 2000) (noting that it is proper to consider documents that are quoted in or attached to the complaint or incorporated in it by reference, or that plaintiffs either possessed or knew about and upon which they relied in bringing suit); *I. Meyer Pincus & Assocs., P.C. v.*

*Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (noting that it is proper to consider a document upon which allegations are based, whether or not it is attached to the complaint). If an allegation is belied by the terms of such documents, the documents are controlling. *Id.*; *see also Alexander v. Bd. of Educ. of City of New York*, 648 Fed. Appx. 118 (2d Cir. 2016) (summary order) (dismissing complaint where documents contradicted allegations).

Rule 7009 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 9(b) of the Federal Rules of Civil Procedure, imposes the additional requirement that allegations of fraud must be stated "with particularity." Fed. R. Bankr. P. 7009; Fed. R. Civ. P. 9(b). Rule 7009 applies to claims that allege that transfers were made with the actual intent to hinder, delay or defraud creditors. Courts often apply a "more liberal view" when an intentional fraudulent transfer claim is pleaded by a trustee, however, "since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *Picard v. Cohmad Sec. Corp. et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011).[1] In addition, while "the fraud alleged must be stated with particularity . . . the requisite intent of the alleged [perpetrator] of the fraud need not be alleged with great specificity." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted); *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Nevertheless, a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent" in order to state a "plausible" fraud claim. *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

As explained below, Defendants seek to dismiss some claims pursuant to section 546(e) of the Bankruptcy Code. Defenses based on section 546(e) are affirmative defenses. *Kirschner v.*

---

[1]    Defendants have argued that the Trustee had access to extensive pre-Complaint discovery. However, other proceedings in this Court have made clear that the Trustee's access to documents was not complete, and certain discovery remains in process.

*Robeco Cap. Growth Funds – Robeco BP US Premium Equities (In re Nine West LBO Sec. Litig.)*,
87 F.4th 130, 144 (2d Cir. 2022) (hereafter referred to as "***Nine West***") (holding that defenses
based on section 546(e) are affirmative defenses.   Defendants have also argued that they
"returned" certain funds to GBGH and that these were used to pay down debts that GBG owed;
these also are properly regarded as affirmative defenses.   Defendants bear the burden of
demonstrating that affirmative defenses apply, and "[p]laintiffs are under no obligation to plead
facts supporting or negating" the affirmative defenses.  *Nine West*, 87 F.4th at 144.  A motion to
dismiss, based on affirmative defenses, can only be granted if facts that establish the defense as a
matter of law appear on the face of the complaint or appear in materials that the Court may consider
because they have been incorporated into the complaint.  *Id.* at 142 (citations omitted); *see also
Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 154 (2d Cir. 2024) (holding it is
permissible to consider whether the allegations of a complaint are by themselves sufficient to
establish an affirmative defense as a matter of law); *Clark v. Hanley*, 89 F.4th 78, 93–94 (2d Cir.
2023) (same).

### The GBG Transfers

The relevant facts regarding the March 2019 transfers, as alleged in the Amended
Complaint (ECF No. 55), are as follows:

1.      GBG is a Delaware company that operated the North American portions of the
wholesale footwear and apparel businesses that operated under the "Global Brands" umbrella.
GBG's portfolio included licensed brands owned by third parties, brands owned by GBG, and
brands owned by certain direct and indirect subsidiaries of GBG.  Am. Compl. at ¶¶ 4, 34, 39.

2.      GBGH was a holding company.  It was the indirect parent company of GBG, there
having been four other layers of intermediate but wholly-owned holding companies between

GBGH and GBG.  *Id.*, ¶¶ Ex. A.  GBGH is a Bermuda company that had its headquarters in Hong Kong.  *Id.* at ¶¶ 2, 4, 35, 43, 45-50 and Ex. A.  GBGH owned other companies that operated other international parts of the overall Global Brands business.  *Id.* at ¶¶ 2, 50.

3.    William Fung Kwon Lun ("**William Fung**") and his brother, Victor Fung Kwok Fung ("**Victor Fung**"), allegedly dominated and controlled GBGH and GBG through their own holdings and through the holdings of the other entities that the Fung brothers directly or indirectly owned or controlled.  *Id.* at ¶¶ 2, 6, 20-21, 51, 108, 188-189, 193, 269.

4.    GBG's directors and officers wore dual hats, as they were also officers and directors of GBGH.  GBG's Chief Executive Officer, Chief Operating Officer, Chief Financial Officer and General Counsel held the same titles at GBGH.   *Id.* at ¶¶ 9, 14-19, 245.  During the relevant years (2018 and 2019) GBG did not have any independent directors and did not have its own independent legal or financial advisors, and its directors did not meet separately from the meetings of the GBGH board of directors.  *Id.* at ¶ 248.  During the relevant times GBG did not prepare stand-alone financial statements; instead, GBGH prepared consolidated financial statements for itself and its subsidiaries.  *Id.* at ¶ 241.

5.    On June 27, 2018, GBG and GBGH agreed to sell certain businesses to Centric Brands, Inc. ("**Centric**").  The "Base Purchase Price" was to be $1.38 billion, subject to adjustments.  *Id.* at ¶ 59.

6.    GBGH announced a special general meeting of its shareholders to obtain approval of the Centric transaction.  The letter that announced the special meeting stated that GBGH intended to use the proceeds of the sale to pay down some existing debt, to pay a special dividend to GBGH's shareholders, and for general working capital purposes.  GBGH's shareholders approved both the sale and the special dividend, in separate resolutions, at a meeting in August

2018. The resolution that approved the special dividend authorized a dividend in such amount as the directors deemed appropriate, subject to and conditioned upon the closing of the Centric sale. *Id*. at ¶¶ 59, 61-62, 64, 66-67.

7.      The Centric sale closed on October 29, 2018. The assets associated with the businesses being purchased by Centric were put into a new subsidiary of GBG, and GBG then sold the equity of that new subsidiary to Centric. GBG received $1.2 billion (less than the originally agreed Base Purchase Price), and it used the entire proceeds to repay an outstanding debt that GBG owed under a prior credit facility, for which GBGH had been a guarantor. *Id*. at ¶¶ 4-5, 55-57, 70-71. The Complaint alleges that as a result there were no funds remaining from the Centric sale. *Id*. at ¶¶ 5, 71, 90, 94, 104, 106, 112, 208, 309, 338, 342, 373. GBG retained some business lines following the completion of the sale. *Id*. at ¶ 72.

8.      Also on October 29, 2018, GBG and GBGH entered into a new credit agreement (the "**RCF Facility**") pursuant to which the lenders provided a line of credit up to $375 million. GBG was the borrower under that facility and GBGH was a guarantor. The credit documents included financial covenants with which GBGH was required to comply. *Id*. at ¶¶ 76-78.

9.      GBGH allegedly faced financial difficulties in late 2018. Members of the Audit Committee of GBGH's board of directors were advised in November 2018 that GBGH likely would default under the covenants in the RCF Facility on or before March 31, 2019. On November 28, 2018, however, a Special Dividend Committee of the GBGH board of directors approved a resolution under which a special dividend of approximately $305 million would be paid by GBGH to its shareholders. The precise amount of the dividend was to be calculated after post-closing adjustments for the Centric transaction had been completed. The dividend purportedly was to be paid from the proceeds of the Centric sale, although those proceeds had all been paid to prior

lenders in October 2018.  The directors allegedly approved the dividend despite internal concerns about the operations, cash flows and business performance of GBGH.  *Id*. at ¶¶ 90-95, 127.

10.     GBGH needed additional liquidity in late 2018, so Fung Holdings agreed on December 18, 2018 to make a $100 million loan to GBGH.  Pursuant to that loan agreement Fung Holdings transferred $100 million to GBGH's Hong Kong bank account on December 20, 2018.  *Id*. at ¶¶ 96, 101, 102-103.  GBG was not a party to the loan agreement.  *See* ECF No. 58-11.  GBGH then transferred $100 million to GBG in four transfers of $25 million each.  The Amended Complaint alleges that no loan agreement was executed between GBGH and GBG, and the Trustee has contended that GBGH's transfers to GBG were capital contributions, though neither party was able (at oral argument) to say how these transfers were treated on the companies' internal accounting records.  On December 19, 2018, GBG wired $100 million (plus an additional $60 million) to Millwork Pte Ltd. ("**Millwork**"), another indirect subsidiary of GBGH that acted as a sourcing agent for GBG and to which GBG allegedly owed money.  *Id*. at ¶ 103 and Ex. A.

11.     On January 31, 2019, the GBGH board of directors formally authorized the payment of a special dividend in the amount of HK$2.4 billion.  *Id*. at ¶ 104.  GBG's Chief Financial Officer, Mark Caldwell, attended the board meeting.  *Id.*  On February 14, 2019, GBGH publicized an offering of Scrip Shares that its shareholders could elect to receive in lieu of receiving cash as part of the special dividend.  The Scrip Shares were to represent a way of reinvesting the cash that otherwise would have been paid to the shareholders who made the elections to take the Scrip Shares.  Elections had to be made by March 28, 2019, and the special dividend was scheduled for payment on April 4, 2019.  *Id*. at 104-107.

12.     The GBGH board of directors intended that the GBGH special dividend would be funded by GBG, and that GBG would borrow additional funds for that purpose.  *Id*. at ¶ 107.  There

was significant overlap among the boards of directors of GBGH and GBG, *id.* at ¶¶ 15-18), and in connection with the proposed dividend and other matters the GBG board of directors held no meetings separate from the GBGH directors' meetings. *Id.* at ¶ 248.

13.     On March 1, 2019, a group identified as the "Controlling Shareholders" advised GBGH that they would not be taking up the offering of scrip shares but that they intended to make a loan to GBGH in the amount of the special dividend that would be payable to them. *Id.* at ¶ 108.

14.     In advance of the planned payment of the special dividend, on March 11, 2019, GBG drew down the remaining $253 million that was then available under the RCF Facility. *Id.* at ¶¶ 111-112. GBGH caused GBG to make this draw. *Id.* at ¶¶ 7, 309, 373, 411.

15.     GBGH had been engaged in discussions with the RCF Facility lenders in an effort to resolve issues regarding GBGH's compliance with financial covenants, but those discussions had not resulted in any agreements by mid-March 2019 and GBGH's auditors predicted that GBGH would be out of compliance with the covenants on March 31, 2019. *Id.* at ¶¶ 131-133.

16.     By March 14, 2019, the RCF lenders had become aware that GBGH intended to pay the special dividend, and they were aware that GBG had drawn the remaining balance on the RCF Facility. The lenders initially sought to obtain a commitment by GBGH that the special dividend would not be paid. *Id.* at ¶¶ 134-138.

17.     On March 26, 2019, GBG was directed to pay $100 million directly to Fung Holdings in repayment of the loan that Fung Holdings had made to GBGH in December 2018, with the payment to be made prior to March 31, 2019. *Id.* at ¶¶ 123-125. The transfer instructions were given by GBG's Treasurer (a US citizen) and approved by Mr. Caldwell as GBG's Chief Financial Officer. The transfer was made from GBG's bank account in the United States. *Id.* The transfer was made without any loan agreement and without any resolution or written consent from

GBG's directors. *Id.* at ¶ 125. GBGH was the borrower of funds from Fung Holdings, and GBG had no obligation to repay that amount. *Id.* at ¶ 394. The transfer allegedly was made with fraudulent intent, to an insider, without reasonably equivalent value, and shortly before substantial other debts were incurred. *Id.* at ¶¶ 183, 185-198. 202, 207-211. The Amended Complaint alleges that certain defendants (including William Fung) "were aware" that GBG was going to repay the loan that had previously been made to GBGH. *Id.* at ¶ 124.

18.    On March 28 and 29, 2019, GBG transferred $196 million from its bank accounts to GBGH's bank accounts in New York. The amount was calculated to cover the net cash dividend to GBGH's shareholders that was to be paid in early April and to provide an additional "buffer" to ensure that adequate funds were available. *Id.* at ¶¶ 115-119. The $196 million transfer was made directly from GBG to GBGH, skipping all four of the intermediate holding companies between GBG and GBGH. *Id.* at ¶¶ 116-117. The transfers were directed by the Controlling Shareholders and were made upon the instructions of GBG's Treasurer (a citizen of the United States) and with notice to Mr. Caldwell, who was the Chief Financial Officer of both GBG and GBGH. The transfers were made from GBG's bank accounts in the United States to GBGH through a correspondent bank account in New York. *Id.* at ¶¶ 118-119, 245, 269. Certain officers and directors of GBG, who were also officers and directors of GBGH, allegedly permitted the transfers without appropriate corporate action on behalf of GBG and without regard to the interests of GBG. *Id.* at ¶¶ 9, 245-249. The transfers allegedly were made with fraudulent intent, to an insider, without reasonably equivalent value, and shortly before a substantial debt was incurred. The transfers by GBG to GBGH also were allegedly concealed from the RCF Lenders. *Id.* at ¶¶ 184-201, 203-211.

19.     GBG allegedly was insolvent and allegedly had unreasonably small capital at the times that it made the March 2019 transfers to GBGH and to Fung Holdings. *Id.* at ¶¶ 212-240. No separate action ever was taken by the GBG board of directors to approve the March 2019 transfers. *Id.* at ¶¶ 12, 122, 125.

20.     On March 31, 2019, GBG drew down $75 million under other credit facilities. *Id.* at ¶¶ 84, 85, 87, 88, 113.  GBGH caused GBG to make these draws. *Id.* at ¶¶ 7, 309, 373, 411.

21.     At the time GBG made its transfers to GBGH and to Fung Holdings, the RCF Lenders had asserted that GBGH was not in compliance with the financial covenants in the RCF credit documents. *Id.* at ¶¶ 142-147.  On April 3, 2019, the RCF Lenders executed a waiver agreement with GBG and GBGH to permit GBGH to pay the special dividend.  The waiver had the following conditions:

- Fung Holdings was to provide GBGH with an interest-free, subordinated loan in the amount of $94,181,882.20 (the **New Shareholder Loan**").  GBGH was to draw down the full amount of that New Shareholder Loan on April 3, 2019 and was to use the proceeds to pay down $94,181,882.90 of the obligations that were owed to the RCF Lenders.

- Fung Holdings was to execute another shareholder loan agreement (the "**Dividend Shareholder Loan**") under which Fung Holdings would provide GBGH with an interest-free, unsecured and subordinated loan of $92,169,046.02, which equaled the amount of the cash that the controlling shareholders of GBGH were to receive as part of the Special Dividend.  GBGH was to draw down the amounts available under that loan in a single drawdown on April 4, 2019.

- Fung Holdings was to execute a legally binding undertaking to pay an additional
$94,181,882.90 to the RCF Lenders on May 31, 2019 unless the amounts owed to those
lenders had previously been reduced below $175 million. *Id*. at ¶¶ 152-156, 158.

22.    The New Shareholder Loan was memorialized in a Shareholder Loan Agreement
dated April 3, 2019. *Id*. at ¶ 160. GBGH drew down the entire available amount
($94,181,882.90) on April 3, 2019. *Id*. GBGH immediately applied those funds in payment of
amounts due to the RCF lenders. *Id*. at ¶ 177.

23.    The special dividend was paid on April 4, 2024. The total cash payments (to those
who had not elected to reinvest funds) was $280,526,000. Of that amount, $87,679,258.89 was
withheld by GBGH and treated as having been disbursed by Fung Holdings to GBGH pursuant to
the Dividend Shareholder Loan. Another $4,489,787.13 was transferred that day by Fung
Holdings to GBGH, equaling the cash dividends paid to William Fung and certain other defendants
as part of the special dividend. *Id.* at ¶¶ 156-159, 164-165.

24.    As noted above, the waiver agreement with the RCF lenders required Fung
Holdings to make an additional payment to RCF if the amount of the outstanding obligations had
not been reduced below $175 million. In May 2019, GBGH and Fung Holdings entered into a
Third Shareholder Loan Agreement under which Fung Holdings loaned $105,818,117 to GBGH.
GBGH used the proceeds of that loan to repay some of the outstanding obligations under the RCF
Facility, which brought the balance below the $175 million target. *Id*. at ¶¶ 178-181.

25.    GBG filed its voluntary chapter 11 petition in this Court on July 29, 2021.

### The Defendants and the Entities They Allegedly Owned or Controlled

26.    The relationships of the various defendants to GBGH is depicted in a chart that was
set forth at paragraph 33 of the Amended Complaint:



27.    William Fung is an individual who directly owned some shares in GBGH and who

indirectly (through other entities) owned or controlled other shares of GBGH.  William Fung is the

former Chairman of GBGH and at the relevant times he was the Vice Chairman of Fung Holdings.

William Fung was a member of the GBGH board of directors and he attended a meeting of the

Audit Committee of the GBGH board of directors in November 2018 at which time GBGH's

financial troubles allegedly were discussed.  *Id.* at ¶ 91.  He also was a member of the special

committee of the GBGH board of directors that was established to determine and finalize the

details of the special dividend.  *Id.* at ¶ 92.  William Fung and his brother, Victor Fung, allegedly

dominated and controlled GBGH and GBG through their own holdings and through the holdings

of the other entities that the Fung brothers owned.  *Id.* at ¶¶ 2, 6, 20-21, 51, 108, 188-189, 193,

269.  William Fung also allegedly controlled GBG through his position as chairman of GBGH.  *Id.*

at ¶ 187.  William Fung approved and authorized the payment of the GBGH special dividend and

he voted in favor of the special dividend at the shareholders meeting in August 2018 on his own

behalf and as a proxy for others.  William Fung also approved the shareholder loan that Fung Holdings made to GBGH in December 2018.  *Id.* at ¶¶ 63, 65-68, 91-92, 95, 104.  He was also part of the group identified as the "Controlling Shareholders" in March 2019.  *Id*. at ¶¶ 6, 108, 187-188, 297, 355.  The Controlling Shareholders allegedly dictated the terms of the GBG dividend transfer.  *Id.* at ¶ 269.  William Fung also allegedly "dictated' the terms of the special dividend transfer that GBG made to GBGH and knew that GBG was repaying the loan that had been made by Fung Holdings to GBGH in December 2018.  *Id*. at ¶¶ 121, 124, 265, 267, 269, 338.  William Fung, his family members and affiliates collectively received $41,952,504 as part of the special dividend. *Id*. at ¶ 168.  The Amended Complaint alleges that William Fung "purposefully directed" his actions and the actions of GBGH at the United States of America by dictating the terms of the special dividend transfer that was made by GBG and by participating directly in the decisions under which the transfers were approved.  *Id.* at ¶¶ 265-268.

28.    Victor Fung is the brother of William Fung.  At the relevant times he was the Chairman of Fung Holdings.  *Id*. at ¶¶ 2, 21.  Victor Fung owned some shares of GBGH directly, and indirectly owned others through his ownership interest in various entities.  *Id*. at ¶¶ 27, 173.  Victor Fung was a member of the group identified as the "Controlling Shareholders" in March 2019.  *Id*. at ¶ 108.  The Controlling Shareholders allegedly dictated the terms of the GBG dividend transfer.  *Id.* at ¶ 269.  In addition, William Fung and Victor Fung allegedly controlled Fung Holdings and thereby allegedly dominated and controlled GBGH and GBG.  *Id.* at ¶¶ 2, 188-189, 193, 269.  Victor Fung allegedly used his control of Fung Holdings and GBGH to cause GBG to transfer funds to GBGH for purposes of the special dividend, and he allegedly knew that GBG was repaying the loan that Fung Holdings had previously made to GBGH.  *Id.* at ¶ 271-72, 342. Victor Fung and his entities received $50,314,460 as part of the special dividend.  *Id.* at ¶ 173.  The

Trustee alleges that Victor Fung "purposefully directed" his actions, and the actions of GBGH, at the United States of America by using control of GBGH (together with the other Controlling Shareholders) to cause GBG to make the dividend transfer and by participating directly in the decisions under which the transfers were approved. *Id*. at ¶¶ 271-72.

29.     The Victor Trust is a Channel Islands trust for which HSBC Trustee (C.I.) Limited acts as trustee.  It appears that the Victor Trust itself is no longer a defendant, as the parties have stipulated to the dismissal of claims against the Trustee of that trust and the Amended Complaint does not otherwise identify the Victor Trust as a party.  The beneficiaries of the Victor Trust are members of Victor Fung's family.  The Amended Complaint alleges that the Victor Trust "directly or indirectly" owned shares in GBGH at the relevant times, though a chart that is set forth in paragraph 33 of the Amended Complaint appears to show that the Victor Trust just held interests in other entities that held shares.  *Id.* at ¶¶ 28, 33, 51.  The Victor Trust was part of the group that was identified as the "Controlling Shareholders" in March 2019.  *Id*. at ¶ 108.  The Victor Trust allegedly had the ability, with other Controlling Shareholders, to dictate the terms of the special dividend, and the Controlling Shareholders allegedly did dictate the terms of the GBG dividend transfer.  *Id.* at ¶¶ 269, 273.  The Victor Trust received (through a subsidiary) received a cash distribution of $7,487,771 as part of the special dividend.  *Id*. at ¶ 171.  The Trustee alleges that the Victor Trust "purposefully directed" its actions, and the actions of GBGH, at the United States of America by using control of GBGH (together with the other Controlling Shareholders) to cause GBG to make the dividend transfer and by participating directly in the decisions under which the transfers were approved.  *Id*. at ¶ 273.

30.     King Lun Holdings Limited ("**King Lun**") is a BVI company that was owned 50% by William Fung and 50% by HSBC Trustee (C.I.) Ltd. as trustee of the Victor Trust.  King Lun

was the 100% owner of Fung Holdings. *Id.* at ¶¶ 23, 33.  King Lun did not own shares of GBGH, but through other entities it indirectly owned more than 30% of GBGH's outstanding shares. *Id.* at ¶¶ 23, 33, 51.  King Lun was part of the group that was identified as the "Controlling Shareholders" of GBGH in March 2019. *Id.* at ¶ 108.  The Controlling Shareholders allegedly dictated the terms of the GBG dividend transfer. *Id.* at ¶ 269.  King Lun, through its representatives, approved the GBGH special dividend, and knew that the funds would originate with GBG. *Id.* at ¶ 278.  King Lun received a distribution of $74,235,959 as part of the special dividend. *Id.* at ¶ 167.  The Trustee alleges that King Lun "purposefully directed" its actions, and the actions of GBGH, at the United States of America by using control of GBGH (together with the other Controlling Shareholders) to cause GBG to make the dividend transfer and by participating directly in the decisions under which the transfers were approved. *Id.* at ¶ 278.

31.     Fung Holdings is incorporated in Hong Kong and was the largest shareholder of GBGH.  Fung Holdings was a direct owner of some GBGH shares and an indirect owner through its subsidiary, Fung Distribution International Limited ("**Fung Distribution**").  Victor Fung was the chairman of Fung Holdings, and Fung Holdings was controlled at the relevant times by William Fung, Victor Fung and other members of their families. *Id.* at ¶¶ 2, 21, 27, 33.  Fung Holdings was part of the group that was identified as the "Controlling Shareholders" in March 2019. *Id.* at ¶¶ 108, 269.  The Controlling Shareholders allegedly dictated the terms of the GBG dividend transfer. *Id.* at ¶ 269.  Fung Holdings also directly or indirectly controlled GBG through the actions of William Fung and other directors of GBGH, as well as Victor Fung. *Id.* at ¶ 188.  Fung Holdings was the direct recipient of the $100 million transfer that GBG made in March 2019 from GBG's US bank account. *Id.* at ¶ 123.  It also received (directly or indirectly) $74,235,959 pursuant to the special dividend, and another 792,179,665 of "scrip shares." *Id.* at ¶ 166.  The Amended

Complaint alleges that Fung Holdings "purposefully directed" its actions, and the actions of GBGH, at the United States of America by dictating the terms of the transfer that GBG made to GBGH and by participating in and by participating directly in the decisions under which the transfers were approved. *Id.* at ¶¶ 269-70. Curiously, the Amended Complaint alleges that Fung Holdings "received' the repayment, by GBG, of the loan that Fung Holdings had previously made to GBGH, but it does not allege that Fung Holdings directed or caused that repayment to be made by GBG. *Id.*

32.    Fung Distribution was a wholly-owned subsidiary of Fung Holdings. Fung Distribution owned 200 million shares of GBGH at the relevant times. Fung Distribution is a BVI entity. *Id.* at ¶¶ 24, 33. The Trustee alleges generally that Fung Distribution had sufficient minimum contacts with the United States to establish personal jurisdiction (*id.* at ¶ 264), but part VI of the Amended Complaint does not contain a separate paragraph summarizing the jurisdictional allegations regarding Fung Distribution. However, the Amended Complaint alleges that Fung Distribution was part of the group identified as the "Controlling Shareholders" in March 2019, *id.* at ¶ 108, and it alleges that the Controlling Shareholders collectively dictated the terms of the GBG dividend transfer. *Id.* at ¶ 269. Fung Distribution allegedly received $7,133,749 in connection with the special dividend. *Id.* at ¶ 170.

33.    Step Dragon Enterprise Ltd. ("**Step Dragon**") is an entity organized under the laws of the British Virgin Islands that is "beneficially owned" by William Fung. Step Dragon "directly or indirectly" owned more than 50 million shares of GBGH at the relevant times. *Id.* at ¶¶ 25, 33. Step Dragon was part of the group identified as the "Controlling Shareholders" of GBGH in March 2019. *Id.* at ¶ 108. The Controlling Shareholders allegedly dictated the terms of the GBG dividend transfer. *Id.* at ¶ 269. Step Dragon allegedly received $1,793,931 as part of the special dividend.

*Id.* at ¶ 169. The Amended Complaint alleges that Step Dragon "purposefully directed" its actions, and the actions of GBGH, at the United States of America by dictating the terms of the transfer that GBG made to GBGH and by participating in and by participating directly in the decisions under which the transfers were approved. *Id.* at ¶ 274.

34.    Golden Step Limited ("**Golden Step**") is an entity "beneficially" owned by William Fung. Golden Step "directly or indirectly" owned more than 26 million shares of GBGH at the relevant times. *Id*., at ¶¶ 26, 33. Golden Step was part of the group identified as the "Controlling Shareholders" of GBGH in March 2019. *Id.* at ¶ 108. The Controlling Shareholders allegedly dictated the terms of the GBG dividend transfer. *Id.* at ¶ 269. Golden Step received $931,468 as part of the special dividend. *Id*. at ¶ 169. The Amended Complaint alleges that Golden Step "purposefully directed" its actions, and the actions of GBGH, at the United States of America by dictating the terms of the transfer that GBG made to GBGH and by participating in and by participating directly in the decisions under which the transfers were approved. *Id.* at ¶ 275.

35.    First Island Developments Limited ("**First Island**") is a BVI entity that is wholly owned by the Victor Trust. First Island "directly or indirectly" owned shares in GBGH at the relevant times. *Id.* at ¶¶ 29, 33. The Trustee alleges generally that First Island had sufficient minimum contacts with the United States to establish personal jurisdiction (*id.* at ¶ 264), but part VI of the Amended Complaint does not contain a separate paragraph summarizing the jurisdictional allegations regarding First Island. The Amended Complaint also does not explicitly list First Island as having been part of the group identified as the "Controlling Shareholders" in March 2019, *Id.* at ¶ 108. However, in paragraph 108 of the Amended Complaint alleges that the Controlling Shareholders included entities through which Fung Holdings, William Fung and Victor Fung held GBGH shares, and that description includes First Island. *Id.* at ¶¶ 23, 33, 108. The

Controlling Shareholders allegedly dictated the terms of the GBG dividend transfer. *Id.* at ¶ 269.
First Island received $7,487,771 in connection with the special dividend. *Id.* at ¶ 171.

36.     Spencer Theodore Fung is the son of Victor Fung and the nephew of William Fung.
Spencer Fung "directly or indirectly" owned shares in GBGH at the relevant times. He is a resident
of Hong Kong. *Id.* at ¶¶ 30, 174. He received $59,222 as part of the special dividend. *Id.* at ¶ 174.
He is not alleged to have been part of the Controlling Shareholders' group and is not otherwise
alleged to have controlled the actions of GBG, though there are vague references to his having
attended a meeting by proxy. *Id.* at ¶¶ 63, 110, 279. The Amended Complaint alleges that Spencer
Fung "purposefully directed" his actions at the United States of America because he allegedly
knew, as a "close relative" of Victor and William Fung, that GBGH was dictating the terms of the
special dividend to GBG. *Id.* at ¶ 279. Spencer Fung also allegedly voted in favor of GBGH's
payment of a dividend and allegedly "understood" when he received the dividend that funds had
originated from GBG. *Id.*

37.     Bruce Philip Rockowitz was Vice-Chairman of GBGH at the relevant times and
had formerly been the Chief Executive Officer of GBGH. He owned GBGH shares. He resides
in Hong Kong. *Id.* at ¶ 31. He was a member of the board of directors of GBGH and of the special
dividend committee of that board that finalized the details for the special dividend, and he knew
that GBG was providing the funds that would enable the special dividend to be paid. *Id.* at ¶¶ 92,
121, 276. In those capacities he allegedly approved the direction that GBG transfer $196 million
to GBGH. *Id.* at 276.

38.     Hurricane Millennium Holdings Limited ("**Hurricane Millennium**") is a BVI
entity that is beneficially owned by a trust established for the benefit of Mr. Rockowitz's family.
Hurricane Millennium "directly or indirectly" owned shares of GBGH at the relevant times. *Id.* at

¶¶ 32, 33, 277.  Hurricane Millennium allegedly knew, through Mr. Rockowitz, that GBGH was dictating the terms of the transfer made by GBG to GBGH.  *Id*. at ¶ 277.  However, there is no allegation that Hurricane Millennium was a member of the "Controlling Shareholders" group or that Hurricane Millennium itself controlled any of the actions of GBG.  The Amended Complaint alleges that Hurricane Millennium "purposefully directed" its actions at the United States of America because it allegedly knew, by its association with Mr. Rockowitz, that the monies originated from GBG and that GBGH was dictating the terms of the dividend transfer.  *Id.* at ¶ 277.  Hurricane Millennium also allegedly approved GBGH's payment of a dividend at a GBGH shareholder meeting.

<u>**Discussion**</u>

**I.    Personal Jurisdiction**

Rule 7004(f) of the Federal Rules of Bankruptcy Procedure provides that if the exercise of jurisdiction is consistent with the Constitution and laws of the United States then the service of a summons in accordance with the provisions of Rule 4004, or in accordance with the provisions of Rule 4 of the Federal Rules of Civil Procedure, is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.  Fed. R. Bank. P. 7004(f).  Defendants have raised no issues as to the manner in which service of process was effected and they have not disputed that the claims asserted in this adversary proceeding either arise under, arise in or are related to a case under chapter 11 of the Bankruptcy Code.  However, the Defendants dispute whether the exercise of personal jurisdiction would be consistent with Constitutional limitations.

Jurisdiction must be assessed individually as to each defendant. *Calder v. Jones*, 465 U.S. 783, 790 (1984). Personal jurisdiction also must be established as to each claim that is asserted. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82-84 (2d Cir. 2018).

The Supreme Court has distinguished between the exercise of "specific jurisdiction," which is an exercise of personal jurisdiction over claims that arise out of a defendant's contacts with a forum, and the exercise of "general jurisdiction," which is the exercise of personal jurisdiction over a defendant whose contacts with a forum are so continuous and systematic that the defendant is determined to be "at home" in that forum for the purpose of any and all claims that may be asserted against it. *Daimler AG v. Bauman*, 571 U.S. 117, 126-127 (2014). The Trustee does not assert that "general jurisdiction" exists over any of the Defendants, and instead has argued that it is proper for this Court to exercise specific jurisdiction over the Defendants.

Due process of law requires that specific jurisdiction be exercised only where a defendant has had sufficient contacts with the form so that the exercise of jurisdiction comports with fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In this bankruptcy case the sovereign authority whose jurisdiction is invoked is the United States (not a particular state), and so minimum contacts with the United States as a whole are sufficient to satisfy due process. *See Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630 (4th Cir. 1997) (holding that the sovereign exercising bankruptcy jurisdiction is the United States, so that minimum contacts with the United States (not a particular state) are all that is required); *Enron Corp. v. Arora (In re Enron Corp.)*, 316 B.R. 434, 444 (Bankr. S.D.N.Y. 2004) (holding that only a federal "minimum contacts" standard is applicable in federal question cases).

In their initial papers the Defendants argued that the "minimum contacts" standard requires a physical presence or physical conduct within a jurisdiction, and they argued that personal

jurisdiction was lacking because the only actions they allegedly took were at shareholder meetings or at board of director meetings that were held outside the United States. *See* Dfs. Mem., ECF No. 57, at 20-21. However, the parties have since agreed in their supplemental submissions that the "minimum contacts" standard may be satisfied, and that personal jurisdiction may be based on conduct that occurred entirely outside the United States, so long as the conduct had effects in the United States and so long as the defendant "expressly aimed" its conduct at the United States. *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 173 (2d Cir. 2013); *Alfandary v. Nikko Asset Mgmt. Co.*, *Ltd.*, 337 F.Supp.3d 343, 365 (S.D.N.Y. 2018). Incidental effects within the United States are not enough; instead, the defendant must have intentionally caused – *i.e.*, expressly aimed to cause – an effect in the United States through its foreign actions. *Gordon v. Invisible Children, Inc.*, 14 Civ. 4122, 2015 U.S. Dist. LEXIS 129047, at *16-17 (S.D.N.Y. Sep. 24, 2015) (*citing Tarsavage v. Citic Trust Co. Ltd.*, 3 F. Supp. 3d 137, 145 (S.D.N.Y. 2014).

Many prior decisions have held that the knowing receipt of a fraudulent transfer is itself a "participation" in an intentional tort, so that a non-resident defendant who receives a fraudulent transfer may be subject to personal jurisdiction in the forum from which the transfer was made and where the effects of the transfer were targeted. *See, e.g., Gambone v. Lite Rock Drywall,* 288 Fed. Appx. 9, 14 (3d Cir. 2008) (holding that a transferee "participated in a fraudulent conveyance, which is a species of the intentional tort of fraud," and that the transferee therefor expressly aimed its conduct at the forum); *Darien Rowayton Bank v. McGregor*, 668 F. Supp. 3d 324, 334 (M.D. Pa. 2023) (transferee's receipt of funds that was intended to defeat the transferor's creditors was conduct aimed at the forum where a lawsuit was pending and gave rise to personal jurisdiction over the transferee); *Montoya v. Akbari-Shahmirzadi (In re Akbari-Shahmirzadi)*, No. 11-15351, Adv. P. No. 13-01035, 2016 Bankr. LEXIS 3957, at *7 (Bankr. D.N.M. Nov. 14, 2016) (describing

the exercise of personal jurisdiction based on the knowing receipt of a fraudulent transfer as a nearly uniform outcome in prior cases); *DCK/TTEC, LLC v. Postel*, No. 14-1739, 2015 U.S. Dist. LEXIS 63279, at *11-14 (W.D. Pa. 2015) (transferee's receipt of a fraudulent transfer with intent to defraud the transferor's Pennsylvania creditors was conduct aimed at the forum and supported personal jurisdiction over the transferee in Pennsylvania); *Ezra v. Wilton Group Inc.*, 2018 N.Y. Misc. LEXIS 4380, at *4-6 (N.Y. Cty. 2018) (transferee's receipt of a payment meant to frustrate collection of a potential judgment against the transferor in a New York lawsuit constituted conduct that was aimed at New York and gave rise to personal jurisdiction over the transferee). I understand the application of this rule with respect to persons and entities who are the "initial transferees" of a fraudulent transfer and who, in that capacity, are alleged to have knowingly participated in a transaction (a transfer) that occurred in the United States and that was a fraudulent act under US law. Those rulings lend support to the exercise of personal jurisdiction with respect to the $100 million transfer that Fung Holdings received directly from GBG, as discussed further below.

With respect to the $196 million of payments that GBG made to GBGH, however, the Defendants in this action are alleged to have been subsequent transferees of the funds that GBGH received. They are not alleged to have received those funds directly from GBG, and there is no allegation that the transfers that GBGH made to its shareholders were made from or through the United States. The alleged fraudulent transfer from GBG to GBGH may have been akin to a tort, but the Second Circuit Court of Appeals has held that an action against a subsequent transferee is not itself an independent action in tort or even an independent conduct-regulating claim at all; instead, "[o]nly the initial transfer involves fraudulent conduct," and a recovery from subsequent transferees is merely a remedy that the statute provides based on that initial wrongful transfer. *In re Picard*, 917 F.3d 85, 98-99 (2d Cir. 2019) (holding that the Court did not need to consider

whether section 550 represented an intent by Congress to regulate transfers occurring abroad because the only wrongful "conduct" that is regulated is the initial transfer from the United States, and an action against subsequent transferees is merely a remedy for that initial transfer).

I agree that in the case of a foreign subsequent transferee something more than knowledge of the allegedly fraudulent origin of the funds is required in order to give rise to personal jurisdiction in the United States. The Supreme Court has emphasized that personal jurisdiction over a defendant, based on the "effects" test, must be based on contacts with a forum that the defendant itself has created. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). If (as the Second Circuit Court of Appeals has held) the receipt of the subsequent transfer is not itself akin to a tort and is not itself conduct that the fraudulent transfer statutes seek to regulate, then the receipt of the subsequent transfer should not be regarded, standing alone, as a participation in an intentional tort. A subsequent transferee's "knowledge" that that a subsequent transfer involves funds that originated in a separate fraudulent transfer from a US forum, without more, also is not a "contact" with the US forum that the defendant has created through its own activities, as required by *Walden*. If jurisdiction is to be based on the alleged intentional wrong (the initial transfer), then the defendants must have engaged in some conduct in relation to that initial transfer.

In this case, many (but not all) of the Defendants are alleged to have exercised control over GBG and to have used their control to direct and cause GBG to make the alleged fraudulent transfers. A transferee (including a subsequent transferee) who has controlled the initial US transferor, and who has directed and caused a fraudulent transfer to be made by that controlled US entity, has itself sufficiently directed its conduct (*i.e.*, its exercise of control) at the United States to support an exercise of personal jurisdiction. *See Universitas Educ., LLC v. Nova Grp., Inc.*, 11-CV-1590, 2021 U.S. Dist. LEXIS 185733, at *24-25 (S.D.N.Y. Sept. 28, 2021) (defendants who

directed that fraudulent transfers be made by a company that was a party to a New York arbitration committed tortious activity that was targeted at New York and were subject to personal jurisdiction in New York); *Dontos v. Vendomation NZ Ltd.,* 582 Fed. Appx. 338, 344-45 (5th Cir. 2014) (noting that the passive recipient of funds by a subsequent transferee may not be sufficient to establish minimum contacts, but that a subsequent transferee who precipitates and directs the underlying transfer is subject to personal jurisdiction); *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 402 (5th Cir. 2009) (holding that a defendant "should reasonably have anticipated being haled into a Texas court for precipitating and directing an alleged fraudulent transfer at the expense of a known, major creditor in Texas"); *Coastal Commerce Bank v. Scully*, Civ. No. 6:17-1011, 2018 U.S. Dist. LEXIS 124155, at *14-15 (W.D. La. 2018) (dismissing claims against subsequent transferees for lack of personal jurisdiction in the absence of allegations that they took specific actions aimed at the completion of the underlying fraudulent transfer).  How this standard applies to the various Defendants is discussed further below.

If minimum contacts have been established, then a court should consider whether an exercise of jurisdiction is reasonable.  Relevant factors include (1) the burden that the exercise of jurisdiction would impose on the defendant, (2) the interests of the forum state in adjudicating the case, and (3) the plaintiff's interest in obtaining convenient and effective relief.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).  Where a defendant resides in a foreign country, a court should also consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction, and the federal government's interest in its foreign relations policies.  *Asahi Metal Ind. Co., Ltd. v. Superior Court*, 480 U.S. 102, 113 (1987). If a defendant has purposefully directed its activities at a forum, however, that defendant must

present a "compelling case" if it seeks to defeat personal jurisdiction on the ground that the exercise of jurisdiction would be unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

A court has the discretion to hold a preliminary evidentiary hearing where personal jurisdiction is challenged, but it may instead defer the issue to trial. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (court has considerable procedural leeway in deciding a motion to dismiss for lack of personal jurisdiction); *CutCo Indus. Inc. v. Naughton*, 806 F.2d 361, 364 (2d Cir. 1986) (court has discretion to decide the proper procedure to follow). In this case, the Trustee initially responded to the motion to dismiss by seeking permission to conduct further discovery on jurisdictional issues. ECF No. 62. However, the Defendants responded by contending, among other things, that they sought no factual hearing and that in connection with the motion to dismiss they did not dispute "any facts that Plaintiff has alleged in support of jurisdiction." ECF No. 66, at pp. 7-8. The motion to dismiss for lack of personal jurisdiction therefore is directed solely at the sufficiency of the pleadings. In that context, the well-pleaded allegations of the Amended Complaint are taken as true, *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994), and they are sufficient if they make out a *prima facie* case that jurisdiction exists. *Penguin Grp. (USA) Inc. v. Am. Buddha,* 609 F.3d 30, 34-35 (2d Cir. 2010); *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001).

### A.    Claims Based on the $196 Million Transfer by GBG to GBGH

One of the named Defendants (Spencer Theodore Fung) was not identified as a "Controlling Shareholder" of GBGH. He allegedly voted in favor of a dividend payment by GBGH, and he allegedly knew that the dividend paid by GBGH had originated with GBG. However, there are no allegations that he personally exercised any control over GBGH or GBG, or that he played any role in deciding how GBGH would fund a dividend payment, or that he

personally participated in any action that caused GBG to make the transfer that it made to GBGH.

He allegedly appeared by proxy at a shareholders' meeting of GBGH and his shares allegedly were

voted in favor of GBGH's payment of a dividend (granting discretion to GBGH's directors and to

what funds were available for that purpose) but that shareholder vote at most just removed a

potential obstacle to GBGH's payment of a dividend; it did not force GBGH to obtain funds from

GBG and did not compel GBG to make an allegedly fraudulent transfer.  There also are no

allegations that Spencer Fung conspired with others, or that the purposeful conduct of other parties

should be attributed to him for jurisdictional purposes.  I agree that the allegations of the Amended

Complaint are not sufficient to support an exercise of personal jurisdiction as to Spencer Fung.

The Amended Complaint therefore will be dismissed insofar as it relates to Spencer Fung, but with

leave to replead.

Hurricane Millennium is owned by a trust, the beneficiaries of which are members of Mr.

Rockowitz's family.  The Amended Complaint alleges that Mr. Rockowitz, in his capacity as a

director of GBGH, exercised control over GBG's actions and participated in causing GBG to make

the $196 million of dividend-related transfers to GBGH.  However, Hurricane Millennium is not

itself identified as a Controlling Shareholder, and there are no allegations in the Amended

Complaint that Hurricane Millennium itself exercised any control over GBGH or GBG or their

respective actions.  Nor is there any allegation that Mr. Rockowitz was acting as an agent for

Hurricane Millennium (as opposed to acting in his individual capacity) when he allegedly

approved and directed transfers by GBG, or that there was any other basis on which other parties'

actions in control of GBGH and GBG should be attributed to Hurricane Millennium.  The fact that

Mr. Rockowitz's family members are beneficiaries of the trust also is not enough, standing alone,

to support a finding that Hurricane Millennium itself engaged in conduct that was directed at the

United States.  I agree that the allegations of the Amended Complaint are not sufficient to support an exercise of personal jurisdiction as to Hurricane Millennium.  The Amended Complaint will be dismissed as to Hurricane Millennium, but with leave to replead.

The other named Defendants are affiliated with (or allegedly under the direct or indirect control of) William Fung and Victor Fung.  They collectively are identified as "Controlling Shareholders" or (in the case of Mr. Rockowitz) as a director of GBGH.  The Amended Complaint alleges that they collectively exercised their corporate control of GBGH and GBG to cause GBG to make the challenged transfers.  GBGH's control of GBG is not contested, as GBG was indirectly wholly-owned by GBGH.  The alleged conduct unquestionably was directed at the United States (the whole point was to transfer funds from the New York bank account of a US company, GBG, to the detriment of GBG's US creditors), the effects of the conduct were experienced in the United States (the alleged fraudulent transfers happened here to the alleged detriment of creditors located here), and the Defendants are alleged to have been aware that the transfers were being made at a time, and under circumstances, that made them fraudulent as to GBG's creditors.  This is sufficient to support an exercise of personal jurisdiction.

Defendants argue that they were merely "minority" shareholders of GBGH because they owned less than 50% of the outstanding GBGH shares, and that as a matter of law this somehow negates the contention that they "controlled" GBGH and GBG.  However, the Amended Complaint alleges that the Controlling Shareholders were in actual control of GBGH, and the Defendants previously represented that for purposes of the motion to dismiss they were not contesting any of the factual allegations of the Amended Complaint with respect to jurisdictional issues.  The admitted collective ownership share of the "Controlling Shareholders" exceeded 40%, and holdings of that size (or less) often are sufficient to confer actual "control" over a public

corporation such as GBGH, and indirectly over the subsidiaries that were directly or indirectly wholly owned by GBGH. *See, e.g., Perlman v. Feldmann*, 219 F.2d 173, 174 n.1 (2d Cir. 1955) (holding that a 33% share ownership "gave working control" of a corporation to the holders of the shares). GBGH's own annual report for the year 2019 also describes the relevant Defendants as the "controlling shareholders" of GBGH. *See* Annual Report, ECF No. 74, Ex. J.[2]

Defendants also argue that they merely approved shareholder resolutions and left it to GBGH's directors to decide whether (and how) to effect a dividend, or that that the Defendants merely approved board resolutions that permitted GBGH itself to pay dividends. However, the Amended Complaint alleges that the controlling shareholders did more than that: *i.e.,* that the controlling shareholders used their collective control of GBGH and GBG to direct and to cause GBG to make the $196 million transfers to GBGH in March 2019. Am. Compl. at ¶¶ 265, 269, 271, 273-276. Defendants may contest those allegations, but factual disputes do not detract from the fact that the pleadings (if taken as true) state a *prima facie* case for the exercise of personal jurisdiction.

Defendants have further argued that the Amended Complaint states that GBG's Treasurer directed the transfers to be made, but does not say how any instructions to do so were communicated to the Treasurer. The Defendants suggest, as a result, that the idea somehow could have originated with the Treasurer alone and that he may have acted without any suggestion or direction from others. Dfs. Mem., ECF No. 57, at 22 n.17. However, as noted above the Amended Complaint alleges that the Defendants directed and caused the transfers to be made by GBG.

---

[2]    Some documents originally were filed by the parties under seal. The Court understands that none of them should remain under seal, but it appears that a copy of Exhibit J has been omitted from the public docket. The parties should take steps to ensure that full, unredacted copies of all filings are available on the public docket.

Further specifics as to how this worked, and how the instructions to make transfers were communicated internally, ought to await discovery and trial. It is sufficient, at this stage, that the Amended Complaint has alleged facts which (when taken as true) are sufficient to establish a *prima facie* case that personal jurisdiction exists.

I therefore agree that the allegations that the Defendants other than Spencer Theodore Fung and Hurricane Millennium exercised actual control over GBG, and that they directed and caused GBG to make the challenged dividend transfers, are sufficient to establish personal jurisdiction under the "effects test." *See Mullin v. TestAmerica Inc.,* 564 F.3d at 402-03 (defendants who precipitated and directed an alleged fraudulent transfer were subject to personal jurisdiction); *Alfandary v. Nikko Asset Mgmt. Co.*, 337 F. Supp. 3d at 364-365 (holding that the court had personal jurisdiction, under the "effects test," over foreign entities who allegedly had used their corporate control to render worthless certain stock acquisition rights that had been granted by the Defendants' US subsidiary); *AutoOpt Networks, Inc. v. GTL USA, Inc.,* No. 3:14-CV-1252, 2015 U.S. Dist. LEXIS 11306, at *16-18 (N.D. Tex. Jan. 30, 2015) (foreign company subjected itself to personal jurisdiction in Texas where its officers directed a Texas subsidiary to make allegedly fraudulent transfers to the foreign company); *Racher v. Lusk*, No. CIV-13-665, 2013 U.S. Dist. LEXIS 162193 (W.D. Okla. Nov. 14, 2013) (personal jurisdiction over fraudulent transfer claim where defendants operated, managed and controlled the transferor).

Although the Defendants have challenged the sufficiency of their contacts with the United States, they have not contended that the exercise of personal jurisdiction would be "unreasonable." I find, in any event, that the exercise of personal jurisdiction is reasonable. The claims here are based on the laws of the United States and based on transfers that were originated here, and it is not clear that those claims could even be pursued in any other forum. The United States has the

predominant interest in enforcing its fraudulent transfer laws. There may be some inconvenience to the Defendants that will be associated with litigation in the United States, but the Defendants allegedly directed fraudulent transfers to be made from the United States by a US entity that they controlled. Any burdens that they might experience are warranted, and are matters that they reasonably ought to have anticipated. The exercise of personal jurisdiction does not offend any foreign relations interests of the United States or any identified policies of any foreign country.

**B.    The $100 Million Repayment of GBGH's Loan from Fung Holdings**

The Amended Complaint alleges that "GBGH" caused GBG to repay the $100 million that GBGH owed to Fung Holdings. Am. Compl. at ¶¶ 10, 123-125. The Amended Complaint also alleges that Fung Holdings controlled GBGH. Curiously, it does not explicitly allege that Fung Holdings used that control to cause GBGH to direct GBG to make the loan repayment. The Trustee argues that it is "entirely implausible" to think that Fung Holdings had no input into the loan repayment. *See* Trustee's Mem. (ECF No. 74) at p. 25. That may be so, but there is no allegation in the Amended Complaint as to what that input was.

The Amended Complaint alleges instead that Fung Holdings knew that GBG was going to make the payment, and knew when it accepted the payment from GBG that it constituted a fraudulent transfer by GBG. The Amended Complaint therefore alleges that Fung Holdings participated in a transaction (a funds transfer) with a US entity (GBG) that originated in the United States and that Fung Holdings knew to be fraudulent. Those allegations show sufficient direct participation in a wrongful US transaction to support an exercise of personal jurisdiction under the authorities cited above.

Defendants' own arguments about the $100 million transfer also support a finding that Fung Holdings purposely directed its activities at the United States. Defendants argue that I should

"collapse" the December 2018 loan that Fung Holdings made to GBGH, the December 2018 capital contribution that GBGH made to GBG, and the May 2019 transfer that GBG made to Fung Holdings, and that I should treat them all as though they were a single transaction and as "steps in a general plan." Defendants' Mem. at 33-34. But such a "collapsing" of transactions would only be proper if the transactions were intended from the start to be connected and if GBG's creditors knew of the intended connection. *See HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635-636 (2d Cir. 1995). Defendants' own contention that I should "collapse" these transactions therefore is premised on the notion that Fung Holdings intended from the outset to provide funds for use by a US entity (GBG), that Fung Holdings did so by lending money to GBGH with the intent that GBGH would make a capital contribution to GBG, and that Fung Holdings expected (and ultimately received) repayment of the loan by GBG and not by GBGH. If that is what Fung Holdings did and what it intended – as Defendants themselves have posited by suggesting that I should "collapse" the transactions – that sequence would constitute purposeful activity directed at the United States, and the fraudulent transfer claim arises directly from that activity.

I therefore agree that the allegations of the Complaint suffice to make out a *prima facie* case that it is proper to exercise personal jurisdiction over Fung Holdings.

## II.    Defendants' Contentions that the Claims are Barred Because the Transferred Funds Were "Already Returned"

Defendants contend that no relief may be sought by the Trustee because the transferred funds allegedly were "replenished" or, in the case of the loan repayment, because the transfer merely undid a set of prior transfers that had been made, and allegedly had no effect on GBG's ability to pay its debts.

A.        **The $100 Million Loan Repayment**

Defendants' argument is easily disposed of as to the loan repayment.  The Trustee alleges that Fung Holdings loaned money to GBGH (not to GBG) in December 2018.  The Trustee also alleges that GBGH then transferred $100 million to GBG as a capital contribution.  If those allegations are correct, then GBG had no legal obligation to transfer funds to Fung Holdings, and any transfer that it made to Fung Holdings in March 2019 was without fair consideration.

Defendants now wish to focus solely on the amount of the cash that moved between the entities in these various transactions, and they characterize the sequence as "a round-trip, wash transaction" that allegedly had no impact on GBG's ability to satisfy its debts.  Defendants' Mem. (ECF No. 57) at 3-4.  However, the form in which transfers are made makes an important difference.  The Trustee alleges that GBGH transferred funds to GBG as a capital contribution. The whole point of a capital contribution is that it provides resources to which creditors (not equity holders) have first rights.  Once a capital contribution is made, that contribution has inured to the benefit of the entity's creditors, and as equity capital it cannot be reclaimed by the parent (or by an affiliate of the parent) if doing so would be in violation of creditors' rights under the fraudulent transfer laws.

If the Defendants were right, then any parent company that received a dividend payment at a time when a subsidiary was insolvent could assert, in defense to a fraudulent transfer claim, that the parent was merely reclaiming some of the capital contributions that it had previously made. I know of no authority for the proposition that such a defense can be asserted, and the whole notion defies common sense.  It would turn the ordinary priorities on their head, and would treat a parent's or an affiliate's prior capital contribution as giving rise to rights that would be superior to the rights of creditors.

There is no suggestion in Defendants' motion or in the Amended Complaint that GBG was satisfying any legal obligation, to any party, when it made the $100 million payment to Fung Holdings. If (as alleged) GBGH made a capital contribution to GBG in December 2018, that contribution inured to the benefit of GBG's creditors, and the contribution could not be taken back by GBG's direct or indirect equity owners at a later date if doing so was in violation of creditors' rights under the fraudulent transfer laws.

### B.    The $196 Million Transfers by GBG to GBGH

The Amended Complaint alleges that GBG transferred $196 million to GBGH. Defendants do not dispute this fact, but they argue that funds were "replenished" or were "returned" to GBG, and that any further recovery by GBG would violate the rule that a party is only entitled to a "single recovery" under section 550(a) of the Bankruptcy Code. 11 U.S.C. § 550(d). However, the suggestion that funds were actually "returned" to GBG is plainly not an accurate description of what happened. Defendants admit that GBGH received $196 million from GBG, and there is no allegation in the Amended Complaint, or in Defendants' papers, to the effect that GBGH ever gave those funds back to GBG. The cases cited by the Defendants involved situations in which a transferee actually returned transferred property to the transferor, which never happened here. *See Whitlock v. Lowe (In re Deberry)*, 945 F.3d 943, 945-46, 948 (5th Cir. 2019) (before bankruptcy, defendant gained control of $232,000 of debtors' funds in a bank account, but transferred those funds back to the debtors); *Lassman v. Patts (In re Patts)*, 470 B.R. 234 (Bankr. D. Mass 2012) (debtor conveyed a joint tenancy interest to his wife but she transferred it back to the debtor prior to the bankruptcy filing).

What the Defendants really are claiming is that they should be entitled to some sort of "offset" to their fraudulent transfer liability, on the theory that Fung Holdings provided funds to

GBGH (through shareholder loans) that were then used to reduce GBG's (and GBGH's) obligations under the RCF facility. Some of the decisions cited by Defendants involved situations in which transferees were given credit, on "equitable" principles, for payments they had made to a debtor's creditors. *See, e.g., Bakst v. Wetzel (In re Kingsley)*, No. 06-12096, Adv. P. No. 06-2109, 2007 WL 1491188, at *3-4 (Bankr. S.D. Fla. May 17, 2007), *aff'd*, 518 F.3d 874 (11th Cir. 1008) (debtor fraudulently transferred a tax refund to a relative to keep it out of reach of the debtor's creditors, but the relative paid the money back to the debtor or to the debtor's creditors). However, courts are not in uniform agreement with this approach. *See, e.g., Nostalgia Network, Inc. v. Lockwood,* 315 F.3d 717, 720 (7th Cir. 2002) (when a fraudulent transfer has been made, "the fact that some or for that matter of it may have later seeped back to the debtor does not legitimize the transfer"). There is no definitive ruling on the point in this Circuit, but the bankruptcy courts in this district have expressed skepticism as to the concept that an "offset" of the kind asserted by Defendants may be claimed. *See, e.g., 45 John Lofts, LLC v. Meridian Capital Grp. (In re 45 John Lofts, LLC)*, 599 B.R. 730, 749 n. 6 (Bankr. S.D.N.Y. 2019); *Tronox v. Kerr-McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 332 n.121 (Bankr. S.D.N.Y. 2013).

I need not resolve this legal issue at this stage of these proceedings, however. The essence of the Defendants' argument is that GBGH's paydowns of the RCF facility fully "restored" the $196 million to GBG (Dfs. Mem. at 10), and that this somehow completely undid the effects of the transfers that GBG had made. This defense can be granted on a motion to dismiss only if the allegations of the Amended Complaint, by themselves, are sufficient to show that the defense is applicable. However, the Defendants' argument is contrary to the ordinary rules of subrogation that govern payments that are made by guarantors. *See, e.g., Putnam v. Comm'r.*, 352 U.S. 82, 85 (1956) ("The familiar rule is that, *instanter* upon the payment by the guarantor of the debt, the

debtor's obligation to the creditor becomes an obligation to the guarantor, not a new debt, but, by subrogation, the result of the shift of the original debt from the creditor to the guarantor who steps into the creditor's shoes.")  If GBGH (as guarantor) made payments under the RCF facility, then GBGH would have been subrogated to the rights of the RCF lenders; at least, the Defendants have made no suggestion that such rights ever were waived or that they otherwise did not exist, and there is nothing in the Amended Complaint that suggests that GBGH would not have been entitled to such subrogation rights.[3]  GBGH's payments to the RCF lenders therefore did not reduce GBG's outstanding obligations; instead, in the absence of any evidence to the contrary the payments by GBGH just substituted GBGH in place of the RCF lenders with respect to a portion of those liabilities.

There are other factual and legal issues that also preclude a dismissal of the asserted claims based on Defendants' theory that the dividends were paid to the RCF lenders and thereby were allegedly "returned" to GBG or for GBG's benefit.

The underlying documents, which the Defendants submitted to the Court (ECF No. 58, Ex. F, G, H and J), do not support the Defendants' contention that the allegedly "returned dividends" were used to pay down the RCF facility.  The loan by Fung Holdings that referenced the dividends payable to the controlling shareholders was the so-called Dividend Shareholder Loan.  The Amended Complaint alleges, however (and the documents submitted by the Defendants confirm) that the repayments that GBGH made to the RCF Lenders came from the separate New

---

[3]    Fung Holdings executed a Subordination Agreement under which it agreed that Fung Holdings itself would not exercise subrogation rights until the obligations to the RCF Lenders were paid in full, but that merely subordinated Fung Holdings' rights and did not eliminate them, and in any event that agreement contained no limit on the subrogation rights that GBGH had as a guarantor of GBG's obligations.  *See* Subordination Agreement, ECF No. 58, Ex. F, at § 6 (pdf p. 35).

Shareholder Loan and from another loan that Fung Holdings made a month later, in May 2019. There is nothing in the record to suggest that the dividend payments, or the proceeds of the Dividend Shareholder Loan, ever were paid to the RCF Lenders.

The Amended Complaint and the supporting documents also do not support the Defendants' contention that the controlling shareholders "returned" the dividends they received. The Amended Complaint alleges that the controlling shareholders had previously agreed, on March 1, to re-lend any of the dividends they received in order to avoid legal issues under Hong Kong law. Am. Compl. at ¶ 159. In doing so the controlling shareholders did not refuse the dividends, and they did not "return" them in the sense that they disclaimed any legal entitlement to receive them. Instead, for reasons that remain to be explained at trial, the underlying documents provided that GBGH would withhold some (but not all) of the dividends payable to the controlling shareholders, and that the relevant shareholders agreed that all such amounts would be treated as having been "disbursed by Fung Holdings" (not by any of the other Defendants) pursuant to the Dividend Shareholder Loan. ECF No. 58, Ex. H, § 4(b).

The upshot of all this is that Fung Holdings made a loan that restored some cash for use by GBGH. However, that loan imposed separate and new obligations on GBGH, and cannot necessarily be said to have been a "return" of the dividends that GBGH paid (at least, they cannot fairly be so characterized as a matter of law on a motion to dismiss). I also know of no legal basis on which loans that Fung Holdings made to GBGH should be treated as "returns" of dividends that other parties were entitled to receive, or as "offsets" to the subsequent transferee liabilities that other Defendants might have. Even as to Fung Holdings the documents make clear that in effect the "dividend" was deemed to have been paid, and that the new obligation under which cash was being made available to GBGH was a loan (not a "return" of the dividend).

For each of the foregoing reasons the underlying facts require further development at trial to determine whether they give rise to any defense of the kind that the Defendants have asserted.

## III.    Allegations of Fraudulent Intent

Defendants argue that the allegations of fraudulent intent are not sufficient to support the intentional fraudulent transfer claims that have been asserted.

### A.    The $196 Million Transferred by GBG to GBGH

The Amended Complaint alleges that that GBG made transfers with actual fraudulent intent. Am. Compl. at ¶ 184.  It also alleges, at length, the existence of various factors that constitute "badges of fraud" from which a fraudulent intent may be inferred, including the facts that (1) the transfers were paid to and for the benefits of insiders, (2) GBG did not receive reasonably equivalent value, (3) the transfers were initially concealed from the RCF lenders and were concealed from other creditors, (4) GBG had been threatened with lawsuits prior to the transfers, (5) the transfers were made either shortly after or shortly before GBG incurred significant liabilities, and (6) the transfers were made at a time when GBG was insolvent or had inadequate capital or was known to be unlikely to be able to meet its further obligations.. Am. Compl. at ¶¶ 184-207, 212-240.  Collectively these allegations are sufficient to state a claim that GBG's transfers were made with the actual intent to hinder, delay or defraud creditors.  *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 405 F.3d 43, 56 (2d Cir. 2005) (explaining that badges of fraud may suffice to show fraudulent intent); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005) (holding that badges of fraud are proper indications of intent); *Tronox Inc. v Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 95 (Bankr. S.D.N.Y. 2010) (sufficiency of allegations of badges of fraud to support an allegation of fraudulent intent).

### B.    The $100 Million Transfer to Fung Holdings

The Amended Complaint also alleges that the transfer of $100 million to Fung Holdings was made with actual fraudulent intent.  Am. Compl. at ¶ 183.  It further alleges the presence of various badges of fraud: *i.e.*, that GBG was insolvent or otherwise in a financial condition that would make the transfer fraudulent as to GBG's creditors, that the transfer was made to an insider (Fung Holdings), that the transfer was without fair consideration, and that the transfer was made either shortly after or shortly before GBG incurred substantial liabilities.  *Id.* ¶¶ 185-207, 212-240. Collectively these allegations are sufficient allegations of fraudulent intent.

## IV.    Section 546(e) Does Not Bar the Fraudulent Transfer Claims.

Defendants argue that the event that first prompted the GBGH directors and controlling shareholders to contemplate the payment of a dividend was the sale to Centric, which closed in October 2018.  They argue that the Centric sale included a sale of securities, that the amount of the GBGH dividend was conceived by reference to the expected proceeds of the Centric sale, and that as a result all of the March 2019 dividend transfers by GBG to GBGH were made "in connection with" a securities transaction.  In their view, this means that the fraudulent transfer claims are barred by section 546(e) of the Bankruptcy Code, which states:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

Determining the proper scope of section 546(e) requires consideration of the Supreme Court's decision in *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018). In *Merit Management*, a company named Valley View Downs, L.P. agreed to buy all of the stock of Bedford Downs Management Corp. Valley View arranged financing by Credit Suisse and directed Credit Suisse to transfer funds to Citizens Bank of Pennsylvania, which acted as a third-party escrow agent. The shareholders of Bedford Downs (including Merit Management) deposited their shares with Citizens Bank. Citizens Bank then distributed the cash to the shareholders and delivered the Bedford Downs shares to Valley View. Valley View later filed for bankruptcy, and its chapter 11 trustee sued to avoid the purchase of the Bedford Downs stock from the selling shareholders.

Section 546(e) only applies if a trustee or debtor in possession seeks to avoid a payment made by or to a covered financial institution or a financial participant in connection with a securities contract. The purchase of stock that was at issue in *Merit Management* plainly was a securities transaction. However, Merit Management was not a financial institution or any of the other types of entities that are protected parties under section 546(e). Merit Management nevertheless argued that the transfer of cash from Credit Suisse to Citizens Bank was a transfer "by" a financial institution, that the receipt of the cash by Citizens Bank also was a transfer "to" or "for the benefit of" a financial institution, and that the transfer of cash by Citizens Bank to Merit Management was a transfer "by" a financial institution, and that all of these occurred "in connection with" the securities purchase. On that theory, Merit Management argued that section 546(e) was applicable.

The Supreme Court held otherwise. Lower courts had labored with the question of whether Credit Suisse and Citizens Bank had been mere "conduits" in the transaction, but the Supreme Court declined to rule on that question. Instead, the Supreme Court held that in applying section

546(e) a court should focus on "the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions." *Id.* at 378. Since the transfer that the trustee actually sought to avoid (the purchase of shares by Valley Bank from Merit Management in exchange for cash) did not involve a transfer by or to a protected entity, section 546(e) did not apply.

The Court began by holding that section 546(e) is merely a limit on the exercise of the avoiding powers that are granted to a trustee under sections 544, 545, 547, and 548(a)(1)(B) of the Bankruptcy Code, and that its scope and meaning has to be interpreted in that context. *Id.* at 379. The Court explained:

> The very first clause [of section 546(e)] – "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title" – already begins to answer the question. It indicates that §546(e) operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126 (2012). ("A dependent phrase that begins with *notwithstanding* indicates that the main clause that it introduces or follows derogates from the provision to which it refers").

*Id.* Accordingly, the "starting point" in deciding whether section 546(e) applies is "the substantive avoiding power under the provisions expressly listed in the 'notwithstanding' clause and, consequently, the transfer that the trustee seeks to avoid as an exercise of those powers." *Id.* The Court held that section 546(e) only offers protection if the transfer that a trustee seeks to avoid is a transfer that "itself" is a payment to a protected party that is a settlement payment, a margin payment or a payment in connection with a securities transaction:

> The transfer that the "trustee may not avoid" is specified to be "a transfer that *is*" either a "settlement payment" or made "in connection with a securities contract." § 546(e) (emphasis added). Not a transfer that involves. Not a transfer that comprises. But a transfer that is a securities transaction covered under § 546(e). The provision explicitly equates the transfer that the trustee may otherwise avoid with the transfer that, under the safe harbor, the trustee may not avoid. In other words, to qualify for protection under the securities safe harbor, § 546(e) provides that the otherwise avoidable transfer itself be a transfer that meets the safe-harbor criteria.

*Id.* at 380-81.  The Court held, on the basis of this analysis, that "the transfer that the trustee seeks

to avoid" is the "relevant transfer for consideration of the § 546(e) safe-harbor criteria." *Id.* at 381.

Of course, a trustee who challenges a transfer on fraudulent transfer or other avoidance

grounds must "establish to the satisfaction of a court that the transfer it seeks to set aside meets the

characteristics" that permit avoidance of the transfer.  *Id.*  A trustee therefore "is not free to define

the transfer that it seeks to avoid in any way it chooses." *Id.*  Instead, the transfer that is identified

and challenged must be one that is avoidable under the particular avoidance powers that the trustee

invokes.  *Id.* at 382.  But if a trustee has identified a transfer that may be avoided under an

applicable avoidance power, and if that transfer itself is not one to which section 546(e) applies,

then the trustee may proceed:

> Accordingly, after a trustee files an avoidance action identifying the transfer
> it seeks to set aside, a defendant in that action is free to argue that the trustee
> failed to properly identify an avoidable transfer under the Code, including
> any available arguments concerning the role of component parts of the
> transfer.  If a trustee properly identifies an avoidable transfer, however, the
> court has no reason to examine the relevance of component parts when
> considering a limit to the avoiding power . . .

*Id.* at 382.

The decision in *Merit Management* quite clearly commands that in deciding whether

section 546(e) applies I should look at the transfer that the plaintiff seeks to avoid and whether that

transfer "itself" was a payment to a protected entity of a kind that invoked the protections of section

546(e).  The transfers that GBG made to GBGH and to Fung Holdings plainly were not securities

transactions.  Defendants want me to look at a prior transaction – the October 1998 Centric sale –

in order to find a "securities transaction" that allegedly is relevant.  However, the Trustee does not

challenge the Centric sale and does not seek to avoid it.  The Trustee only challenges the March

2019 transfers that GBG made.  Defendants do not want to focus on the transfers that are the actual

subjects of the Amended Complaint, and instead they want to re-define the relevant transactions to try to bring section 546(e) into play, but that is exactly what the Supreme Court said in *Merit Management* that I should not do.

The facts in this case also are nothing like the facts in the *Boston Generating* decisions that have been cited by the Defendants. *See Holliday v. K Road Power Mgmt., LLC (In re Boston Generating LLC)*, 617 B.R. 442 (Bankr. S.D.N.Y. 2020); *Holliday v. Credit Suisse Sec. (USA) LLC, et al.*, No. 20 Civ. 5404, 2021 U.S. Dist. LEXIS 173359 (S.D.N.Y. Sept. 13, 2021); *Holliday v. Credit Suisse Sec. (USA) LLC (In re Bos. Generating, LLC)*, No. 21-2543-br, 2024 U.S. App. LEXIS 23800 (2d Cir. Sept. 19, 2024). In the *Boston Generating* case, a holding company named EBG Holdings LLC ("EBG") and its wholly-owned subsidiary, Boston Generating, agreed to make a tender offer to holders of interests in EBG and to pay a dividend to those interest holders as part of a planned recapitalization. The transactions were financed in part by funds that Boston Generating borrowed and then transferred to EBG. EBG transferred the funds it received from Boston Generating, along with other funds that EBG had borrowed, to Bank of New York ("BONY"), and BONY used the funds to complete the recapitalization and tender offer. *In re Boston Generating*, 617 B.R. at 457. The courts held that the transfer by Boston Generating was made to complete a securities transaction to which Boston Generating was itself a party and was protected by section 546(e). In that regard, the transfers are issue were themselves transfers that were made to complete a securities transaction.

In this case, the $196 million of transfers that GBG made to GBGH were *not* made to complete a securities transaction. Defendants' sole argument is that somehow the motivation for the transfers was a sale by GBG, six months earlier, of the stock of a subsidiary. But those sale

proceeds were not even used to fund the dividend.  The sale proceeds had already been paid to GBG's creditors, as noted above.

At least two other recent decisions have rejected efforts to use *Merit Management* to protect a transaction from avoidance merely because some or all of the transferred funds had originated from a prior securities transaction.  *See Halperin v. Morgan Stanley Inv. Mgmt. (In re Tops Holding II Corp.)*, 646 B.R. 617 (Bankr. S.D.N.Y. 2022) ("*Tops*"); *Greektown Litig. Trust v. Papas (In re Greektown Hldg., LLC)*, 621 B.R. 797 (Bankr. E.D. Mich. 2020) ("*Greektown*").  In *Tops*, a group of private equity funds caused a company to issue notes and then to pay the proceeds to shareholders as dividends.  When the dividends were later attacked on fraudulent transfer grounds, the defendants argued that the transfers were protected by section 546(e) because the note offerings involved protected parties and because the dividend payments were funded by, and thereby were "related to" and occurred "in connection with," the note offerings.  *Id.* at 679.  Judge Drain rejected the defendants' argument that the dividends "were not standalone transfers" and that the dividends needed to be regarded as "only one element of an integrated transaction" that "started with" a safe-harbored note issuance.  *Id.* at 681.  Judge Drain held that *Merit Management* required him to focus on the transfer(s) that the plaintiff sought to avoid, and held that the challenged dividends in *Tops* did not involve protected parties or securities transactions.  The defendants' contentions that the dividends were "related" to the note offerings, or that they arose out of the note offerings, or that they were funded by the note offerings, or that they were integral parts of a series of transactions that included the note offerings, were not enough to bring section 546(e) into play.  *Id.* at 685–86.

In *Greektown*, a debtor agreed to make payments to certain other parties.  The debtor sold notes in order to raise the necessary funds, and Merrill Lynch (as underwriter) purchased the notes.  A liquidation trustee in Greektown's bankruptcy case alleged that the payments that the debtor

45

made with the proceeds of the note issuance were fraudulent transfers.  The defendants argued that under *Merit Management* the transactions should be collapsed and that the relevant transfer should be deemed to be a transfer "by" Merrill Lynch to the defendants and that the transfer was "in connection with" the sales of the Notes to a financial institution (Merrill Lynch) because it was related to those sales.  The court rejected that contention.  It held that "[p]er *Merit Management*, the relevant transfer is the one that is identified by the trustee and is otherwise an avoidable transfer." *Id.* at 820.  Since the trustee did not challenge the transaction with Merrill Lynch, and since the payments that the debtor made to other parties did not involve any financial institution, section 546(e) did not apply.  *Id.* at 820–21.

The purported link between the October 2018 Centric sale and the March 2019 transfers from GBG to GBGH is even weaker than the purported links in *Tops* and in *Greektown*.  In *Tops* and in *Greektown* the transfers that were challenged had actually been funded by a prior securities transaction.  That is not the case here.  The Amended Complaint alleges that all of the proceeds of the Centric sale were immediately applied to the reduction of an outstanding credit facility, and that no other proceeds were left.  No matter how the Defendants purported to explain or to justify the purported dividend in their communications with GBGH's shareholders, the transfers that GBG made in March 2019 were funded by new borrowings, *not* by the prior Centric sale.  The Amended Complaint alleges explicitly that any purported link between the dividend and the proceeds of the Centric sale was simply untrue.

The Supreme Court confirmed in *Merit Management* that in challenging a transfer a trustee must identify characteristics of a challenged transfer that actually make it subject to avoidance, and in that sense a trustee is not free to define a "transfer" in any way the trustee chooses.  So long as the Trustee identifies the necessary elements for avoidance, however, a Court has no reason to

look beyond the particular transfer that a Trustee has challenged. In this case the Amended Complaint alleges all of the necessary elements for the avoidance of the transfers that GBG made in March 2019, and there is nothing about those particular transfers that would bring the protections of section 546(e) into play. *Merit Management* makes clear, under these circumstances, that section 546(e) is not applicable.

## V.    Whether Defendants Are Properly Alleged to Have Been Transferees

Defendants argue that the dividend payments by GBGH that were owed to Fung Holdings, Victor Fung, King Lun, Fund Distribution, Step Dragon and Golden Step were withheld by GBGH and were treated as having been re-loaned by Fung Holdings to GBGH, and that as a result those Defendants were not "transferees" as a matter of law. I cannot say, as a matter of law, that this is correct. The dividend payable to the relevant defendants was never cancelled. The relevant Defendants may not have taken actual possession of the cash dividends, but there is no basis, from the allegations of the Amended Complaint, upon which I could conclude that the defendants lacked dominion and control over the amounts of the dividend that were owed to them, or that they lacked the power to give directions to GBGH as to how to treat those sums. *See Wells Fargo Rail Corp. v. Black Iron LLC (In re Black Iron LLC)*, 609 B.R. 390, 417 (Bankr. D. Utah 2019) (holding that a company exercised "dominion and control" over funds that it had assigned to another party, even though the company did not actually receive the funds). The Defendants may have used their dominion and control over the dividends to direct GBGH to hold the funds as a more convenient way of funding the loan that was to be made by Fung Holdings (and they may otherwise have settled up with Fung Holdings as to how this would work), but that does not preclude the contention that the Defendants were transferees. The details are matters that require further evidence at a trial.

## **<u>Conclusion</u>**

For the foregoing reasons, all claims against Spencer Fung and Hurricane Millennium will be dismissed for lack of personal jurisdiction, but with leave to replead.  The motion to dismiss is otherwise denied in all respects.  A separate Order will be entered to this effect.

Dated: New York, New York
      December 16, 2024

                  <u>/s/</u> **<u>Michael E. Wiles</u>**
                  Honorable Michael E. Wiles
                  United States Bankruptcy Judge